QUINN EMANUEL URQUHART & SULLIVAN, LLP
 Harold A. Barza (Bar No. 80888)
 halbarza@quinnemanuel.com
 Amar L. Thakur (Bar No. 194025)
 amarthakur@quinnemanuel.com
 Vincent Pollmeier (Bar No. 210684)
 vincentpollmeier@quinnemanuel.com
865 South Figueroa Street, 10th Floor
Los Angeles, California  90017-2543
Telephone:    (213) 443-3000
Facsimile:    (213) 443-3100

QUINN EMANUEL URQUHART & SULLIVAN, LLP
 William O. Cooper (Bar No. 279385)
 willcooper@quinnemanuel.com
50 California Street, 22nd Floor
San Francisco, California 94111
Telephone:    (415) 875-6600
Facsimile:    (415) 875-6700

Attorneys for Plaintiff,
Aylus Networks, Inc.

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| AYLUS NETWORKS, INC., a Delaware corporation,<br><br>                Plaintiff,<br><br>        vs.<br><br>APPLE, INC., a California corporation<br><br>                Defendant. | CASE NO.   3:13-cv-04700-EMC<br><br>**AYLUS' OPENING CLAIM CONSTRUCTION BRIEF**<br><br>Tutorial: October 20, 2014, 2:30 pm<br><br>Time: November 10, 2014, 2:30 pm<br><br>Place: Courtroom 5, 17th Floor<br>Judge: Honorable Edward M. Chen |

# <u>TABLE OF CONTENTS</u>

<u>Page</u>

I.    U.S. PATENT NO. RE 44,412 ......................................................................... 1

    A.    Introduction to the '412 Patent ........................................................... 1

II.    CLAIM CONSTRUCTION LAW ................................................................... 5

III.    CLAIM CONSTRUCTION ............................................................................. 6

    A.    Handset ............................................................................................... 6

        1.    Apple's Construction Improperly Seeks to Graft a Tangential
            Reference about Prior Art from the Specification onto the Claim ............... 7

        2.    The Claims Require Aylus' Construction .................................... 9

        3.    The Specification Supports Aylus' Construction ....................... 11

    B.    VCR controls ..................................................................................... 12

        1.    Apple's Proposed Construction Would Render the Applicable
            Claims Inoperable and Irreconcilably Conflicts with the Claims ............. 13

        2.    Apple's Proposed Construction Conflicts with the Specification ............... 15

    C.    Video Play Controls ......................................................................... 16

    D.    Wide Area Network ......................................................................... 18

    E.    Remote from the UE ......................................................................... 20

IV.    CONCLUSION ............................................................................................. 22

# **TABLE OF AUTHORITIES**

**Page**

## **Cases**

*Apio, Inc. v. Mann Packing Co., Inc.*,
No. C07–5628 JF, 2008 WL 4571558 (N.D.Cal. Oct. 14, 2008)...........................17

*Asetek Holdings, Inc. v. CoolIT Sys. Inc.*,
No. C-12-4498 EMC, 2013 WL 6327691 (N.D. Cal. Dec. 3, 2013) ..........................8

*Becton, Dickinson & Co. v. Tyco Healthcare Grp., LP*,
616 F.3d 1249 (Fed. Cir. 2010)...........................15

*Bell Commc'ns Research, Inc. v. Vitalink Commc'ns Corp.*,
55 F.3d 615 (Fed. Cir. 1995)..........................9, 11

*Bicon, Inc. v. Straumann Co.*,
441 F.3d 945 (Fed. Cir. 2006) .........................9, 10, 13, 15

*Brown v. 3M*,
265 F.3d 1349 (Fed. Cir. 2001) ..........................5

*Cisco Sys., Inc. v. Lee*,
557 F. App'x 963 (Fed. Cir. 2014) ..........................5

*Comaper Corp. v. Antec, Inc.*,
596 F.3d 1343 (Fed. Cir. 2010) ..........................21

*Electro Med. Sys., S.A. v. Cooper Life Sciences, Inc.*,
34 F.3d 1048 (Fed. Cir. 1994) ..........................7

*GE Lighting Solutions, LLC v. AgiLight, Inc.*,
750 F.3d 1304 (Fed. Cir. 2014), *reh'g denied* (June 17, 2014)........................9, 14, 15

*Hologic, Inc. v. SenoRx, Inc.*,
639 F.3d 1329 (Fed. Cir. 2011) ..........................21

*HowLink Global LLC v. Network Commc'ns Int'l Corp.*,
561 F. App'x 898, 906 (Fed. Cir. 2014)........................15, 16

*Interactive Gift Express, Inc. v. Compuserve Inc.*,
256 F.3d 1323 (Fed. Cir. 2001)........................13, 21

*Invitrogen Corp. v. Biocrest Mfg., L.P.*,
327 F.3d 1364 (Fed. Cir. 2003)..........................17

*Liquid Dynamics Corp. v. Vaughan Co., Inc.*,
355 F.3d 1361 (Fed. Cir. 2004) ..........................5

*Markman v. Westview Instruments, Inc.*,
52 F.3d 967 (Fed. Cir. 1995), *aff'd*, 517 U.S. 370 (1996) ..................5, 14

1   *Merck & Co., Inc. v. Teva Pharm. USA, Inc.*,
    395 F.3d 1364 (Fed. Cir. 2005) ............................................................................ 9, 13

2
    *O2 Micro Int'l Ltd. v. Beyond Innovation Technology Co., Ltd.*,
3       521 F.3d 1351 (Fed. Cir. 2008) ........................................................................................ 5

4   *Phillips v. AWH Corp.*,
    415 F.3d 1303 (Fed. Cir. 2005) .......................................................... 5, 6, 9, 13, 17
5
    *Starhome GmbH v. AT & T Mobility LLC*,
6       743 F.3d 849 (Fed. Cir. 2014) .......................................................................................... 9

7   *Talbert Fuel Sys. Patents Co. v. Unocal Corp.*,
    275 F.3d 1371 (Fed. Cir. 2002 ......................................................................... 14, 16
8
    *Teleflex, Inc. v. Ficosa N. Am. Corp.*,
9       299 F.3d 1313 (Fed. Cir. 2002) ....................................................................................... 9

10  *Thorner v. Sony Computer Entm't Am. LLC*,
    669 F.3d 1362 (Fed. Cir. 2012) ................................................................................... 5, 7
11
    *Toshiba Corp. v. Imation Corp.*,
12      681 F.3d 1358 (Fed. Cir. 2012) ................................................................................... 5, 8

