UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

Before The Honorable Edward M. Chen, Judge

AYLUS NETWORKS,                      )
                                     )
          Plaintiff,                 )
                                     )
vs.                                  )    No. C 13-4700 EMC
                                     )
APPLE,                               )
                                     )
          Defendant.                 )
_____)

                              San Francisco, California
                              Monday, October 20, 2014

  TRANSCRIPT OF PROCEEDINGS OF THE OFFICIAL ELECTRONIC SOUND
            RECORDING 2:31 - 4:16 = 106 MINUTES

APPEARANCES:

For Plaintiff:
                         Quinn Emanuel Urquhart &
                           Sullivan, LLP
                         865 South Figueroa Street
                         10th Floor
                         Los Angeles, California 90017
                    BY:  AMALDEEP LAL THAKUR, Esq.

                         Quinn Emanuel Urquhart &
                           Sullivan, LLP
                         3842 Sacramento Street
                         San Francisco, California
                           94118
                    BY:  WILLIAM OWEN COOPER, Esq.


          (APPEARANCES CONTINUED ON THE NEXT PAGE)

*Echo Reporting, Inc.*

2

APPEARANCES:   (Cont'd.)

For Defendant:
                              DLA Piper US, LLP
                              2000 University Avenue
                              East Palo Alto, CA 94303
                         BY:  MARK FOWLER, Esq.
                              CHRISTINE KERBA CORBETT, Esq.
                              JONATHAN H. HICKS, Esq.
                              ROBERT BUERGI, Esq.
                              ERIK R. FUEHRER, Esq.
                              KIM MOORE, Esq.


Transcribed by:               Echo Reporting, Inc.
                              Contracted Court Reporter/
                              Transcriber
                              echoreporting@yahoo.com

3

Monday, October 20, 2014                                    2:31 p.m.

P-R-O-C-E-E-D-I-N-G-S

--oOo--

THE COURT:  Good afternoon, counsel.  If you can make your -- state your names, please, for my benefit.

THE CLERK:  Just let me call the case.  Sorry. Calling case C-13-4700, Aylus versus Apple.  Counsel, please come to the podium and state your name for the record.

MR. THAKUR:  Good afternoon, your Honor.  Amar Thakur for Plaintiff Aylus Networks, Inc.

THE COURT:  All right.  Thank you, Mr. Thakur.

MR. FOWLER:  Good afternoon, your Honor.  Mark Fowler, DLA Piper for Defendant Apple.  I have with me some of my colleagues, my partner, Christine Corbett, my partner, Robert Buergi.  Back in the gallery is Kim Moore, who is in-house counsel at Apple.  And we have Doctor Nathaniel Polish (phonetic), who is our expert in this case.

THE COURT:  All right.  Thank you.  Welcome.

MR. THAKUR:  In light of that, I might introduce my colleague, Will Cooper.

THE COURT:  Certainly.

MR. THAKUR:  And also present in the courtroom is Doctor Shamin Nakvi (phonetic), the lead inventor.  And also joining me is Mr. Paul Karan (phonetic).  He's the chief technology officer at Aylus.

4

THE COURT:  All right.  Thank you.

So how would you like to proceed?  Are you going to take the lead?  Are you going to use somebody else or --

MR. THAKUR:  No.  I'm going to take the lead.  The parties agreed that I would present first, but I'd like to reserve some of my time for rebuttal.

THE COURT:  Sure.  I'm hoping it's not going to be so argumentative that we have formal presentation, opposition and rebuttal, but -- I remind you that we do have -- my understanding, we've got claim construction coming up, so -- I'm mainly interested in understanding the technology, the architecture, how it differs, you know, from the past and from what I understand, things like Roku and those sorts of matters.

But why don't you go ahead.  And you can assume I know very little.

MR. THAKUR:  Okay.

THE COURT:  It's not a giant leap to make that assumption.

MR. THAKUR:  What brings us here today, obviously, is a technology tutorial for a patent infringement case between Aylus and Apple.  And at the center of that is the patented invention of RE-44412.

What is this invention about?  What this invention is is a transformative architecture of controlling and

5

delivering media content on a commercial scale over wide area networks.  To understand the innovation, it's important to understand what was there before.

Before I talk a little bit about the invention, let me talk a little bit about the state of the art that existed to which the inventor came.  First of all, the media content.  The media content was -- in 2004 was typically stored in a single-purpose storage device.  You went out and bought movies on a DVD.

By 2004, what people had come to decide they wanted to do was to create their essentially own libraries.  So instead of me having to plug in individual DVDs between my movies that I wanted to watch, I could essentially have a selection of movies stored in a single device.

And that device most likely was going to be a home computer.  It was certainly -- in that time frame, media servers that were specially designated for movie servers had come into existence.  So that's what existed in 2004.

THE COURT:  What's an example of a media server back then in 2004?

MR. THAKUR:  Most likely your PC.  And the key to understanding that media server environment is, the individual user was the library.  They would download the movies, store them onto the media library.

And one of the key drawbacks to the individual being a

6

librarian is you have to be a little bit of a technophile to understand how to do that. So certainly it limited certain growth in media libraries. But that was the status of media in 2004.

At this time, the media renderers had existed. The most ubiquitous display device was your analog television. In 2004, that's what most people had. But analog TV's would be quickly replaced by digital TV's that were connected to the internet. If you will, the flat screen revolution is ramping up.

So what did people do? At that time, you took your home office, you took your PC, you loaded your movies onto that PC, you connected it through your home network to the television, and you could control the delivery of media content in your home through the television. But to do that, you had to have a piece of software. And that piece of software was called a control point software. And that control point software sat on your home computer.

In 2004, who is at the centerpiece of home software? It's Microsoft. So the prior art -- and frankly, there's different architects within the prior art, but Apple has aggressively tried to present to this Court the UPNP, so we'll go ahead and adopt for purposes of this discussion that particular version of the prior art.

So that -- in that arena, the version of prior art is

there's a media rendering.  The primary media rendering that Microsoft brings to the table is the X-Box.

THE COURT:  The renderer.  The actual display device would be your flat screen.

MR. THAKUR:  Correct.

THE COURT:  So what is the difference between a media renderer and the ultimate display?  It's the device that sends a signal to the display?  How do you define "media renderer"?

MR. THAKUR:  What a media renderer is is, a media renderer is what receives the content, the media movie, and then displays it on a television, essentially takes the digital signals and allows the television to convert that to a display.

So it's the -- it's the X-Box that sees the videos, but then you watch it on your television and you play it there. It's rendering it.

THE COURT:  E-player would be a media renderer as well.

MR. THAKUR:  So in the state of the art at that time is Microsoft building X-Box for video gaming.  And number two, Microsoft is in the business of building software.  What they were most interested in is building a control point software that resided on the computer that would allow you to watch these movies.

8

In fact, that software was sold by Microsoft as -- one of the software that was sold was the X-Box media extender. So essentially, this is a software that sits on top of Microsoft Windows.

So Microsoft is in the -- is now in the business of selling media control point software and selling media renderers. But it wants to become at the center, at the heart of this environment.

So what Microsoft does is it creates a forum. What is a forum? It's an invitation, voluntary invitation to other players in the industry to say, hey, let's all work together so we can communicate using the same language so that we can grow our business into the next revolution of media entertainment.

So Microsoft forms what is called the UPNP forum. It's not a standards organization. It's a forum where people get together. And at this forum, it invites the players. It invites the media providers, content providers, Disney. It invites the person who makes the media servers, Avaya.

And as I explained to you earlier, the media server could be a special purpose just for movies or it could be most likely your PC. There are people who value this technology enough that they may go out and buy their own media server dedicated for movies, and that would have been Avaya. Your media server manufacturer would most likely be

9

a PC as well.

And invited the media renderer manufacturers.  Samsung was obviously a large player in the television business and said, you want to sell more of your flat screens, let's figure out how all these contents communicate with each other.

THE COURT:  That's where I get a little confused. The media renderer in this case does refer to the display device and not necessarily the device that takes the media, be it a DVD or some streaming video or something.  They'll render it usable with the display device.

MR. THAKUR:  Correct.  So the media renderer is the aspect of the -- is the technology device that receives the content, and then the display device is what displays it.  Samsung fills the rendering capability into the television.

So most display devices are device -- television screens that cannot -- that basically have within them the ability to receive signals and then convert them into a digital display.  So the media renderer is, from a technological standpoint, separate than a display, but certainly you could build a renderer into the display.

THE COURT:  But it's built into the display -- if you take a Samsung TV, flat screen TV, would that be the digital input, USB or the HDMI or what would it be that is

the rendering part?

MR. THAKUR:  It goes through the input into the guts of the Samsung television.  And what Samsung television then does is takes that movie unit content and converts it to a display format and puts it on the television.  So that's the display scenario.

So in this environment where Microsoft creates this forum, these individuals come to participate.  And the purpose of this is to create protocol so they can all communicate.  So you can't really have protocols until you communicate -- until you develop a structure in which this environment is going to work.

So the next step they did was develop an architecture.  The architecture essentially took what existed.  So media servers and -- media renderers and media servers were terms of art well known in the industry before Microsoft came along.  But what they did was they talked about how the two were going to structure.

And at the end of the day, what Microsoft was interested in was that piece in the middle, the control point software, the user input.  That's where Microsoft makes its money.

So what Microsoft is interested in is making sure that they can sell the control point software so all these companies can essentially communicate with each other so

11

that you can have media content more easily available inside the home.  And that control point software is what goes on the PC, as you would understand.  That's Microsoft's business.

So that's what Microsoft proposes, and eventually these group of individuals agree as an architecture, that you have media server and media renderer, and you're going to have a control point software inside the house that will allow you to communicate.

So in this environment --

THE COURT:  Wait.  Give me an example of a physical setup of how you have a control point on a desktop, for instance on a PC, that operates with the server.  Can you give me an example within -- instead of block diagrams, give me something concrete.

