**Pages 1 –  149**

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

BEFORE THE HONORABLE EDWARD M. CHEN, JUDGE

AYLUS NETWORKS, INC.,                )
                                     )
           Plaintiff,                )
                                     )
  VS.                                ) NO. C 13–04700 EMC
                                     )
APPLE, INC.,                         )
                                     )  San Francisco, California
           Defendant,                )  Friday
                                     )  November 21, 2014
_____)  1:11 p.m.

TRANSCRIPT OF PROCEEDINGS

APPEARANCES:

For Plaintiff:          QUINN EMANUEL URQUHART & SULLIVAN, LLP
                        865 South Figueroa Street
                        Tenth Floor
                        Los Angeles, California  90017
                    BY: AMAR L. THAKUR, ESQ.
                        VINCENT M. POLLMEIER, ESQ.
                        and
                        QUINN EMANUEL URQUHART & SULLIVAN, LLP
                        3824 Sacramento Street
                        San Francisco, California  94303
                    BY: WILLIAM OWEN COOPER, ESQ.


Reported by:            BELLE BALL, CSR #8785, RDR, CRR
                        Official Reporter, U.S. District Court


(Appearances continued, next page)

APPEARANCES, CONTINUED:

For Defendant:          DLA PIPER, LLC
                        2000 University Avenue
                        East Palo Alto, California  94303
                 BY:    ERIK R. FUEHRER, ESQ
                        MARK FOWLER, ESQ.
                        CHRISTINA KERBA CORBETT, ESQ.
                        ROBERT BUERGI, ESQ.
                        JONATHAN H. HICKS, ESQ.

Also Present:           SHAMIM NAQVI, Ph.D.
                        DANIEL J. WIGDOR, Ph.D.
                        KIM MOORE, ESQ.

**FRIDAY, NOVEMBER 21, 2014**                                    **1:11 P.M.**

**P R O C E E D I N G S**

**THE CLERK:**  Calling Civil Case be No. 13-4700, Aylus Networks Inc. versus Apple, Inc.  Counsel, please come to the podium and state your appearances for the Record.

**MR. THAKUR:**  Amar Thakur, for Aylus Networks. Joining me today are my colleagues Will Cooper, Vince Pollmeier, and our expert Dan Wigdor.  Also present in the courtroom is Dr. Shamim Naqvi.

**THE COURT:**  All right, thank you.  Mister --

**MR. FOWLER:**  Good afternoon, Your Honor.  Mark Fowler, DLA Piper, for Apple.  And with me at counsel table today are my colleagues Christine Corbett and Robert Buergi. From Apple, in-house counsel Kim Moore.  And Jon Hicks, at the end of the table.

**THE COURT:**  Great.  Thank you.  Welcome, everyone.

All right.  I see I have a presentation here.  What I would like to do is go claim by claim.

And I don't know if you have a preferred sequence, but I have my own sequence here.

(Document handed up to the Court)

**THE COURT:**  All right.  I'll add this to the pile. And unless you have reason otherwise, I would like to hear your respective views on each of these terms, starting with "handset."

Belle Ball, CSR #8785, CRR, RDR
Official Reporter - U.S. District Court
(415) 373-2529

**MR. FOWLER:** Very well, Your Honor. I'm going to be -- with your permission, Your Honor, I'm going to be splitting the duties today with Mr. Buergi. He's going to be handling the "handset" term.

**THE COURT:** Okay.

**MR. THAKUR:** Your Honor, the "handset" was a Plaintiff term.

**THE COURT:** Yes.

**MR. THAKUR:** I will start with "handset."

**THE COURT:** Yes.

**MR. THAKUR:** Your Honor, we actually brought -- put together a PowerPoint presentation that will help walk through our arguments.

We will -- certainly, we can stop at any point if you prefer to have questions.

**THE COURT:** Okay.

**MR. THAKUR:** But can we start with that?

(Documents displayed)

**MR. THAKUR:** And we have "handset" at the very end, so I apologize.

**THE COURT:** That's why I asked.

**MR. THAKUR:** There we go.

(Document displayed)

**MR. THAKUR:** Your Honor, before you is the -- the claim term that's being interpreted and the various

constructions that the parties have proposed.

Of certain note is the fact that Apple, itself, has adopted our construction in its IPR to the PTO.  So at a minimum, it's conceded that our construction is a reasonable construction.

So the issues before the Court is under our construction, what we're providing is:

"a wireless handheld...device that supports radio access technology."

And our point through all the of the construction hearing today is that the right place to decide that question should be based on the intrinsic evidence, which is the specification.

(Document displayed)

MR. THAKUR:  So, what is our issue with their two constructions?

The first issue is they say it must be a mobile phone capable of making and receiving calls over the PSTN.

The patent never limits the invention to a phone.  And the actual capability of making a phone is truly irrelevant to the invention.  So, a requirement is being inserted into the claim that would be absolutely irrelevant.

(Document displayed)

MR. THAKUR:  As I said, the patent, itself, expressly discloses our proposed construction.  It says that the

specification expressly allows for the use of radio access technologies like wifi and GSM and CDMA. And as we will talk a little bit later in the case, those functionalities must be invoked. Those are essential to provide access -- the device access to the system.

The ability to make a phone call is irrelevant to providing the system access to the invention.

(Document displayed)

**MR. THAKUR:** But Apple says it must be the phone. And that evidence is basically marshaled in two categories.

The first is, there is one line in the patent where it says (As read):

"...the handsets are no longer used only to make and receive phone calls."

And the second piece of evidence they present is a declaration of their expert, saying, "I'm a person of ordinary skill in the art. And if I had read the word 'handset,' I would have understood it to mean a mobile cell phone."

Your Honor, the first sentence, the patent itself says the handsets are no longer used to make and receive telephone calls. The point we are making is the inventor came to this technology from a telephone cellular background, to say, "I'm going to develop a commercial architecture for delivery of media content."

So, he knows how to say "mobile phones," and he knows how

to say "handsets."  He chooses the word "handset" carefully, and describes within the patent what its capability is.

And the second argument that a person -- an expert would know that we're not referring to a handset is -- I'm referring to mobile phone, that also is inconsistent with the facts of 2004.

In 2004, Dr. Naqvi was looking at the smartphones and PDA, saying, this is going to be become the center of the universe.

I'm going to grab something real quick.

In 2004, the single largest maker of handsets for smartphones was Palm (Indicating).  BlackBerry was number two. And there were others, but that was the world they dominated.

Your Honor, this handset (Indicating) is a wifi-enabled device that I could have used to access -- to implement this invention.  And what they're saying is that a person of ordinary skill in the art would say the number-one device company in the market, Palm, and their devices, should be ignored altogether.

**THE COURT:**  Well, it operates as a cell phone, too; does it not?

**MR. THAKUR:**  It does not.  This is a PDA.  It's a wifi-enabled device for e-mail --

**THE COURT:**  I am thinking about the other generation, where you could place calls.

**MR. THAKUR:**  I'm not disagreeing that they could.  My

point is:  In the marketplace of 2004, the largest maker made a device that was -- that was not capable of making the phone call, and would have implemented this invention.

And so, the idea that a person of ordinary skill in the art would only think of a cell phone is inconsistent with this reality.

(Document displayed)

MR. THAKUR:  Your Honor, in summary, as we have said, the right place to go for this determination is the patent. And the patent tells you about functionalities that the device must have to implement the invention, which is wifi and cellular capability.

It does not require the ability to make a phone call.

THE COURT:  Okay.

MR. THAKUR:  Your Honor, that is our argument.

THE COURT:  All right.  Thank you.

MR. BUERGI:  Good afternoon, Your Honor.  Robert Buergi for DLA Piper on behalf of Apple.

THE COURT:  All right.  Good afternoon.

MR. BUERGI:  Can we switch to our slides, please?

(Documents displayed)

MR. BUERGI:  Your Honor, Slide 65 shows the parties' construction of "handset."  Apple's construction is based on the plain meaning of the term and specification.

Now, Aylus' counsel held up a Palm, but that's a bit of a

red herring because the dispute here between the parties' constructions is whether an iPad is a handset.  That is, the iPad tablets.  I'm sure the Court has seen them.

The dispute is not whether a Palm device is a handset. And that's because Aylus has accused of infringement iPad tablets, arguing that they are handsets.  But, as we will see, they're not handsets.

So, as I mentioned, Apple's construction is based on the plain meaning of the term and the specification.

(Document displayed)

**MR. FOWLER:**  We know that claim terms are generally given their ordinary and customary meaning.

(Reporter interruption)

**MR. FOWLER:**  We know that claim terms are generally given their ordinary and customary meaning.  That's the meaning of the term to one of skill in the art, at the time of the invention.

Here, the time of the invention was 2005 or 2006.  And, the Court may remember in that time, handsets were mobile phones.  It was the thing you put in your pocket, you take it out of your pocket, you hold it up to your head and you make a phone call.

**THE COURT:**  What about the non-phone PDA?

**MR. BUERGI:**  The non-phone PDA, as you will see in a second, is not a handset in light of the specification,

because the specification --

THE COURT:  Okay, you were talking about what was going on in 2004-2006.  You just made the statement that: Everybody knew what we were talking about then --

(Document displayed)

THE COURT:  -- was a phone.  And I just presented -- reminded of the old Palm PDA that was not a phone.

MR. BUERGI:  Fair enough.  I should revise my statement to say everyone knew a handset was at least not a tablet, because those did not exist.  And it was something smaller that you could put in your pocket and take out of your pocket.  And then, further in light of the specification, the specification requires that the device can make and receive phone calls.

(Document displayed)

MR. BUERGI:  So, with regard to the claim's ordinary meaning we have Apple's expert Dr. Polish telling us in his declaration:  A handset can make and receive telephone calls. Dr. Polish has decades of telephony experience that is outlined in his resume that was attached to his declaration.

(Document displayed)

MR. BUERGI:  And Aylus seems to admit as much.  If we look at Aylus's opening claim construction brief, Aylus discusses integrating PDAs with wireless phones to create smartphones.  And then in the same breath, it refers to those

as "handsets."  So looking at Aylus's own brief, it seems to think handsets are synonymous with smartphones are synonymous with mobile phones.  They're discussing the same thing.

Now, Apple's construction is also consistent with the specification, which I alluded to before.

(Document displayed)

**MR. BUERGI:**  The specification says, for example, at column 4, Line 63 (As read):

"...handsets are no longer used only to make and receive telephone calls."

It's the same.  Handsets today may do a lot.  But the fundamental thing they do is make and receive calls.  That's what makes them handsets.

**THE COURT:**  Let me ask you, I mean, first of all, you know, we all know about the rule, specifications not being used to support limitations unless it's clear that that was the intent of the patentee.

But, that statement alone, it does seem to assume that there are handsets that receive phone calls.  It doesn't indicate to me any sort of embodiment.  You know, it's just an observation, like some historical fact.

**MR. BUERGI:**  Your Honor, you are saying that the specification is assuming that it's a historical fact that handsets make and receive phone calls, that's the fundamental thing that they do.  Is that --

THE COURT:  Well, yeah.  In other words, this is not a specification that is describing a particular embodiment.  It seems to me it's more descriptive.  It makes a certain assumption, but I'm not sure what --

MR. BUERGI:  I think Your Honor is right.  I think you've hit the nail on the head.  This is not describing a particular embodiment.  This is describing all handsets.  And it's describing as fundamentally, handsets make and receive telephone calls.  I think that's what it says, in plain black and white.

In other words, it's not discussing a particular type of handset.  It is just saying all handsets, as a blanket statement, as a blanket statement, the fundamental thing they do is make and receive telephone calls.

But --

THE COURT:  Well, it can also be read to mean typically, or often, some -- I mean, it doesn't -- it just says handsets generally are no longer used only to make, receive calls.  It certainly does assume that the majority, in the main, handsets were used for that purpose.  I'm not sure it precludes an implicit statement that there are some handsets that don't make and receive calls.

MR. BUERGI:  What might shed light on this issue is looking at a second passage from the specification.

THE COURT:  Okay.

**MR. BUERGI:** Which appears at column 15, at lines 4 to 45.

(Document displayed)

**MR. BUERGI:** This passage gets more specific. This is talking about how they are Class A and Class B handsets. It says Class A and Class B handsets are possible. And then it says there are four scenarios for Class A and Class B handsets. And it lists them, 1, 2, 3 and 4. And it describes various things about each scenario.

But we see in this quote from the specification, in each of the four scenarios, both classes of handsets can make voice calls.

So this confirms: Of all the classes of handsets that the specification envisions, in each of the four scenarios, they make voice calls. You can see the four instances of voice calls there. Scenarios 1, 2, 3, and 4.

**THE COURT:** What functional role would phone calls make in the operation of handsets here?

**MR. BUERGI:** Your Honor, are you asking in the scope of the claims, what role would a voice call --

**THE COURT:** Well, I mean when it describes the invention, in the scope of the -- you know, with respect to the actual claims, I just -- if you step back at a higher level, why would the inventor impose a -- is there some functional reason to impose such a limitation?

**MR. BUERGI:**  I think the reason to impose the limitation other than, of course, the specification defines "handset" in that manner, is this was the platform that the inventor was building on.  If you recall the slide from a few slides ago in Aylus's opening brief, it's talking about how at this time in the mid-2000s, PDAs were being integrated with wireless phones to create smartphones, which Aylus's inventor Dr. Naqvi referred to as a "handset."  So that's the platform they were building on.  Those were the devices where they said:  Okay, I'm going to use this to make the purported invention.

I'm not sure that a voice call, itself, has any particular functionality when it comes to the claims.  But, it is certainly reasonable to define "handset" in light of the specification to make voice calls, because that is the thing that the inventor had in front of him when he made the purported invention.  As we can see from Aylus's opening brief on the screen, when they discuss the background of the invention.

**THE COURT:**  So, is it your supposition that the inventor didn't know about non-telephone handsets at the time, such as PDAs?

**MR. BUERGI:**  Even if the inventor knew about those, when the inventor and/or the patent attorney wrote the specification, they chose to clearly describe handsets as

fundamentally making and receiving voice calls.  So --

THE COURT:  Why didn't they use the term "cell phone"?

MR. BUERGI:  You're asking --

THE COURT:  If that's what the assumption was, why not be a little bit -- why isn't the term "cell phone" used?

MR. BUERGI:  Well, I think they're synonymous.  I think he could have used "handset" or "cell phone," and he just chose "handset."

I'm not going to purport to know what was going through the mind of an inventor of why he chose "handset" over "cell phone."

THE COURT:  Could it be that "handset" is a slightly broader category of devices than "cell phones"?

MR. BUERGI:  In light of what the inventor wrote in the specification, I think we have to assume that "handset" and "mobile phone" or "cell phone" were synonymous.  And they're also synonymous with "cell phone," which Aylus admits in its opening brief.

THE COURT:  Okay.

(Reporter interruption)

MR. BUERGI:  Apple's construction also refers to the public switched Telephone Network.  Aylus makes a big deal about this in its brief, but this is a fairly innocuous term. It just acknowledges that phone calls are made over the public

switched Telephone Network.

And this excerpt on slide 71 is from the declaration of Dr. Polish.  But that term "public switched Telephone Network" comes directly from the specification at a discussion at column 1, lines 41 to 45.

(Document displayed)

**MR. BUERGI:**  And so, we know that -- oh, and staying with the specification, we know that Apple's construction is consistent with the specification.  And if we consider whether Aylus's construction is also consistent with the specification, the answer is no.

The Federal Circuit tells us that claims must be interpreted in light of the purpose of the invention.  Here, the specification says that one of the purposes of the invention was to overcome the small size of handset displays.

Slide 72 is showing an excerpt from the specification at column 4, lines 14 to 21.  And it is describing how the small size of a handset display is not amenable to a long-duration session.  In other words, watching a video for a long time.  And it would be desirable to view multimedia services on larger devices.

So, the small size of the display was the problem that the invention was trying to address.

**THE COURT:**  As would be the case with the Palm PDA.

**MR. BUERGI:**  That is correct.

(Document displayed)

MR. BUERGI:  And I don't think Aylus disputes that, because it admits that in its brief.  Again, going to the same paragraph in Aylus's opening brief, it says handsets also have small screens.

So, I don't think there's any disputes that handsets had small screens at the relevant time.

But if we look at Aylus's construction --

(Document displayed)

MR. BUERGI:  -- it doesn't mention anything about small screens.  That's because it's trying to encompass iPad devices, tablet devices, that have large screens.  But when Aylus tries to do that, it's conflicting with the problem stated by the specification, which is handsets having small screens.

In other words, Aylus's --

THE COURT:  So now you want to import a limitation that the handset has to have a small screen, so even if you had an iPad with a phone capability, or a phone, the new iPhone 6 or Galaxy, with the larger screen, a larger screen, you then don't meet this implicit limitation?

What does that have to do with it?  What does the small screen -- I didn't realize you were asking for another limitation.

MR. BUERGI:  Well, to be clear, Aylus -- Apple's

construction does not recite small screens.  It recites a mobil phone, which has a small screen.

THE COURT:  Well, mobile phones can have large screens, as we now know.  So, where do you stand on that?

MR. BUERGI:  I think in light of the specification, once it has a large screen, it's no longer a handset.  Whether it is a mobile phone or not -- I don't think it's a mobile phone either, but the specification says that handsets have small screens.

THE COURT:  So now you're asking for another limitation:  Has to have a small screen.  And how would you define that?  Something less than five inches?  You know, what do you do about a mini iPad?

I mean, now there's a whole gradation.  By every inch, you can have something.  So, are you going to draw that line?

MR. BUERGI:  Well, the issue --

THE COURT:  Where do you get that?

MR. BUERGI:  Again, the dispute is over iPad tablets.  And there's nothing in the specification that would support calling --

THE COURT:  How am I supposed to know that?  There's no summary-judgment motion in front of me.

MR. BUERGI:  Well, I mean, looking further down the road, there will be eventually when we show up to the Court in a few months, and we say, "Your Honor, handsets aren't -- this

construction doesn't cover tablet computers."

That will be the dispute down the road, which we can address now by properly construing "handset" as being a mobile phone, because those have small screens, and the specification says that small screens were a problem that led to the purported invention.

So Aylus's construction, again, that tries to encompass devices with any size screen conflicts with that purpose of the specification, and conflicts with Aylus's own admission that handsets have small screens.