13  *U.S. Surgical Corp. v. Ethicon, Inc.*,
    103 F.3d 1554 (Fed. Cir. 1997) ....................................................................................... 5
14
    *Verizon Servs. Corp. v. Vonage Holdings Corp.*,
15      503 F.3d 1295 (Fed. Cir. 2007) ....................................................................................... 8

16  *Vitrionics Corp. v. Conceptronic Inc.*,
    90 F.3d 1576 (Fed. Cir. 1996) .................................................................... 5, 9, 11, 12

17

18

19

20

21

22

23

24

25

26

27

28

1    **I.      U.S. PATENT NO. RE 44,412**

2           **A.      Introduction to the '412 Patent**

3           U.S. Patent No. RE44,412 (the "'412 patent") claims a transformative architecture for

4    controlling and delivering media content on a commercial scale over wide area networks.   Ex. 1

5    ('412 Patent) at 5:35-48, Fig. 12.

6           In order to understand the patent at issue in this case it is important to understand the

7    technological background at the time of invention.   In 2004, the world of home entertainment was

8    rapidly changing.   Media content that was traditionally stored on a single-purpose storage device

9    (e.g., a DVD ) was increasingly aggregated and placed in networked media servers (e.g., storage

10   devices located on a home computer).   This enabled people to more efficiently develop and

11   maintain personal media libraries.

12          Display devices were also evolving.   The most ubiquitous display device was an analog

13   television (TV).   But analog TVs were being replaced by digital LED or plasma TVs, a revolution

14   that accelerated as the price of digital TVs decreased.   Media renderers (devices with hardware

15   and software for rendering media content) were often built into the television itself.   Media

16   renderers could be connected to media servers over local area networks.   The software that

17   enabled the user to select media content from the media server to be rendered by the media

18   renderer was the control point, which also resided on a local area network.   Media content

19   providers (e.g., Disney), media server manufacturers (e.g., Avaya), and media renderer

20   manufacturers s (e.g., Samsung ) created a forum to develop universal plug-and-play ("UPnP")

21   protocols so that the these devices could communicate.

22

23

24

25

26

27

28

UPnP had three distinct logical entities: (i) a control point; (ii) a media server; and (iii) a media renderer:



(UPnP Architecture at Fig. 3).

Ex. 2 (John Ritchie, et al., *UPnP AV Architecture:0.83* (June 2002) at Fig. 3.)

These three entities resided in a local area network, typically an individual residence. Remote controls, connected to the local area network by infra-red or Bluetooth technology, enabled a user to utilize the control point software to select media content from the media server to be rendered by the media renderer for display on a TV.   Users could update their media content libraries by purchasing DVDs and uploading the content to their media server (e.g., a computer) or by finding media content on the Internet and downloading it to their media server.   Traditional UPnP thus enabled users to utilize local control points to stream media content resident on local media servers to local media renderers for display on local TVs.

Dr. Shamim Naqvi, the lead inventor on the '412 patent, recognized the shortcomings inherent in the traditional UPnP architecture.   First, each individual had to have a media server to store content.   These servers, typically a part of a home computer, were expensive and had limited capacity.   Second, individuals had to spend inordinate amounts of time uploading media content from DVDs or finding and downloading media content from the Internet.   Third, because of the

1    limitations of the local area network, the user was limited to watching the media content stored on

2    the user's media server.   Fourth, because the only display device connected to the media server

3    and the media renderer was the home TV, users were limited to watching the media content on a

4    single display.   Finally, each user needed to have the processing capability in their home to run

5    the sophisticated control point software.

6            Dr. Naqvi's examination of the inherent shortcomings of the traditional UPnP architecture

7    was not in a vacuum.   He noticed that another technological revolution, the early precursors to

8    modern day smartphones, was gaining steam.   Although Nokia and Motorola devices led the US

9    wireless phone market in 2004, a small group of pioneering companies (e.g., Ericsson, Palm,

10   Kyocera, and Blackberry (f/k/a RIM)) began integrating PDAs with wireless phones to create what

11   we now call smartphones.   Dr. Naqvi believed that such smartphones would become the

12   centerpiece of a user's technological life and that such smartphones would converge with the

13   world of home entertainment.   But Dr. Naqvi understood the handset's limitations.   Handsets had

14   limited battery and processing capabilities.   Handsets also had small screens and poor screen

15   resolution, and were therefore poor display devices.   And because wireless bandwidth was limited

16   and presented security, latency, and fidelity issues, streaming media content to a handset posed

17   additional problems.

18           As claimed in the '412 patent, Dr. Naqvi transcended the technological difficulties in

19   media content delivery and display by radically transforming UPnP and integrating the handset

20   into this new architecture.   Dr. Naqvi disaggregated the control point into two logical entities—

21   the control point and the control point proxy—that could cooperate and negotiate the delivery of

22   media content.   *See, e.g.,* Ex. 1 ('412 patent) at claim 1, Figure 12.   The control point proxy now

23   resided in a user endpoint—e.g., a handset—and remained in the local area network.   *See, e.g.,*

24   Ex. 1 ('412 patent) at claim 1.   The control point, by contrast, was moved to the cloud—to a

25   network element on a wide area network.   *Id.*   The media server, for its part, could now reside

26   anywhere in the world; it simply had to be connected to the Internet.   *Id.*   And the media renderer

27   could likewise reside anywhere in the world, as long as it, too, was connected to the Internet.   *Id.*

28

-3-



Ex. 1 ('412 Patent) at Figure 12.

This new architecture harnessed the capabilities of the existing technology in an entirely new way, maximizing the ability to control and access media content for delivery and display. By separating the control point software into two separate entities—and moving one of them into the cloud—the handset could now be used to **select** the media content, but was no longer required to receive the content itself.   Instead, the media content—as a result of cooperation between the control point proxy on a handset and the control point in the cloud—could be controlled and delivered from remote media servers directly to local media renderers, which could be connected to large display devices.   This eliminated the problem of having a small screen on the smartphone.   It also overcame the security, latency, and fidelity concerns associated with using wireless devices by enabling the streaming of media content from a media server to a media renderer.   Dr. Naqvi's new architecture also revolutionized the scope of media content accessible to consumers: instead of being limited to the media content library on the local media server, a user could now utilize the wide area network to access media from any server connected to the Internet.   Because a single control point could service numerous control point proxies, the '412

1 patent's architecture enabled the efficient and secure distribution of media content on a

2 commercial scale over wide area networks.