MR. THAKUR:  You've got a PC, you've got video games.  And you've got a media renderer, which is the X-Box.  And the media renderer is plugged into the television.  And you use the Windows media extender on the PC software, and you can now render the game onto the X-Box onto the television.

THE COURT:  I was never a gamer, so that's why it's new to me.

MR. THAKUR:  I'm sorry.  That's the Microsoft version.  They didn't have movies.  But essentially, the

12

concept would be the same.  You could have movies library on your television, you could have a software that is on the computer, you could have a renderer of that, and it would link the renderer which plugs into a Samsung television, and you would have movies.  It's essentially the same concept.

THE COURT:  Why do you need an X-Box in between the PC and the display, the television?

MR. THAKUR:  The reason you have an X-Box is because Microsoft renders -- because the renderer from Microsoft's technology wasn't built into the phone -- isn't built into the television.  So the renderer is essentially -- accepts content and then displays it onto the television.  The television can only display it a particular way.

So when you're dealing with Microsoft video gaming, the content that comes in comes in a particular format, and then it recognizes the format the television can display it on, and it displays it on that format.

If the content is -- and that's actually one of -- exactly the thing that Microsoft hoped to do, was that the way the renderer displayed the content on Samsung would be the same as what it displayed on Sony.  So all of them could agree to the same protocol for display, so some of this work was no longer necessary.

So into this architectural environment came Doctor

13

Shamin Nakvi.  Quick background on Doctor Nakvi.  He has two PhDs, one physics from Cambridge, another one from computer science.  And he had two decades of experience at AT&T Bell Labs and working for the Department of Defense.

Prior to that, he had developed the Motorola push to talk technology that sold for several hundred million.  The reason I give you the background is not just to sort of -- you can see how great the renderer is.  It's where he came from.  He came from AT&T Bell Labs.  He came from an environment of computer networking and telecommunications. He didn't look at this invention from the perspective of architecture for media content.

So when he arrived at the scene, he looked at the existing structure and said, this is a lot of shortcomings. So let's talk about what the problems were that he needed to be solved.  So first let's look at the media server.  The media server is expensive and has limited capacity.  Best-case scenario, you're going to put 100 DVDs onto your local computer.  It is limited.

If you bought -- and then allow your computer space to be taken up.  If you bought a special-purpose server, you were spending a lot of money for each person to have their own servers.

Number two, every time you wanted to update that library, you would get a DVD, and you would load it onto the

14

media server.  If you will, every person has their own library.  And that's not an easy thing to do, update the library.  It's time-consuming, it's burdensome, and frankly, hard to do on a regular basis as new content comes in.  So you -- then you have to go outside and buy the movies and so on.  So that was the shortcoming of the media server in the local environment.

Then you look at the media renderer.  The media renderer on the screen, you could only access the store that -- the media content that was stored on the local media server.  And obviously, when you are dealing with a piece of software that deals with delivering content from a media server to a media renderer, the software has to have processing capabilities.  So you were building in additional processing capability at the local area network that was frankly unnecessary.

The software obviously -- software processing takes computer power.  So I would be the first to tell you, that was less of the concern.  The bigger concern was the content.

So he arrived in this environment where he saw a shortcoming in the media servers and the media renderers.  But let's talk about what brought him into this environment.  As I explained, what brought him into this environment was telecommunications.  He was not a media content delivery

person.

What he did was he saw the phones in 2004. And in 2004, the most ubiquitous phone in America was the Nokia. But certainly a world of SmartPhone makers had come into existence, and what they were doing was making these phones more powerful.

So what he did was he looked at those SmartPhones. He said, as the SmartPhones get bigger and more capable, they might be at the centerpiece of your life, but they too have some shortcomings. One, the phone had limited battery and limiting processing capabilities.

Two, the screens themselves are small. And so you don't really want to watch the movie on your small screen. You don't want to have poor screen resolution. And therefore, they have service for display devices.

Mobile devices also have different issues than traditional computer network. They don't -- they lack some of the same security capabilities. There's a delay associated with latency because the bandwidth capability of a wireless network is going to be less.

And effectively, at the end of the day, the fidelity, the quality of the picture is going to be low. And certainly one of the fundamental things about home entertainment is, watching movies is a shared experience. It's something you do with family. It's something you do

16

with others.  Watching it on your own SmartPhone is fundamentally not the most likely and most desirable place to do it.  You want to watch it on the big screen.

So when you look at the SmartPhone limitations, he already was aware of the limitation in the media renderer and the media server.  And he said, this architecture that you have is completely limiting.  What you need to do is use the strength of different technologies that are coming into play and use them in a more efficient way.

So what he did was, he came up with a transformative architecture.  That's his invention.  So let's talk a little bit about that transformative architecture.  What did he do?  First, he understood that -- the components that were in play, the media server where the content is, where -- the media renderer where you have the television screen that you want to watch it at.

And then he looked at the control point software and he said, well, if I want my handset to be the center of my universe, I'm going to need to have some software on there that allows me to select and do the minimum things necessary.  Basically, I want to watch a movie where I want to watch it.

So what he did was he took the control point software and he disaggregated it.  So the idea was that the software was broken into, one, on your handset, and two, in a -- in

17

the wide area network.

So as we explained, the control point user box, which is software, resides in the user end point and essentially gives the user the ability to select what they want and display whatever they want to display.  But it doesn't have to be the brains in the network.

The brains in the network is the control point.  It's the software that resides in the cloud, the wide area network.  Now, I use the word "cloud" a little bit loosely because in 2004, the word "cloud" had actually -- to my knowledge, had not been invented.  I believe it's a term that came later.  But the idea was, in the wide area network, you would have a central processing capability that could deliver this on a commercial scale.

One of the other most critical parts of his invention was, you're not just disaggregating the cloud and the control point software and putting it on the wide area network.  What you do with this control point software is it resides exclusively in the signaling domain.

What does that mean?  I'll show you visually a little bit later.  What control point logic in the signaling domain means is, I basically place an order with a server out there who knows who I am, decides what I want, authenticates -- if you will, it has the processing power to essentially deal with orders.

18

And then what the control point software does is, it reaches out to the media server where the movie is located and tells them to send it directly to me.  It is not in the bearer domain.

THE COURT:  Not in the what?

MR. THAKUR:  It's not in the bearer domain.  So the signaling domain is the communication domain.  The bearer domain is what gets the content to the server.  And what it does, again, is -- what Doctor Nakvi was thinking about at that time frame was, the world of computing is essentially going to become a world of distributing computing.  He saw the future of computing because that was his network background.

Essentially, you're going to want a secure server that authenticates, knows my billing information and card, and you're going to want a storage device where the server is located, but is not going to need the same power.  And so you're going to disaggregate that.

Someone gave me an example.  When I go into a line at Chipotle, I order a burrito.  If the same guy goes back and makes it and delivers it to me before he goes to the next customer, it's a very slow process.  If the signaling person takes my command and tells it to the cook, chef back there to make the burrito and then pass it to the end of the line, that's a more efficient commercial process, and that was a

19

critical element of his invention.

What did we do with the media server?  You no longer have to have your own private media server.  The media server can sit in the wide area network.  Essentially, you can have a commercial movie provider.  You know, everyone doesn't need to have their own library.

And the advantage of that, as I explained, was I'm not going out buying movies, loading them.  I am a professional business enterprise and load these movies and manage these networks.  As new movies come on, load them up and make them available.

So again, the media server now has been taken away from the house and put it on the commercial scale.  What happens to the media renderer?  The media renderer was -- the way it worked was, in my computer, I built a relationship with an individual television that I wanted to watch it.

But Doctor Nakvi said, why am I limited to watching the movies that I want on my television?  Perhaps I'm traveling.  I'm staying at the Marriott.  Perhaps I'm visiting my parents, and I want to watch it there, and I want to watch it on the television that's there because, as I explained, entertainment and movies is essentially a shared experience.

So I want to watch -- more pointed, I want to access any movie anytime, anywhere in the world, and I want to watch my movie on -- anywhere, on any television that I go

20

to, that I choose.  So there is a disaggregation of the link between the home PC and the media renderer.  You have now taken advantage of the internet and the cloud to make that available.

So you may ask, how does this all work.  I'm not quite sure I understand how this all works.  So let me give you an example of how this all works.  The first thing we do, the centerpiece of all our lives today, as Doctor Nakvi believed would happen, is the user end point.  It is our tool that we carry everywhere that allows us to be empowered in the media space.

So the first thing we do in this environment, we have a user end point.  In this environment, what already exists is a movie store.  For the movie store to exist, there has to be two different pieces.  It has to have a control point software, and that control point software resides in the signaling domain, takes the orders, if you will, and then the movie score has to have media service with these large storage devices where I can store the movies.

As you can understand, there are -- media servers can have a lot of complexity to it as well.  Obviously, I may want redundancy.  I may want to put one movie store in Colorado.  I may want to put one in Australia.  You know, the movie "12 Years a Slave" is extremely popular since it won the Oscar, so I need to have multiple servers able to do

it.

The point being is, the commercial media provider can build a network that has two different components, a component where the control point software is located in the signaling domain, and a component where the media server is located in the bearer domain.

Let me emphasize -- we talked about the prior art -- this concept of signaling and bearer domain were nowhere to be found because they were unnecessary in a Microsoft environment.

So this is what exists. And the third thing that exists is televisions that are connected to the internet. You have display devices at your home, at a hotel room, at my parents' house. So the world we live in today, just to recap, I have my user end point, I have a movie store --

THE COURT: Your end point is -- that's not necessarily the display device. That's the --

MR. THAKUR: Yes. So user end point is a device that you use in your hand. The media server is where the movie is located, which has two components, control point and the media server, and then there is the media renderer, which is basically the device that plugs into the television display device.