**THE COURT:**  Okay.

**MR. BUERGI:**  I will be happy to answer any further questions.

**THE COURT:**  No.  Let's move on to the next one.  Thank you.

**MR. BUERGI:**  Thank you, Your Honor.

**THE COURT:**  So next on my list, probably not on yours, is "VCR controls."

(Reporter interruption)

(Document displayed)

**MR. THAKUR:**  Your Honor, before this Court is the issue with respect to "VCR controls."  And our first slide lays out the differences between the parties to the proposed constructions.

Again, I just pause and note that Apple has accepted our

construction as a reasonable one before the PTO.

So the issue before this Court is --

(Document displayed)

**MR. THAKUR:**  -- that when the inventor used the word "VCR controls" in the '412 patent it was -- meant it was required for the controls of a videocassette recorder.  A particular hardware device.  It was not meant VCR controls in terms of pause-play, but actually for the control of a physical VCR.

Your Honor, intrinsically, there's not a single mention in the patent of an actual VCR.  Number two, from the reading of the invention, including a VCR would render this invention meaningless.  Because our invention is about digital libraries being accessed in the wide area network, a VCR cassette being played.  And the idea that our user end point would be controlling a VCR would be antithetical to what our invention is.

And the most significant point --

**THE COURT:**  Well, why couldn't it be a VCR remote?

**MR. THAKUR:**  I guess you could have a remote, but the remote would have to have these control point proxy capabilities.  And that capability would not be possible in a VCR remote.  We defined the user end point, but we say the user end point has all these capabilities.  And that's what defines the invention, not the thing.  And so --

**THE COURT:**  The VCR remote would only have an infrared transmission.

**MR. THAKUR:**  Correct.  And it would not have a wifi transmitter, for example, to communicate in the wide area network to go get content.

So, what we are saying is throughout the patent, the patent mentions the use of the term "VCR controls" but never says "VCR" because it's talking about VCR control for controlling the presentation.  Pause, play, forward.  That is what is clearly intended by the patent.

To somehow import into the patent the requirement that when you are talking about VCR controls you are talking about a VCR, that would essentially render -- you know, it would take the invention back a decade while the network architecture that he was thinking for a commercial --

**THE COURT:**  I see that your -- at 17, lines 35, 38, you highlighted the term "VCR-type controls."

**MR. THAKUR:**  Correct, Your Honor.  And --

**THE COURT:**  That's clearer than just the word "VCR controls."

**MR. THAKUR:**  That's correct, Your Honor.  I can see that if someone had said in the claim "VCR-type controls," it might have added additional clarity.

But as you can read up above, in the section up above (Indicating), we talk about the control point and the media

renderer and the media server.  And we describe for a media server a DVD player, which is -- at that time was the most frequent way to deliver video content.

So, if DVD player could have been a server, the VCR controls in claim 1 would render that invention inoperable.

THE COURT:  Had this been drafted to say "VCR-type controls" throughout the whole thing, we probably wouldn't be here on this one.

MR. THAKUR:  I acknowledge that.  I will not deny that.  If we had used the word "VCR-type controls," it would have been unnecessary.  And I acknowledge that that was not in there.

But from the invention, the media server that is disclosed that it is intended to work with, it -- it couldn't be a DVD player under their interpretation.  And that is to describe "media server of choice."

(Reporter interruption)

MR. THAKUR:  It could not.

THE COURT:  Well, it says on column 5, which you cited here, lines 35 through 48 (As read):

"The control point and control point proxies cooperatively negotiate media delivery from a user-selected media server, such as a home stereo or DVD player to a...media renderer, such as TV...The control point proxies also include VCR controls for

controlling the presentation of the selected media delivery."

So it would have to be able to communicate with the media -- well, the handset -- or the controls would control just the media renderer?  Or the server?

MR. THAKUR:  It's controlling the content from the media server.  It could do it through the media renderer or directly through the media server.  But, the point is that the media server would have to be a video cassette recorder, is what they say.

And the one we disclosed, we disclosed a DVD player because that was the technology of choice.  So, so, the one media server that we disclosed that we would be controlling would not -- would not be the media server they would insist that claim 1 be.

THE COURT:  Okay.  All right.  Thank you.

MR. THAKUR:  Thank you.

(Document displayed)

MR. FOWLER:  Your Honor, I think that the issue here is on this particular claim term, it's driven by the claim language, itself.

We have lots of Federal Circuit authority -- I'm on Slide 28 now -- that basically says that inquiry for claim construction starts and ends with the claim terms, themselves.

(Document displayed)

**MR. FOWLER:**  Here, for claim 1, we're talking about claim 1 here, we have a "VCR cassette recorder (VCR) control" which matches up to our construction.  And that's important here --

(Document displayed)

**MR. FOWLER:**  -- because of claim -- well, for two reasons.  But among other reasons, claim differentiation.  And we have some case law here from the *Chicago Board* case and *Innova*, where it's very clear that the Federal Circuit says if different claims use different terms, you have to honor that difference.  Otherwise you vitiate the claim language.  And, it's presumed that these different claim terms have different meanings.

Now, here, we have a classic example of that.  Almost like a law-school example.  We have claim 1, which says (As read):

"video cassette recorder (VCR) controls..."

Claims 20 and 27 recite "video play controls" which is a claim term that we will be addressing later in the afternoon.

These two things can't mean the same thing, under the presumption that the inventor, when using different words, meant different things.

Yet, Aylus has construed these two terms to mean exactly the same thing.

(Document displayed)

**MR. FOWLER:**  Now, by doing that, what they do is they

-- let me go back to that slide, Slide 31.

(Document displayed)

MR. FOWLER:  They've completely written the words "video casette recorder (VCR)" out of the claim.  You might as well just take a red pen and run it through there, because what they wish it said was "video play controls" or maybe "VCR-type controls" but they've written those words out of the claim to give them no meaning.

(Document displayed)

MR. FOWLER:  Now, one thing that I think -- I didn't sense it from the presentation today, but it's certainly in the papers, is they, they try to argue:  Well, what you're trying to do is impose the presence of a VCR, itself.

We have never taken that position.  If you look at Slide 32, the claim language talks about "VCR controls on the UE." That's the user equipment, which would be like a remote control.

Now, we've never taken the position that the UE is a VCR, which is what's suggested in their papers, or that the VCR controls need to be part of the VCR.  It's what you said, Your Honor, earlier, when you were talking about a remote control.

And in this instance what we're talking about here, or at least the reasonable conclusion to draw from the language in the claims in the specification, is that the inventor had in

mind -- and remember, we're talking about quite a while ago, not now, we're not talking about today -- that you'd have a remote control that would have VCR controls on them that could be dual-purposed for purposes of practicing the invention. Which is not unusual in technology. You take something that already exists, and you dual-purpose it.

So, you could be using those controls that could be used on the VCR for this other purpose of practicing this invention. That's the logical thing to conclude here, is that -- what was meant. Otherwise, why would he be saying "VCR controls"? Doesn't say in the claims, "VCR-type controls."

(Document displayed)

**MR. FOWLER:** Now, as I mentioned before, and on Slide 33, if the Court were to adopt Aylus' construction, the Court would be reading "VCR" completely out of the claim. The whole term. And the acronym "VCR." And, that's wrong. That's one reason their construction cannot stand. You would be vitiating the claim language.

Second, it would be violative of the claim differentiation doctrine which says if you use different terms in the claims, that they shouldn't be given the same meaning. And --

**THE COURT:** What is your response to the argument that it would make no sense? That if you literally required a VCR remote, which existed at the time of the invention, in the

mid-2000s, it just wouldn't operate; it doesn't have the capability of, you know, serving as the control point or control point proxy?

MR. FOWLER:  Sure.  I would say there is several things I would have to say that are interrelated.  First we have to take the invention as claimed by the inventor.  And so, he said what he said.  And he claimed it the way he did.  That's one.

Two, this whole notion about it being inoperable, there's no support for that.  If you go back and look at their slide, they don't cite anything for that.  He just said that.  That's attorney argument.

There's nothing in the specification that suggests that's true, and I don't believe Dr. Wigner spoke to that issue.  Presumably, if it were true, we would have heard from him on that issue.

Third, as I said, the logical conclusion to draw from this, Your Honor, is not that you were going to take a traditional VCR remote control, because it doesn't say "a VCR remote control" -- the whole thing, as in -- almost like "handset" before.  It's not taking it off the shelf and then pointing it and then using it.  It's saying "using the VCR controls."

So, what you do is on a remote control that you could use today to operate this invention, you could have dual-purpose

buttons on the control.  And if you think about -- I know we're going today, not yesteryear.  But if you go and you think about the buttons on any remote control that you might points at your TV, those same buttons can be used to operate your TV, or your -- or your DVD box, or any other things that might be on your stand up there.  They could be dual-function, depending on maybe hitting a function key or something that would indicate what you're pointing it at.

My conclusion from reading the specification is that the inventor had in mind having something that was already there, that somebody was familiar with, the user, VCR controls that they could use for a VCR, but dual-functioning those for practice of the invention.

I think that's a reasonable conclusion, and one would have to draw in light of the -- the very plain use of this language.

**THE COURT:**  The invention contemplates that these, this -- the VCR controls be in the UE?

**MR. FOWLER:**  It has to be, according to the claim.  The VCR controls are on the -- let me go back and -- I think I have --

(Document displayed)

**MR. FOWLER:**  If we look at Slide 32, it says:

"controlling a presentation of delivery via the VCR controls on the UE."

And I think when we are talking about the UE, if you just think about this case generally, you are talking about some kind of remote control.

THE COURT:  Where -- oh --

MR. FOWLER:  It's actually in the claim, itself.

THE COURT:  I'm looking at it.  It's lines 51 through 52?

MR. FOWLER:  Let me see if we have a miscite there.

You are correct, Your Honor.  That appears to be a miscite.  Yeah, there shouldn't be a quote about that.

What it says, if you look at column 24, it says (As read):

"The video cassette recorder controls...to control the presentation of content provided by the MS and rendered by the MR, wherein the CPP logic resides in the UE."

So that's not a correct quote, at least in this location. But what it's talking about is those controls are on the UE.

THE COURT:  And, and the way it works --

MR. FOWLER:  I'm sorry; I was just pointed out -- the correct cite, which also supports our position, is actually -- instead of saying 51 and 52, it should be 60 and 61.

And, I apologize for interrupting Your Honor.

It says (As read):

"are not in communication with the UE via the local..."

I'm sorry.

"...wireless network..."

Where is it?  I'm sorry.  Next down.  I'm sorry.  61 and 62, instead of 51 and 52 (As read):

"Once media content delivery is negotiating controlling a presentation delivery..."

(Reporter interruption)

**MR. FOWLER:**  (As read)

"Once media content delivery is negotiating, controlling a presentation of delivery via the VCR controls on the UE."

So the slide should say "24:61-62" rather than "51-52."

**THE COURT:**  All right.  And so the purpose of the VCR controls is really only to control the MR at the presentation?  Or is it supposed to also operate and be able to communicate with the media server?

**MR. FOWLER:**  Well, I think I would agree with Counsel (Indicating) on that, is that the way that this is typically envisioned -- and we will see this in some of the other claims -- is that the UE is in the user premises.  That's the way it's described in some of the figures, for example, like figure 13 of the patent.  And so it's going to be pointing at the MR.

And the issue is, it can indirectly -- those -- those signals can be indirectly routed, but it's going to be more

directly pointed directly at the MR.

In other words, you're not in your living room pressing that and a signal is going a thousand miles away to another device in another state.

**THE COURT:**  So it's not communicating directly with the media server, in selecting, for instance, the media --

**MR. FOWLER:**  Well, at least, at least in the way it is described in the specification.  I don't think that's necessary -- that that conclusion is not necessary to decide this particular issue, because the issue here is whether it's going to be VCR controls.

The issue here, again, is whether those controls can be dual-purposed for another purpose, whether it's communicating with the MR or the MS.

**THE COURT:**  Well, I guess it kind of goes to the impossibility argument that I think your opponent was making, that if this was intended to communicate with the MS, then even a dual-purpose or multi-purpose universal remote, for instance -- I don't know, I guess -- does that have the capability, can it function in that way, if it weren't using a wifi network or, you know, some kind of cellular network or something like that?

**MR. FOWLER:**  So, I think that's -- in some ways, this discussion is similar to what the Court had on the last claim term that we were talking about in "handset."

The claims don't specify that extra degree of functionality. It's saying that basically the UE must have these VCR controls on them.

It doesn't preclude, for example, that the device that has the VCR controls has all of the types of things that you were just describing. Doesn't preclude it from having the capability, wifi capability or being able to connect with the internet. It doesn't preclude any of those things from being in the device that has the VCR controls. So, the whole notion that it's impossible doesn't hold any water.

First of all, there's no support for it in the specification or any of the extrinsic evidence they supported. And two, our construction doesn't preclude any of those things from being in the device.

THE COURT: Well, but you say that the VCR controls have to be on the UE, as it says in lines 62 and -3, right?

MR. FOWLER: That is true under both parties' construction; that's correct.

THE COURT: But it also -- the claim requires that there be provisioning of the UE -- I'm looking at lines 46 -- provision of the UE of the wide area network with control point proxy logic that includes logic to negotiate content delivery, with at least, you know, the MS and the MR, logic to cooperate with CP logic to negotiate, so, this -- the UE has got a pretty big role.

**MR. FOWLER:** That's correct. And if you look at the constructions again, I have those in front of you, Your Honor, on 27.

(Document displayed)

**MR. FOWLER:** There is nothing about Aylus' construction that addresses that issue, either. Both are addressing the immediate issue of controlling the display, play, pause, rewind in their construction. Neither construction precludes those things from being the case.

Elsewhere in the claims are other requirements that are on top of this (Indicating) that have to be met, so the device would have to do that. That's certainly true.

And then, there's nothing in the claim language that would preclude extra functionality from being in there to make sure that the rest of the claim language can be satisfied.

**THE COURT:** All right. Let me hear rebuttal on this. And I'd like rebuttal to the claim differentiation, and then the point that was just made, that there's nothing in here that would render, sort of, impossibility.

**MR. THAKUR:** Okay. So the first one is the issue of claim differentiation. What Apple didn't, sort of, go into detail of was there was actually -- this patent involved a reissue application.

So, the claims 1 through 19 were the original claims. When they went and sought a reissue, claims 20 through 33, the

word "VCR controls" was replaced by the term "video play controls" to add this clarity.

So, I -- my suspicion -- and I'm almost certain of this fact -- is that when they went to get a reissue, somebody said:  You're going to hear this argument some day.  Let's rephrase this to be more clear, to be "video play controls." That was the intent.

What the inventor tells me is that VCR commands are extremely well understood in the telecommunications space for controlling video content.  And those VCR commands are part of the -- the terminology used within the protocols for streaming media content.

This patent discloses one technology that is sort of the technology -- we're going to be talking a little bit about that -- which is called the real time streaming protocol.  And the real time streaming protocol refers to controlling VCR commands.

So, I brought a copy of the wikipedia page for ease of review.  Sorry, I only brought two.  I apologize.

(Document handed up)

**MR. THAKUR:**  And, the terminology "VCR commands for controlling content" were extremely well known and were disclosed in the patent.  The change between "VCR commands" and "video play controls" occurred as a result of the issue. And this Court can easily synchronize the construction.

So, I guess what I'm saying is if the Court adopts our proposed construction for "VCR controls" we would be willing to propose a slightly different construction of "video play controls" to generically mean video play controls, and not be as limited as "VCR controls."

And then the Court could, as --

THE COURT:  Well, as a matter of law, are you saying that the doctrine of claim differentiation does not apply when there's been a reissuance?

MR. THAKUR:  Your Honor, I thought about this issue, and I wish it was true.  The answer is:  I did not find an answer, one way or the other.  This issue -- to the extent this issue has arisen, I did not find cited case law that would address this.

So since they raise it force the first time in a supplemental brief, if it had been raised earlier I would have proposed the solution that I propose today.  The solution that I propose today is that you accept the construction for "VCR controls" as described.  And for "video play controls," you adopt a slightly different construction, which is "controls for the display of video content."

THE COURT:  As opposed to -- what is it that you --

MR. THAKUR:  Well, the difference is in this one (Indicating) we've put in -- in "VCR controls" we say "controls for display of video content" and we put in very

specific -- pause, play, rewind, stop.  Those are the buttons that existed on the VCR.

THE COURT:  Yeah.

MR. THAKUR:  Whereas "video play controls" are more broader.  So, the terminology does not limit -- need to be limited to those.  And it would have a slightly broader context.  There could be other video play controls.

So, for example, you could control sound on the -- you know, by -- the controls actually, you know, in today's devices usually include those things (Indicating), but they also include other things.  You know, sound control.  Screen size.

So our point is the alternative constructions of "video play control" would be broader than the one for "VCR controls."

THE COURT:  So they would not be the same.

MR. THAKUR:  They would not be the same.

THE COURT:  You would eliminate the parenthetical?

MR. THAKUR:  That is correct, Your Honor.

THE COURT:  Well, how does that answer -- and that's your response, your partial response to the claim differentiation --

MR. THAKUR:  Correct.  I believe what that does is it overcomes the argument that it must -- that we're proposing an identical construction for two different terms.  That would no

longer be true.

THE COURT: What about this impossibility? I would like you to elaborate on how, you say, it just couldn't be.

MR. THAKUR: Understood. So, if I may show a visual, it will be easier. What is a user end point I think would be helpful to just -- let me see if I can find one.

(Document displayed)

MR. THAKUR: Here we go. So, here is how claim 1 works. What you have on the device is ability to select content. Which, you select content from the movie store.

And then once you've selected the movie content, claim 1, 2 and 4 give you three different ways to instruct the delivery. Where both -- so --

THE COURT: Where you instruct the what?

MR. THAKUR: Where you instruct the delivery of the content.

So the way claim 1 -- the claims that work together in this case are claims 1, 2 and 4. And I think we'll be hearing a lot of them over the course of the day today.

What claim 1 does is it says -- you go to the movie store and get the movie. If the user end point isn't -- what -- local wireless, which is basically Bluetooth or wifi content with just the media renderer or media server, both the control point and the movie store deliver.

Claim 2 -- I'll explain more in detail when we get to it.

I just want Your Honor to have a visual context about what you were asking about, is:  Who gets the content?