## II.      CLAIM CONSTRUCTION LAW

4            Claim construction is a matter of law for the Court to decide.   *Markman v. Westview*

5 *Instruments, Inc.*, 52 F.3d 967, 979 (Fed. Cir. 1995) (en banc), *aff'd*, 517 U.S. 370 (1996).   "[T]he

6 court should look first to the intrinsic evidence of record, *i.e.*, the patent itself, including the

7 claims, the specification.   And, if in evidence, the prosecution history.   Such intrinsic evidence is

8 the most significant source of the legally operative meaning of disputed claim language."   *Liquid*

9 *Dynamics Corp. v. Vaughan Co., Inc.*, 355 F.3d 1361, 1367 (Fed. Cir. 2004) (quoting *Vitrionics*

10 *Corp. v. Conceptronic Inc.*, 90 F.3d 1576, 1582 (Fed. Cir. 1996)).

11           Claims should typically be accorded their plain and ordinary meaning to one of skill in the

12 pertinent art in the context of the claims, specification and prosecution history.   *See Phillips v.*

13 *AWH Corp.,* 415 F.3d 1303, 1313 (Fed. Cir. 2005) (en banc).   Embodiments from the

14 specification should not be imported into the claims.   *Toshiba Corp. v. Imation Corp.,* 681 F.3d

15 1358, 1369 (Fed. Cir. 2012) ("We do not read limitations from the specification into claims."); *see*

16 *also Cisco Sys., Inc. v. Lee*, 557 F. App'x 963, 971 (Fed. Cir. 2014).   "There are only two

17 exceptions to this general rule: 1) when a patentee sets out a definition and acts as his own

18 lexicographer, or 2) when the patentee disavows the full scope of the claim term either in the

19 specification or during prosecution."   *Thorner v. Sony Computer Entm't Am. LLC,* 669 F.3d 1362,

20 1365 (Fed. Cir. 2012).

21           Courts may also look to extrinsic evidence, such as dictionaries, in construing claims.

22 *Phillips*, 415 F.3d at 1317.   Extrinsic evidence is, however, "less significant than the intrinsic

23 record" and "less reliable than the patent and its prosecution history in determining how to read

24 claim terms."   *Id.* at 1317-18.

25           Of course, the court need not construe every claim element.   *See U.S. Surgical Corp. v.*

26 *Ethicon, Inc.*, 103 F.3d 1554, 1568 (Fed. Cir. 1997); *O2 Micro Int'l Ltd. v. Beyond Innovation*

27 *Technology Co., Ltd.*, 521 F.3d 1351, 1360 (Fed. Cir. 2008).   Elements that are not technical

28 terms of art may not need to be construed.   *Brown v. 3M*, 265 F.3d 1349, 1352 (Fed. Cir. 2001).

Often, "the ordinary meaning of claim language . . . may be readily apparent even to lay judges, and claim construction . . . involves little more than the application of the widely accepted meaning of commonly understood words."   *Phillips,* 415 F.3d at 1314.

## III.   CLAIM CONSTRUCTION

The claims in the '412 patent are easily understood by a person of ordinary skill in the pertinent art.   To clarify the meaning of a limited number of terms, and to respond to Apple's proposed constructions, however, Aylus proposes constructions for the following five terms: (i) handset, (ii) VCR controls, (iii) video play controls, (iv) wide area network, and (v) remote from the UE.

### A.   Handset

| Aylus' Proposed Construction | Apple's Proposed Construction |
|---|---|
| A wireless handheld communication device that supports radio access technology (e.g., Wi-Fi, GSM, CDMA). | A mobile phone capable of making and receiving calls over the Public Switched Telephone Network. |

Handset appears in claims 5, 6, 13, and 14, which depend from claim 1, and claim 33, which depends from claim 27:

5. The method of claim 1, wherein the UE is implemented on a **handset**.

6. The method of claim 5, wherein the **handset** comprises a display, and the MR uses the display.

13. The method of claim 12, wherein CPP logic is implemented in a UE resident in a **handset** and in a remote control device.

14. The method of claim 13, wherein a user uses the CPP logic in the **handset** when the user is remote from the MR and uses the CPP logic in the remote control device when the user is local to the MR.

33. The UE of claim 27, wherein the UE is implemented on a **handset**.

1.   <u>Apple's Construction Improperly Seeks to Graft a Tangential Reference about Prior Art from the Specification onto the Claim</u>

Apple's proposed construction for handset plucks "Public Switched Telephone Network" from the background "***Related Prior Art***" (emphasis added) section of the '412 patent and attempts to import into the term "handset" language unnecessary to the performance of the invention and irrelevant to the language of the claims.   This is impermissible.   Importing any examples from the specification into the claims—especially examples of prior art, as opposed to the invention itself—is forbidden:   Claims in a patent "are not to be interpreted by adding limitations appearing only in the specification."   *Electro Med. Sys., S.A. v. Cooper Life Sciences, Inc.*, 34 F.3d 1048, 1054 (Fed. Cir. 1994).   Accordingly, even preferred embodiments "will not be read into the claims when the claim language is broader than such embodiments."   *Id.*   "There are only ***two*** exceptions to this general rule: 1) when a patentee sets out a definition and acts as his own ***lexicographer***, or 2) when the patentee ***disavows*** the full scope of the claim term either in the specification or during prosecution."   *Thorner v. Sony Computer Entm't Am. LLC*, 669 F.3d 1362, 1365 (Fed. Cir. 2012) (emphasis added).

Apple seeks to insert "Public Switched Telephone Network" into the straightforward claim term "handset."   But neither of the two exceptions to the rule against importing limitations into claims—lexicography or disavowal—are present.   *See id.*   Along with many other technological concepts, "Public Switched Telephone Network" is simply part of a broad background explanatory section in the first portion of the specification.   The Public Switched Telephone Network is mentioned only twice in the entire patent, both times in the section entitled "Discussion of Related Art," and both times as an ***alternative*** component of an ***exemplary*** embodiment.