And the patent does a pretty explicit job of separating. A television and a display is different. The

22

renderer is a different device than the display.  You actually have a dependent claim in a display.

And frankly, for purposes of this case, that's actually not in dispute because the accused product is a renderer, not the display.  But that's the TV, the box, the renderer.

So where are we at today?  The world we live in today is you have my phone, my movie provider, and we have televisions.  So how does this actually now work?  The first thing is, when I get a phone, I build a relationship with the place that provides movies.

There may be a relationship that goes one time.  I register my name and address, tell it my age so it can decide what kind of movies I'm entitled to.  I tell it my e-mail address.  It can be -- bottom line is, there's a relationship built between me and the movie store, and there are things that the movie store is going to want to know on a regular basis or on a one-time basis when we're not actually taking information.

It can pre-register my credit card information and put a separate payment server in addition to the connector of the control point server or it can make me pay for the movie every time I order.  Certainly it's going to want to know whether I'm on a WiFi network or on a cellular network.

The point is, the user end point builds a relationship, some of which is initial, some of which is subsequent, on a

23

media.  But the bottom line is, the user has now decided that he wants a relationship with the media store.

Now the television that I use in my parents' house.  How does the television at my parents' house know I want -- I can let this phone control me?  The way it actually works is, the television announces itself to the phone.  And it can be done multiple different ways, one of which ways is UPNP protocol that these companies adopted.  There's three other protocols, Jenny (phonetic), RFIT, Bluetooth.

I might take an interesting detour from a human perspective in here.  What happened, as I explained to you, was in November of 2004, Doctor Nakvi entered this arena from a computer networking space.  So the architecture that he developed was purely from his telecommunication network architecture background.

And while he was generally aware of the existence of UPNP as a company, they were talking to each other, he had very little knowledge about it.  Once he presented his technology invention to the VCs and they agreed to fund him, then -- one of the earliest employees of his company was called Mr. Ellis Wong (phonetic).  And he's one of the co-inventors of this.  Mr. Wong is a brilliant engineer who -- what he does is build devices that communicate in the media space.  And he had knowledge of the UPNP, and he's the one who said, if you need to relate devices, one of the options

24

is UPNP.

And the point I say is that the theme of this case is somehow the invention existed in a UPNP world, and the reality of it is, the UPNP world was onto itself to which Doctor Nakvi became, and it only played a minuscule role in his invention in one of four protocols for a dependent claim that Mr. Wong brought.

THE COURT:  How does the -- you say the television announces itself to the hand-held.  They have to sync up in some way?

MR. THAKUR:  They build a relationship.  There's actually a lot of detail in the figures of the patent, which I don't want to -- Figure 15, 16, 17, the first -- of the relationship is how the devices sync up.

And if I may go to -- there's almost four or five pages of specification column talking about how the announcements happen.  But I understand your simple question right now is how does it happen.

What happens actually is the phone has a message that it continually pings to the cell tower.  When you are within a certain tower, the television picks up that I am within my access, someone who is capable of using my technology.  And then it essentially announces itself and says, I'm available to display your movie.

Because -- the reason why the announcement is necessary

25

is, my mom may have her own cell phone, and it might have -- and that relationship existed. So if I want to basically take power, it's got to announce itself, and I've got to build a relationship.

And in fact, you hit the issue spot on because that's actually going to be -- in about two slides, I'm going to talk about how the process actually works.

So as I explained -- where are we at now? We're at a person who has a phone. There's a media company out there that has a control point software in the signaling domain and a media server. We have televisions out there. My user has now built a relationship with the media movie store.

And now I'm at my parents' house, and the television has announced to me that I'm available, and I have now built a relationship with my mom's television. So now, into the evening hour, we want to watch a movie. How does this work?

Now that the user has the user application on it because it's built a relationship with the movie store, step one, I access the movie. In today's world, almost everything is touch screen and through tiles. I've shown that display. So basically, you get these movies available in tiles. You want to pick which movie.

So once you've done that, you pick a movie by pressing that tile. I haven't seen "12 Years a Slave." It won best movie. I'd like to watch it with the family. We click up

26

on it and press the button, and now the movie is going to get displayed.  Let's talk about that process.

The '412 patent is a negotiation that takes place to provide the delivery.  Some of the negotiation has already taken place.  The first is, the user end point and the media renderer have built a relationship.  e user end point and the control point already has some existing relationship.

Now in that signaling domain, I send the message to the control point and say, I want to watch "12 Years a Slave." Remember, it already knows that I'm Amar, and it already knows I want to watch it on my mom's television.  In the signaling domain, I say I want to watch the movie.

The control point software processes it.  For example, I believe "12 Years a Slave" is an R movie.  It knows Mr. Thakur is above the age of 18 and allows me access to the movie.  Maybe I have a subscription.  It doesn't need to charge me.  Or perhaps I don't.  It's $5 or $10 per movie. It goes to the payment server.

My point is, the control point proxy resides in the -- and process the order.  Once the order is processed, it goes to the media server where the movie is resident.  And I think, as we saw, as I explained earlier, from a redundancy standpoint, you're not going to have one media store.  These are really high-density storage devices.  There is going to be lots of redundant capability.

27

It's going to go to the movie, lets you in the media server as a resident in Chicago or Colorado, which one is available based on load balancing.  It says, this movie now needs to be delivered to Mr. Thakur's mom's house.  And this is the destination address.

Now, in any negotiation, there are things that are known and there are things that are not known.  If I tell -- I can preset that the movie is going to be in English, all the movies are going to be delivered in English.  It's preset in the negotiation.  Or if -- if it happens to know Mr. Thakur is a foreign language candidate and it has multiple movies available, it can provide me the offer and say, as part of this negotiation, what language do you want it in.

But my point is that the negotiation process is about providing the necessities to provide the content to the renderer.  But what happens in any negotiation is there are lots of elements that need to be negotiated, most of which are already preagreed upon.  So for example, I want the movie in MPEG-2-LA.  That's what the display is.  That's how it's served.  That's what the phone is.

Certainly as you can imagine an environment where the user end point, the phone, the media server, the movie provider, the movie renderer, the television provider all are the same, certainly they're going to preagree upon some

28

of the essentials, the data program.

So that's how the movie ends up on my phone selection through the signaling domain at the movie ordering store to the media server where the movie is located to my parents' television, where we can enjoy the movie.  At my hands are the video play controls.  I control the movie, the display with my handset.  And those are VCR type controls.  I think it's referred to as video play control software.

So that is how the invention works.  And that is why Doctor Nakvi said this is about a commercial scale.  A distributed cloud computer.  The claim makes it absolutely clear that the whole purpose of this invention is to provide a control point logic that is configured to deal with multiple unrelated devices running CPP logic.

That, your Honor, is what our invented technology is.

THE COURT:  Your example, is the renderer built into the TV?  What is the --

MR. THAKUR:  Your Honor, in our example, we showed you the television, but actually, we actually showed you the renderer.  If you look at this screen, the renderer is sitting to the right of the television.  It's a separate device.  Certainly in the accused environment, the Apple television is a separate device that plugs into the television.

THE COURT:  Apple TV is an example of a renderer,

29

then?

MR. THAKUR:  Right.  And X-Box is an example of a renderer.  An Apple TV is an example of a renderer.  That's what we see as the content.  It plugs into the display device.

THE COURT:  So Roku I have at home, that is not an example of this architecture because it cannot control --

MR. THAKUR:  Let me restate that.  I have not examined Roku.  Roku happens to be a client.  So I will just simply say, I am unaware of Roku infringing his patent.

THE COURT:  The way it typically works, that is still -- you have to be in the room to control it.  You can't send it somewhere else.  It's tied to a particular TV, right?

MR. THAKUR:  Without detailed knowledge of my client's architecture, I won't say yes, but I believe the answer is yes.

THE COURT:  For any typical DVD player that is internet-ready by which you receive Netflix and Hulu and everything else, those are examples of not this, because this you can use your hand-held, send it to any TV that's in a different city, in a different house?

MR. THAKUR:  The Netflix you're watching on your television is not accused here, your Honor, that's correct. This is a unique architecture that Apple has invented -- has

30

implemented.  It allows a single player to provide content on a commercial scale.

THE COURT:  And the hand-held communicates directly through the wide area network to the server rather than going through -- you know, rather than communicating with, let's say, a box in the same room that then happens to be hooked up to the internet and then sends it out and comes back?

MR. THAKUR:  I mean, there may be a WiFi router in the house, but yes.

THE COURT:  Right.  Right, right, right.

MR. THAKUR:  There is no -- that was the heart of the invention was to take this expensive hardware that you had to purchase into the house and put it on the cloud.

THE COURT:  Okay.  Great.  Thank you.

UNIDENTIFIED SPEAKER:  Good afternoon, your Honor. Do we have to do something to switch over to -- I'm going to use the --

THE COURT:  It's up.

UNIDENTIFIED SPEAKER:  Your Honor, before I get rolling on my presentation, do you have our --

THE COURT:  Yes.

UNIDENTIFIED SPEAKER:  Okay.  Thank you.

There is one issue that I wanted to address up front because your Honor put your finger on one of the disputes

that the parties have.  That is, what constitutes a media renderer, whether it needs to have a display.  That's actually a dispute, a live dispute between the parties.  It is not one of the 10 terms that's been identified for construction in the first round.

As your Honor may recall from the case management conference, I think we have 12 disputed terms.  This is one of the two that fell below the line, but it's certainly Apple's view that the media renderer not only is what's generating the content to be displayed, but the display itself.

THE COURT:  The claim construction specifically says that the construction fro Aylus does not require the media renderer to have the display.  So we do have a dispute with that.  And when Aylus's counsel says that Apple TV is a media renderer, we strongly disagree with that.  When they say the X-Box is a media renderer, we strongly disagree with that.