In claim 2, you have a user end point with a relationship with both the media renderer and the media server.  The control point deals with the delivery stuff once the movie is purchased.

And claim 4 deals with a scenario where the local phone device does not have local connection to the media renderer or the server, or the media renderer, that would be device.

So what I'm saying was our patent contemplates that you would need to get content from a media server to a media renderer.

Let's look at claim 2, the most likely scenario in the real world, which is:  I have a phone or device.  I pick a movie, and I have wifi connection.  And then I want to go to the media server to get the movie onto my media renderer.

That can occur with either me going to the wifi, to the server to get it, or more likely, as the Court has predicted, is once I've decided the movie, I will go to the television, the media renderer which is on the wired network, and say "Go get me the movie."

So in that scenario is how claim 2 would work.  So my point is in claim 2, the patent we described is a DVD player, on the user end point, as one potential media server, except the DVD player has now scaled in a commercial scale to this

renderer.  But our point was digital video content would reside on a remote location.  And, we would go and get this content using the device.

And, once the movie is played, I'm controlling that content through my phone.  What am I controlling at that point?  I'm controlling the television.  The renderer.  Why would I be controlling a VCR?  Because if you have VCR controls you would be rendering -- you would be controlling VCRs.  We're not controlling VCRs; we are controlling the display of video content.

So, why would we have that?  The only argument they made today was:  Ah, but you could have video play controls, but it could be a dual purpose.  I could also have this remote that could do dual.  So they're reporting into our claim that it is -- that the device must be dual-purpose.  It must also control the VCR --

**THE COURT:**  Well, it's a way of complying literally, if you read "VCR controls" the way they do, as something that actually controls a VCR, whether the VCR is in the system or not --

**MR. THAKUR:**  Correct.

**THE COURT:**  -- it has capability of doing these other things, like work with Apple TV or media renderer.

**MR. THAKUR:**  Right.

**THE COURT:**  And, and you'd still comply.  But the

minimum requirement is, among other things, one thing it's got to be do is be able to control a VCR, even if you never use the VCR.

MR. THAKUR:  As a theoretical possibility, that is correct.  If I may use an analogy, let's presume -- just one second.

I'm thinking of going to Russia for a vacation, or I'm thinking of going to Japan for a vacation.  If I was going to Russia, I would get a visa for Russia.  If I was going to Japan, I'd get a visa for Japan.  If I was going to both, I'd get a visa for both.

(Reporter interruption)

THE COURT:  Everybody has to slow down, here.

MR. THAKUR:  Understood.  My apologies.  I'll repeat.

If you are planning to go to Russia, you get a visa for Russia.  If you're planning to go to Japan, you get a visa for Japan.  If you're planning to go to both, you get a visa for both.

Our world, the invention, operates in a single scenario where we're going to Japan.  Why would we have the requirement of getting an extra visa just because we put in the words "VCR controls," which, literally said, would mean that dual requirement?

I guess, if you're asking me the question, technologically possible, I step back and concede it is technologically

possible to have those capabilities.  But, does it make any logical sense?  It does not.

THE COURT:  And what's the doctrine that says in claim construction, you can construe what would otherwise seem to be language that's -- has a fairly plain suggestion on its face, but you sort of just look at the logic of the function and all that, and say:  Well, does it really perform any utility to read in this limitation, or not?

MR. THAKUR:  Your Honor, what I would say is that the term "VCR controls" is under- -- the patent must be understood in light of the claims and the specification.  And the claim terms do not have that plain and ordinary meaning as this must be a video casette recorder.  What it means is VCR commands.

And as I have shown you, the RTSP protocols and all the protocols of that era used to -- when they were talking about controlling video content, "VCR controls," "VCR command" has become common terminology.

THE COURT:  Where is that in the Record, in terms of its common terminology in the field at that time?

MR. THAKUR:  Your Honor, since I didn't get a chance to reply to supplemental, I did, for the Record, bring a copy of the RTSP protocol.  And on the second line of the RTSP protocol it refers to "VCR command to pause and play."

And the RTSP protocol is the protocol used for streaming video content.

THE COURT:  Well, all right.  But this -- this wasn't submitted -- this is the first time you submitted this.

MR. THAKUR:  I acknowledge that.

THE COURT:  All right.  I'll give you one chance to say something quick, and I want to move on.

MR. FOWLER:  Sure.  Well, first of all, our position was not in our supplemental brief.  It was in our opening brief.  So, I don't know what that issue about needing extra time -- they had an opportunity to brief this.

One thing I would say quickly has to do with reissue, because the point Counsel made I think actually underscores why Apple's position is right.

First of all, you are right, Your Honor.  There is no law that somehow says claim differentiation doesn't apply to reissue.  If anything, seems to me it should apply with more force.  Because, as we pointed out on the slide before, the existing claim 1, it kept the "VCR controls" language.

And, if we could go back to our slides?  If I could ask the Court Clerk to do that, please?

Thank you.

(Document displayed)

MR. FOWLER:  So, here we have claim 1.  It has "VCR controls."  Claim 20 and 27 were added by reissue, as Counsel said.  He said they were added to clarify.

Well, I can't speak to why they did 20 and 27.  But they

couldn't have meant to clarify claim 1, because they had the ability if they wanted to, to amend claim 21 -- I mean claim 1 to change "video casette recorder (VCR) controls" to "video play controls." In fact, they amended claim 1 otherwise to add "wide area network."

So if they had wanted that to be something other than "video casette recorder (VCR) controls" they could have done that, but they didn't.

So, not only is there claim differentiation, there was clearly a choice made here not to change that language to make it like 20 and 27, which underscores the fact that it should be read differently.

And again, one thing I didn't hear from Counsel at all is the construction that they're offering would vitiate the language in claim 1, under either position.

And, Your Honor, if -- to the extent that you're going to take notice of this thing that was just handed up, I would note that even that talks about "VCR type," and it doesn't talk about "controls"; it talks about "commands." So, I'm not sure that adds anything to what is already in the intrinsic record.

That's all I would have, Your Honor unless you have any questions.

THE COURT: All right. Thank you.

MR. FOWLER: Thank you.

THE COURT:  Well, the next logical one is the "VCR play control."  "Controls."

And now we have a list suggesting deletion from its proposed construction, deleting of the parenthetical.  Right?

Is that correct?

MR. THAKUR:  Correct, Your Honor.

THE COURT:  Anything you want to add to that?

MR. THAKUR:  No, Your Honor.

THE COURT:  At this point?

Okay.  Any comments from Apple?

MR. FOWLER:  No, Your Honor.  Our position on this is this is just plain reading; it doesn't need any construction at all.  So I don't really have anything to add to that, no, Your Honor.

THE COURT:  Okay.  All right.  The next one on my list is the "negotiate media content delivery between MS and MR."  So, I'll hear your comments on that.

I'm trying to understand, I know there's a dispute about whether or not universal plug-and-play architecture is implicitly part of the limitations.

And I'm not sure how that jibes with the Apple wording of its proposed construction.  I don't know if that wording is unique to UPnP, and therefore it's sort of brought in *sub rosa* there, or what.  But --

MR. FOWLER:  Thank you.

**THE COURT:** Maybe you can explain that to me.

**MR. FOWLER:** Yes, Your Honor. Out of all of the terms, this is the one I planned to spend a little bit more time on. And I think my presentation will address that issue directly.

If we could perhaps switch back to our slides?

(Document displayed)

**MR. FOWLER:** So, Your Honor, again, I'm starting with Slide 4, which is the claim language "negotiate media content delivery between the MS and the MR."

Apple's construction, as we will see in a minute, basically has three parts to it. The first is that you compare the transfer protocols and the formats that are supported by each of the MS and MR. So you just -- what formats are supported by the MS, what formats are supported by the MR, what protocols are supported by each.

Then you compare them to find commonality. You pick one that is common. And then you instruct the system to proceed, using the common protocol and common format.

And as we'll see, that's how one of ordinary skill in the art would understand this phrase "negotiate media content delivery" to mean, in light of both the specification and the understanding of one of ordinary skill in the art at the time.

That's the support of our position. I'll address Aylus's construction and why it can't be right, later.

(Document displayed)

**MR. FOWLER:**   This is what I said.   Our position is supported by the specification.   The underlying UPnP specifications, and the understanding of one of skill in the art.

(Document displayed)

**MR. FOWLER:**   So the key question, I think you've put your finger on, Your Honor.   And I think it's -- really, the ultimate decision that the Court may need to make here is: Would one of ordinary skill in the art reading the claims in the specification be viewing the claim language through the prism of UPnP?

Right, that's what the Federal Circuit commands the Court to look at is how one of ordinary skill in the art would read this.   And so the issue here is:   Would they be reading it with UPnP in mind?

And I think the answer to that is clearly yes.   And I'll go through that first, and then we'll talk about what the consequences of that are to this claim limitation.

So, the first thing is we look at what the patent specification says.   And I'm not going to go through every cite, because as I'll point out later, there's 31 references to "UPnP" in the spec.

Here, though, it's very clear.   It says:   The UPnP architecture includes these three things:   CP, MS, and MR.

That's about as clear as you can be.

(Document displayed)

**MR. FOWLER:**  And then, another example of why one of skill in the art reading this patent would know that they're supposed to be thinking about UPnP is comparing figure 11 of the patent and figure 3.  We don't have the legend for figure 3 of the UPnP A/V architecture, but it's found at Exhibit 13 at Page 5.  And you can see these things are almost identical.

Look at the top of both.  You have a control point.  On the left, you have the media server.  On the right, you have the media renderer.  And then down below, you have the out-of-band transport protocol.  That's literally at the bottom of figure 11.  It's above the oval, pointing down to the oval below.

So you're talking about someone reading this who knows the technology, and they would look at figure 11, and they would say, "Hey, we're talking about the UPnP architecture."

And, in fact --

(Document displayed)

**MR. FOWLER:**  This is the clincher for me -- and we talked about this a little bit at the tutorial -- is it says here in the patent specification -- we have the cites at the bottom of Slide 8, it's column 17, 7 through 8, and 17:60 through 61.  Says (As read):

"In certain embodiments, the UPnP architecture is

extended into the wide area network environment."

The second quote is:

"Thus, in a wide area networking extension of UPnP, moving the CP into a network element..."

And then, continues.

The embodiments that we are talking about that are claimed, the claimed embodiments are these embodiments (Indicating).  The wide area network embodiment.

We just talked a minute ago about -- for example, claim 1 when they did the reissue, they specifically added "wide area network" as part of the claim.

So, there may have been other embodiments that are discussed in the specification, but what the inventor had in mind was extending this into the wide area network environment.

And, I realize that maybe Your Honor won't want to rely on this, but if you think back to the tutorial and you think back to Aylus's description of the invention, at a broad level what they were saying -- and I'm not endorsing this necessarily, but what they were saying was UPnP was something that took place in your living room, with your VCR, and your TV and your remote.

And that was all well and good, but what made this alleged invention of Mr. Naqvi's so special is you could go out on the internet and do it.  It's the wide area network part of this

that allegedly made this so special.

So, it's those embodiments that were claimed.  And we see here in the specification, it's specifically talking about extending the UPnP architecture.  It says that not once, but twice.

(Document displayed)

**MR. FOWLER:**  And then just as a refresher, Your Honor, you don't have to take my word for it.  I mean, I think all you need do is look at their brief.

We have Slide 9, I have right out of their own brief, what they said here.  And this is just unusual candor.  Maybe they didn't think about the consequences of what they were saying.

But they're talking about here, on Page 1 of their own opening brief in this case, that it's important to understand the technological background.

Agreed.

Down below at Page 1, when they talk about the important technological background, they talk about UPnP, and the fact that that was developed.

(Document displayed)

**MR. FOWLER:**  Then you go on to Page 2.  At the top of Page 2, they say the same thing I did just a minute ago:

"UPnP had three distinct logical entities."

And it talks about the CP, MS, and the MR.

And if you were to go down to look at the rest of Page 2

of that brief, which I didn't copy here because I couldn't fit it onto one slide, they are talking about UPnP.

**THE COURT:**  So, why isn't all this just background? Why was it imported as a limitation?

**MR. FOWLER:**  I'll get to that in a minute.  It's not a limitation.

The key -- the key issue here is how one of ordinary skill in the art reading this would -- what he would understand -- he or she would understand when they got to that claim phrase "negotiate."  How would they understand this?

So, it's not a limitation.  It's a question of how one of ordinary skill in the art reading the specification, seeing this word which is not clearly defined in the specification -- you notice that neither party is saying, "Hey, look at what the specification..."

It says negotiate equal.  There's no lexicography in there.  There's nothing in the claim language that specifies what that is.

So, you -- necessarily, the Court has to decide:  How would one of ordinary skill in the art understand this to be?

And if one of ordinary skill in the art understood that this was in fact --

(Document displayed)

**MR. FOWLER:**  -- an extension of UPnP, they would turn to UPnP for that answer.

And here, again, you know, at Pages 2 and 3 of their brief, Dr. Naqvi, the inventor, so-called lead inventor here, he understood it was -- he said there were limitations to the UPnP, and so he wanted to transform it, which is another way of saying "extending it."

(Document displayed)

**MR. FOWLER:** So, if we understand that one of ordinary skill in the art would not just take this as background, but the kind of -- the environment in which this was being -- you know, the oxygen in the room that one would draw upon if there's not something specific in the claim, or not something specific in the specification to understand what something means -- and, Your Honor, just keep this in mind because when we get to their construction, keep in mind:  This has to have some meaning to somebody reading it.  It can't just be a magic word that means anything.  It has to mean something to the reader.

**THE COURT:** Let me ask you.  Claim 17 makes reference -- express reference in the claim --

**MR. FOWLER:** Yes.

**THE COURT:** -- to UPnP protocols.

**MR. FOWLER:** Right.  And I will address that in a minute, Your Honor, too.

**THE COURT:** And 18 lists a number of protocols in addition to UPnP.

MR. FOWLER:  Absolutely.

THE COURT:  So, you are a big advocate of claim differentiation.

MR. FOWLER:  Yes, I am.

THE COURT:  What's the problem?

MR. FOWLER:  Well, I'll tell you that.  So -- well, this is jumping ahead a little bit.  But, we're talking about two different things.  We're talking about for the negotiation, what does "negotiation" mean?

And, excuse me.  Let me get my copy of the patent.

So, claim 17 is talking about using one of these protocols not for negotiation purposes; that would be claim differentiation.  It's talking about whether it's local.  It's the detection feature.  Whether what's connected, you can use one of these protocols.

18, you notice here there's nothing here about the negotiation.  If this had to do with negotiation, then Your Honor would be absolutely right.  I would be wrong to be standing up here.  I could be hung by my own words on claim differentiation.

But, these are talking about announcing the presence and determining that it's local.  Those are two different features.  And there, there, the inventor said for those two particular things, you can use any of these particular technologies.

There's nothing like that, there's no guidance given like that for the negotiation feature of this.

(Document displayed)

**THE COURT:** But it does suggest, --

(Document displayed)

**THE COURT:** -- does it not, that claim 1 and 17 18 are dependent claims.

(Document displayed)

**THE COURT:** Not necessarily tied or limited to --

(Document displayed)

**THE COURT:** -- UPnP.

**MR. FOWLER:** Well, Your Honor --

(Document displayed)

**MR. FOWLER:** We're not limiting this to UPnP either. And, let me advance. There's some other important things that I'd like to say.

(Document displayed)

**MR. FOWLER:** But, this is their argument. I mean, what I -- what I'm addressing here is on slide 23.

Our construction is not limited to any particular UPnP specific protocol or command. That's the kind of thing that's talked about in claim 17 or 18, where they say you can use these protocols.

And if you think about a standard, what it is, as -- Your Honor, forgive me for saying something that may be

obvious.  But, you have a set of software that's a standard like UPnP, that says no matter what the manufacturer, no matter what the box, you're always going to do the same thing the same way.

And the way I think of it as a layperson is you've got a software command, and it has to have certain syntax.  So no matter what equipment, what manufacturer, you're always going to use that.  And that's a protocol or command.

We're not limiting this construction in any way to any particular UPnP protocol or command.  What we are saying instead is that -- and so, that's a red herring.  That is just a complete red herring by Aylus.  There's no particular protocol or command.  A non-UPnP architecture could do what we are talking about.  So, there's -- it's not limited.

This goes back to the point I was making before:  What would one of ordinary skill in the art understand this negotiation to mean?

And where I got in my presentation is:  Reading the patent, they would understand that this is an extension of UPnP.  And where it's not talking about something else, like claim 17 or 18, where it's calling out, well, for this function you can use something else, people would understand it in the context of UPnP.

Now, let me just, if I could, Your Honor --

(Document displayed)

MR. FOWLER:  Let me advance to the kind of contrary position here.  Okay.

So, if -- if "negotiate media content delivery" doesn't mean what one of ordinary skill in the art understanding this to be talking about UPnP means, then what the heck does it mean?

They say first plain and ordinary meaning, but I will say -- point out, Your Honor, maybe we will hear something today that they've never explained what that is.

And I would submit, Your Honor, that if the plain and ordinary meaning of the term "negotiate media content delivery between the MS and the MR" were to be the construction, we have just rendered this completely meaningless, because at that point virtually anything could be that.

But, this word has meaning.  It is presumed -- each word in the claim is presumed to have meaning to one of ordinary skill in the art.  This would render this a black box.

So let's turn to their second thing.

(Document displayed)

MR. FOWLER:  They say:  Well, okay -- okay, let's just assume for the sake of argument, that is basically what they are saying, that Your Honor doesn't adopt plain and ordinary meaning.  We've got a different construction.

And, let me just put a full stop there for a second.  That implicitly acknowledges, by the way, that this construction is

not the plain and ordinary meaning.  They don't say in their brief, "And by the way, our construction is the plain and ordinary meaning."  They say, "If you don't want to have plain and ordinary meaning, we have a construction for you."

But let's look at their construction.  It effectively just does one thing.  It effectively replaces the word "negotiate" with the word "coordinate."  There's no support in the intrinsic record, in the claims, or in the specification for that word swap.  None.

And furthermore, I would submit, Your Honor, that that doesn't provide the jury any additional guidance.  If we were standing up here and talking to the jury about "negotiate" and were talking about "coordinate," would they really have any more understanding of what that term means?

And so what they're basically doing is they're trying to leave this as a black box that means that "negotiate" could mean anything.  That "coordinate" can mean anything.