The first mention in the specification of this telephone network explains that Base Station Controllers are combined into switches called Mobile Switching Centers, which are connected to the Public Land Mobile Network/Public Switched Telephone Network:

"2. Discussion of Related Art.   Commonly deployed wireless communication networks, usually referred to as 2.5G networks, support both voice and data services.   Typically, mobile handsets are connected to a Base Transceiver Station (BTS) using a Radio Access Network (RAN) that uses a modulation scheme such as CDMA (Code Division Multiple Access) or GSM (Global System for Mobile communications).   The BTSs are connected via fixed links to one or more Base

Station Controllers (BSCs), and the BSCs are aggregated into switches called Mobile Switching Centers (MSCs).   The MSC is connected to the Public Land Mobile Network/Public Switched Telephone Network (PLMN/PSTN), typically through a gateway switch called the Gateway Mobile Switching Center (GMSC)."

Ex. 1 ('412 patent) at 1:38-51 (emphasis added).

The second mention of this telephone network explains that a Session Initiation Protocol (SIP) request may be routed to the Public Switched Telephone Network: "The Serving CSCF [Call State Control Function] (S-CSCF) actually handles the session states in the network and provides the following functions . . . Forward the SIP request or response to a BGCF [Breakout gateway control function] for call routing to the PSTN or CS [circuit switched] Domain."   Ex. 1 ('412 patent) at 3:25-40.

Neither of these passages from the specification discussing Related Prior Art that mention the Public Switched Telephone Network remotely suggest that they were intended to inform the scope of the claimed invention   And neither of them describe functionality set forth in the claims. As the title of the section indicates, these passages are simply a part of a background section relating to prior art.   Moreover, in each instance, the "Public Switched Telephone Network" is provided as one option.   In the first instance to a Public Land Mobile Network, and in the second instance to the CS Domain.

As explained above, trying to read limitations from the specification into the claims is improper.   *See, e.g., Toshiba Corp. v. Imation Corp.,* 681 F.3d 1358, 1369 (Fed. Cir. 2012) ("We do not read limitations from the specification into claims.").   Trying to read limitations into the claims that unambiguously are not intended to define the invention but instead simply describe prior art is wholly impermissible.   *See Asetek Holdings, Inc. v. CoolIT Sys. Inc.,* No. C-12-4498 EMC, 2013 WL 6327691, at *4 (N.D. Cal. Dec. 3, 2013) (the claim construction was "fundamentally flawed because the statement above concerns the prior art, and not the present invention"); *see also Verizon Servs. Corp. v. Vonage Holdings Corp.,* 503 F.3d 1295, 1304-05 (Fed. Cir. 2007) (rejecting a proposed construction supported by language from the specification that "is excerpted not from a description of the invention of the ' 711 patent, but rather from a

1    description, in the 'Background Art' section of the patent, of how the internet works in general").

2    Apple's proposed construction should therefore be rejected.

2.    The Claims Require Aylus' Construction

4    Instead of importing tangential examples from the specification into the claims, proper

5    claim construction focuses on the words of the claims themselves.   "[W]e look to the words of the

6    claims themselves, both asserted and non-asserted, to define the scope of the patented invention."

7    *Vitronics Corp.,* 90 F.3d 1576, 1582 (Fed. Cir. 1996) (*citing Bell Commc'ns Research, Inc. v.*

8    *Vitalink Commc'ns Corp.,* 55 F.3d 615, 620 (Fed. Cir. 1995)).   The context in which a claim term

9    is used is of critical importance:   "[T]he claims themselves provide substantial guidance as to the

10   meaning of particular claim terms.   To begin with, the context in which a term is used in the

11   asserted claim can be highly instructive."   *Phillips v. AWH Corp.,* 415 F.3d 1303, 1314 (Fed. Cir.

12   2005) (en banc) (citations omitted); *see also, GE Lighting Solutions, LLC v. AgiLight, Inc.,* 750

13   F.3d 1304, 1315 (Fed. Cir. 2014), *reh'g denied* (June 17, 2014).

14   Unless there is a clear indication that alternative definition should apply, claims should be

15   given their plain meaning.   *See, e.g., Teleflex, Inc. v. Ficosa N. Am. Corp.,* 299 F.3d 1313, 1325

16   (Fed. Cir. 2002) ("In the absence of an express intent to impart a novel meaning to claim terms, an

17   inventor's claim terms take on their ordinary meaning.   We indulge a 'heavy presumption' that a

18   claim term carries its ordinary and customary meaning.") (citations omitted); *see also Starhome*

19   *GmbH v. AT & T Mobility LLC,* 743 F.3d 849, 857 (Fed. Cir. 2014).   A claim construction that,

20   likewise, gives meaning to all the terms is preferred over the alternative.   *See, e.g., Merck & Co.,*

21   *Inc. v. Teva Pharm. USA, Inc.,* 395 F.3d 1364, 1372 (Fed. Cir. 2005) ("A claim construction that

22   gives meaning to all the terms of the claim is preferred over one that does not do so.")   (citations

23   omitted); *Bicon, Inc. v. Straumann Co.,* 441 F.3d 945, 950 (Fed. Cir. 2006) ("[C]laims are

24   interpreted with an eye toward giving effect to all terms in the claim.") (citations omitted).

25   Here, the claims themselves unambiguously support Aylus' construction—"a wireless

26   handheld communication device that supports radio access technology (*e.g.,* Wi-Fi, GSM,

27   CDMA)."   And Apple's construction—"a mobile phone capable of making and receiving calls

28   over the Public Switched Telephone Network"—bears no relationship to the claim language.   The

communication, described in the claims, among and between the user endpoint/handset, CPP
logic, CP logic, MS, and MR—all over a wide area network—in order to stream media content
from a media server to a media renderer (i) requires the employment of radio access technology
(Aylus' construction) and (ii) has nothing to do with the Public Switched Telephone Network
(Apple's construction). This is clearly evident from the claim language. For example:

- the **user endpoint** can be a **handset**. Ex. 1 ('412 patent) at claim 5 ("The method of claim 1, wherein the **UE** is implemented on a **handset**.") (emphasis added)

- the **user endpoint/handset** includes **control point proxy logic (CPP) logic**. *Id.* at claim 1 ("the **UE** of the wide area network with **control point proxy (CPP) logic**") (emphasis added)

- the **user endpoint/handset** and **CPP logic** operate over a **wide area network**. *Id.* ("the **UE** of the **wide area network** with **control point proxy (CPP) logic**") (emphasis added)

This **CPP logic** on the **user endpoint/handset** must, according to the claims, engage in the
following activities on the **wide area network**:

- "negotiate media content delivery with at least one of the **MS** and the **MR**." *Id.* (emphasis added)

- "cooperate with **CP logic** to negotiate media content delivery between the **MS** and the **MR**." *Id.* (emphasis added)