So your Honor, what I plan to do today is take a little bit different tact than what we had seen before in terms of the way to approach this.  And what I've done here is, we have four technologies that I would like to address briefly. I think this will take about maybe 20, 25 minutes.  Probably closer to 25.

And each of these technologies that we have up here,

32

Universal Plug and Play, UPNP, which counsel referred to, proxies, IP multi-media sub-systems, otherwise known as IMS, and networks are all things that are going to come into play, and you'll need to be considering as the building blocks in deciding what the claim terms mean that we've put before you.

Now, the first one I want to address is Universal Plug and Play, which I'll just call UPNP going forward.  And this is fundamental because it is what the alleged invention is built on top of.  It is something that is the building blocks, the basics of it.

And your Honor, I'm only going to refer to the patent once or twice.  I saw that counsel -- just to give you a sense of -- I would like to use the ELMO just for a minute here, if we could.

The '412 patent at Column 17, lines -- I think that's seven through eight.  And we see here in certain embodiments, the UPNP architecture is extended into a wide area network environment.  And then down below in that same column at line 60 through 63, it says, "Thus, in a wide area network, an extension of UPNP, moving the CT into a network element such as the serving note of an IMS session and placing the CPP into the handset optimizes usage of the wireless spectrum usage.

And although this is something that we're going to have

to wait until the Markman hearing to talk about, these are embodiments that were ultimately claimed in the patent.  So what we see from the patent itself is that the foundation of the alleged invention is UPNP.

And to talk about that just a little bit more, you don't have to believe me when I say that because we can look at -- notwithstanding what we heard a little while ago from counsel, this is Aylus's opening Markman brief.  And the first thing they say -- of course we all agree with it.  In order to understand the patent at issue, in other words, what it means in this case, it is important to understand the technological background at the time of the invention.

So agreed.  And then we look at the bottom of page one. One of the very first things Aylus did was to say media content provides, e.g. Disney, media server manufacturers, e.g. Avaya, and media vendor manufacturers, e.g. Samsung, created a forum to develop Universal Plug and Play, UPNP protocols so that these devices could communicate.  So agreed.

And then the very next thing that we see in their brief on page two is we have a statement UPNP had three distinct logical entities, the control point, a media server and a media renderer.  And then you'll see this figure, Figure 3. I'll come back to that when I give my presentation -- PowerPoint presentation in a minute.

34

So this was the backdrop of all of this.  Now, I heard something this afternoon that's a little bit at odds with what I'm about to show you, I think, at page two.  It says here -- and I'm going to paraphrase.  It says here, "Doctor Nakvi," the person that was just referred to, "the lead inventor on the '412 patent, recognized the shortcomings inherent in the traditional UPNP architecture."  So Doctor Nakvi, looking at the brief at least, was looking at the architecture and recognized the shortcomings of it.

And then -- this is page three of the brief -- Doctor Nakvi examined those shortcomings, and he realized they weren't in a vacuum.  And that's where we had the discussion of SmartPhones coming onto the scene.

And then finally, your Honor, it says, "As claimed in the '412 patent, Doctor Nakvi transcended the technological difficulties in media -- delivering display by radically transforming UPNP and integrating the handset into this new architecture.

So the sole point of this, your Honor, is to -- and we'll be addressing this at the Markman hearing itself -- is that when we're talking about this alleged invention, it's sitting right on top of UPNP.  Most of what we're talking about is UPNP, if not all of it.

If I could have the PowerPoint back up, please.  Thank you.

35

So, your Honor, turning to the next slide, we see that -- just a few facts about UPNP. It's a protocol and standard designed to connect network devices such as PCs, entertainment equipment -- and to give you another example that might be more relevant to today. That's like a DVR, right? And intelligent devices. That would include, for example, a cell phone.

Microsoft introduced UPNP back in 1999. That's five to six years before the earliest priority date for the '412 patent. So it was around a long time before Doctor Nakvi and his colleagues came up with this purported invention.

We see here a cross-industry group called the UPNP forum was created to guide the creation of standards. By 2003, there were over 500 companies, and there were a number of specifications that had been put together, very detained documents which I'll talk about in a minute. And that today, there's over a thousand companies involved in the UPNP forum.

What I have here is a picture. It's to illustrate the point. It's not intended to be the actual architecture. We'll get to that in a minute. But the goal of UPNP is to allow devices to detect and interact with each other. And this is just an arbitrary set of lines. The gray lines don't mean anything in particular. The ultimate point of UPNP is that any one of these devices can communicate with

36

any of the other devices.

So, for example, in the upper left-hand quadrant, we have a desktop computer with a monitor.  That computer could communicate with the lower left-hand quadrant.  We have a TV.  It could send -- it could send a video there or a movie or whatever.  And then in the lower right-hand quadrant, we have a speaker.  It could send the audio there instead.  So UPNP allowed these devices to talk to each other.

Here we have a figure that we've put together to illustrate this point.  On the left you have a couple sitting on the couch.  One of them is holding a cell phone. They can use that phone to control, connect and share media, personal media from that mobile device on any of those other devices we see.  We see a TV on the wall, we see speakers around the room, we see a tablet, we see a laptop.

And how does it do that?  Well, it uses a network.  And we're going to be talking about networks a little later. Here we have the example of a WiFi or an ethernet network, but it frees it from -- you don't have to use hardware because you have a network that you can do this on.

And you can send the multi-media to multiple devices. So, for example -- I gave you the example before, you could send the video to the TV, you could send the audio to the speakers.

Now, as I mentioned a while ago, there are a number of

37

specifications.  And, your Honor, we have submitted a number of these specifications as exhibits as part of our Markman. If you look at the bottom of Slide 7 that I have up in front of you now, you'll see the exhibit numbers.  If at some point you would like to look at those, that's where you'd go for this.

One of them is called the UPNAV -- UPNP-AV architecture specification.  That's the one I'm going to talk about mainly today.  But another thing to keep in mind when we get to the Markman hearing again is these were around for a long time.  A lot of companies had done -- worked with these, and they were well-established, well-known documents.  They weren't sitting on a shelf at Microsoft.  They were not sitting in some unmarked library somewhere.  They were being used.

So let's talk about UPNP-AV architecture.  You may recall this figure that we're looking at.  We're now on Slide 8.  This is Figure 3 from the UPNP-AV architecture spec.  It's the same -- I think we saw that in Aylus's slides a little bit ago.  You saw that in mine.  It's actually also in both Aylus's claim construction brief and in our brief.

People recognize that this is an important document. So let's break this down.  Some of this was covered before, so I won't spend a ton of time on it, but you have the media

38

server.  Again, that can be anything that has media on it. It could have a movie or a song.  We have some sample devices there.  It could be a DVR.  It could be a computer. It could be any number of things.

     Then you have the media renderer.  This is where we have our disagreement that we're not going to be addressing at the Markman itself.  But it is the device that is going to be allowing and then showing on itself the actual video content.

     Then we have the control point.  And that is the feature that negotiates content delivery between the MS and MR.  And again, MS is an abbreviation for media server, MRSD the abbreviation for media renderer.  Those same abbreviations are also used in the '412 patent.

     So in order for this to happen, the control point needs to communicate with the media server and media renderer. Now, under the architecture, these communications are happening using UPNP protocols.  You have a common language that's agreed to by people, so you know what the commands are going to be.  That's important to remember when we get to it later.

     But the even more important part is what happens next, is this -- this transfer that's actually happening, the content transfer between the media server and the media renderer, you will note that that's talking about an out-of-

39

bounds transfer.

Now, I'm not saying that the '412 patent claims are limited to what's on the slide, but the '412 patent discusses the transfer of content from the media server to the media renderer.  And that's what's depicted here.  It talks about other things too, but that's what's depicted here.

And you'll see here that under the UPNP-AV architecture, that the protocols that are used for doing this are not UPNP protocols.  I think on Wednesday we're going to have a hearing in front of your Honor about whether we're going to have a chance to file a reply brief, but one of the points that they make in their last set of briefs before the Court on this -- I won't stand here to argue Markman, but I'm just going to tell you why I'm talking about this -- is somehow limited to UPNP and UPNP protocols.  That's an incorrect statement.  We do not claim that at all.

As a matter of fact, we see here that you don't have to use UPNP protocols, and it's expected, in fact, that you're not.  But what do you need to do?  And this is really the $24 question in some respects, is you have to have the media server and the media renderer talking the same language.  They have to pick the protocol that they're both going to use, and they have to pick a data format that they both have to use.  And that's made clear in the architecture, and

we'll talk about that in a minute.

Here, what I'm showing you now, your Honor, is -- again, we have the actual site if you want to go back and look at this later, is we have the 10-step process that explains under UPNP how all of this occurs, how the whole identification of content and the transfer occurs.  And we have the page cite for that there.

And this is basically -- this is not something we typed in.  This is the PDF of these 10.  And I'm going to quickly go through these.  I'm not going to -- I'm going to take them on one at a time.  Because again, the invention is built on top of this.  I mean, to the extent there's differences, it's built on top of this solid framework.

So what do we have?  The first thing that happens is you have to discover the devices.  And your Honor asked a question of counsel about how that could happen, and it can really happen if you take it at a high level two different ways.  The CP, what's sometimes called pulling, it could pull all of the different devices that are hooked up to the network and determine which one of those are UPNP devices.  It's looking for UPNP devices.  Or an individual UPNP device can do something I think which counsel correctly referred to as announcing itself on the network.  One way or the other, this control point identifies which UPNP devices are on the network.

41

The second step identified by the architecture is identifying the content.  So in this case, we have a media server that's been identified, and it's been -- it's been decided that's the media server that it's going to look at. And here in this particular example that we use, there are four movies on this media server.  Of course in the real world, there's likely to be a lot more, but for this purpose, we have four.  You identify the content.