**THE COURT:**  What does "coordinate" -- presumably that is a broader term than the way you've defined it.  What's an example of how you can negotiate media content delivery or coordinate that transport, other than the -- the proposed construction that Apple has laid out?

What's an example of what would be excluded?

**MR. FOWLER:**  You know, Your Honor, that's their term.  I don't know what they mean by that.  That's the problem.

THE COURT:  I'm just curious.  Does something come to mind?  Because you are asserting that this thing is too broad.  It's --

MR. FOWLER:  Well, undefined, I think, Your Honor, is the way I would put it, is:  What does it mean?  I would say "black box," which I guess you could say is too broad in the sense that it could mean anything.

THE COURT:  Do you have a view that this encompasses something that is different than three-step process that you've laid out?

MR. FOWLER:  Well, I think -- well, I don't know what's in their mind.  So, I would have to say since they contend that -- whether you call it "negotiate" or "coordinate" -- is something different than what we have identified, then they must necessarily believe that it extends to other things.

What I'm saying, Your Honor, is we just have to always go back to the -- the dictate of the Federal Circuit, which is that the whole purpose of claim construction is to use plain and ordinary meaning to one of ordinary skill in the art.  And the way to determine that is by reading the specification, and the knowledge of one of ordinary skill in the art.

And the two exceptions to this -- we didn't brief this, Your Honor, but you're probably well familiar with this.  The two exceptions to that rule are lexicography and disclaimer.

Either in the spec or in the file history.

No one's arguing lexicography here, and no one's arguing disclaimer.  So that takes us back to how one of ordinary skill in the art would understand this, which, you know, I'm sorry, Your Honor, if I'm in a circle, but at this point that takes us back to the plain teaching of the specification.

And what we have in Dr. Polish's and Dr. Kou's declarations is that one of ordinary skill in the art reading this would do it in the background of UPnP.  And it tells you how the MR and the MS do what's described in the negotiation.  And that's the meaning.

Anything else that we turn to, any other construction -- we've now stripped it, we've stripped the construction out of any moorings that are in the patent.

**THE COURT:**  What other architectures are here?  Or were there, at the time, beside UPnP?

**MR. FOWLER:**  I don't know the answer to that, Your Honor.  Perhaps Mr. Buergi might.  But, the point -- my point is that one reading this (Indicating) would understand it to be in the context of UPnP.

**THE COURT:**  All right.  Let me hear the response.  And, I guess I would like to start of off with that last question, that is, what is it that is excluded?

I mean, as a layperson looking at Apple's three-step process, it seems like pretty -- it would be universal,

logical.  What's excluded?

**MR. THAKUR:**  Your Honor, I have been doing claim construction both as a plaintiff and a defendant for two decades now.  And the whole purpose of claim construction for a defendant is to propose a construction that they don't do.  So, the obvious option is:  What do they do?  But I won't say what they do.  I'll show you what some of the other stuff do.

If I might just quickly turn to the slide real quick.

**THE COURT:**  Slow down.

**MR. THAKUR:**  Sorry.

**THE COURT:**  And, lowering the -- your pitch of voice doesn't slow things down; it's the tempo.  So you need to take a breath once in a while.

**MR. THAKUR:**  Very well.

(Document displayed)

**MR. THAKUR:**  So what we have here in Apple's proposed construction actually are two significant issues.  The first one is this issue of comparison.  And the second one is this issue of instruction, which would read out the preferred embodiment of the patent.

So, put another way, there are actually two non-infringement arguments that Apple proposes, two non-infringement arguments in this construction.

(Document displayed)

**MR. THAKUR:**  Let's focus on the first one.  The first

one is:  What they're asking for is a step that in the process of deciding when to send media content from a media server to a media renderer, their capability both in terms of transport and data content must be negotiated before it's done.

So, what they are creating, UPnP was a multi-vendor environment.  So different people had different -- you had a Samsung and a Sony television.  So you ask me:  What is the alternative?

I am certain that when Samsung signed up to become a member of UPnP, they did not make a business decision to say, "We will not build both the media server and the media renderer in a proprietary system."  That is essentially what they are asking the Court this do.  So, the alternative is a single preselected data format and data content.

So for Apple to win today, they are asking the Court to jump three hurdles.  The first hurdle to is read the patent and determine there is a hole.  The hole, it doesn't -- that it does not disclose negotiation.  If it discloses negotiation, we should stay in the patent.

**THE COURT:**  Say that again.

**MR. THAKUR:**  If the patent discloses negotiation in the patent, itself, then that should be where we would start. There's no reason to go outside to figure out what "negotiation" means.

So the first step that they ask you is to find a hole in

the patent in terms of what "negotiate" means.  And we'll show you that the patent expressly teaches you, so why are we filling a hole?

The second step they ask you to conclude is once you find a hole, you must use UPnP technology to fill the hole, but not any of the other ones.  That's the second step they jump.

The third step they ask you to do is once you decide there is a hole, and to fill it with UPnP, you must go to the UPnP spec.  And what is the most compelling argument, I hope, they ask this Court to rewrite the UPnP spec before bringing it in.  So, there are three things that Apple is asking to you do here.

So, let me start with the first one.  It's in the patent.  And we could stop at the end of this process, and talk no more.

(Document displayed)

    **MR. THAKUR:**  This is the UPnP diagram of how you communicate between the three devices.

The difference is because UPnP was a multi-vendor environment, you had this first three bullet points where the features exchanged what capabilities they had.  Which made sense in a multi-vendor environment.

What they're asking this Court to do is replace this relatively simplistic structure of the old UPnP.

(Document displayed)

MR. THAKUR:  And read out the actual invention.  The patent disclosure.  The patent discloses in figure 15 all the performance.  Including the negotiation.

The only thing it does not do in that negotiation is compare transfer protocols, which is an entirely unnecessary step if you have already decided what transport protocols to use.  And we'll show you that the patent discloses which transport protocol.

So this figure 15 breaks down into three segments.

(Document displayed)

MR. THAKUR:  So, if you look at figure 15, this is the first component, which is this component (Indicating).

(Document displayed)

MR. THAKUR:  This component is what I call the device discovery.  The user end point and that media television get to know each other.  If you will go into the patent, as this Court has already noticed in claim 17 and 18, we say one of the way of doing this is using UPnP.

In fact, we say one of the way of doing device discovery, you can use four different technologies that were available for device discovery.  But this is relating to the device discovery.

Then, you go to the next portion of the patent.

(Document displayed)

MR. THAKUR:  This relates to negotiating the delivery

of the media content.  This is what I was saying earlier on, Your Honor:  There is no hole in the patent to fill.

So if I can walk you through figure 15, what has happened in figure 15 is over the first portion, I've come into a house, I've developed a relationship with a media renderer and my phone.  We both know each other.  But the user end point is the communication tool.

In the next step, the association, it sends the information back to the -- the control point server, and says, "I am Amar, I have a media television renderer at my house and I would like to go to the control point in the movie store and say, 'Please play this movie on this television here.'"

And that is the elements -- if I can -- 1608, view the SSP device discovery information, back to the control point server.

**THE COURT:**  Where is this?

**MR. THAKUR:**  This is 160- -- 1508, excuse me.  So, 1501 through 1507 is the relationship portion.

Now, I would like to watch the movie on this media renderer so I send that information back to the movie store. The control point.

At that point, the control point, which is the movie store, knows I want to watch the movie.  And I want to watch the movie on this television.

So now we have all three of the devices associated that is

1508 -- -9.

Now, in 1510, the device, the server executes the relay control discussion logic. So it knows who wants the movie, and who to send it to. And it's going to use that infrastructure to make that happen.

So then, once the movie store knows how to do this, it sends the information back to the phone. Me. And says, I am now able to do this. We are all set.

Then I, my user device, goes to guess the media renderer, the television, and says: We're all set. Prepare for a connection.

To prepare for a connection, the media renderer says: Yes, Amar, I'm ready to connect, accept the movie; please go ahead and send it. The connection response, which is -- all three are now agree to proceed.

At that point, the RTSP describe, which is the relay transport protocol, is sent to the control point, to get the streaming protocols delivered.

So, if I could crystallize the issue, this is the issue. What Apple says, if you look at the next slide --

(Document displayed)

**MR. THAKUR:** -- is that there must be a comparison of transport protocols. And it shows you three different transport protocols. Our patent says: Use RTSP. It has selected the protocol for delivery.

So, the only thing that they are asking this Court to do is go to UPnP and import the step that the media server and the media renderer negotiate which transport protocol to use, instead of picking one.

Our invention picks one.  They want this negotiation because presumably their device has picked one.

This environment works when Samsung, Sony and different people use different protocols.  If I'm building a system, I don't have to compare these transport protocols.  That is the difference.

So what I was trying to say was they say there is a hole in the patent because there must be a discussion of which one to use (Indicating).  Our patent shows you which one to use. Their additional step serves no purpose whatsoever.

THE COURT:  There's no comparison needed.  It is preselected, the protocol is preselected.

MR. THAKUR:  Right.  And I will show you in the spec where it says that that's an option.

THE COURT:  And I would like to see that in the claim language.

MR. THAKUR:  Your Honor, in the claim language it says in negotiate the delivery, we show you the step.  What they're asking you to do is go down one level below, and get involved in the protocol selection process.  And our patent doesn't get involved in the protocol selection process because

it already picked one.

THE COURT: Well, why does the word "negotiate" appear? What is there to negotiate?

MR. THAKUR: Oh, the "negotiate" is the steps up above, which is the associating the device, and executing the relay decision to send it to them.

So, one option would be to send it to the user end point; one option would be to send it to the media renderer. Another option would be which kind of data format to use.

And we'll show you in figure 17 that that step of 1610 can include trans-coding which is -- what I'm saying is the transport protocol is picked in our one. Our patent discloses the data format doing it even completely differently than what they propose the construction would be. So, it would be reading out figure 17 for the data format.

THE COURT: So, tell me again: What does "negotiate" mean in this context? Where it says "negotiate media content delivery between the MS and the MR."

MR. THAKUR: Correct. So what "negotiate media content delivery" means is that the control point location -- I must identify who the -- who is the requirer, my phone. I must conclude: Where is the destination, the media renderer, I want to send it to.

I need the destination address, the IP address for it, and I need to find a transport protocol to get there. In this

case I've got the RTSP one.  And so, what the patent means in terms of negotiation is going through these steps to get there.

And, it may also include -- the patent negotiate was written --

THE COURT:  When you say "identify the transport protocols," depending on the MR?

MR. THAKUR:  Yes.  But in this particular case, identifying the transport protocol means that when it is ready to send the content, it needs a transport protocol.  There's no disagreement that a transport protocol is needed.

(Reporter interruption)

MR. THAKUR:  And there's no disagreement that a data format is needed.  But if, within your patent system, you have identified -- in your negotiation you've identified the transport protocol, and you've identified your select protocol, you're going to take that option and proceed with it.

So --

THE COURT:  But the patent covers a broader situation.  Not just whether it's the same vendor and one preselected protocol.  It is capable of hunting and comparing and choosing the --

MR. THAKUR:  Correct.  So what we are saying is we can implement it with a fixed system, a single-vendor

environment, or you may implement it in a multi-vendor environment using this option.

We're not excluding the comparison process.  We're saying the comparison process is not necessary to make the invention functional.  And so, don't read in that limitation into the patent.

THE COURT:  So their -- their construction would exclude a single-system preselected protocol scenario.

MR. THAKUR:  As disclosed here (Indicating), correct.

THE COURT:  And that is what the problem is.  It's too restrictive.

MR. THAKUR:  It requires it, rather than allows it.

THE COURT:  And the point of the specification is that that shows one embodiment that doesn't require it.

MR. THAKUR:  Correct.

THE COURT:  Okay.

MR. THAKUR:  And --

(Document displayed)

THE COURT:  So what would you -- in terms of the word, though, "negotiate," I mean, it strikes me is -- a jury's not going to know what that means.  It's not an obvious lay term.

MR. THAKUR:  (Nods head)

THE COURT:  And so to say "plain meaning" isn't going to be very helpful.

**MR. THAKUR:**  Your Honor, I found the word "plain meaning" helpful.  If the Court concldes that it is not, and I expect it will issue a construction, I would expect that the construction would allow the flexibility for a preselected protocol or -- so, something on the magnitude of negotiate, transport, using a data transfer protocol and a data format. Which could -- which would be broad enough to allow for a single format or a multi-format.

**THE COURT:**  Okay.

**MR. THAKUR:**  And as I said, the last step of figure 16 deals with the issue of instruction.  We come back to that. They have put the instruction for delivery into the negotiation step, and that's inconsistent with the way the spec deals with it.

So their instruction actually has taken an instruction for delivery, put it into negotiation, and done so in a format, because what they're talking about is what the IT server does, the control server does.  And the instruction for delivery, as this Court earlier, itself, recognized, it would actually, most likely, come from the media renderer, itself.

And on the front page of the patent, the preferred embodiment involves an instruction that does not come from the server, but actually from the media renderer.

I'll get into a little more detail about that, but let me talk a little bit about the data.

(Document displayed)

**MR. THAKUR:**  So, remember, we said they required a comparison of both the transport protocol and the data formats.  Our patent shows you an alternative, which is called "trans-coding."

What that means, in sort of plain English is I can have a fixed data.  Just one way of doing it.  Mpeg.

Actually, this slide may help better.

(Document displayed)

**MR. THAKUR:**  I can have a fixed way of data.  I've already decided which data form to use.

No. 2 is I can have devices that compare to data format.

And the third way for me to do is it to do what is called a trans-coding.  What "trans-coding" means is I'm going to keep only one version of the data.  I'm not going to have a menu of five different items.

But if you want me to change that item a little bit differently, I will do it, accommodate one of you.  So it is a single data format that is modified, like a cook -- order-on basis, rather than a precooked selection option.

What Apple is asking this Court to do is rule out the pre-provision which is disclosed in the spec, rule out the trans-coding that's disclosed in the spec (Indicating), and require the comparison and selection of data which actually happens to be the one embodiment that's not disclosed in the

spec.

THE COURT:  So maybe you can explain to me what trans-coding is, and how that's described in figure 17.

MR. THAKUR:  Certainly Your Honor.  It is actually in somewhat rather detail described in Column 23 through 24, in lines 35 through 38 (As read):

"Trans-coding can involve, for example, changing the spatial and/or color resolutions of a video stream to take advantage of higher-resolution viewing capability of a discovered device."

So what trans-coding is, you take the data and you modify the data based upon the media renderer that it's going to.

And then it goes down below and explains technologically how trans-coding occurs.

THE COURT:  And that changes the data format?

MR. THAKUR:  Correct.

THE COURT:  Okay.

MR. THAKUR:  Just to be accurate, it changes the data.  The word "format" is associated with something that exists.  So, it changes the data, and you create a new data.

So, while the format could be, you know, I'm going to send 16 digits at a time, you still send 16 digits at a time, but the data, itself, is trans-coded.  Which makes it -- it's (Inaudible) preselected is no longer an option.

(Reporter interruption)

**THE COURT:** Preselection is --

**MR. THAKUR:** Preselection is no longer an option because the data is changed as it's sent. Before it's sent.

**THE COURT:** Couldn't you preselect the format?

**MR. THAKUR:** Could you preselect the format? I guess you could say: I'm going to accept the format in a particular compression level, yes.

**THE COURT:** And the trans-coding, that's an option? Is it required? Or --

**MR. THAKUR:** Absolutely an option, because figures 15 and 16 don't mandate that.

**THE COURT:** It's only in 17.

**MR. THAKUR:** Correct.

**THE COURT:** But it is an option that you say is precluded by Apple's proposed construction.

**MR. THAKUR:** Correct.

**THE COURT:** All right.

   (Document displayed)

**MR. THAKUR:** Your Honor, so, again, I'm going to quickly come to a conclusion on this issue, where they say: UPnP is what our patent is about.

   If you look at the summary of the invention, UPnP shows up at the very end. And what it -- why our inventor used UPnP was it was relating to device association. That was what interested him the most.

And actually, in terms of technologically, I explained, was actually the inventor Ellis Wong who was the UPnP specialist who joined the group towards the end, who brought this capability in, and said:  Let's use what's out there.

**THE COURT:**  They say UPnP is referred to numerous times throughout the specifications.

**MR. THAKUR:**  Absolutely.  I do not disagree that UPnP was a very material presence.  It may have been a dominant presence.  But, that doesn't mean that my patent is limited to that, sort of, one scenario, and the other technologies that are disclosed are irrelevant for my consideration.

So, this is the second point, I think, Your Honor:  I believe there is no hole in the patent; we should stop there. But if the Court concludes that there is a hole in the patent, why are we going to UPnP as the only option for incorporating it?

That's the second jump that Apple asks this Court to make is find a hole, go fill that hole with UPnP, because a reader would only understand it to be UPnP.  And in the summary of the invention it shows up at the very end for device relationship.  If you read claims 17 and 18, we only talk about UPnP for device recognition.

We don't deny UPnP was a material presence.  It's in our brief; it's in our patent.  But, that doesn't mean that the others did not exist.

So, first point:  There is no hole.  Second point:  There is -- we shouldn't have to go to UPnP to fill it.  Even, again, the patent, the very slide they show, you know, "in certain embodiments."  Why would you say "in certain embodiments" when the entire patent is about UPnP?

Yes.  UPnP is a material presence.  We recognize it; we don't deny that.

(Document displayed)

**THE COURT:**  All right, thank you.

**MR. THAKUR:**  Your Honor, actually, one last point: They say you have to go to UPnP spec.  And I made the point that they asked this Court to rewrite the spec before it can import.

So, if the Court believes intrinsic evidence is enough, we can stop.  But, I do want to show this Court the rewrite of the UPnP spec that would be required.  I'll promise it will take no more than 30 seconds.

**THE COURT:**  All right, but don't talk too fast.

**MR. THAKUR:**  Okay.

(Document displayed)

**MR. THAKUR:**  So, what Apple asks this Court to do is say the control point performs these ten steps.  And, they should be imported in the specification because someone would not know what "negotiation" is.