- "control a presentation of content provided by the **MS** and rendered by the **MR**." *Id.* (emphasis added)

Indeed, numerous claims expressly require a user endpoint/handset to operate on networks
that employ radio access technology. For example:

- claim 2: "local wireless network"

- claim 3: "Wi-Fi network, a WiMax network, and a Bluetooth network"

- claim 7: "3G network and in communication with the serving node"

- claim 9: "local wireless network"

- claim 10: "3G network"

- claim 17: "Universal Plug and Play (UPnP) protocols"

- claim 18: "UPnP protocols, Jini technology, RFID, and Bluetooth"

- claim 23: "local wireless network"

- claim 25: "UPnP protocols, Jini technology, RFID, and Bluetooth"

Not a single claim term, expressly or impliedly, suggests that the Public Switched Telephone Network is required to practice the invention.   It is, as mentioned above, simply a background concept in the prior art.   Because "the words of the claims themselves…define the scope of the patented invention" the court should accept Aylus' proposed construction.   *Vitronics Corp.,* 90 F.3d at 1582 (*citing Bell Commc'ns Research, Inc. v. Vitalink Commc'ns Corp.*, 55 F.3d 615, 620 (Fed. Cir. 1995)).

### 3. The Specification Supports Aylus' Construction

Contrary to Apple's selective use of the Related Prior Art Section of the specification, a complete evaluation of the specification supports Aylus' construction.   Like the claims, the specification is filled with examples establishing that the claimed "handset" requires the use of radio access technology, and does not require use of the Public Switched Telephone Network. For example, the specification explains that, at the time of the invention, handsets were being produced that support radio access technology:

> In conjunction with deployments of various kinds of access networks, handset manufacturers are also producing handsets that support multiple radio access technologies. Examples of such handsets today are those that support Wi-Fi and GSM/CDMA cellular networks. In such handsets, known as Class A handsets, both the circuit-switched session of the GSM/CDMA network and the packet-switched session of Wi-Fi can co-exist and be active simultaneously. Moreover, there are numerous proposals for voice call handoffs between cellular (GSM/CDMA) and Wi-Fi networks.

Ex. 1 ('412 patent) at 14:41-50.

Another example from the specification that supports Aylus' construction is an explanation that multiple Wi-Fi networks can support the use of a handset:

> Another type of handset, called a Class B, handset only supports either a circuit-switched session or a packet session at any given time. If the handset roams into a Wi-Fi area from a cellular area, the circuit-switched session is replaced by a new packet-switched session supported by the new Wi-Fi network in a Class B handset; in a Class A handset the circuit-switched session can be allowed to persist. This corresponds to removing one Incoming Leg of the AVS (representing the circuit-

switched cellular connection) and adding another Incoming Leg (representing the Wi-Fi connection) to the underlying AVS for Class B handsets.

*Id.* at 14:56-67.

Numerous other examples from the specification support Aylus' construction that "handset" should be construed as "a wireless handheld communication device that supports radio access technology (e.g., Wi-Fi, GSM, CDMA)." For example:

- "handsets connected to a 3G wireless network." *Id.* at 5:40-41.

- "the MS being on a 3G network." *Id* at 6:19.

- "[t]he local wireless network is a Wi-Fi network, a WiMax network, or a Bluetooth network." *Id.* at 6:8-9.

- "the MS nor the MR are in communication the UE via the local wireless network." *Id.* at 6:11-12.

Because the specification is replete with embodiments where a "handset" is a wireless handheld communication device that supports radio access technology—including embodiments that are not connected to the Public Switched Telephone Network—and because there is no indication in the entire patent that a "handset" must be a cellular phone that operates on the Public Switched Telephone Network, the Court should accept Aylus' proposed construction for "handset."

**B.      VCR controls**

| Aylus' Proposed Construction | Apple's Proposed Construction[1] |
|---|---|
| Controls for display of video content (e.g., play, pause, rewind, stop buttons). | Controls for a video cassette recorder (VCR). |

---

[1]   As an initial matter, Apple's Proposed Construction is ambiguous. By its use of the word "for" it is unclear if Apple means controls of the type which control a video cassette recorder or the controls included in a video cassette recorder.   Because the former construction would be the equivalent of Aylus' Proposed Construction, which, lacking ambiguity, would be less confusing to a jury, this analysis proceeds from the conclusion that Apple intends the latter meaning in proposing its construction.

1    The term "VCR controls" appears in independent claim 1 and in claim 15, which depends

2  from claim 1:

3        1.    A method of controlling and delivering media content from a media server (MS) to

4  a media renderer (MR) utilizing a wide area network for control, comprising the acts of…once

5  media content delivery is negotiated, controlling a presentation of delivery via the **VCR controls**

6  on the UE.

7        15.    The method of claim 1, wherein, if one of the MS and MR are remote from the UE,

8  the CPP logic provides information about invoked **VCR controls** to the CP logic on the serving

9  node to allow the CP logic to control the remote MS or MR.

10              1.    <u>Apple's Proposed Construction Would Render the Applicable Claims
              Inoperable and Irreconcilably Conflicts with the Claims</u>

11

12    Apple has proposed a construction for VCR controls—which the claims require be content

13  display controls for such items as a "handset" and a "remote control"—as the hyper-literal and

14  wholly inoperable "controls for a VCR."   A VCR is a device that ingests physical videocassettes

15  and renders the video for display.   Read in the context of the claims, Apple's proposed

16  construction produces an absurd result that would render the claim inoperable and confuse the

17  jury.   By contrast, Aylus' proposed construction—"controls for display of video content (e.g.,

18  play, pause, rewind, stop buttons)"—is consistent with the context of the claims, is supported by

19  the specification, and accords with the basic purpose and functionality of the claimed invention.

20    The ***context of the claims*** is a central component of claim construction.   "[T]he claims

21  themselves provide substantial guidance as to the meaning of particular claim terms. To begin

22  with, ***the context in which a term is used*** in the asserted claim can be highly instructive." *Phillips*

23  *v. AWH Corp.,* 415 F.3d 1303, 1314 (Fed. Cir. 2005) (en banc) (emphasis added).   Likewise,

24  claim constructions generally must give meaning to all the terms in the claims.   *Merck & Co., Inc.*

25  *v. Teva Pharm. USA, Inc.,* 395 F.3d 1364, 1372 (Fed. Cir. 2005) ("A claim construction that gives

26  meaning to all the terms of the claim is preferred over one that does not do so." (citations

27  omitted)); *Bicon, Inc. v. Straumann Co.,* 441 F.3d 945, 950 (Fed. Cir. 2006).