But is that all that's happened?  Let me go back. There we go.  So what happens in addition to the content in this step, the second step, is the important part that we talked about before, is the control point needs to identify what transport protocols are supported by that particular media server.

So if you've got a DVR, the piece of equipment you're talking about, and what data formats are supported.  A transport protocol, you can think of as -- an easy way is how I'm going to transport the content.  The data format is the actual way that the format is laid out in the device.

The third step we have in the media server -- I mean, you have -- you may be familiar with some of these.  An MP-3, MPEG-4, AVR are different formats that you can store media in.

So what happens next?  You have Step 3.  Remember what I said before, these two devices, the MS and the MR, are

42

going to be communicating with each other during this transfer process.  So the control point needs to look over at the media renderer and say, okay, what transport protocols do you support, and what data formats do you support.

So it's previously done that in Step 2 for the media server.  Now it's doing it for Step 3 for the media renderer.  And here comes the key point.  What the control point will do at this point in time is it will match.  It's going to play matchmaker here.  It's going to find a protocol that's common to both the media server and the media renderer, and it's going to find a format that's common to both of those, and it's going to select that for purposes of the transfer.

And the key thing here to remember is that if that doesn't happen, there's not going to be a transfer.  If there's not a successful match, there cannot be a transfer.  And that's recognized by the UPNP architecture.  And that's core to what's happening here, this negotiation that counsel referred to.

And not to hide the ball here, your Honor, counsel was referring to the negotiation.  I'm referring to the negotiation.  That's actually a disputed claim term, part of the disputed claim term.

THE COURT:  What is part of the disputed claim

43

term?

UNIDENTIFIED SPEAKER:  The full claim term is more than negotiation, but the word -- the full claim term is negotiate the media content between the MS and MR.

So I'm not meaning to be cute here.  I'm sure counsel wasn't either.  But when we're talking about the transfer of content between the media server and the media renderer, we're -- from Apple's standpoint, we're talking about this negotiation that we're talking about right here.

So let me move on.  So the fifth step identified in the spec is that the CP will tell the MS and MR that we're about to establish a connection.  Basically, the way I view it from a layman standpoint is, heads up, this is about to happen.

And then what will happen is, either the MS or the MR will return something called an instant ID.  You'll see that on the slide.  And that's basically something that is going to be used during the transfer to say, for this particular transfer between these two different devices, this is the ID that we're going to use as opposed to some other transfer, different devices later in time.

Then we select the desired content.  In this case, you have this URL that's highlighted in yellow in the middle of the page.  And the way this works is that you have HTTP, that's the protocol that was chosen in this matchmaking

44

operation we've talked about before.  On the right hand, we have MP-4.  That's the data format.  And in the middle, we actually have the content, which is the movie "Godzilla" at Example.com.  That's the content that's been chosen.

Step 7 is you start the transfer of the content from the --

THE COURT:  So this Step 6 assumes that the media server is -- is something that's part of URL.  There's a server out there on the internet.

UNIDENTIFIED SPEAKER:  Right.  It's going to recognize it.  That's exactly right.

THE COURT:  Not your local DVD player or your library.

UNIDENTIFIED SPEAKER:  It's not a VCR player, right.  That's fair to say.

So then you start the content transfer.  That's fairly self-explanatory.  I'm going to pause here for a second because UPNP is not just about the transfer of the content. It's what you can do to it when it's being transferred.

And your Honor, as you'll see when we do Markman, there are some claim terms that touch upon this.  Not the words I'm using here, but what happens is -- this is not something that was invented by Doctor Nakvi and his colleagues.  Here you can see that what can happen is, once the transfers happen and -- actually, let me go back because this has to

45

do with the controls as well.  I neglected to point this out.

On Slide 7, the way you start the transfer, is you literally hit the play button.  If you have a phone or a device, you hit the play button to start the transfer.

But once the transfer is happening and you're watching the movie, for example, in the example we've been using, you can adjust brightness with your control software, you can contrast, increase the volume and so forth.  So these are not some things that were invented or are subject to new inventions in the '412 patent.

Number 9 is basically not highly germane to this case, but it's basically saying that if you get bored in the middle of the movie and you want to launch another movie between the same media server and the same media renderer, you can shortcut the process and just send that URL, or you're done with the movie and you want to use something that's still on that same pairing, you can restart there.

Step 10, not surprisingly, is when you're done and you're done done, the control point will send a notice to the MS and the MR that we're done and it's over.

So that's the 10-step process.  And again, the reason that's important, your Honor, is this whole patent is built right on top of that.  It's using the same words.  You may recall that I showed you just a moment ago a page from their

46

brief where they say on page two of their opening claim construction brief, UPNP had three distinct logical entities, control point, media server and a media renderer, and they used the figure from the specification that I just showed you, the AV specification.

And as counsel said, people knew what these were.  So people knew what they were, and they knew what they were from this specification.

THE COURT:  What was the control point?  How was that controlled?  Where did that reside in?

UNIDENTIFIED SPEAKER:  Well, that could be -- as I said, it could be, for example, in a phone.  It could be in anything.  It could be in a lap -- you could use it as a laptop.  There's nothing specified.  It could be any kind of device.

THE COURT:  The impression I got was that in the -- sort of the prior art, that that control point was something that was part of Microsoft type software that resided on a computer or on some -- and that's different than something that resides on a handset that then communicates via -- and how does it communicate to the media server or media --

UNIDENTIFIED SPEAKER:  That's a fair question.  At the time that this was set up, I suppose the most common use case would be a computer.  That's true.  But there's nothing

47

about the specification that would exclude, for example, the most modern SmartPhone from being used.

It's any kind of intelligent device that would be able to support it.  Undoubtedly at the time, that most common use case was a computer.

THE COURT:  Is there an example of plug and play protocols which connect the control point to the media server and media renderer taking place over a wide area network?

UNIDENTIFIED SPEAKER:  The UPNP specification software -- I'll confer with my colleague -- doesn't talk about the network itself.  There were others, however, that took the UPNP specification and put it on a wide area network before Doctor Nakvi did, and that, for example, is the subject of our IPR.  Intel did that, for example.

Our lead reference in the IPR is the 102 reference that is a big Intel textbook that takes the UPNP, discusses it in detail and puts it into that file.

THE COURT:  And was there a product that --

UNIDENTIFIED SPEAKER:  I don't know.

UNIDENTIFIED SPEAKER:  Good afternoon, your Honor.

THE COURT:  Good afternoon.

UNIDENTIFIED SPEAKER:  I do not know specifically if there was a product associated with Intel textbook prior art.  The Intel textbook did have a CD with it that had

48

tools on it.  I'm not sure the Court would count that as a product or not.  Tools that a user can use to test UPNP and develop it.  Whether that's a product or not, I don't know.

UNIDENTIFIED SPEAKER:  Would you like me to proceed, your Honor?

THE COURT:  Yes.

UNIDENTIFIED SPEAKER:  So what I have here -- and this is more for your reference, your Honor.  You can call it almost a cheat sheet.  Again, we have the page cite to the specification.  This is at Slide 28.  There's a flow chart.  And it depicts exactly what we just went through.  I'll run through it very, very quickly, other than Step 1.  Step 1, as you may recall, is not part of the negotiation process.  It's discovering what devices are on the network.

And so here what we have is this flow chart.  You can see the media server on the left.  You can see the media renderer on the right.  So if there's communication between the control point and the media server, it will show up on the left-hand side.  If it's between the control point and the media renderer, it will show up on the right-hand side.

And very quickly, what the spreadsheet shows is exactly what we saw before, is that you have identification of the content and what transfer protocols and data formats are on the MS.  And the next step is you have the same information being obtained in terms of the protocol and the data format

from the MR.

Then you have this critical matching step in the middle where you have to match the protocol and the format. After that, you have the heads-up warning that this is coming and the instant ID being issued.

After that, you have the URI that's sent to -- which I think I mistakenly referred to earlier as the URL. That is the desired content as well as the transfer protocol and the data format.

Then you have the play command to start the transfer, followed by the --

THE COURT: Again, just -- what does CDS stand for? I'm on your Slide 28, right? Is that where you are?

UNIDENTIFIED SPEAKER: Yes.

THE COURT: So the first thing it says CDS, colon colon browser slash search. What is CDS again?

UNIDENTIFIED SPEAKER: CDS there stands for contents directory service, I believe. On the previous slides with the main figure, one of the services on the media server was named content directory, which was the service that informs the control point what content is available and also what protocols and data formats are available. And that service, I believe, is just referred to there as CDS.

As a matter of fact, your Honor, if -- you may have the

50

same questions.  And I won't put up two of these at the same time, but I will hold it up.  If you look at Figure 3, you can see content directory, connection manager, AV transport. And those boxes I'm looking at say Slide 15 right now.

THE COURT:  Slide 3?

UNIDENTIFIED SPEAKER:  Fifteen.  This is figure -- from Figure --

THE COURT:  Fifteen.

UNIDENTIFIED SPEAKER:  One five.

THE COURT:  Oh.

UNIDENTIFIED SPEAKER:  See those boxes in the media server content directory connection manager AV transport?

THE COURT:  So CM on the other side is connection manager?

UNIDENTIFIED SPEAKER:  Right.  On the flow chart. Then you'll see, right, CM.  And then you'll see below that, EVT.  That's the correspondence.

THE COURT:  AV transport is -- what is an AV transport?

UNIDENTIFIED SPEAKER:  That is a service that resides on both the media server and media renderer.  And that was in a vote in -- starting in Step 6.  That service receives the URI or URL from the control point that specifies the movie that you want to watch along with the

51

selected transfer protocol and the selected format.

An example of that is on Slide 22, where the control point was selecting the Godzilla movie over HTTP in the MP-4 format.  The AV transport service is the service that the control point uses to send that information to the media server.  And it also resides on the media renderer for additional functionality.