But what Apple has done is taken the spec and hidden the

actual truth from the Court.  And what I mean by that is --

(Document displayed)

**MR. THAKUR:**  -- this is what the section actually looks like.  They cropped the top of the thing, and they cropped --

**THE COURT:**  What is this from?

(Document displayed)

**MR. THAKUR:**  So, this is the slide they showed you.

(Document displayed)

**MR. THAKUR:**  But this slide is really this slide (Indicating).

(Document displayed)

**MR. THAKUR:**  This is the spec sheet for the UPnP specification.

So what they have presented to this Court as being the UPnP specification for control point is actually this (Indicating).  Not what they provided you.

**THE COURT:**  And, what -- what is there that's important?

**MR. THAKUR:**  What's there that's important is --

(Document displayed)

**MR. THAKUR:**  -- if you read the section at the top, it says (As read):

"The following describes a generic Central Point (sic) algorithm that can be used to interact with a

variety of..."

Stuff.  As I said, if they asked this Court to import the spec in, they ask this Court to do one thing first:  It must change that word "can" with "must."  They ask -- the third step they ask this Court to do is rewrite the specification before it is imported.

And the same is true at the end of the -- end of that section.

(Document displayed)

**MR. THAKUR:**  It describes UPnP as a typical structure.  When you say something is typical, you mean it can be different.  And what they say is it can't be different; require it.

(Document displayed)

**MR. THAKUR:**  And again, rewrite that word "can" to a "must" before you import it into the patent.

**THE COURT:**  Okay.

**MR. THAKUR:**  That's all I have on that, Your Honor.

**THE COURT:**  Thank you.

**MR. FOWLER:**  Your Honor, may I have just a few minutes, please?

**THE COURT:**  Yes.

**MR. FOWLER:**  Thank you.  So, I'm afraid I'm not a fast writer.  And I would request that the Court, if the Court's going look back at the transcript of this hearing on

one issue, that it do so with what Counsel just said.

Because Your Honor asked the $24 question: If "negotiation" doesn't mean what Apple says it means, what does it mean? You asked Counsel that question very directly.

And look, look at what he said. He started to say "negotiate" means this, this, this and this. And I have some rough notes. And he didn't even get through before he was stopped.

But he did have -- he said what "negotiation" meant to him. And it wasn't the same as what our construction was. But it sure as heck wasn't "coordinate." And it wasn't "plain meaning."

So, I take this all with a grain of salt because Counsel is very learned, but he is not Dr. Wigner. Dr. Wigner never said anything of what we just heard today. There is no support for this. This is all lawyer argument.

But what it underscores, if -- it sure is not plain meaning to a jury, and it's not what they said. He was imposing a lot of requirements: Must, must, must, must be all these things. Their own construction doesn't adopt that. So, their construction sure can't be right.

I didn't hear anything -- he was attacking our construction, Apple's construction. I didn't hear anything that supports their construction, which would be just a black box.

Your honor, I don't know the easiest way to demonstrate this. I want to show something both on my slides and on the ELMO.

But, can I ask Your Honor, do you have a copy of the patent handy? Because then I can just point to it.

THE COURT: Yes. Yep.

MR. FOWLER: So, what I would like to do is if you could turn to figure 15, if you have that, and just give me a second to find my proper place in my slides so I can show you something.

(Document displayed)

MR. FOWLER: Here we go.

So, one of the predicates of the arguments that was made with respect to figure 15 and 17 -- and I again want to underscore that although they had least two briefs to do this, you didn't hear their expert Dr. Wigner say any of this, and this is not in their briefing, so this was just argument from Counsel that you heard -- is at least what I heard is that figure 15 represents an embodiment that wouldn't be covered by Apple's construction because it's -- I can't remember the exact word, but it's a single system or integrated system --

THE COURT: Preselected protocol.

MR. FOWLER: Preselected, right. But that's not what -- and that this (Indicating) is not UPnP. That was my takeaway, is figure 15 is not UPnP involving multiple

components, different components, and it's a single environment.

THE COURT:  Well, the point is there's no comparison. There's no attempt to figure out which protocol to use because it's already been preselected.

MR. FOWLER:  Well, that's what he said.  But if you look -- Your Honor, I apologize for pointing like this.  But if you were to look at figure 15 on the left-hand side -- and I know this is small, but if you look at 1512?

Do you see that, Your Honor, step 1512?

THE COURT:  Yeah.

MR. FOWLER:  And you see where it says "Prepare for connect," "connection," and then there is an open and closed parentheses?

THE COURT:  Yes.

MR. FOWLER:  And what I would like to draw your attention to -- and this is actually in our brief where we point out this particular command.

But if you look up on the screen right now on Slide 16, and you look at step 5, you can see here it talks -- it has that exact command:  PrepareForConnection.  It's in the first line there.  I realize it's a little faint.

But, where it says "Configure Server/Renderer" --

(Reporter interruption)

MR. FOWLER:  It says (As read):

"The devices's

ConnectionManager::PrepareForConnection()..."

Do you see that command there, Your Honor?

**THE COURT:**  Yes.

**MR. FOWLER:**  That's the same command that you see in 1512 (Indicating).

So, if that teaches you anything, Your Honor, that teaches that 1512 is not the closed system that they're talking about, but something that's operating in the manner described in UPnP.

And you certainly can't necessarily draw the conclusion that was argued by Counsel, which is unsupported by the record.

And the same thing would apply to figure 17 which he pointed to.  And if you turn to figure 17, you can see in the left-hand column at step 1709 on the left-hand side of the figure, 1709, it has that same command.

So, again, at least these two figures seem to contemplate that you're operating within the world of UPnP because these two figures are using a specific UPnP command.

So --

**THE COURT:**  But, address the more general point that the way you define it, whether it's faithful or not to UPnP, requires -- not merely allows, but requires that there be a comparing of transfer protocols and content formats when one

embodiment of this patent is one that involves a preselected protocol and format, and there's no need to compare.

MR. FOWLER:  Well, I would take issue with disclosing something that's preselected.  That's the inference that was drawn by Counsel.

What I was saying is that by using this UPnP protocol command, you could draw the other inference.  So there's nothing here that would be the sharp disclaimer.

And again, there's nothing in the record in terms of evidence that I'm aware of -- Counsel can correct me if I'm wrong -- that would support anything he said.

But what we do know, what is in the record before you, is you can look at Dr. Polish's and Dr. Kou's declaration which says that you need to be able to match up the two protocols and the two systems and two different devices; otherwise they won't work.

And Your Honor, unless you have other questions, that's what I have.  I guess to summarize, you know, one reading this, one of skill in the art -- Dr. Kou says this, Dr. Polish says this -- would understand this to refer to the negotiation process described in these steps.  They've said that.

Their construction, on the other hand, can't be right.  We know that.  It can't be right.  Counsel's own description in response to your direct question of what "negotiation" means in this patent proves that to be wrong.

So, we know their construction is not right.  So I guess the dilemma the Court will have is the evidence points -- supports our construction, Apple's construction.  If we know their construction's wrong, where else do you go?

At that point I'm kind of wondering, well, if our construction is not right and we know theirs is (sic) right, is it indefinite?  Because it has to have meaning.

**THE COURT:**  I'm not sure that's a natural inference, but there's also the problem that two sides take extreme positions, and just because they're both wrong doesn't mean it's indefinite.  So, I think that's a non sequitur.

Explain to me 1712, RTSP.

**MR. FOWLER:**  I'm going to ask Mr. Buergi to come up and address that, if you don't mind, Your Honor.

**THE COURT:**  Okay.

**MR. FOWLER:**  So, I'm sorry; your direct question is -- I may have --

**THE COURT:**  Of course, maybe it's figure 15 I was looking at.

If you look at 1514, RTSP describe and RTSP response, if I'm not mistaken, I thought that was what was referred to, looking at figure 15 toward the bottom, as a description of the sort of preselected protocol.

(Off-the-Record discussion between counsel)

**MR. BUERGI:**  Your Honor, I think setting aside RTSP

describe and RTSP setup for a second, regardless of the existence of those things in the bottom of the figure, the reference in the figure to the function, the specific UPnP function PrepareForConnection still necessarily requires that there was a selection of supported transfer protocol and data format.

And --

THE COURT:  Right beneath that, it says "RTSP streaming."  Right?

MR. BUERGI:  Correct.  And so, regardless of that saying RTSP streaming, the fact that it says "PrepareForConnection" necessarily requires that there is a selection of data format --

THE COURT:  What is RTSP streaming?

MR. BUERGI:  RTSP is real time streaming protocol. And my understanding -- I have to admit I may not be fully educated on this because we haven't heard this from Aylus before.  But my understanding of RTSP is it's a method for delivering video.

And, in the context of the figures, it's not really relevant to what we're discussing.  I understand RTSP to be one of the out-of-band transfer protocols that would exist on the bottom of Figure 12 (Indicating), going from the media server to the media renderer.  As opposed to the negotiation steps which occur elsewhere in the architecture, specifically

between the control point and the media server, and between the control point proxy and the media renderer in the case of Figure 12.

So, the "RTSP" refers to something that's just not related to the negotiation step that we're talking about.

THE COURT:  What does "out-of-band transport protocol" mean?

MR. BUERGI:  That simply refers to the fact that the video delivery is delivered using a non-UPnP protocol.  UPnP does not support delivery protocols.  So you have to use something else like RTSP.  The UPnP instead is used for the negotiation of that delivery.

So once the actual delivery happens, that doesn't use the UPnP.  The UPnP comes before that.

THE COURT:  How do we know there is negotiation, as you have defined it in figure 15?

MR. BUERGI:  I'm glad you asked that.  I just wanted to mention that.

(Document displayed)

MR. BUERGI:  Again, returning to step 1512 in figure 15, it's "PrepareForConnection()," which, by the way, is not a generic term.  It's obviously a specific function call.

(Document displayed)

MR. BUERGI:  And if we go to Apple's slides at slide 16 --

MR. FOWLER:  18.

MR. BUERGI:  Well, I know -- if we go to 16, which shows the UPnP AV architecture, and again, returning to step 5 where it discusses that exact same function call -- and this function call, by the way, doesn't appear anywhere else.  This comes from the UPnP spec.

(Document displayed)

MR. BUERGI:  It says that function -- that action -- informs the media server and media renderer that an outgoing/incoming connection is about to be made -- and this is the important part -- using the specified transfer protocol and data format that was previously selected.

So when you're calling PrepareForConnection, you call that after you previously selected a supported transfer protocol.  And the supported data format.

In other words, this step 5 occurs after the previous steps in which you select a supported transfer protocol and data format.

In other words, a transfer protocol and data format that is supported by the media server and the media renderer.  So to just close the circle here, the fact that that function call is in figure 15 shows that you're performing the steps in the UPnP AV architecture.

THE COURT:  Well, so --

MR. BUERGI:  At least, step 5, which -- I'm sorry, I

didn't mean to --

THE COURT:  Yeah.  But you can get to step 5 if you have a single-vendor system without going through steps 3 and 4.

Isn't that the argument on the other side?  That you don't have to go through because it's not a multi-vendor situation where you have to hunt and make sure -- protocols, and then link them up?  That you may already have -- you can skip right to 5?

MR. BUERGI:  I think there are two responses to that.  First is the UPnP spec does not disclose that.  And second, and more importantly, when the UPnP architecture is starting discovering devices, it doesn't know what -- who the manufacturers of the devices are.  They could be all the same, from the same manufacturer, or they could be wildly different.

So this is something that still has to be done to even discover that you're in a single -- I forget the term -- a homogeneous system.  The UPnP architecture doesn't know that these devices are similar, until it performs those steps.

After it performs those steps, sure, it may discover:  Oh, all these devices support the same set of transfer protocols and data formats.  But, unless you perform those steps, I don't see how there would be any way of knowing that.

And, if I could just say one more thing:  Even if that's true, that's not what figure 15 says.  It has that specific

function call, which is defined only in one place, only in the UPnP AV architecture.  And the UPnP AV architecture teaches those steps.

MR. FOWLER:  It presupposes that the other steps have occurred before.

THE COURT:  Well, maybe that's the question.  Because, prepare for a connection, if it presupposes, it does not include -- step 5, not steps 3 and 4.  And I think the argument on the other side is that one of the embodiments of this patent could be you skip from 2 to 5, and you skip 3 and 4.  Unlike UPnP architecture.

MR. BUERGI:  That -- the embodiment of skipping steps 2 to 4 does not exist in the specification, anywhere.  That doesn't exist in the UPnP architecture.

MR. FOWLER:  And it's not supported --

THE COURT:  Where do you see that in figure 5?  Where is step 3 and 4?

MR. BUERGI:  I'm sorry, Your Honor; could you repeat your question?

THE COURT:  Where are steps 3 and 4 of the UPnP negotiation architecture evident in figure 15?  Could you show me?

MR. BUERGI:  Yes.

THE COURT:  I see where step 5 is.  It's at 1512.

MR. BUERGI:  So steps 3 and 4 are not expressly --

the actual words are not in figure 15, but they are the precursor steps to step 5.  So you can't do step 5 unless you've done steps 3 and 4.  And, for that matter, steps 2 and 1 before it.

If you read the steps in the architecture, they come in a logical sequence.  And each one is built upon the previous one.

**THE COURT:**  All right.  Let's move on to the next --

**MR. THAKUR:**  Your Honor, if I can make one point on this?

**THE COURT:**  One quick point.

**MR. THAKUR:**  I promise.  This question, media prepare for connection is actually, in the spec, described as an optional feature.  So our disclosures --

**THE COURT:**  Where are you looking at?

**MR. THAKUR:**  If you look for -- sorry.

Can you put that slide back up?  The one Apple slide back up?

(Document displayed)

**MR. THAKUR:**  If you read the section that says (As read):

"Note:  Since PrepareForConnection() is an optional action, there may be situations..."

Where they do not implement PrepareForConnection.  The point I'm making, Your Honor, is our patent in figure 15 uses

UPnP device discovery.  It says:  Hey, UPnP is a standard protocol for me to go ahead and secure a connection for delivery.

It -- so my point is, Your Honor, we know when we want to use some elements of UPnP.  And we use them.  When we don't want to use some elements, we don't use them.

They're asking this Court that we must buy this UPnP specification, wholesale.  And as we showed you, the patent says -- it says "can."  It doesn't say "must."

And they would ask this Court to rewrite that spec.  That's it, Your Honor.

(Reporter interruption)

**THE COURT:**  All right.  We're going to take a break, and then we will come back, and I want to discuss "proxy."  And then, "cooperate" and "serving node" are the last three terms.  Right?

Thank you.

(Recess taken from 3:07 to 3:21 p.m.)

**THE COURT:**  Okay.  Let me -- I do have a followup question on what we were just talking about.  And that is:  When it says negotiate media content delivery between the MS and the MR, can it be talking about anything other than transfer protocols and data formats?

In other words, we're not talking about identifying the user or -- you know, this is specific.  Negotiating content

media content delivery between -- whether it -- you know, it's restricted to the three-part scheme of Apple, or it's broad enough to encompass the single-vendor -- are we talking about anything other than some kind of coordination of data formats and transfer protocols?

MR. FOWLER:  I agree with Your Honor.  I wouldn't use the word "coordinate."  But I agree that's the subject matter. Yes, Your Honor.

MR. THAKUR:  Your Honor, we agree that's the subject matter, but it's not limited to that subject matter.  There are things in the real-world architecture -- when you go below the architecture, there are real-world practical capabilities.

So, for example, you would want to make sure -- if it's a device, if it's a battery device, has sufficient battery. There are things that -- up above capability that you may monitor.  You may decide routing, for example.  If you have -- you know, in a commercial environment, the same movie is not going to fit one server or one delivery.  You may have different places where it's sent.

So, negotiating delivery includes use of a transport protocol and a data format.  But also, in a pragmatic environment, will likely involve other analysis.

THE COURT:  An example of another analysis in the media content delivery between the MS and the MR would include what else, besides protocols and formats?

**MR. THAKUR:** The negotiating pathway, the locate -- you know, alternative -- the alternatives from where the media -- there are alternatives to media center, you know, selecting a particular media center.

**THE COURT:** Media server?

**MR. THAKUR:** Server, thanks.

**THE COURT:** You mean there may be multiple media servers --

**MR. THAKUR:** (Nods head)

**THE COURT:** -- that could provide the same --

**MR. COOPER:** Correct.

**THE COURT:** -- content.

**MR. THAKUR:** So, establishing -- negotiating the full relationship.

**THE COURT:** You can't come up with anything more specific than "coordinate" in terms of "negotiate"?

**MR. THAKUR:** Your Honor, I think the word "negotiate" means negotiate. Negotiate transport of content using a format and a protocol. We are essentially offering to merge the one with Apple without requiring those steps.

**THE COURT:** All right. Let's move on to "proxy."

(Document displayed)

**MR. FOWLER:** Your Honor, I think I can move through this one fairly quickly.

As you know from reading our papers, we think that the

definition of "proxy" used by the examiner should be given pretty heavy weight here.

We have some cases, *Phillips* and *Salazar*, that say that the Court can note what the examiner did because the Court can note that the examiner can reflect what one of skill in the art did or understood at the time of the invention.

And here --

(Document displayed)

**MR. FOWLER:** -- we have a definition of "proxy" that comes from dictionary.com. As I'll point out later, in contrast, this definition is in the context of what we're talking about. We're talking about computer services and software. And that definition is:

"A process that accepts requests for some service and passes them on to the real server."

And on slide 52 --

(Document displayed)

**MR. FOWLER:** -- this is all in our papers -- we have an excerpt out of Exhibit 5 at Page 16 that shows that the examiner took note of that dictionary definition.

And we have the excerpt out of the actual file history at the bottom of the slide, at Exhibit 6 at Pages 4 and 5, where he utilized that definition.

(Document displayed)

**MR. FOWLER:** Now, Aylus never challenged that

definition during prosecution.  The specification, itself, does not specifically define "proxy" or contradict this definition.  And so, it would be appropriate to utilize this definition.

(Document displayed)

MR. FOWLER:  Now, we now go off of into kind of two branches here.  One is that Aylus attacks our position by basically saying:  Well, okay, you have that definition.  We don't agree that's the right one, but even if it was, your construction is not the definition.

So what I would like to do is address that for a minute.  The job of the Court is, of course, to construe the term in the context of the claims that it's surrounding.

And what we did here, Your Honor --

(Document displayed)

MR. FOWLER:  -- was we took the examiner's definition of "proxy" -- this is slide 55 of our deck -- and then we applied it to the surrounding claim language.

And I'm going to walk through that in a minute, but the high-level view is:  The language which is the top -- the claim language which you can see at the top of the slide is:

"the CP logic serves as a [first/second] proxy."