28

Claim constructions, moreover, must be logical and must provide for operable inventions. *See Interactive Gift Express, Inc. v. Compuserve Inc.,* 256 F.3d 1323, 1336 (Fed. Cir. 2001) (rejecting claim construction that is "illogical and does not accord with the plain import of the claim language"); *Talbert Fuel Sys. Patents Co. v. Unocal Corp.,* 275 F.3d 1371, 1376 (Fed. Cir. 2002), *vacated on other grounds,* 537 U.S. 802 (2002) ("a construction that renders the claimed invention inoperable should be viewed with extreme skepticism"); *Markman v. Westview Instruments, Inc.,* 517 U.S. 370, 390 (1996), *aff'd,* 517 U.S. 370 (1996) (claims should be construed to "preserve the patent's internal coherence").

Apple's proposed construction—"controls for a video cassette recorder (VCR)"—ignores the context of the claims, denies the effect of numerous key terms in the claims, is illogical, and, if accepted, would render the applicable claims inoperable.   The acronym VCR in the disputed term "VCR controls" stands for "video cassette recorder."   *See, e.g.*, Ex. 1 ('412 patent) at claim 1 ("video cassette recorder (VCR) controls").   These **VCR controls** exist in the **control point proxy logic (CPP logic)** on a **user endpoint (UE)**: "provisioning the **UE** of the wide area network with **control point proxy (CPP logic)** that includes…**video cassette recorder (VCR) controls**…."   *Id.*   These VCR controls control a presentation of content provided by the MS and rendered by the MR:   "provisioning the UE of the wide area network with control point proxy (CPP logic) that includes…video cassette recorder (VCR) controls to **control a presentation of content** provided by the MS and rendered by the MR…."   *Id.*   Thus, the claims require that the VCR controls are controls *for a user endpoint* to control the presentation of content.   A user endpoint is, plainly, not the same thing as a video cassette recorder (VCR).   In fact, numerous claims expressly negate this possibility.   Claim 5, for instance, contemplates a "UE implemented on a handset."   A VCR cannot be a handset.   Likewise, claim 13 requires "a UE resident in a handset and in a remote control device."   A VCR cannot be a remote control device.   And, moreover, claim 28 includes "the UE of claim 27 comprising a display."   A VCR cannot be a display.

The context of the claims—in which the VCR controls are for user endpoints such as handsets and remote controls—thus makes clear that the controls are not necessarily for an actual

1   VCR.   Instead, the context of the patent makes clear that the term VCR controls indicates the

2   basic functionality of controls—such as play, stop, pause, etc.—for controlling the presentation of

3   video content.   *See GE Lighting Solutions, LLC v. AgiLight, Inc.,* 750 F.3d 1304, 1315 (Fed. Cir.

4   2014), *reh'g denied* (June 17, 2014).   Apple's construction would render the claims illogical and

5   inoperable: controls for a handset, remote control, or display to control the display of video

6   content streamed over a wide area network cannot logically be controls for a VCR—a device that

7   ingests physical videocassettes and renders them for display.   *See Becton, Dickinson & Co. v.*

8   *Tyco Healthcare Grp., LP,* 616 F.3d 1249, 1255 (Fed. Cir. 2010) ("[A] claim construction that

9   renders asserted claims facially nonsensical cannot be correct."); *see also GE Lighting Solutions,*

10  750 F.3d at 1320.   Finally, such a construction would impermissibly read numerous claim

11  terms—such as "handset," "remote control," and "display"—out of the claims, as these

12  embodiments would be replaced by a VCR.   "[C]laims are interpreted with an eye toward giving

13  effect to all terms in the claim." *Bicon, Inc. v. Straumann Co.*, 441 F.3d 945, 950 (Fed. Cir. 2006)

14  (citations omitted); *see also HowLink Global LLC v. Network Commc'ns Int'l Corp.,* 561 F. App'x

15  898, 906 (Fed. Cir. 2014).   The court should therefore accept Aylus' proposed construction.

16              2.       Apple's Proposed Construction Conflicts with the Specification

17          The conclusion that Apple's construction is contrary to the context and structure of the

18  claims is not just dictated by the claim language, it is strongly supported by the specification.

19  That is, that the VCR controls are part of the CPP logic on the user endpoint, and that the user

20  endpoint cannot be required to be a VCR—as Apple's construction would have it—because a user

21  endpoint is such things as a handset, a remote control, and a display is also abundantly clear from

22  the specification.   For example, the specification states that the UE may be implemented on a

23  handset with a display.   *See* Ex. 1 ('412 patent) at 6:12-14 ("**The UE may be implemented on a**

24  **handset**, and the handset may include a display that is used as the media rendering device.").

25  Likewise, the specification states that the UE—which is required to have CPP logic—may be a

26  remote control unit.   *See id.* at 6:25-31 ("The CP logic is configured to serve multiple unrelated

27  devices running CPP logic; these devices can be handsets and **remote control units**.).   The

28  principal CPP can depend on the location of the user; for example, the user may use the CPP logic

in the handset when the user is remote from the MR and use **the CPP logic in a remote control unit** when the user is local to the MR."   *See also, id.* at 5:46-48 ("The control point proxies [which reside on the UE ] also include VCR controls for controlling the presentation of the selected media delivery"); *id.* at 17:34-35 ("there can be a CPP implemented in a handset, and also in a remote control unit"); *Talbert Fuel Sys. Patents Co.. v. Unocal Corp.,* 275 F.3d 1371, 1376 (Fed. Cir. 2002).   Therefore the Court should accept Aylus' proposed construction.

### C.   Video Play Controls

| Aylus' Proposed Construction | Apple's Proposed Construction |
|---|---|
| Controls for display of video content (e.g., play, pause, rewind, stop buttons). | Plain and ordinary meaning. |

Video play controls appears in claims 20 and 27:

20. A method of controlling and delivering media content from a media server (MS) to a media renderer (MR) utilizing a wide area network for control, where a user endpoint (UE) is provisioned with control point proxy (CPP) logic that includes (i) logic to negotiate media content delivery with at least one of the MS and the MR, (ii) logic to cooperate with network control point (CP) logic to negotiate media content delivery between the MS and the MR, and (iii) video play controls to control a presentation of content provided by the MS and rendered by the MR, wherein the CPP logic resides in the UE and serves as a first proxy, comprising the acts of…once media content delivery is negotiated, receiving ***video play controls*** from the UE.