THE COURT:  So let me just -- I mean, is this -- this architecture, from what I can tell, looks like -- when I refer to my Roku at home or my Samsung DVD player that's internet-ready, it looks sort of like this.  Am I not right? How is that different from this?

UNIDENTIFIED SPEAKER:  I have to confess, I also don't know the details of how Roku works.  The functionality at a high level is similar certainly.  I don't know if those particular devices --

THE COURT:  Even your Comcast box at home, when you want to watch a movie, you know, you've probably done that or bought Pay Per View boxing or something.

UNIDENTIFIED SPEAKER:  I actually have an Apple TV, which is different.

THE COURT:  Oh, okay.  All right.  Well, I'm in the old generation, so --

UNIDENTIFIED SPEAKER:  Yes.  Yes.  But the overall concept is the same, yes.  It's certainly very similar.  I'm

not sure the underlying guts use UPNP and therefore use the steps that we're discussing here, but the overall concept is very similar.

THE COURT:  Okay.  All right.

UNIDENTIFIED SPEAKER:  So we were just finishing up.  Again, this is more for your reference later, your Honor.  If you'd like the cheat sheet here, we have it.  So again, I'm going to leave UPNP behind us right now, but the take-away that we'd like you to have from this is that this is a well-established, well-documented specification.  It was something that the patent built upon and that one reading the patent would have knowledge of this and would understand the terms, in light of this technology that we've been discussing.

So the next term is "proxies."  This is --

THE COURT:  Let me ask, is UPNP largely a -- the gist of it a set of conventions and a form by which devices can communicate with each other with a given protocol that everybody sort of agrees to?  I mean, is that --

UNIDENTIFIED SPEAKER:  Well, yes and no.  This goes back to what I was saying before is -- let me roll back to the figure that we were talking about a minute ago, is there are some common -- I apologize.  This is a little slow.  So -- excuse me, your Honor.  Just a minute.  The right figure.  I'm looking for the annotated Figure 3.  Here

we go.

So as I mentioned before, in the top half of this figure, when the control point is speaking with the media server and the media renderer, it's using UPNP protocol. And that's that common language. And you go to the specification to find that.

But the actual transfer that's happening -- and this is really what's at issue for Markman that we're going to be talking about. The transfer between the media server and the media renderer, the protocols that are used for that, those are just industry protocols. They're not UPNP-specified. They're not UPNP-specific.

And what UPNP says is that the control point engages in an activity where they have to be matched. You could have any set of protocols, but they have to be matching.

So the example that we gave before, roll back down, is here on Slide 19, there are multiple transport protocols that are being used on each side. There are multiple data formats. Those are not UPNP protocols. Those are not UPNP formats. Those are industry formats, but they have to be met.

THE COURT: And what UPNP does is sort of ensure they're matched by communicating with a common protocol to the MR and the MS and ensuring that they do match before the transfer -- transport function --

54

UNIDENTIFIED SPEAKER:  I think that's a correct statement.

THE COURT:  Okay.  All right.

UNIDENTIFIED SPEAKER:  So one of the things that's going to be discussed during the Markman is a claim term that involves proxy.  I'm not going to talk about the claim construction issue itself right now.  I'm just going to -- that's not the point of what we're doing here today.

But it is important to understand generally what proxies were at the time.  And what we have here, your Honor, is -- this is one -- the only place I'll be talking about the prosecution file this week, but I think it's informative -- is what you see on the screen here for this particular slide is a definition from Dictionary.com.  And if you're familiar with Dictionary.com, you can look that up, and it will pull up for you a whole slew of different definitions for a given term.

And this particular Dictionary.com definition for "proxy" was used by the examiner during the prosecution of the '753 patent.  The '753 patent was what the '412 patent was before it went to reissue.  They had a patent.  They sent it back into the Patent Office to change the claims, and it came out as the '412 reissued patent.

During the initial prosecution, an issue came up during prosecution.  There was some prior art.  There was some

55

discussion.  And the examiner went and used this definition of "proxy networking."  The applicant never disputed it. And as you can see -- and this is just to show what one of skill in the art, which the examiner would be deemed to be, at the time would understand a proxy to be.

And it says, "A process that accepts requests for some service and passes them on to the real server."  And the example that's used in this definition is a web proxy that allows multiple clients inside an organization to access the internet through a single secured or shared connection.

So the next slide, although it's entitled "Proxy," shows no proxy.  This is actually the absence of a proxy. You have individual clients, which could be computers, like a laptop, for example, communicating directly with the internet, the internet being a collection of servers.  And it's making requests and receiving responses directly.

But the next slide shows the use of a web proxy server. And what that does -- and if you think about it, an office place, for example, it's very common where you have a bunch of folks sitting at their various desks or cubicles or whatnot, but they're all being routed through a proxy server.  That may be the case here in the court, for example.

And that proxy server in the example that we have here on the screen is used to maybe have anti-virus software on

56

it.  So that before anything can come in or go out, it's going to be screened and perhaps quarantined.  But it's not limited to that.

You could have, for example -- another simple use case would be if you had restrictions on who -- what websites the users in your company can visit.  You do that with a proxy server.  Or if you wanted to ensure that you had an accurate collection of information and you wanted to track all the messages that were coming into the company and all the messages that were coming out, you could do that on a proxy server.

The main point of the proxy server is it's a centralized location where you can manage communications that are coming inside and outside the company.  And that is a proxy in the context of a computer system.

I want to very quickly talk about IP multi-media sub-systems, IMS.  This is a complex topic.  I am going to be skating at the very top of it because I think -- hopefully, this is all you're going to need to know for purposes of the Markman hearing.

I should also say -- and I believe counsel mentioned this as well -- is that a substantial portion of the patent is devoted to specification of the claims.  The specification is devoted to talking about IMS.  So that's another source for you to look, if you're interested in

57

looking at this some more.

So IMS is an architecture that was developed for delivering multi-media content using IP, internet protocol. Now, the primary goal of this was so that a user of a cell phone or a Smart device could download media -- multi-media content to that.

And so for example, AT&T or Verizon, they have these cellular networks, and they wanted to find a good way allowing you to download content like a movie or something to your phone.

The reason that something like IMS was necessary is because while IP, internet protocol, is used for many networks, cellular networks don't use IP.  They're set up with a different structure.

And so IMS was developed as a way to basically bridge or marry the two so that they could sit on top of each other.  I'm using really layman's terms here, but married, brought together so that they'd get used in combination so that you could use internet protocol in connection or in the context of a cellular network.

Now, what we're looking at here --

THE COURT:  Maybe you should get to even more basic level.  What is an internet protocol?

UNIDENTIFIED SPEAKER:  It's the set of protocols that are used to communicate over a network.  The most

common example of that is the internet, but it doesn't have to be the internet.  It could be any kind of data network that you might have, for example, here in the court.  Just a basic -- it's basic protocols used for that kind of communication.

What we have here -- and I'm sorry.  The take-away from that is, the one thing to remember is that the cellular network is not using that.  That's what necessitated the need for having something like IMS.  Because the rest of the world is using IP for data network transfers.  It's not cellular.

What we're looking at here is Figure 1.  This is actually Figure 1 of the '412 patent.  And this again just touches upon very -- at a high level, the complexity of the architecture.  And kind of a take-away point for your Honor is that you can divide this architecture into three parts, really, an application layer -- and that would have the servers on it that would include the servers that would have the content.  So if you had a movie on a server, that would be on the application or part of the application of this architecture.

You have a control layer.  That would include, for example, AT&T's servers.  And you have the transport layer, which would include the user equipment, which would include the phone as well as in a cellular network, the cell

stations that the phone is connected to.

And the other thing that we'll be probably talking about at Markman some is that IMS uses something called session initiation protocols to deliver content, to establish. And it's SIP. And I'm going to show you that in a minute.

It's not really important right now how that works or the details of that. It's just a flag that IMS uses something called the session initiation protocol.

THE COURT: Is that delivery over a cellular network or over the internet?

UNIDENTIFIED SPEAKER: Well, we'll see that. I'll show you right now a little bit of that. This is back to Figure 1. And I'm going to break this down into two parts. The second part will answer your question, I believe. So this is Figure 1 from the '412 patent. You can see the AS. Those are the application servers.

And this is that top -- top of the three that we talked about before. It's the application layer. The middle is the control layer. And you can see that there's these things that we've highlighted as CS -- I'm sorry -- CSCF. Those are something called call state control forms. So the details of that are not important, but that's where the control functionality is happening in that layer.

And then you have the UE, which is the user equipment,

60

which would be the cell down at the bottom.

But the part that's not highlighted really goes to your question, your Honor, is if you were to look at this, you'll see -- and maybe we should have highlighted this, but you can start right under third-party AS.  Do you see in the upper right-hand corner?

THE COURT:  Yeah.

UNIDENTIFIED SPEAKER:  You can see that there's an SIP there.  And then if you were to go down right below that first layer, there's a bottom line, ISC SIP.  And then you go within that control layer, and you'll see there's at least a half a dozen SIPs there.  And then down below, you'll see SIP down in the transport layer.

And what that's indicating is that across these different aspects, you're using the SIP, the control, right?  And to further answer your question, if you look at the next slide that we have, you can see that you can use different networks within IMS.

And down below, you have -- you can use a PSTN, which is the public switch telephone network.  You can use a CS network, which is a circuit switch network.  In the middle you can use IP or an IMS network.

Whatever one of those networks you're using, though, you're still using the SIP.  That's something that's common throughout.

61

THE COURT: Remind what SIP is again. I mean, I know it's session initiation protocol, but what does that mean?

UNIDENTIFIED SPEAKER: It's the -- it's the way you -- it's a control signal. That's the way I would -- it's a control signal. It controls the different steps that have to happen for all of these things.