So the process we're talking about -- and I don't think there's a dispute over this -- is the CP logic -- that's in green, so that's where it fits into Apple's construction --

and the real server here is either the MS or the MR, I can't believe that there would be a dispute over that, that's what we're talking about here -- and then the request for service are the control messages.

And let me walk through each one of those in turn.

(Document displayed)

MR. FOWLER: So, stepping back, at a high level, we have the spec sites at the bottom of slide 56 -- these are all in our brief -- where it talks about the CP being the proxy, we know that from the claim, receiving control messages from the CPP, and then sending those control messages at the proxy to either the MS or the MR that's described the specification cites we have down below.

(Document displayed)

MR. FOWLER: So, let's take each one of these in turn.

The CP logic is recited in the claim that's reflected in our construction. It's also reflected by the definition.

(Document displayed)

MR. FOWLER: We also know that the claims recite the MS and the MR. Those are the real servers of the examiner's definition. So, that's in Apple's construction.

(Document displayed)

MR. FOWLER: We also know that the control messages are received by the CP from the CPP. That's -- in the claim

it talks about the CP cooperating with the CPP logic.  The specification says that these requests emanate from the UE with CPP logic, and are forwarded to the CP.

So this is the part of the construction that's -- it's from the CPP.  I don't think there's any dispute about that.

(Document displayed)

**MR. FOWLER:**  And then lastly, the control messages, that's in the specification.  So, these are each of the parts.

So what we've done is we've taken the examiner's definition and we've applied it to what's taught in the specification.

(Reporter interruption)

**MR. FOWLER:**  We've taken the examiner's definition and we've applied it to the teaching of the specification.

So let's turn to Aylus's construction.

(Document displayed)

**MR. FOWLER:**  Now, first of all, they ignore what the examiner said "proxy" is.  They ignore the fact that they did not challenge the examiner's definition of "proxy" during prosecution.

But, I think the more important point here, Your Honor, is their whole construction is based upon a definition of "proxy" that clearly doesn't apply.

(Document displayed)

**MR. FOWLER:**  They're basing it on a definition of

"proxy" that has to do with, like, a shareholder, you know? Where I have a share and I say to the clerk, the clerk can vote my share. That kind of proxy. That's the definition that they're relying on, as a person authorized. That has nothing to do with computers; nothing to do with software.

If we're going to be pointing to a definition of something, we should point to a dictionary definition that pertains to the technology, which is what the examiner did.

(Document displayed)

**MR. FOWLER:** Neither the claims nor the specification refer to an authorized actor, which is what their construction is. And it doesn't shed any light as to what it would mean for a CP logic to act as an authorized actor.

And that's really all I have on this, Your Honor, unless you have some questions.

**THE COURT:** I guess the question I have is that: First of all, the proxy, you've got first or second proxy --

(Document displayed)

**THE COURT:** -- and the two proxies appear at different points in claim 1.

**MR. FOWLER:** Uh-huh.

**THE COURT:** And so your definition about, you know, taking it, and messages from the CPP --

(Document displayed)

**THE COURT:** I mean, I think my simple-minded -- why

don't we just construe the term "proxy"?  It's got a different context -- the second proxy has a different context than the first proxy.

And, your definition doesn't seem to take that into account.  At least, I'm not understanding it to be so.

**MR. FOWLER:**  Well, a fallback position that the Court could take -- and we've discussed this as well -- is you could just define "proxy" and use the definition out of the dictionary.  That would be an alternative approach.

**THE COURT:**  That was going to be my next question.  If you simply substitute "proxy" for what the claims examiner did, and accepted, and what seems to me to be uncontested, at least in the prosecution of -- process that accepts requests for some service, and pass them on to the real server --

**MR. FOWLER:**  I don't -- Your Honor, I think -- I think our construction, Apple's construction is more -- is faithful to the teaching of the specification.  But that approach I would not say is wrong.

**THE COURT:**  All right.  Let me find out what's wrong with that from your perspective.

**MR. THAKUR:**  Your Honor, so, first of all, we actually accept the examiner's definition as one possible explanation.

Our concern with Apple's construction or proposed construction was that they transform the examiner's proposed

definition into two entirely not -- non- -- I mean, non-infringement arguments allegedly that have nothing to do with this case.

(Document displayed)

MR. THAKUR:  So, if the Court wants to adopt the definition of what the examiner actually said, that is, "request a service and passes it on to a real server," we do not object.  If that was the question the Court was asking.

THE COURT:  Would there be any confusion about what the real server is?  Or would that be obvious in the context, as this unfolds before a jury?

MR. THAKUR:  Your Honor, it will be absolutely clear, in our opinion.

THE COURT:  All right.  Well, seems like the parties don't disagree with going that route.  And it seems to me that's faithful both to the prosecution history here, and the examiner's employment of the dictionary term, which was not contested.  So, that's what I'm inclined to do.

Let's move on, then, to "cooperate," cooperate with the CP logic to negotiate media content delivery, et cetera.

Some of this sounds familiar.  But, tell me what the -- what your view is.

MR. FOWLER:  Sure.

(Document displayed)

MR. FOWLER:  Here again, Your Honor, I don't know if

-- I'm tempted to just say one thing, and then ask Your Honor if you would like the other side to speak.  Because --

(Document displayed)

**MR. FOWLER:**  -- I'm not sure anymore what the dispute is.

If you look, we have on slide 35 Apple's revised construction.  And in the revised construction -- and this is not something we have done for this hearing.  This is in the submission that we gave Your Honor, that Your Honor signed off on.  We've added the words "at least."

From the briefing, Aylus had a single complaint about our construction.  They only had one thing to argue about.  And that -- that was their reading of our prior construction, which was everything without the words "at least."

And their position was that our construction would mean that the CPP logic could communicate with only the MS or the MR, but not both.  And that the CP logic could only communicate with the MS or the MR, but not both.

That was not our intent.  So when that argument was made, we quickly said:  No, I'm sorry -- and I'll take the blame for this.  Maybe our construction was ambiguous in that respect.  But, that was never our intent.

So we added the words "at least" in there, which means that under our construction, the CPP logic could communicate with both the MS and the MR, and the CP logic could

communicate with both the MS and the MR.

Since that was their only dispute with our construction, I don't know what to respond to. I can go through my whole deck explaining this, but it might be more advantageous to hear, Your Honor -- it's up to you -- what they have to say.

But what I can say is their construction is certainly not right. Again, this is very similar to some of the other claim terms we've looked at. They said plain and ordinary meaning, but they don't say what that is. We don't know what that is.

And they again say: Well, if you don't like plain and ordinary meaning, we have a construction for you, which suggests that they think "plain and ordinary meaning" means something different. And that's: Work with CP logic to coordinate the transport of audio/visual content from the MS to MR.

But again, as with the other claim term we talked about, there's no support in the specification or anywhere in the intrinsic evidence, or for that matter, the extrinsic evidence, that would support basically exchanging "cooperate" with "work with." There's no support for that at all. They just said it.

And it certainly doesn't give the guidance -- any guidance to the jury as to the meaning. So I would say that there's no support for their construction.

I'm not aware of any attack that they have on our

construction as revised, so it strikes me that our construction is the way to go.

Your Honor should -- may I have the chance to rebut if they do have --

**THE COURT:**  Yeah.  So, let's -- let me hear what Aylus's concern is.  Then you will get a chance to respond.

(Document displayed)

**MR. THAKUR:**  Your Honor, what Apple is doing -- Apple's argument is:  We rebut it to a prior construction, because that's what we had.  And they have changed the construction, and so we didn't get a chance to rebut that slightly new construction.

But what the construction does is still preserves what is obviously their intent of -- of carving out one of the claims that is the accused claim.

So, let me explain what I mean by that.  What they are saying --

(Document displayed)

**MR. THAKUR:**  -- is that the -- the user end point must communicate with at least one, and the other one must communicate with at least the other one for purposes of delivery.

Our patent expressly contemplates, discloses, and is the preferred embodiment, that the negotiation of the delivery will actually occur by one, not -- one or -- or not the other.

So my point is:  Once I have purchased the movie and I have wifi access, I'm going to go to the media renderer to go get the movie.  I'm not going to go back to the store every time I want to watch the movie.

And their construction would require that every time I want to watch a movie, I have to go back to the store to get permission.

But, let me bring it back to the spec.

(Document displayed)

**MR. THAKUR:**  So the intrinsic evidence is:

"The user may optionally decide to disengage the serving node from controlling the media server and allow the media control to be handled directly from the media renderer."

That scenario is ruled out by their construction.

(Document displayed)

**MR. THAKUR:**  It also rules out how claims 1, 2 and 4 work.  The way the invention was contemplated was there can be three scenarios in which how the media content will be delivered.  It will be where both do something, which will be okay with their construction; where one --

**THE COURT:**  You say both do something?

**MR. THAKUR:**  Right.  So, both the phone and the server (Indicating) work together to have the content delivered.  That is claim 1.

Claim 2 is the user has purchased the movie, and now he wants to watch the move in his house.  I have wifi access.  I go to the media renderer.  The media renderer goes to the server and brings me the movie.  I don't go back to the movie store again.

Claim 4 is the third alternative.  The third alternative is:  I don't have -- I don't have wifi access.  So I go back to the movie store and say:  I want to watch this movie on this media renderer; please send it.

So that's three different structural scenarios for delivery.

What they're trying -- what their construction does is rule out claim 2.  And they do that by artificially inserting in this requirement that one must talk -- at least one must be talking to each.

And the spec is littered with examples where this second alternative scenario, which is claim 2, is disclosed.

(Document displayed)

**MR. THAKUR:**  And what they do is selectively cite language in support of their point.  But, let me show you the language (As read):

"The CPP logic is invoked to negotiate media content delivery between a media server and the media renderer, if the media server and the media renderer are both in communication with the UE via a local

wireless network."

This is claim 2. In claim 2, CP does not communicate with the media server or the media renderer. This requirement that they're inserting in is contrary to what claim 2 does, and what is the intent.

THE COURT: You said "CP."

MR. THAKUR: Oh, sorry. The CPP. So this scenario is where the phone has wifi access, goes to the media server, which goes to the media -- excuse me -- goes to the media renderer, which goes to the media server, and gets the movie. It is our preferred embodiment. It is on the front page of the patent.

THE COURT: It says (As read):

"The CPP logic is invoked to negotiate media content delivery between an MS and MR if the MS and MR are both in communication with the UE via a local wireless network."

Both -- the UE is talking to both the MS and the MR?

MR. THAKUR: Yes. When I have the ability to talk to both of them, and I have the wifi capability, I have a wifi router in my house, I can communicate with my media renderer. Wifi router can take me to the media server. And, third possibility is I can communicate to my media renderer, which can then send wire line information to the media server.

THE COURT: But what's highlighted, isn't that what

you -- I thought that's what you described as claim 1, where the phone is in -- in communication with both the renderer and the server.

MR. THAKUR:  No, that's claim 2.  So let me just go back and show you the three pictures of claim 1, 2, 3.

(Document displayed)

MR. THAKUR:  Claim 1 is this:  Claim 1 is I'm in connection with 1.  I've got a Bluetooth connection to my television, but I don't have wifi access to the media server. That is claim 1.

(Document displayed)

MR. THAKUR:  Claim 2 is I have local wireless connection to both.  Wifi.

(Document displayed)

MR. THAKUR:  Claim 4 is I have neither.

THE COURT:  Then when you have neither, then you have -- you use a non-wifi method of instructing the media renderer?

MR. THAKUR:  That's correct.  I'm going through my phone to the store, to ask the store to send the movie to my particular media renderer.

THE COURT:  So the phone, the phone is not using wifi.  The phone is using --

MR. THAKUR:  Cellular, to go through to the movie store, which goes to the media server and sends it to me.  So,

there's three possible alternatives.  That's claim 4.

And, what they do in this structure is read out claims 2 and 4, where one can handle both.

The intent I think in all of this is, just to be upfront, is to read out claim 2.  They're okay with claim -- in this particular scenario, they read out claim 4.  And claim 4 is not an asserted claim.

So, this is a scenario that is contemplated by our patent and would be read out by this construction.

(Document displayed)

**THE COURT:**  It says the CPP logic which resides in the -- the phone?

**MR. THAKUR:**  Right.

**THE COURT:**  The handset?  Communicates with at least one of the MS -- that doesn't preclude communicating with both.  Right?

**MR. THAKUR:**  Correct.  But in this scenario they also say and --

**THE COURT:**  And the CP logic, which resides --

**MR. COOPER:**  In the serving unit.

**THE COURT:**  Serving.

**MR. THAKUR:**  Has to communicate with at least one.  And in this scenario, in the delivery step, that one goes silent.

**THE COURT:**  What do you mean, that one goes silent?

MR. THAKUR:  The movie store is no longer involved in the delivering the movie to my house, if I have local wireless access to both the server and the media renderer.

So, what they are making as a requirement -- I'm not saying it's not possible to do what they are doing.  What they're doing is making it a requirement.  And that requirement reads out the embodiments of claim 2 and claim 4.

THE COURT:  So, again, so it's the second half that bothers you.  The "and the CP logic communicates with at least the other of the MS and MR."

MR. THAKUR:  That's correct, Your Honor.

THE COURT:  And, that means -- what does it mean in plain language, "CP logic"?

MR. THAKUR:  That means the -- the iTunes store.  The movie store.  The movie store does not have to communicate with the media server or the media renderer for deliveries, once I have already purchased the movie.

THE COURT:  How does it send it, then, if it doesn't communicate?

MR. THAKUR:  The movie store doesn't send the movie.  The movie store gives me authorization to -- gives the phone authorization to the media center.

Now I have wifi, I can work in my triangular way to get the movie.  I don't go back to the movie store to get the movie every time I want to watch it.  I go to the movie store

only once to get -- purchase the movie.  But once the delivery -- this is relating to the delivery step.

Once I've purchased the movie for the delivery, I don't have to go every time to the movie store to get a movie.  I have local wifi access.  I go to my media renderer.  The media renderer goes to the media server, and I'm watching the movie at home.  That is claim 2.

THE COURT:  But for the media renderer to obtain the content from the media server, that doesn't require the CP logic to communicate with the media renderer.

MR. THAKUR:  That is correct.  The CP is no longer necessarily involved.

THE COURT:  Okay.  All right.  Let me get your response to that.

MR. FOWLER:  Thank you, Your Honor.  So, we disagree with what was just said.  And this is basically another way of claim differentiation.  That's the argument that's essentially being made.

Claim 1 has the claim language that we are construing here.  Okay?  And for the reasons that are explained in our brief -- and I can walk through them here if you want -- the CP has to be in communication with one of the two:  The MS or the MR.  And the CPP has to be in communication with the other.  That's taught in the patent.

What we've just heard is:  Well, no, that can't be the

case because 2 and 4 talk about something different.

But, we're construing claim 1, not what's in 2 and 4.  And the reason that's important is because there's three different use case being described here.

If you look at the bottom of claim 1, at Line 60, the use case that's in claim 1, which is the claim language we're construing says (As read):

"If one of the MS and MR are not in communication with the UE..."

So that's the context of claim 1 that we're construing.

Claim 2, on the other hand, is a different use case.  It's at line 66.  It says (As read):

"If the MS and the MR are both in communication with the UE..."

And then they pointed out claim 4, different use case, at line 6 (As read):

"If neither the MS nor the MR are in communication with the UE..."

So the language we're asking the Court to construe has to do with the use case in claim 1.  Claims 2 and 4 present a different use case.

So, this is not question of a dependent claim somehow narrowing a broader independent claim.  It's changing the claim.  It's not saying -- it's changing it.  It's different.

So, you are not comparing apples -- you are comparing

apples and oranges when you do that.

THE COURT:  I guess I'm looking at this, and the words that you want me to construe seem to appear two times. Lines 49 through 51, and then again at 58 through 60.

MR. FOWLER:  Effectively, that's right, Your Honor.

THE COURT:  You just read the latter, and not the former.

MR. FOWLER:  That's right.  And that is because the use case -- what makes 2 and 4 different in claim 1 is not what's happening up around line 48-ish or so.  It's happening, what's in around 60, 61.  That's the variable.

And so, you're talking about a different use case.

THE COURT:  But if you start with a broader -- it seems to me -- I don't understand why -- I mean, the limitation is in the afterwards at line 60, if one of the -- one is not in communication.  But that, that's a condition after you've already talked about invoking the CPP logic and et cetera, et cetera, to negotiate media content.

I mean, that's the base.  And then you've got one of three scenarios after that.  Either one of them's not in communication, or both are in communication, or neither are in communication.

And, your construction seems to preclude some of those, as a base, not as a qualifier that's expressed in there.

MR. FOWLER:  Well, no.  I'm glad you raised that.

There's nothing about claim 2 or 4 that precludes -- well, looking at claim 2 first, there is nothing about claim 2 that precludes the CP from being in communication with the MS or MR. There's no words of conclusion there that say that that can't be or is not the case.

And if you look at claim 4, there is nothing in there that talks about the CPP not being in connection with either one of those. So, there's no words of preclusion.

So there is nothing -- my only point here, both in pointing to the fact that there is a different use case and the fact that there are no word of preclusion, there is nothing about claim 2 or 4 that should affect the construction of the language in claim 1. Just as a matter of basic claim construction rules.

So then, that reverts back to the arguments we made in the brief -- I didn't cover them here -- as to why our construction of claim 1 is correct.

And I didn't hear anything with respect to claim 1 from Aylus's counsel that said we were wrong in that regard. The only thing I would say -- and I apologize I wasn't quick enough to write it down, but Counsel started with a reference to the specification that had some reference to "media control."

Again, I didn't write down the cite fast enough, but I believe that refers to what happens long after what's being

discussed here.  And it has to do with once the movie's been downloaded, all the negotiation is done, all the coordination is done, and you're stopping, fast-forwarding, rewinding.

So, I don't think that cite is relevant at all.

THE COURT:  I still am confused by your analysis with respect to claim 4, which is dependent on claim 1, and says "Wherein CP logic is invoked to negotiate media content delivery..." et cetera, et cetera, "if neither the MS nor the MR are in communication with the UE..." and your proposed construction of the independent claim 1 would say that the logic, the CP logic communicates with at least one or the other of the MS or the MR.

MR. FOWLER:  Right.  So, you're right in that respect.  I misspoke on that.