> 27. A user endpoint (UE) for communication with a serving node in a network, the serving node having control point (CP) logic that includes logic to negotiate media content delivery with at least one of a media server (MS) and a media renderer (MR), wherein the CP logic, MS, and MR reside outside of the UE and the CP logic resides in the signaling domain and serves as a first proxy, the UE comprising…once media content delivery is negotiated, control a presentation of media content provided by the MS and rendered by the MR with **video play controls**.

**I. Video Play Controls Are Controls for Display of Video Content**

The term "video play controls" was added to claims 20 and 27 of the '412 patent during reissue proceedings before the Patent Office.   *See* Ex. 1 ('412 patent) at claims 20 and 27.   The term was added to give full scope to the functionality described in the specification, not to change the meaning of this aspect of the invention.   As with "VCR controls," the context of the claims establishes that "video play controls" are controls for the display of video content, and not controls for a VCR.   While Apple's proposed construction is now "plain and ordinary meaning," Aylus requests its construction to prevent Apple from arguing, later in the case, that the plain and ordinary meaning of "video play controls" somehow relates to controls for a VCR.

Claim construction analysis "begins with the language of the claims themselves" and "claim language 'generally carries the ordinary meaning of the words in their normal usage in the field of invention.'"   *Apio, Inc. v. Mann Packing Co., Inc.,* No. C07–5628 JF, 2008 WL 4571558, at *2 (N.D.Cal. Oct. 14, 2008) (quoting *Invitrogen Corp. v. Biocrest Mfg., L.P.,* 327 F.3d 1364, 1367 (Fed. Cir. 2003)).   Thus, "[i]n some cases, the ordinary meaning of claim language . . . may be readily apparent even to lay judges, and claim construction in such cases involves little more than the application of the widely accepted meaning of commonly understood words." *Phillips v. AWH Corp.,* 415 F.3d 1303, 1314 (Fed. Cir. 2005) (en banc). "**Controls** for the dis**play** of **video** content" gives effect to the widely accepted meaning of the commonly understood words of the claims: "**video play controls**."   No additional limitation should be imported into the plain meaning of this term.

In addition to the plain language of the claim terms, the context of the claims also supports the notion that "video play controls" are not controls for a VCR but instead are, simply, controls for the display of video content.   "[T]he context in which a term is used in the asserted claim can be highly instructive." *Phillips.,* 415 F.3d at 1314.   "Video play controls" must be part of a "**user endpoint**" that includes "**control point proxy logic**." *See, e.g.*, Ex. 1 ('412 patent) at claim 20 ("**a user endpoint (UE)** is provisioned with **control point proxy (CPP) logic** that includes … **video play controls.**").   And the user endpoint may be a handset, a remote control, and even a display.   *Id.* at claims 13 ("a UE resident in a handset and in a remote control device"),

28 ("the UE of claim 27 comprising a display"), and 33 ("[t]he UE of claim 27, wherein the UE is implemented on a handset").   A user endpoint is, indeed, not a VCR.   What distinguishes video play controls from other types of controls is not the specific physical item that the controls are a part of, but instead what the controls actually do.   "Video play controls" are traditional controls—such as play, pause, etc.—for the display of video content.

**D.      Wide Area Network**

| Aylus' Proposed Construction | Apple's Proposed Construction |
| --- | --- |
| An electronic communication network that connects nodes in a large geographical area. | Plain and ordinary meaning. |

Wide area network appears in claims 1 and 20.

1. A method of controlling and delivering media content from a media server (MS) to a media renderer (MR) utilizing a wide area network for control, comprising the acts of:

provisioning a serving node in the ***wide area network*** with control point (CP) logic that includes logic to negotiate media content delivery with at least one of the MS and the MR, wherein the CP logic, MS, and MR resides outside of a user endpoint (UE) and the CP logic resides in the signaling domain and serves as a first proxy; provisioning the UE of the ***wide area network*** with control point proxy (CPP) logic ....

20. A method of controlling and delivering media content from a media server (MS) to a media renderer (MR) utilizing ***a wide area network*** for control, where a user endpoint (UE) is provisioned with control point proxy (CPP) logic that includes (i) logic to negotiate media content delivery with at least one of the MS and the MR, (ii) logic to cooperate with network control point (CP) logic to negotiate media content delivery between the MS and the MR, and (iii) video play controls to control a presentation of content provided by the MS and rendered by the MR, wherein the CPP logic resides in the UE and serves as a first proxy, comprising the acts of:

1    provisioning a serving node in the ***wide area network*** with control point (CP)

2    logic….

3    ## I. The Invention Relates to a Wide Area Network

4    The '412 patent, entitled "digital home networks having a control point located on a wide

5    area network," relates to streaming video content over a wide area network. *See, e.g.,* Ex. 1 ('412

6    patent) at claim 1 ("utilizing a wide area network"); *id.* at 5:35-36 ("The invention provides

7    systems and methods for implementing digital home networks having a control point located on a

8    wide area network. "); *id.* at 17:25-27 ("Moving the control point into the wide area network

9    enables a user to connect to services provided by MSs that are not located in the home, such as

10   foreign television stations."). Indeed, one of the innovative aspects of the '412 patent is that it

11   took principles relating to local area networks and applied them to wide area networks. *See, e.g.,*

12   *id.* at 17:7-8 ("In certain embodiments, the UPnP architecture is extended into a wide area network

13   environment."); *supra* section I.A.

14   Extrinsic evidence such as dictionaries "may be useful to the court, but it is unlikely to

15   result in a reliable interpretation of patent claim scope unless considered in the context of the

16   intrinsic evidence." *Phillips,* 415 F.3d at 1314. While dictionary definitions and other extrinsic

17   evidence should not be afforded undue weight—and are irrelevant when the intrinsic evidence

18   resolves the meaning of a claim term—various dictionary definitions explain that a wide area

19   network is an electronic communication network that connects nodes in a *large* geographical area.