THE COURT: And is this transmitted -- over what network? I mean, is it --

UNIDENTIFIED SPEAKER: That's an excellent question, your Honor. If you go back to Slide 48, you'll see that SIP is crossing all through these different kinds of networks. It doesn't matter if the bottom one is a public switch telephone network or a CS network. You're still using SIP. The middle one can be an IP network or an IMS network. It doesn't matter. You're still using SIP. So it's not bound to a particular network.

THE COURT: In practical real world terms, this is something that is used whether it's over a cellular network or over an internet wide area network?

UNIDENTIFIED SPEAKER: That's correct, your Honor. And that is something we're going to be addressing in more detail in the context of one of the claim construction disputes later.

The last thing I want to talk about is networks, your

Honor.  And there's only three slides, and this should take just a few seconds.  Because there's only really one point I want to make about this.

The first slide I have here is Slide 50, and it says "Wide area networks are typically large."  "Wide area network" is one of the claim terms that's in dispute, so I'm not going to go into what the parties' constructions are, but I think it's fair to say that both parties agree that they're typically large.

An example of a wide area network, probably the widest area network would be the internet.  Kind of looking at the next -- kind of the far side of that is a LAN or a local area network.  And these are typically small, and you would find them in your home.  You could set up one in your home or you might have one in your office.

The only point we want to leave you with, though, is the next point, your Honor, is if you have a network, it's not either a wide area network or a local area network. That is not the universe of the networks.

You could have a metropolitan network, for example.  My understanding is that Google at some point set up a WiFi network for the City of Mountain View.  That would be an example of a metropolitan network.  It's not a local area network, it's not a wide area network.

Or you could have a regional area network.  An example

of that is the IEEE has developed specifications for a wireless regional area network that would cover more ground than say the City of Mountain View or, for example, a hypothetical, the bay area or some portion of it.  But not that.

The take-away here, though, is all networks are not either wide area networks or local area networks.  And again, this is one of these things where I wish I could start arguing the claim construction, but I realize this is not the time to do it.  But that's one of the facts that we wanted to leave you with.

And unless my colleague has anything else -- and the answer is no -- then I think that ends my presentation.

THE COURT:  All right.

UNIDENTIFIED SPEAKER:  Does your Honor have any questions?

THE COURT:  Not at this point.  I would like to invite counsel, if you have any just -- I wouldn't call it rebuttal, but I guess it sort of is rebuttal, but --

MR. THAKUR:  Absolutely.  And I want to be clear. I came here not to argue claim construction.  I wanted to give you a base of the technology, how it works and what the beauty of the user experience is.

Apple is the largest corporation in the world, lots of counsel, very competent presentation.  I'm not going to

64

disagree with what they've done. And I also recognize what a defendant's job is. A defendant's counsel is to be an advocate, to look into the patent and see what's the best arguments they can come up with.

So this is the best they've come up with, and I don't dispute their judgment on that. But I do think it's important that you understand that what they are in each one of these claim terms that Apple is doing in terms of technologically. We do think that the technology is being slightly misrepresented.

So I will only talk today about what we disagree on on the technology. I will be careful not to get into the claim terms.

So the first presentation they gave us today was about UPNP. And they said, our patent is the next of UPNP. My point is, there are other technologies out there. For the first time today, they themselves recognize Intel had at least a conceptual writing about other technologies in architecture. And they talk about Doctor Nakvi aware of the architecture.

Our point is, your Honor, rather than fighting about what is not a disagreement, let's just accept the architecture. And we accept the UPNP architecture. What that does not mean is that the only way our patent will operate, it will take every single element of the UPNP

65

architecture.

So we don't want to somehow get jammed into saying that's all we do.  And you heard about the word "technology negotiate."  Our patent makes no mention of UPNP negotiation.  We've got detailed disclosure in Figures 15, 16, 17 about our negotiation.

So our point number one is, we don't use UPNP for the negotiation element.  And so it's not as though we -- the only way you would operate would be the UPNP art specification, and that's what our patent is.  That's not the case.

So our point technologically is, UPNP negotiation is not what we got.  It was -- UPNP to us was about device recognition and communication.

Number two, I think even if somehow this whole extrinsic world of UPNP was incorporated and said we had to operate the UPNP way, to be perfectly clear, what they're saying is, there's two elements, which is the transfer protocol and the data format have to be negotiated.

Commonsensically, your Honor, if Microsoft is providing the movie and Microsoft is providing the renderer, they can prenegotiate.  So the question isn't that there isn't an agreement of data format.  In the UPNP world, the people with unrelated providers provide new devices.  There's a Sony television -- Sony movie communicating with an Apple --

66

a Samsung television.  So they have to talk about what language.

But if I am providing both the television and the server, we can preagree if you have a priority agreement. So what -- just the dispute, just so you understand -- crystallizing the dispute.  I won't argue the dispute. Crystallizing their dispute is, if we were to do it only UPNP, we would have to do it -- we would have to have this negotiation, and this -- the things we negotiated preagreement can't be brought into the negotiation.

Because one of the things, if you and I already agree to negotiate in English, then we don't have to rediscuss that.  So what I'm saying is, in a proprietary system where I make both the media server and the media renderer, I can preagree to a data format.

And if I agree to the data format, in my negotiation step, I don't have to renegotiate the data format.  And -- that -- this is the only point I'll make from the brief. That is in the UPNP specification unambiguously.  And it uses the words UPNP literature explains the scenario exists in which UPNP components may interact with each other using either the standard UPNP control protocol -- these are the protocols that come back -- and then the most important -- or using some private communication method.  This is in the spec of UPNP.

The point is, if you and I preagree to the data format, we don't have to negotiate it again.  But that's just the technological dispute.  We'll save the disagreement and discussion for later on, unless the Court has some more questions on that.

So I'll then move to the next one.  Your Honor, the priority one is well briefed, so I don't think technologically we have much more of a disagreement on that issue.

The third one is the IMS network.  Frankly, I -- it's actually not as complicated on a technological level as counsel made it seem.  So let me explain that because I actually thought this Court grasped it right on point.

When you are in a packet-based network only, when I am dealing in a purely internet format and the cellular world is not involved, I am in a packet-based communication, I don't need an artificial piece of software that will make -- which is IMS.  So IMS is a piece of software that carriers put on their system so that all your communications appear to be packet, even though it's circuit-switched or not.

But if I'm in a pure packet-based network, which is the prior art, I don't have to be in IMS.  Of course the patent discloses a lot of the IMS because that's the new concept, right?  The new technology.  If I have A that exists and B that's coming on new, I explain how the VU would work.  But

68

technologically, nonIMS networks are packet-based networks.

We explain -- and this goes into the prosecution history. It made it unambiguously clear to the Patent Office, we are not limited to IMS network. And let me be absolutely clear. I'm going to give you a real world example technologically. This is my phone. I'm going to go into my phone. I'm going to go into settings. I'm going to turn on airplane mode. My phone is no longer on a cellular network.

So if I had WiFi access, which I do not, I would be able to do -- be operating in a pure packet-based network, no IMS network. And I can do what -- the movies I wanted, I can do all the things I showed you I wanted to do in airplane mode. And that is --

THE COURT: IMS -- IMS applies to cellular-based networking?

MR. THAKUR: It applies -- what happens is, phone companies, Verizon, they have cellular systems and they have IP data networks. But they need to combine the two networks. So they combine it, but inserting an IMS layer on top of it.

And our -- through the prosecution history, like I said, we told them, wait, this is not a requirement of our patent. So you cannot have disclaimed it any more clearly than by actually having a negotiation with the Patent Office

69

on this issue.

And your Honor, I did not follow the distinction between the wide area networks and the local area networks and its relevance, so I have nothing to add to that one.

If this Court doesn't have any more questions, that's all I have.

THE COURT:  Not at this point.  I'll have some before we leave.

MR. THAKUR:  Of course.

THE COURT:  All right.  With that being said, let me address, perhaps somewhat prematurely, but the motion that you have on -- I know you didn't come here to argue this motion, but let me tell you where I stand on that. That may obviate things with respect to the various motions to strike.

It seems to me that certainly not the spirit and I think not the letter of the disclosure process was complied with by Apple.  I mean, I understand the argument that, well, you could sort of figure it out when you look through the reference and why might be called upon, et cetera, et cetera, but frankly, the whole purpose of the disclosure process is to make things express and to limit, you know, guessing games and hunting around.

So I don't look very favorably on sort of very subtle disclosures.  And it seems to me, though, the cure for that

70

in this context is not to strike, but to allow the reply. And I'm in favor of just letting it all come in at this point, to put it simply and bluntly, rather than getting into striking and this and that.

I mean, you filed your stuff, and I think -- if it comes in, I think it is a fair response to allow some response.

MR. THAKUR:  Your Honor, actually, I -- if you would be courteous enough to allow us to argue the motion now, I'm happy to do so and reach a decision because you're saving two days -- staying two days in San Francisco.

But let me address actually your substantive comment. We didn't file this motion.  Okay.  Let me tell you exactly how this process went down.  The way this process went down was, they first -- we had a disagreement about the Local Rule on whether -- how the PLR briefing -- the briefing should have taken place, what should have been included and what should not have been included.

We read the Local Rule a certain way, and they read the Local Rule a different way.  When they called me up and said, we read this differently, we want a reply, we said, we'll make you whole.  And that's the motion for a surreply. Which frankly is unnecessary because this Court has already said, you will listen however long it takes to get the claim construction right.  But essentially, we agreed to make them

whole.

Then secondly, they went back and filed a motion to strike against our expert report, our expert, which was a rebuttal to their expert. And what I think happened -- I'll tell you exactly what I think happened. There was a team on their side that's substantive, and there's a team on their side that's procedural. The procedural team was burying us with motions.

I will tell you over the last week, I have gone to bed at 11:00 o'clock, missed my kids' PTA conference because I had to work on these motions and reply to this tutorial. So if that was their goal, they succeeded.