But, this is still a different use case than is described in claim 1.  So, I'm not sure that 4 would necessarily inform what claim 1 requires.

THE COURT:  But it's a dependent claim, so you have to assume that -- you know, it narrows claim 1.  And if claim 1 is already narrowed so much that you can't have claim 4, then that's kind of a problem, isn't it?

MR. FOWLER:  I understand what you're saying, Your Honor.  I understand what you're saying.

So, again, just to flesh this out, to turn back again -- because this is a similar argument that we had with one of the

other claim terms.  It is -- the default here, by the way, is not Aylus's construction, which is a non-construction.

So if you were to determine that our analysis is wrong in some respect, that doesn't mean that the construction offered by Aylus is correct.

**THE COURT:**  Uh-huh.  Okay.

**MR. FOWLER:**  And I would say that, you know, if you would go back to, again, our brief -- or I can run through it if you would like -- actually, I'll do it.

(Document displayed)

**MR. FOWLER:**  The teaching of the specification is pretty uniform in this regard.

(Document displayed)

**MR. FOWLER:**  And, I'll just hit a high spot here.

One thing that is important, I think, is this issue, which is -- we have this in our brief -- is the whole point here was to avoid -- the alleged point, this is what the inventor said, was to save money by not using the wireless network, the cellular network.

And the way that that was supposed to be accomplished is what's described on slide 40 --

(Document displayed)

**MR. FOWLER:**  -- which I believe is a variation of slide -- figure 13.  And we don't have it down here.  But, figure 13 of the patent, where you have the CP communicating

with the MS over the internet or a wide area network.  And that's described in the full figure as being the -- I think it's the service or something like that.

And then on the right, it's the user premises, where you have the wifi network for control point proxy, and then the media renderer.

That's the teaching of the patent, is that you have one of these things talking to one, and one talking to the other.

And if you go -- I'm going to go backwards on the slide a minute, Your Honor --

(Document displayed)

**MR. FOWLER:**  That's what the spec teaches, that's at slide 38.  And the cites we have there, which are talking about one talking to the one, one talking to the other, that's consistent through the spec.

(Document displayed)

**MR. FOWLER:**  And that's what's described in the figure as well.  This is the full figure before we annotated it, which is one -- that's what is described in the specification as being the cooperation.

So what we've done here is we've taken what the spec teaches as being the cooperation; we've put it into our construction.

What Aylus has done again is to offer essentially a non-construction by saying "plain and ordinary meaning" or

swapping in the word "work with" with "cooperate" when there's no basis for that.

That's all I have.

THE COURT: All right, thank you. All right.

Let's go to "serving node." Maybe you can explain to me what an IMS session is.

MR. BUERGI: An IMS session is a session between a serving node and the UE, using IMS.

That may be a simplistic definition. I'm not sure --

THE COURT: What is IMS?

MR. BUERGI: "IMS" stands for IP multimedia sub -- something. You'll have to forgive me; I don't know --

THE COURT: IP multimedia --

MR. BUERGI: Subsystem, yes, that's correct.

(Reporter interruption)

THE COURT: IP multimedia subsystem.

MR. BUERGI: That's correct.

THE COURT: I saw that somewhere. Right. I don't know that what that means.

MR. BUERGI: Correct. The acronym often is not informative, unfortunately.

IMS, at a very high level, was meant and designed to bridge the cellular world and the IP world. That is, the world of IP network, such as the internet.

The cellular network and the internet are different

networks.  They operate in fundamentally different ways.  So it's not easy for communications to jump from one to the other, or for communications and data to bridge these networks.

So at a very high level, IMS was meant as a bridge between those two types of networks.  And actually, that makes sense in light of the claims, which discuss the IMS session being between the UE, which is the mobile phone, for example, and the serving node which exists on the wide area network.

So the mobile phone -- the UE is using the cellular network, for example, because someone's out in the world.  And the serving node is on the wide area network, which might be, for example, the internet.

So you have these two devices on these two separate types of networks.  And they need a way to talk to each other to bridge the networks.  And that's what IMS is.  It lets you -- it acts as that bridge.

THE COURT:  So, what -- an IMS network, when you say it serves as a bridge, I guess I'm still not understanding exactly how it does that.

What is it?

MR. BUERGI:  Well, to be clear, we were discussing -- or I, at least, was discussing IMS sessions.  I believe the Court asked about IMS sessions in particular.

THE COURT:  Okay.  Now I'm going to ask what an IMS

network is.

MR. BUERGI:   The definition of an IMS network is best provided by the patent, I believe, in or at column 7, lines 37 to 40, where it is describing figure 4.

And it's saying the relevant portions of an IMS network, at least according to the preferred embodiment, include the following things.  And then it lists various things.

And discussing those various things probably gets too far down into the weeds for purposes of this construction.

THE COURT:   Illustrated in figure 4, looks like?

MR. BUERGI:   The specification says that figure 4 has the -- at least the relevant portions of the IMS network.  So, I believe as far as the specification is concerned, the IMS network has to have at least these things.

THE COURT:   Okay.  Well, just looking at it is not particularly helpful to one not skilled in the art.  So -- I can't say I'm getting a lot out of looking at figure 4.

MR. BUERGI:   I agree.  Perhaps it would be best to discuss other passages in the specification that discuss the serving node, and the IMS session in particular.

(Document displayed)

THE COURT:   Okay.

MR. BUERGI:   If we're looking at Apple slides, slide 76 has the parties' constructions.

And I should note -- I'm sure the Court is aware of this,

118

but I should just note that Aylus has changed its construction to narrow the issue, so that Aylus agrees that a serving node is a node configured to establish something with the UE.

The dispute is whether that something has to be an IMS session.

THE COURT:  That is the nub of the dispute.  Right?

MR. BUERGI:  The node is the serving -- right.  The node is the node of the claim term "serving node," correct.

THE COURT:  Whether an IMS session must be involved or not?  That's the dispute between the parties.

MR. BUERGI:  Whether there's an IMS session is the dispute, correct.  Right.

(Document displayed)

THE COURT:  What's an example -- this shows my elementary misunderstanding.  What's a concrete example of a serving node?

MR. BUERGI:  It's difficult to think of a concrete example, because these are things that are -- if you were to look at -- if I had a concrete example here, it would look like a box, a random box.  A server.  It sits in a data center or at AT&T's data centers.

It's hard to explain what the concrete example is.  It's really just a generic-looking server, from all outward appearances, I would imagine.

THE COURT:  So, any device that operates in the

network?

MR. BUERGI:  No.  Well, the serving node has specific functionality, and has to create an IMS session.  Although, looking at it, just looking at it, I'm not sure you could know that it creates IMS sessions with the UE.

Perhaps I misunderstood the Court's -- oh, you're asking what a concrete example is.  I'm not sure -- I'm not sure I can provide one.

It's something -- it's this piece of machinery that provides -- that can -- creates an IMS session with the cell phone.  Not sure how to describe it, other than through its functionality.

THE COURT:  Well, a node is defined in some dictionaries as a junction in the local area network or wide area network or similar system of networks.  It's at a junction?

MR. BUERGI:  Well, I don't think the claim-construction dispute resolves around what a node is, because that's repeated in both parties' construction.  But I think it's about what makes it a serving node in particular, in light of the specification.

THE COURT:  Yeah.  But do you understand -- I was hoping to understand exactly what a node is.

MR. BUERGI:  I think for purposes of our conversation today, it's just something that sits -- is a network element

that sits in the network.

THE COURT:  Okay.

MR. BUERGI:  And for claim 1, that would be a wide area network.

But the more interesting question is:  What makes it a serving node in light of the specification?

THE COURT:  Okay.

MR. BUERGI:  And to answer that question, we should remind ourselves that the specification is always relevant to claim construction.

And without a customary meaning of the term, the claim -- the specification provides the best context and meaning for the term.

Now here, "serving node" is not a term of art.

(Document displayed)

MR. BUERGI:  It's not a term that is used in the UPnP specifications.  It's not a term that's used in the IMS standard.  It's not a term that has a common meaning.  And we have Dr. Polish confirming that in his declaration.

The relevant excerpts are on slide 78.

(Document displayed)

MR. BUERGI:  And also -- I'm sorry, got the slide number wrong.  That was slide 78.

And so, because it's not a term of art, we have to look to the specification.

And when we look to the specification, we see that the specification consistently and repeatedly describes the serving node as establishing an IMS session with the UE. Apple's briefs have lots of examples of this.  We're going to discuss a few of them today.

One of them is shown here on Slide 79.  This is an excerpt from column 12.  And it is describing how the handset initiates an IMS request to the serving node 408, and the IMS session is established between the serving node and the UE.

(Document displayed)

**MR. BUERGI:**  If we look at another example from the specification, on slide 80 it shows three different excerpts that describe the same thing (As read):

"...an IMS/SIP session has been established between the PA and the Media Server Control AS in the serving node."

I should explain that "PA" in the specification is "personal agent" and that is part of the UE.  So for our conversation today, the PA is the UE.  It's a part of the UE.

So the IMS sessions that are being established here in these excerpts from the specification are between the serving node and the UE.

(Document displayed)

**THE COURT:**  What about the fact that they are placing the specification where it describes communications between

the serving node and the UE or non-IMS, as well as IMS, such as 2.5G?

**MR. BUERGI:**  That, I will -- let me jump to those. We have slides on that.  Let me jump to those, if Your Honor doesn't mind.

**THE COURT:**  Sure.

(Document displayed)

**MR. BUERGI:**  So, I believe this slide 85 directly addresses what you were asking about.  And this is based on Aylus's argument that the specification discloses non-IMS embodiments.

That is, I think, what Your Honor was just reading about. 2.5G was a non-IMS embodiment.  That is --

**THE COURT:**  Yeah.

**MR. BUERGI:**  -- there's a protocol that's not IMS.

**THE COURT:**  Right.

**MR. BUERGI:**  And another one, it says as well, there's a handset on a public-switch telephone network.  And 2.5G, by the way, is a cellular protocol (Unintelligible)

(Reporter interruption)

**MR. BUERGI:**  2.5G, by the way, is a cellar protocol. That's what a UE might use on the public-switch telephone network.

But, a handset on the public switch telephone network, regardless of what protocol it's using, 3G, 4G, can still

receive an IMS session.  And we know that from figure 1.

Figure 1 shows the UE at the bottom.  And, there's an IMS session being established between the UE and the components above it.

We know that in part of because the figure refers to that dotted line there, which represents the session as a session, as a SIP session.  It's a -- SIP is the protocol used to establish IMS sessions.  That was in the -- one of the excerpts we just looked at said "IMS/SIP session."  So for purposes of this figure, those are synonymous.

And the point here is that the IMS session is being established, even though the UE is on the public-switch telephone network or a circuit-switch network.

In other words, you can establish the IMS session regardless of what the underlying lower-level type of network is.  2.5G is a cellular network.  And we discussed that the typical case where you would have an IMS session is the cellular network, where the mobile device is on the cellular network.  And this figure reflects that.

So, just to summarize, figure 1 shows that you can still have an IMS session.

**THE COURT:**  You can, but do you have to?

**MR. BUERGI:**  You don't have to, if you're not communicating outside of the cellular network.  Or if the phone isn't communicating at all, for example.

If it's not communicating with any other entities on the network or other networks, it doesn't need an IMS session. It's just sitting there.

But, that case falls outside of the claims. The claims discuss the UE communicating with the serving node. And in that case, because the serving node is on a wide area network or other IP network, you do need an IMS session.

THE COURT: That's the key. Because the claim requires that the communication with the serving node in a wide area network, it has to be an IMS session.

(Document displayed)

MR. BUERGI: I think the real key is the specification's overwhelming and consistent description of the serving node establishing IMS sessions with the UE, and the specification's further discussion of the invention being an IMS invention.

That part of the claim certainly is consistent with that, and an important factor. But I'm not sure I would refer to it as the key, being the most important point. Again, we have to look to the specification here.

And in light of the specification, that conclusion is inescapable. The conclusion that there has to be an IMS session between the UE and the serving node.

THE COURT: But in the specification in column 2, line 25, says the defining characteristic of 2G, 3G -- 2.5G,

3G multimedia services is that the handset can send and receive IP data packets at any time, the IP context with the handset is maintained so long as the handset is powered on and connected, and that contrasts with traditional telephony.

So --

MR. FOWLER:  Correct.  And the context of this discussion and the excerpt you just read is IMS.  If you look, if you -- a few paragraphs before -- well, the whole -- the section as a whole, field of the invention, starts with IMS networks.

So it's saying:  We're going to start discussing IMS networks here.

That's on -- I'm looking at column 1, line 35.  And then if you look a little beyond the excerpt that Your Honor just read, it's -- keeps talking about IMS.

So, when I read that excerpt, I think we're in the world of IMS already.  Which is not surprising, because the inventor defined his invention -- purported invention -- as being an IMS invention.

THE COURT:  Uh-huh.  In Paragraph 1:

"The invention generally relates to IP multimedia subsystem (IMS) networks."

MR. BUERGI:  Correct.

THE COURT:  Is that what you are referring to?

MR. BUERGI:  Yes.

(Document displayed)

MR. BUERGI:  And there is a similar excerpt shown on this slide, 84.  The second excerpt is what I'm referring to, which appears on Column 5, lines 48 to 52.

Again, the invention utilizing IMS.  And that's important, because the Federal Circuit has told us:  When you use those magic words "the invention," the patentee is not entitled to a scope broader than that.

(Document displayed)

MR. BUERGI:  In other words, when the specification uses those words "the invention," you are allowed to take the patentee -- you have to take the patentee at his word, that the invention is that.

And here, the specification defines the invention as an IMS invention.  So, the claims have to be tied to IMS somehow. And the way they're tied is through the -- the claim term "serving node," which establishes IMS sessions with the UE.

(Document displayed)

THE COURT:  What does it mean in column 2 when it says (As read):

        "Typical of proposals for 3G network architecture,

        the IP IMS architecture..."

What does that mean?  I don't know if you can explain that.  It's at line 44 and 45.

MR. BUERGI:  Well, it's explaining that figure 1 is

showing an IMS architecture.  And I think the reference to "Typical of proposals for 3G network architectures" may refer to the fact that at this time, IMS may have been evolving.  It still may be evolving today.

But, these standards, as the Court may note, evolve over time.  And there are always proposals on how to change them, or update them.

So this -- if I remember correctly, 3G may have been either emerging or still evolving at this time of this invention, in the mid-2000s.  And so, there may have been proposals on how to integrate IMS in a 3G network or architecture or environment.

THE COURT:  So, maybe you can explain to me:  What's the relationship between 3G network and IMS architecture?

MR. BUERGI:  The 3G -- 3G is a cellular protocol. You may have noticed on your phone -- they don't do this anymore, but they used to say "3G," when you were connected to a 3G network.  And sometimes now they say "4G," which is the newest iteration of that.

THE COURT:  Yeah.

MR. BUERGI:  So, returning to the IMS conversation, IMS is a bridge between that cellular network, the cellular world, and an IP network.  Like the internet, for example.

THE COURT:  Like what?

MR. BUERGI:  The internet.  The internet is an IP

network.

THE COURT:  All right.

MR. BUERGI:  And so, I will quickly move through just a few more slides, if Your Honor doesn't mind, to address some Aylus' arguments.

Aylus, in its briefs, points to these out-of-band communications which we discussed earlier.  And it says: Well, these out-of-band communications aren't IMS.

But, the out-of-band communications are not relevant to what we're discussing.  The out-of-band communications are between the MS and the MR.  What we're discussing here is communication between the serving node and the UE, which are two entirely separate entities.  So, the communications that are out of band are not relevant to the communications we're discussing.

And in fact, if you look at the specification, it even says that the out-of-band media transport is still under the control of IMS.  That's shown on Apple's slide 86.  That's an excerpt from column 15 of the patent.

So even if we were to claim that the out-of-band communications are relevant, they still involve IMS.

(Document displayed)

MR. BUERGI:  Now, Aylus, in its briefs, makes a big deal about how during prosecution history, the word "IMS" was removed from the claims.

THE COURT:  Yeah.

(Document displayed)

MR. BUERGI:  And that term, "IMS," was removed from the claim term "IMS network."  And here, we're construing a different term.  We are construing "serving node."

So, Apple doesn't dispute that the networks are not limited to IMS.  We don't dispute that.  They could be IMS networks or non-IMS networks.

But, we're not defining what the networks are.  We're defining what the serving node is.  And we're not defining the type of network in which the serving node resides.  We're defining what the serving node is.

And Apple's construction fully allows the serving node to reside in non-IMS networks.

(Reporter interruption)

THE COURT:  So, how does that work?  How does a serving node -- what's a function of a serving node in a non-IMS network?

MR. BUERGI:  The function of the serving node, regardless of the type of network it's in, is still to establish IMS sessions with the UE.

And you may ask, well --

THE COURT:  How do you have such a session if you're operating in a non-IMS network?

MR. BUERGI:  The establishment of the IMS session is

separate from the network in which the serving node is placed. And we can see that if we look at figure 1. This was one of Aylus's arguments.

Aylus argues: Well, let's assume you have a non-IMS network. How can you have IMS sessions?

(Document displayed)

**MR. BUERGI:** And we only have to look to figure 1 of the patent to see that that's possible. Figure 1 of the patent, which we just looked at -- let's look at it again -- shows the UE at the bottom. And it has an IMS session with the components on top. The various IMS components. The P-CSCF, the I-CSCF and others.

**THE COURT:** What are those?

**MR. BUERGI:** The P-CSCF is a proxy. And I know "proxy" was a claim term we just discussed, so I hesitate to bring that up. But in the specification, it's a proxy element that acts as gateway between the UE and the components above it.

The I component stands for something that escapes me now, but they are discussed in the specification at columns 2 and 3. The I component is the interrogating CSCF. And at the top of column 3 it lists five things it has to do.

But the long and short of it is these are components of the IMS network that help the serving node establish an IMS session.

THE COURT:  Where is the -- where is the serving node in this diagram?

MR. BUERGI:  The serving node in this diagram unfortunately appears as a black box, because it's been copied so much that the detail has been lost.

But what that says is "S-CSCF," which is another one of these IMS components.  And that is the component that actually establishes the IMS session.

And if you look at the specification, it treats the serving node as synonymous with the S-CSCF.