20   That is, various dictionaries confirm that in order to qualify as a wide area network, the connection

21   of nodes must take place across a large geographical space (e.g., the connection of nodes in

22   different states or countries) and not small ones (e.g., the connection of nodes within the same

23   home or building). For example, Webster's Dictionary defines "wide area network" as "a

24   computer network that spans a relatively large geographical area." Ex. 3 (*Random House*

25   *Webster's Dictionary (*4th ed. 2001*)).*

26   The alternative to a wide area network is a local area network. *See, e.g.,* Ex. 1 ('412

27   patent) at 18:36-38 ("An IGD is an 'edge' interconnect device between a residential Local Area

28   Network (LAN) and the Wide Area Network (WAN), providing connectivity to the Internet."). A

1   local area network is an electronic communication network that connects nodes over a small

2   geographic area.   *See, e.g.,* Ex. 4 (*Webster's New World Computer Dictionary* (9th ed. 2001))   ("a

3   computer network that uses cables a radio signals to link two or more computers within a

4   geographically limited area (generally one building or group of buildings))."

5          In practice, a local area network may be a single floor, a single building, or a single site;

6   and everything outside of this area in the network would be in a wide area network.   One of the

7   key advantages of the invention is delivering media across large geographical areas on a

8   commercial scale, thereby enabling users to stream media content residing anywhere in the world

9   to their home television displays.   *See, e.g.,* Ex. 1 ('412 patent) at 17:25-27 ("Moving the control

10  point into the wide area network enables a user to connect to services provided by MSs that are not

11  located in the home, such as foreign television stations.").   Because the geographical boundaries

12  delineating wide area networks from local area networks are central to the '412 patent's

13  revolutionary architecture for accessing, delivering, and rendering media content, the Court should

14  adopt Aylus' construction of wide area network.

15         **E.     Remote from the UE**

| Aylus' Proposed Construction | Apple's Proposed Construction |
|---|---|
| Not located on the same electronic communication network that connects devices in a small geographic area as the UE. | Plain and ordinary meaning. |

22         Remote from the UE appears in claim 15, which depends from claim 1:

23         15.   The method of claim 1, wherein, if one of the MS and MR are **remote from the UE**,

24  the CPP logic provides information about invoked VCR controls to the CP logic on the serving

25  node to allow the CP logic to control the remote MS or MR wherein the UE is implemented on a

26  handset.

**I. "Remote" Does Not Mean "Resides Outside"**

As discussed above, one of the innovative aspects of the '412 patent was to extend media delivery architecture into a wide area network—an electronic communication network that connects devices in a large geographic area.   Ex. 1 ('412 patent) at 17:60 ("a wide area networking extension of UPnP").   Claim 15 is one example of this innovation.   In claim 15, the CPP logic on the UE communicates with the CP logic on the wide area network regarding invoked VCR controls (such as play, pause, etc.) to enable the CP logic to control the remote media server or remote media renderer.   This architecture allows the CP logic to interact with entities on the wide area network in order to effectuate user instructions, thereby empowering users to control and render media content located anywhere in the world.   Accordingly, "[r]emote from the UE" in this context means that one of the MS and the MR are not located on the same electronic communication network that connects devices in a small geographic area as the UE; that is, that one of the MS and the MR are not located on the same local area network as the UE.

This meaning is evident from the other claims in the patent, which the Federal Circuit has explained can be "valuable sources of enlightenment as to the meaning of a claim term." *Hologic, Inc. v. SenoRx, Inc.*, 639 F.3d 1329, 1336 (Fed. Cir. 2011) (citations and quotations omitted); *see also Phillips,* 415 F.3d at 1314 ("[o]ther claims of the patent in question, both asserted and unasserted, can also be valuable sources of enlightenment as to the meaning of a claim term.").   In the '412 patent, the MS and MR "reside[] outside of the UE":   "provisioning a serving node in the wide area network with control point (CP) logic that includes logic to negotiate media content delivery with at least one of the MS and the MR, wherein ***the CP logic, MS, and MR resides outside of a user endpoint (UE)*** and the CP logic resides in the signaling domain and serves as a first proxy…"   Ex. 1 ('412 patent) at claim 1 (emphasis added).   "Resides outside of a user endpoint," in this context, simply means that the CP logic, media server, and media renderer are not stored on the physical device that is the user endpoint.   Thus, first, to indicate that the MS and the MR are not on the same device as the UE, the patent uses the words "resides outside of a user endpoint."   *Id.*   And, second, to indicate the distinct requirement of being at another location in the wide area network, the patent uses the term "remote from the UE."

1    *See, e.g., id.*; *Interactive Gift Exp., Inc. v. Compuserve Inc.,* 256 F.3d 1323, 1331 (Fed. Cir.

2    2001) ("In construing claims, the analytical focus must begin and remain centered on the language

3    of the claims themselves...."); *Comaper Corp. v. Antec, Inc.,* 596 F.3d 1343, 1348 (Fed. Cir. 2010)

4    ("There is an inference ... that two different terms used in a patent have different meanings.")

5    (citation omitted).   Accordingly, "remote from the UE" should be construed as "not located on the

6    same electronic communication network that connects devices in a small geographic area as the

7    UE."

8    **IV.**     **CONCLUSION**

9        For the foregoing reasons, Aylus respectfully requests that the Court adopt its proposed

10   constructions.

11   DATED: September 11, 2014        QUINN EMANUEL URQUHART &
                                 SULLIVAN, LLP

12

13                          By    */s/ Amar L. Thakur*

14                                Amar L. Thakur
                               Attorney for AYLUS NETWORKS, INC.

15

16

17

18

19

20

21

22

23

24

25

26

27

28

               Case No. 3:13-cv-04700-EMC

**CERTIFICATE OF SERVICE**

I hereby certify that I caused a true and correct copy of the foregoing to be served by electronic mail upon the following:

MARK D. FOWLER, Bar No. 124235
mark.fowler@dlapiper.com
CHRISTINE K. CORBETT, Bar No. 209128
christine.corbett@dlapiper.com
ROBERT BUERGI, Bar No. 242910
robert.buergi@dlapiper.com
ERIK R. FUEHRER, Bar No. 252578
erik.fuehrer@dlapiper.com
JONATHAN HICKS, Bar No. 274634
jonathan.hicks@dlapiper.com
**DLA PIPER LLP (US)**
2000 University Avenue
East Palo Alto, CA   94303-2214
Telephone:   650.833.2000
Facsimile:   650.833.2001

ROBERT WILLIAMS, Bar No. 246990
robert.williams@dlapiper.com
**DLA PIPER LLP (US)**
401 B Street, Suite 1700
San Diego, CA   92101-4297
Telephone:   (619) 699-2700
Facsimile:   (619) 699-2701

Attorneys for Defendant
APPLE INC.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on September 11, 2014, at San Francisco, California.

*/s/ William O. Cooper*
William O. Cooper