So now, why am I not getting the remedy that I should be entitled to under their own representation? They said the disclosures should be complete. If a name is not disclosed, that should be given. And that's the remedy we're asking for.

Having said that, I understand what this Court is saying, and you're absolutely right. If all these motions are pending, come off the table, we show up at claim construction without further issues, we'll withdraw our motion.

UNIDENTIFIED SPEAKER: Your Honor, if I may respond to that.

THE COURT: Yeah.

72

UNIDENTIFIED SPEAKER:  While I do -- I'm sorry that he had to miss certain of his kids' events.  These are all driven by the way that Aylus decided to structure its claim construction briefing, which is not at all the way the Local Rules are --

THE COURT:  It was not ideal.  And that's not the way I normally see things.  I agree with you on that.  But if we're going to move forward and everybody has had a chance now to respond substantively, why don't we just move forward and get to the merits of this thing in claim construction.

UNIDENTIFIED SPEAKER:  And so, your Honor, if we're entitled to have the supplemental reply claim construction brief and all the other motions go off the table, we would be okay with that.

THE COURT:  So the last -- so you feel to complete the circle and to eliminate any prejudice, you want a reply -- I thought it was their -- now I'm confused too. Whose failure -- who first -- so you briefed your claim construction terms that they didn't address?

UNIDENTIFIED SPEAKER:  Your Honor, so Aylus first filed its opening claim construction brief only addressing the Aylus designated claim terms.  We then filed our responsive claim construction brief addressing both the Aylus designated claim terms and the Apple designated claim

terms.

THE COURT:  Right.

UNIDENTIFIED SPEAKER:  And then Aylus filed their reply brief only addressing the Apple designated claim terms.

And so what we've not had an opportunity to do is to respond to their arguments on the Apple designated claim terms.  And had they done it the proper way, we would have that opportunity, and the Court also would have had the benefit of our position before even going into the Markman hearing.

THE COURT:  All right.

UNIDENTIFIED SPEAKER:  I'm sorry.  And then after that, what led to the other briefing is they then submitted the declaration of Doctor Wigdor (phonetic).  And this is one where there was absolutely no notification at all in the patent Local Rule 4-3 disclosure.  They don't -- they don't dispute that.  They agree that there was no disclosure of Doctor Wigdor.  They say, as Mr. Thakur does now, that it was in response to our, quote, unquote, improperly submitted declarations.

THE COURT:  Right.

UNIDENTIFIED SPEAKER:  Your Honor, if I could -- I don't know if you want me to get into argument.

THE COURT:  I'd rather not go over that ground.

UNIDENTIFIED SPEAKER:  Okay.

THE COURT:  I think the only question at this point is whether Apple should be allowed to file a, quote, reply brief or supplemental responsive brief.  And what's wrong with that?

MR. THAKUR:  Your Honor, what we offered them -- when they first came to us with that issue, I said, look, if we had done -- for argument purposes, we will read the rule the way you read it.  We read the rule differently, and maybe we're wrong.  Okay.  We'll concede -- let's read the rule your way.  Let's not burden the Court.  That's my exact language.  Not burden the Court.  Let's read the rule your way.

If we read the rule their way, we would have briefed our five terms, and we would have briefed our alternative constructions for the Apple items.  They would have gotten a chance to respond to the Apple construction, the alternative constructions, and we would have also gotten a reply brief to rebut their construction arguments against our terms.

THE COURT:  Right.

MR. THAKUR:  So what I said was, let's just make you whole.  Obviously, we have to ask the permission of the Court.  You get a chance to rebut our alternative proposed construction.  That's your limited reply brief.  You get the last word on that.  We get our five terms to rebut your last

proposal, making you whole.  Let me finish.

Their argument was, absolutely not.  Our brief must be unlimited in scope.  We will actually argue entirely -- basically, they wanted the last word on their five terms, which they would not have gotten, except to argue against -- my point is, they would have reargued their initial terms.

Number two, they went so far as to say, absolutely not. Aylus should get no extra briefing whatsoever.  We are the only one who gets briefing, and we get unlimited briefing in scope.  That's not a fair negotiation.

UNIDENTIFIED SPEAKER:  So if I could address that, your Honor.  So as to their, quote, unquote, compromised positions, Aylus had an opportunity in their reply claim construction brief to address our arguments on the Aylus designated claim terms.  They have that opportunity.  The way they structured it, they had that opportunity, and they chose not to.  That was a decision that they made.

Apple, on the other hand, we did not have that opportunity.  There was nowhere in anywhere of the claim construction briefing process, as it was improperly set up from the get-go by Aylus, for us to even address Aylus's arguments as to the Apple designated claim terms.

So now for Aylus to come in and say, okay, Apple, we'll make you whole, we also -- and whole, you know, what they're asking -- what they're willing to give us is what we should

76

have been entitled to anyway.  Being that they're saying, we'll make you whole, but only if we now also get an opportunity to address and reply to your arguments on the Aylus designated claim terms, even though they could have --

THE COURT:  Right.  No.  I understand that.  And the Local Rules contemplate the opportunity to file a reply. You have the opportunity to file a reply.  It's up to you whether you want to reply with respect to Aylus terms or not.

But Apple has not had a chance, because it wasn't included in the first round, if things got out of kilter, to certainly extend.  And so consistent with Local -- Patent Local Rule 4-5(c), it seems to me that Apple, if they want, should have the right to exercise their opportunity to comment via reply on its terms.  Not any more on Aylus's terms.  You've already had your shot on that.  And that's what I'm going to allow.

So tell me when you're going to file that by.  Soon. when is the hearing?  When is the claim construction hearing?

UNIDENTIFIED SPEAKER:  November 10th.  October.

THE COURT:  The 27th, correct.  All right.  So that's two weeks before the claim construction hearing.

UNIDENTIFIED SPEAKER:  Your Honor, obviously, the Court (indiscernible).

THE COURT:  I'd like that on Friday, by Friday. Just make sure we've got enough time, given the complexity of these issues.  And meanwhile, to the extent there are motions to strike, I'm going to deny those and allow the filing of the various -- the two declarations here.

There has been a withdrawal of some exhibits, and that's -- right?

UNIDENTIFIED SPEAKER:  Apple has agreed to withdraw four of the exhibits that were at issue on Aylus --

THE COURT:  All right.  So that stands.  But the declarations of Mr. -- or Doctor Wigdor and Doctor or Mr. Ku (phonetic) will remain.

MR. THAKUR:  Your Honor, we didn't want to file this motion.  We were happy with Mr. Ku's arguments.

THE COURT:  All right.  Well, good.  Let's take it on the merits.

MR. THAKUR:  We've got another pending issue. We've got another motion that's before the claim construction hearing, even though this Court said it was not inclined to grant a stay prior to the -- we had to brief that.  In the course of last week, your Honor, we had to brief that as well.

And yet here we are, and there's another motion that we have to appear for before this Court.  I would plead to this Court to address that motion as well.

78

THE COURT:  All right.  Is it stayed because of the IPR petition?

UNIDENTIFIED SPEAKER:  It is, your Honor.  And our reply to that is due tomorrow with the court.

THE COURT:  And when is the PTAB supposed to rule on the petition?

UNIDENTIFIED SPEAKER:  In March of 2015.

THE COURT:  All right.  Well, I'm going to -- you can file your reply brief.  I will take it under submission. I don't need to hear argument unless I set argument.  I think my views on this have now been stated in probably a third or fourth case, and that is I am skeptical of any complete stay prior to a clear intent on the part of the PTAB to take any action on an IPR petition.

I have made some adjustments in some cases where scheduling is such that, well, we can do some things now and let's defer the whole chunk of claim construction, if it only means waiting another 30 days or 60 days.  I mean, I sort of take a practical approach.  And here the practical approach is that you brief this thing ready to go.

And to now pull the plug on that -- you know, if claim construction were off three more months from now, I might say, well, let's wait another month.  Let's hold our horses and save some resources and see what happens.  Because frankly, like most judges around here, if a petition is

granted, I'm assuming in part, I think you're going to see a lot of stays around here.

But until that happens, I don't operate under any presumption at all and look at it as a practical way.  But given how far along we are in the process, and we're on the eve of claim construction, haven't gone through the tutorial, you've briefed it, you've now hired your experts, you know, it's water under the bridge.

But if you want to file your brief, I will take it and deem it taken under submission and rule.  But that -- just to be transparent, that's how I see the stay issue.

MR. THAKUR:  Your Honor, you had oral arguments scheduled on that.  I assume what you're doing is --

THE COURT:  I'm going to vacates that, unless I call you up and say, you know, this is something complicated enough, I do want to hear.  But right now, I don't think I need it.  All right.

MR. THAKUR:  Thank you, your Honor.

UNIDENTIFIED SPEAKER:  Thank you, your Honor.

THE COURT:  All right.  So I'll probably -- well, unless I issue the stay, I'll see you at the claim construction.  Thank you.

UNIDENTIFIED SPEAKER:  Your Honor, I'm sorry.  The supplemental claim construction brief that we'll be filing on Friday, is it a 10-page limit as requested in the papers?

80

THE COURT:  Yes.

UNIDENTIFIED SPEAKER:  Thank you, your Honor.

(Proceedings adjourned at 4:16 p.m.)

*Echo Reporting, Inc.*

81

CERTIFICATE OF TRANSCRIBER


I certify that the foregoing is a true and correct transcript, to the best of my ability, of the above pages of the official electronic sound recording provided to me by the U.S. District Court, Northern District of California, of the proceedings taken on the date and time previously stated in the above matter.

I further certify that I am neither counsel for, related to, nor employed by any of the parties to the action in which this hearing was taken; and, further, that I am not financially nor otherwise interested in the outcome of the action.

Echo Reporting, Inc., Transcriber

Tuesday, October 28, 2014

*Echo Reporting, Inc.*