(Document displayed)

MR. BUERGI:  For example, if you look back at column 7, lines 37 to 40, it lists the P-CSCF, the I-CSCF, and then the serving node.  But it doesn't list the S-CSCF, because the serving node is the S-CSCF.

And you can see examples of that in, for example, figures 15 and 16.

THE COURT:  All right.  All right.  But then, looking at the cloud on the right, and it says "PSTN/CS Network," and only above when it comes to the CSCF stuff in the node does it say "Other IP or IMS Network."

So where does the UE -- you're saying it partially goes through an IMS network?

MR. BUERGI:  Let me get us back on track.  We took a little detour there.  We were discussing whether a serving

node can establish IMS sessions, if it's not on an IMS network.

And, figure 1 shows that it can.  Because the serving node resides in the middle part, the middle cloud.  And figure 1 labels that cloud or network as "Other IP or IMS Network."

In other words, it is labeling that network as IMS network, or --

**THE COURT:**  Says "or."

**MR. BUERGI:**  -- other network, meaning or a non-IMS network.  So figure 1, itself, shows that that network that the serving node can reside on doesn't have to be an IMS network.  It can be an other network, an other IP network.

**THE COURT:**  So if it were the other IP network and not an IMS network, and the line below that, the cloud is a PSTN, how -- it still doesn't explain to me how you can have an IMS session.

**MR. BUERGI:**  Well, the figure -- the point of this figure is that the specification says you can have this IMS session either in an IMS network or an other network that is a non-IMS network.

And I can't rewrite the specification; I have to take the specification at face value.  If it says that the IMS session can exist in an other network other than an IMS network, we have to accept that.

**THE COURT:**  Where is figure 1 referred to in the

specifications?  What column am I looking at?

MR. BUERGI:  It is discussed starting at column 2 at line 44, going through column 3, line 44.

THE COURT:  Okay.

MR. BUERGI:  And so --

(Document displayed)

MR. BUERGI:  -- just to close the discussion, if we look at Aylus's construction and what it says, well, it doesn't really say much.  It says that there only has to be communications between the node and the UE.

But, that's already recited by the other claim language, the surrounding claim language.  The surrounding claim language says that the CP logic, which is in the serving node, cooperates with the CPP logic which is in the UE.  That was the term that was just discussed.  And so, that cooperation necessarily requires communication.

And so, Aylus's construction is only parroting what's already required by the surrounding claim language.  By doing that, Aylus is effectively vitiating the serving part of the node from the claim limitation.

In other words, Aylus is saying:  This node doesn't have to serve anything.  The thing that the node sense is IMS sessions.  And Aylus has tried to eliminate any requirement that it serves something in particular.

Aylus's construction also ignores the teaching of the

specifications, which repeatedly and consistently teach that the serving node establishes an IMS session with the UE.

In fact, the specification never says that the serving node cannot establish an IMS session with the UE.

Those are all the points I had, unless Your Honor has questions.

THE COURT:  No, let me hear the response.  Thank you.

(Document displayed)

MR. THAKUR:  Your Honor, this was the most complicated term when I first read it.  And when I was done with it, I came to realize it is the least complicated.  And my goal is to get you there, to agree with me.

THE COURT:  Good.

MR. THAKUR:  So there's two ways to look at it. First is to look at it from a legal standpoint, because there are there are some legal issues involved there.  And the second one is to educate it from a technological perspective.

And I have spent more than my fair share of time of learning the technology, and understanding how to simplify it.

So, let's take a look at the legal one first.  In the world, there's IMS networks, there are non-IMS networks, and there are networks where both are present.

An example of a non-IMS network is 2.5G, which is expressly disclosed in the patent.

I'll go down to some examples of those.

(Document displayed)

MR. THAKUR:  There are 1xRTT, and there are other packet internet protocol data.  So, there are non-IMS networks that exist.

(Document displayed)

MR. THAKUR:  There are IMS networks that exist.  And what is the IMS network that exists?  It is 3GPP standard.

When they came out with the 3G standards, the wireless carriers got together and said:  We want to be to be able to provide multimedia sessions over our circuit switch network.  And they agreed to an architecture, which is called the IMS architecture, so that it would work that way.

So basically, all of the carriers would work essentially the same way for delivering multimedia content.

So today --

THE COURT:  So an example, again, of an IMS network is what?

MR. THAKUR:  A 3- -- a cell phone working on a 3G network is you're using an IMS network.  If I am using a --

THE COURT:  What's the difference between the 2.5 and the 3G?

MR. THAKUR:  That made it an IMS network?

THE COURT:  Yeah.

MR. THAKUR:  What happened was in 2-point -- I am not familiar with 2.5 as much, but I am certainly more familiar

with 3G.

2.5 used an architecture structure that was very less complicated that they were able to essentially put packet data over circuit.  I don't know the details of that architecture.

The other alternative was to create this architecture which is now disclosed in starting column 2, line 48 all the way through column 5, about -- so what IMS is providing: Packet data over circuit using a particular architecture. That's what makes it an IMS architecture.  If you read column 1, it defines IMS as essentially an overlay.

So, the question that I know I struggle with:  What is IMS?  And I finally began to understand what IMS is.  You have your wireless carrier, and sitting above them are a bunch of servers with some software logic that facilitate providing packet data over circuits which -- doing a certain way.  That is an IMS network.

You could do the same thing using a different structure, and that's what 2.5 did.  And that is a non-IMS structure.

The other alternative is to have a pure non-IMS network which is just going from wifi through the internet, to your Yahoo! web server.  Completely non-IMS structure.

So, what existed in the world at that time was these three possibilities.

And what happened was --

(Document displayed)

**MR. THAKUR:**  -- when we filed the patent claim, we specifically said "IMS network" in the claim.

(Document displayed)

**MR. THAKUR:**  And it was a comprising claim.  So when we say our patent operates on an IMS network, as a matter of law, we can operate in an IMS network and a non-IMS network.

(Document displayed)

**MR. THAKUR:**  That is what the claim looked like, as originally filed.

What happened was the PTO examiner said:  Spell out IMS.

(Document displayed)

**MR. THAKUR:**  And it was the first time where the light bulb went off, and said:  Ah, if we do that, we are limiting ourselves to this universe (Indicating).  We have no desire to limit ourselves to this universe.  We want to be able to limit ourselves to have that capability.

(Document displayed)

**MR. THAKUR:**  Also work on a non-IMS capability.

So as a matter of law, what is it that we added?  What we added was the ability to work exclusively in a non-IMS network.  Because we already had the ability to work on a pure IMS or a hybrid under the original claims.

So as a matter of law, the only addition we made by striking out the IMS network is the ability to not work on an IMS network.  And when we work on a non-IMS network, there is

no capability to have an IMS session, because those servers and logic that the wireless carriers use are not even going to be invoked.  We're working in a pure non-IMS structure.

So, that is what the prosecution history claim added.

(Document displayed)

**MR. THAKUR:**  The patent expressly disclosed that capability of having non-IMS networks exclusively.

And what Apple argues is:  Ah, well, we're not talking about network; we're talking about the serving node in the network.

So what they do is they go to the claim, claim 1, and they divorce the words "serving node" from "serving node in the wide area network," as if they can construe that term and be ignorant about what the real term is.

So, I -- if you take a piece of a term that has a full meaning, but actually take a smaller piece, and say:  But this has to have a different meaning that would negate what the original meaning was, that's what they're asking.

And, what -- what they're asking is to say it is limited to an IMS session, because that's the only way the specification discloses.  But, that is actually not true.

The last time the inventor spoke with the patent office, the same day he went to the prosecution office and struck out the word "IMS network," the same day, he disclosed what our invention is.  The serving node is.  And, distinguished a

serving node over the prior art.

And when he distinguished the serving node over the prior art, the last time he talked to the office, he said:  It's managing media requests in a network session.  He didn't say:  Managing media requests in a network IP, IMS, IMS session.

And that is extremely important because when you are distinguishing over the prior art, and all the prior art has nothing to do with IMS, wouldn't you take the easy victory?  And say:  Your Honor, I don't -- this prior art references don't have anything to do about IMS sessions; my invention is about an IMS session?  It would have been an easy victory.

No; the last time he spoke to the patent office about sessions, he talked about a network session, not an IMS network session.

**THE COURT:**  Okay.

**MR. THAKUR:**  So, that's the legal argument.

From a technological argument, I was hoping to make sure that this Court had a reasonable understanding of what an IMS network is.

I think you kind of asked me already, so if you have any questions about it -- I spent a lot time trying to figure it out.  If you have any questions, I'm happy to answer.

**THE COURT:**  Well, you say it -- it kind of overlays the 3G.  And is it -- is it a method of using a different kind of protocol or system to convey signals?  Or what, what is it?

That's what I'm trying to figure out.

MR. THAKUR:  Correct.  So, like I said, the -- you know, the patent spends a couple of pages explaining what an IMS network is.  What it is, it's actually -- an IMS, it's an architecture.

So, what I do is there's a way for me to convert packets, packet data, and send it over circuit data, and maintain these network sessions.  What happens in a network -- in a media communication session, which is a phone call, it's -- a phone call, you want a constant connection because you don't want the phone call to drop.

In a packet-based network, you want to collect data at a particular period of time, and piece it together and send it.  And so, what -- what these carriers did was under the 3GPP standard, said:  We'll all agree to this structure which will be implemented either through hardware and through serverware, and every single one of us will put this in our system and we will use this for managing IMS sessions.

The reason they -- you're asking from a business standpoint why they did it.  From a business standpoint, the primary reason they did it was:  They also wanted to get into the vein of -- they make money by selling cellular air time.  If you are using more of their air time to buy movies, then they get -- they generate more business.

So that was the incentive in 2000, and whatever time frame

they came out with the 3G standard was they were interested in putting together a network that people would use cellular for multimedia sessions, rather than going through wifi.

THE COURT:  So, it facilitates a larger flow of data, multimedia --

MR. THAKUR:  Through the wireless networks.

THE COURT:  Through the wireless.

MR. THAKUR:  So it's their competition against the internet.

THE COURT:  And the patent here discloses an embodiment whereby the communication of the UE is strictly through the internet.

MR. THAKUR:  (Nods head)

THE COURT:  Not through any cellular network.

MR. THAKUR:  (Nods head)

THE COURT:  Therefore, a non-IMS session.

MR. THAKUR:  Correct.

THE COURT:  Okay.  I'll hear a brief rebuttal.

(Document displayed)

MR. BUERGI:  Briefly -- excuse me.  Briefly, Your Honor, because Aylus Counsel again brought up the amendment that was made during prosecution history.

(Document displayed)

MR. BUERGI:  I'd like to discuss the *Decisioning.com* Circuit case, which has a nearly identical fact pattern.  And

we discussed this in our briefs, but let me speak through it here, briefly.

In that case, the patentee removed the word "kiosk" from the claims during prosecution.  And when it came time to construe one of the claim terms, which was "remote interface," the Federal Circuit said:  That may not be limited to a kiosk because you deleted "kiosk" during prosecution, but the claims still are not entirely removed from the concept of the kiosk.

And the Federal Circuit says:  We're still dealing with the specification, and we see that the specification says the kiosk is the invention.

Just like here, the invention is described in terms of IMS.

And the Federal Circuit said:  The specification consistently describes the invention of having characteristics of the kiosk.

Just like here, where the specification repeatedly, over and over, says that the serving node establishes IMS sessions.

And so, in light of that specification discussion of kiosks, the Federal Circuit says:  Patentee, I saw that you removed "kiosk" during prosection history, but we're still going to construe "remote interface" to include characteristics of a kiosk.

And they construed "remote interface" to be publicly accessible because kiosks are publicly accessible.

So this prosecution amendment isn't the end of the story. That's not some magic wand that says that the claims now have nothing to do with IMS.

THE COURT:  Well, it certainly creates an inference, at the very least.  Even if it's not the end of the story and not alone, perhaps, dispositive, depending on the circumstances and how strong the -- you know, you've got to weigh the specification of the claim language.

It certainly does move the meter to some degree, doesn't it?  It's not irrelevant.

MR. BUERGI:  Certainly with respect to the term that was amended, which is "IMS networks," the networks surely don't have to be IMS networks now.  But we're, again, construing another term, "serving node."

So with regard to that term, we can't say it's entirely divorced from the concept of IMS, especially --

THE COURT:  Why can't a serving node exist in a non-IMS network and not have an IMS session, if it's done completely on the internet?

MR. BUERGI:  That might, in another patent that doesn't have the disclosure of the specification that repeatedly and exclusively talks about the serving node establishing an IMS session.

If Your Honor is looking at the patent and you do a search for "serving node," and just scroll through all the instances

of "serving node," you'll be amazed how consistently and repeatedly it discusses the serving node establishing IMS sections.

And so, in light of *Decisioning.com*, the point is that the specification still is what rules. Not the amendment during prosecution.

THE COURT: So, are you saying that in the specification, "serving node" is used exclusively in conjunction with IMS sessions?

MR. BUERGI: Yes. And to clarify, there is never a case in the specification where it says the serving node establishes a non-IMS session or a session -- well, a non-IMS session.

Aylus hasn't identified such a case; Dr. Wigner hasn't. It's just not there.

THE COURT: All right. Let me just ask factually whether that's accurate.

MR. THAKUR: Your Honor, the last time we talked to the patent office, the dispositive time, we called it "a network session." We never called it "an IMS session."

So that was -- because at that point, the inventor had realized that by putting "IMS" in the claim, he had somehow inadvertently limited it, he took the limitation out, and spoke with the examiner, and specifically said "non-IMS session."

When I asked the inventor, I said why was it so disclosed, it was disclosed initially in the way as the -- the most complicated scenario is the way -- when you write a patent, and he's written apparently quite a few, you write the most complicated structure that's possible, and in that structure you explain it.

So the most complicated structure is:  Where there's an IMS network and a non-IMS network.  So the specification heavily disclosed that.

It only dawned on him that by having said "an IMS network" he had limited the claim when the patent office came back to him.  And when he went back to the patent office, he absolutely clarified the network.  He absolutely clarified that we are talking about non-network sessions.

**THE COURT:**  But if you look at the specifications, is there -- if I didn't know this fact you've just asserted, is there anything in the specification that would so indicate, that "serving node" is something other than that which would operate in an IMS session?

**MR. THAKUR:**  So in the patent, itself, it discloses these non-IMS network capabilities.  And so, when he discloses the embodiment, he discloses IMS network sessions.

But when he discloses the fact that the patent can operate on these non-IMS networks, that necessarily means even initially he disclosed non-IMS sessions, from the beginning.

And even right from figure 1 it says:  Other IP or -- or IMS networks.  He's disclosing the ability to work on non-IMS networks, from day one.

And that's why the examiner allowed it.  Otherwise, the examiner would have never allowed it when he took out "IMS."

THE COURT:  What about the argument that:  Yeah, it acknowledges -- there's an acknowledgement of non-IMS network, but any time that the notion of serving node is used, it's service in connection with an IMS session?

MR. THAKUR:  So that's incorrect with the second statement I just made in the prosecution history.  When he's talking about the serving node in the prosecution history at the same time as the claim, at that point he says "network session."  He does not say "IMS network session."

So, the last time our inventor spoke to the patent office, he called it a network session, not an IMS network session.

THE COURT:  And that portion of the prosecution history is found --

MR. THAKUR:  Correct.  It's a 2005 amendment at claim 7.  And we gave the Court a copy of the slides, so you will have a copy of the slides.

And to be precise, we are talking exactly about the serving node here.

THE COURT:  But, but that -- what you just said in terms of his communications with the examiner, is that

attached to a declaration?  Or where is it?

MR. THAKUR:  Your Honor, it is in the file history which was -- was the file history attached?  The file history was included in the briefing, Your Honor.  If not, it's certainly -- we can make that available expeditiously to the Court.

THE COURT:  All right.  So you are relying heavily on the prosecution history, plus the disclosure of non-IMS networks in the claim as well as in the specification, so --

MR. THAKUR:  Your Honor, as a matter of logic, the later in time should deal with the earlier in time.  The last time we spoke, we made it clear.

We understand -- we do not disagree, Your Honor, that the reality of it is that the inventor understood he did not disclose something, and he went back and corrected it.  And made that -- but that correction was unambiguous.

THE COURT:  And that is a part of the public record, that's part of the prosecution history that's publicly available.

MR. THAKUR:  Correct.  Absolutely, Your Honor.

THE COURT:  All right.  Well, I think that's the last term, right, that we need to address today?

MR. FOWLER:  Yes, Your Honor.

THE COURT:  Okay.  Then I will take the matter under submission.  And, see where we go from here.

148

Do we have a further date in this matter?

MR. FOWLER:  No, Your Honor.

THE COURT:  All right.  Maybe we should set as a control date, a status conference.  Once I get out my claim construction, we'd better set firm dates on everything else.

But, just as a control date, why don't I set something out -- well, we're already almost -- early January?

MR. THAKUR:  (Nods head)

THE COURT:  Mid-January?

THE CLERK:  January 15th?

THE COURT:  Okay.  January 15th at 10:30 for status.

MR. THAKUR:  Works for me, Your Honor.

MR. FOWLER:  Yes, Your Honor.

THE COURT:  10:30.

MR. FOWLER:  10:30?

THE COURT:  I know this is -- people always want claim construction before further ADR, but is there any thought, now that you've gone through this -- at least this process, to this point, about any kind of ADR process that might intervene between now and actual rendering of claim construction?

MR. THAKUR:  Your Honor, you know, the Plaintiff is always interested in settlement.  But they made it clear to us that they would not be interested.  So really, I think the question is better posed to defense counsel.

**THE COURT:** All right. Well, let me ask, let me ask defense counsel.

**MS. CORBETT:** Well, same thing. We're always interested in settlement, but I think that the guidance of the claim construction order would be definitely useful for settlement discussions. As well as the pending IPR.

**THE COURT:** All right. And I figured you would say that. All right.

Well, then the ball is in my court at this the point. Thank you.

**MR. BUERGI:** Thank you.

**MS. CORBETT:** Thank you, Your Honor.

**THE COURT:** Appreciate it.

(Conclusion of Proceedings)

## CERTIFICATE OF REPORTERS

I, BELLE BALL, Official Reporter for the United States Court, Northern District of California, hereby certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.

*/s/   Belle Ball*_____

Tuesday, December 16, 2014

Belle Ball, CSR 8785, CRR, RDR