UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| AYLUS NETWORKS, INC., | No. C-13-4700 EMC |
| Plaintiff, | **CLAIM CONSTRUCTION ORDER** |
| v. | |
| APPLE, INC., | |
| Defendant. | |

## I. INTRODUCTION

Plaintiff Aylus Networks, Inc. ("Aylus") has filed suit against Defendant Apple Inc. ("Apple") for infringement of its '412 patent. Currently pending before the Court are the parties' claim construction briefs.

## II. FACTUAL & PROCEDURAL BACKGROUND

The '412 patent concerns an invention "whereby a user of a computer or mobile device can direct and control video signals from servers located on the internet to be rendered for display on a display device (*e.g.*, a television)." FAC ¶ 10. Specifically, the '412 patent describes a media streaming architecture that allows a user to coordinate the transport of media content from an internet-based media server, to a physically proximate media renderer. *Id*. at ¶ 12. Aylus claims that AppleTV infringes the '412 patent. *Id*.

On November 3, 2014, the parties stipulated to constructions for the following claim terms: "wide area network," "remote from the UE," and "resides in the signaling domain." Docket No. 87. In addition, both parties stipulated to amending one of their proposed constructions. *Id.* Apple

amended its proposed construction for the term "cooperate with the [network control point/the serving node] CP logic." Aylus amended its proposed construction for the term "serving node." *Id.*

### III. DISCUSSION

A. Legal Standard

Claim construction is a question of law to be determined by the Court. *See Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 979 (Fed. Cir. 1995) ("hold[ing] that in a case tried to a jury, the court has the power and obligation to construe as a matter of law the meaning of language used in the patent claim"). "The purpose of claim construction is to 'determin[e] the meaning and scope of the patent claims asserted to be infringed.'" *O2 Micro Int'l Ltd. v. Beyond Innovation Tech. Co.*, 521 F.3d 1351, 1360 (Fed. Cir. 2008). Words of a patent are generally given the "ordinary and customary meaning" they would have to a person of ordinary skill in the art who had reviewed the intrinsic record at the time of the invention. *Phillips v. AWH Corp.*, 415 F.3d 1303, 1312-13 (Fed. Cir. 2005) (*en banc*). "In some cases, the ordinary meaning of claim language . . . may be readily apparent even to lay judges, and claim construction in such cases involves little more than the application of the widely accepted meaning of commonly understood words." *Id.* Elements that are not technical terms of art may not need to be construed at all. *Brown v. 3M*, 265 F.3d 1349, 1352 (Fed. Cir. 2001).

However, in many cases, the meaning of a claim term as understood by persons of ordinary skill in the art is not readily apparent. In those cases, the court looks to "sources available to the public that show what a person of skill in the art would have understood disputed claim language to mean." *Phillips*, 415 F.3d at 1313 (quoting *Innova/Pure Water, Inc. v. Safari Water Filtration Sys., Inc.*, 381 F.3d 1111, 1116 (Fed. Cir. 2004). Those sources include intrinsic evidence (the claims, specification, and prosecution history) and extrinsic evidence (*e.g.*, dictionary definitions and treatises) concerning relevant scientific principles and the meaning of technical terms. *Id.* at 1314; *see also Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1582-83 (Fed. Cir. 1996).

"[I]ntrinsic evidence is the most significant source of the legally operative meaning of disputed claim language." *Id.* Extrinsic evidence may be considered, but is less reliable and less significant than intrinsic evidence. *Id.* at 1317-18. As such, a "court should look first to the intrinsic

1 evidence of record" before consulting any extrinsic evidence. *Liquid Dynamics Corp. v. Vaughan
2 Co., Inc.*, 355 F.3d 1361, 1367 (Fed. Cir. 2004) (quoting *Vitrionics*, 90 F.3d at 1582).

3     While intrinsic evidence in the specification is potentially useful in construing the claims,
4 limitations from the embodiments described in the specification should not be imported into the
5 claims. *Toshiba Corp. v. Imation Corp.,* 681 F.3d 1358, 1369 (Fed. Cir. 2012). "There are only two
6 exceptions to this general rule: (1) when a patentee sets out a definition and acts as his own
7 lexicographer, or (2) when the patentee disavows the full scope of the claim term either in the
8 specification or during prosecution." *Thorner v. Sony Computer Entm't Am. LLC,* 669 F.3d 1362,
9 1365 (Fed. Cir. 2012).

B. "Handset"

| Aylus | Apple | Court |
|---|---|---|
| A wireless handheld communication device that supports radio access technology (*e.g.*, Wifi, GSM, CDMA) | A mobile phone capable of making and receiving calls over the Public Switched Telephone Network | A wireless handheld communication device that supports radio access technology (*e.g.*, Wifi, GSM, CDMA) |

"Handset" appears in claims 5, 6, 13, and 14; each of which is depend from claim 1. "Handset" also appears in claim 33, which depends from claim 27. The relevant claims provide as follows:

    Claim 1:     A method of controlling and delivering media content from a media server (MS) to a media renderer (MR) utilizing a wide area network for control, comprising the acts of: provisioning a serving node in the wide area network with control point (CP) logic that includes logic to negotiate media content delivery with at least one of the MS and the MR, wherein the CP logic, MS, and MR resides outside of a user endpoint (UE) and the CP logic resides in the signaling domain and serves as a first proxy; provisioning the UE of the wide area network with control point proxy (CPP) logic that includes (i) logic to negotiate in response to a media content delivery request, determining a network context of the UE and a network connectivity of the MS and MR; invoking the CPP logic and the CP logic to cooperatively negotiate media content delivery between the MS and the MR if one of the MS and MR are not in communication with the UE via a local wireless network; and once media content delivery is negotiated, controlling a presentation of delivery via the VCR controls on the UE.

    Claim 5:     The method of claim 1, wherein the UE is implemented on a **handset**.

|   |   |   |
|---|---|---|
| Claim 6: | | The method of claim 5, wherein the **handset** comprises a display, and the MR uses the display. |
| Claim 13: | | The method of claim 12 [same as claim 1], wherein CPP logic is implemented in a UE resident in a **handset** and in a remote control device. |
| Claim 14: | | The method of claim 13, wherein a user uses the CPP logic in the **handset** when the user is remote from the MR and uses the CPP logic in the remote control device when the user is local to the MR. |
| Claim 27: | | A user endpoint (UE) for communication with a serving node in a network, the serving node having control point (CP) logic that includes logic to negotiate media content delivery with at least one of a MS and an MR, wherein the CP logic, MS, and MR reside outside of the UE and the CP logic resides in the signaling domain and serves as a first proxy, the UE comprising. |
| Claim 33: | | The UE of claim 27, wherein the UE is implemented on a **handset**. |

The parties' basic dispute is whether the term "handset" encompasses devices that are not cell phones. Aylus argues that the term handset includes devices that are not phones; Apple argues to the contrary.

Apple contends that the "ordinary and customary meaning" of "handset" is "a mobile device that can make and receive phone calls." According to Apple, this understanding is evidenced in the specification, which provides: "handsets are no longer used *only* to make and receive telephone calls." '412 patent ("PAT") at 4:60-63 (emphasis added). While that language does evidence an expectation that the "handset" referred to in the specification is a telephone, the Court declines to read this expectation into a limitation for three reasons.

First, importing limitations from the specification into the claims is impermissible, unless the patentee (1) acted as its own lexicographer; or (2) explicitly disavowed the scope of the claim term. *Electro Med. Sys., S.A. v. Cooper Life Sciences, Inc.*, 34 F.3d 1048, 1054 (Fed. Cir. 1994) (Claims in a patent "are not to be interpreted by adding limitations appearing only in the specification."). Here, the only reference to a "Public Switched Telephone Network" in the '412 patent is in the "Related Prior Art" section of the specification. Docket No. 1-1 at 27. Therefore, construing the term "handset" as referring exclusively to those handsets that connect to a public switched telephone network is impermissible absent a showing that either Aylus (1) acted as its own lexicographer, or (2) disavowed the full scope of the claim term either in the specification or during prosecution. *See*

4

*Thorner,* 669 F.3d at, 1365. Apple does not contend, and the Court does not find, that either of these exceptions apply. Thus, such a limited construction is improper.

Second, the term "handset" is semantically distinct from the term "cell-phone." That the patent application was approved using the term "handset" evidences an understanding that the user endpoint could be a device other than a cell-phone. Moreover, this makes sense given the time period in which the patent was granted. In 2004, Personal Digital Assistants (PDAs) were a popular gadget[1]. A PDA, as understood in 2004, was a handheld personal computing device, some of which served as phones, and some of which did not[2]. Thus, the Court rejects Apple's contention that in 2004 the term "handset" did not refer to anything other than a cell-phone. To the contrary, the Court finds that in 2004, a person of ordinary skill in the art would have understood the term "handset" to include both PDAs and cellphones.

Third, as Aylus contends, none of the claims require accessing a Publicly Switched Telephone Network to practice the invention. Rather, in the context of the claimed invention, the defining functionality of the "handset," as the user endpoint, is its ability to connect to different types of radio access networks. For example, various claims refer to the handset connecting with the following networks:

- claim 2: "local wireless network"
- claim 3: "Wi-Fi network, a WiMax network, and a Bluetooth network"
- claim 7: "3G network and in communication with the serving node"
- claim 9: "local wireless network"
- claim 10: "3G network"
- claim 17: "Universal Plug and Play (UPNP) protocols"
- claim 18: "UPNP protocols, Jini technology, RFID, and Bluetooth"
- claim 23: "local wireless network"
- claim 25: "UPNP protocols, Jini technology, RFID, and Bluetooth"

---

[1] This fact was presented by Aylus at the hearing, and was not disputed by Apple.

[2] This fact was presented by Aylus at the hearing, and was not disputed by Apple.

Thus, to practice the invention, a "handset" *must* connect to radio access networks, but need not connect to Publicly Switched Telephone Networks. As such, it would be odd to define "handset" as a device that can perform a function unrelated to practicing the invention.

For the foregoing reasons, the Court rejects Apple's contention that the term "handset" refers exclusively to a device that connects to the Public Switched Network, and adopts Aylus's construction – *i.e.* A wireless handheld communication device that supports radio access technology (*e.g.*, Wifi, GSM, CDMA).

C. "VCR Controls"

| Aylus | Apple | Court |
| --- | --- | --- |
| Controls for the display of video content (*e.g.*, play, pause, rewind, stop buttons). | Controls for a video cassette recorder (VCR). | Controls for the display of video content that traditionally appear on a VCR (*e.g.*, play, pause, rewind, stop buttons). |

The term "VCR controls" appears in independent claim 1 and in claim 15, which depends from claim 1. The relevant claim language is as follows:

Claim 1: A method of controlling and delivering media content from a media server (MS) to a media renderer (MR) utilizing a wide area network for control, comprising the acts of . . . once media content delivery is negotiated, controlling a presentation of delivery via the **video cassette recorder (VCR) controls** on the [User Endpoint] UE.

Claim 15: The method of claim 1, wherein, if one of the MS and MR are remote from the UE, the CPP logic provides information about invoked **VCR controls** to the CP logic on the serving node to allow the CP logic to control the remote MS or MR.

Apple argues that the phrase "VCR controls" should be strictly interpreted as "the controls to a video cassette recorder." Aylus argues that "VCR controls" is understood as shorthand for the controls that traditionally appeared on a VCR – *e.g.* play, stop, rewind, fast-forward, and pause.

Apple's construction has its virtues. It retains the express language of the claim term, altering it only to define the acronym VCR. According to Apple, this construction is appropriate because the claim terms are self-defining. The Court disagrees.

As an initial matter, is undisputed that the '412 patent describes a media-streaming architecture that does not involve a video cassette recorder. Further, it is undisputed that the term "VCR controls" describes a set of buttons, which appear on the handset and allow a user to control the presentation of the video which is streaming from the internet. PAT at 5:46-48 ("The control point proxies [which reside in the UE] also include VCR controls for controlling the presentation of selected media delivery.").

In light of these undisputed facts, it seems plain that "VCR controls" should not be read as referring to buttons that control an *actual* video cassette recorder. Rather, "VCR controls" refers to a command menu, with a set of commands that typically appear on a VCR— *i.e.* play, stop, rewind, fast-forward, etc. This reading is supported by the obvious nature of the invention, the language of the claim terms as construed herein, and by the complete absence of a VCR in the '412 patent. Neither the claims nor the specification of the '412 patent disclose the operation of a VCR. Thus, necessitating the existence of a VCR, or the existence of controls to a non-existent VCR, makes no sense.

Apple first argues that its construction is proper because it does not *necessitate* the existence of a VCR, but just the existence of "VCR controls on the user endpoint." However, it is hard to imagine how the controls to a VCR could exist as part of the patent without invoking the existence of a VCR – somewhere. Otherwise, there would seem to be little point to requiring VCR controls.

Next, Apple argues that its proposed interpretation is proper because the '412 patent elsewhere makes reference to "video play controls." PAT at 26:13-14. According to Apple, that term cannot mean the same things as "VCR controls" because such an interpretation would violate the assumption that "different claim terms convey different meanings." *Chicago Bd. Options Exch., Inc. v. Int'l Secs. Exch., LLC*, 677 F.3d 1361, 1371 (Fed. Cir. 2012) ("this court assumes that different terms convey different meanings") (citing *SEB S.A. v. Montgomery Ward & Co.*, 594 F.3d 1360, 1369 (Fed. Cir. 2010).

This argument does not require the construction that Apple proposes for two reasons. First, based on the doctrine of claim differentiation, an assumption may be rebutted if it dictates an absurd result inconsistent with the other rules of construction. *Seachange Int'l, Inc. v. C-COR, Inc.*, 413

1  F.3d 1361, 1369 (Fed. Cir. 2005) (claim differentiation is "not a hard and fast rule and will be

2  overcome by a contrary construction dictated by the written description or prosecution history.").

3  Here, as discussed above, reading the existence of a VCR or a component of a VCR, into the claim

4  results in an absurd result based on the architecture of the invention and other claim language.

5        Second, even if the doctrine of claim differentiation were to apply, it would not require the

6  Court to adopt Apple's proposed construction. "Video play controls" and "VCR controls" can be

7  construed to convey different meanings, without conjuring Apple's construction of a literal VCR

8  control. For example, here, the Court construes the term "VCR controls" to mean "buttons that

9  control the presentation of video content, similar to those that traditionally appear on a VCR (*e.g.*,

10 play, pause, rewind, stop buttons)." This construction may convey a meaning different from "video

11 play controls," which may refer more broadly to a set of controls beyond that which were typically

12 found on a VCR control – *e.g.*, skip; toggle; scrub; or graphical user interface selections.

13       Thus, for the foregoing reasons, the Court rejects Apple's proposed construction and

14 construes VCR controls to mean: "controls for the display of video content that traditionally appear

15 on a VCR (*e.g.*, play, pause, rewind, stop buttons)."

16 D.    <u>"video play controls"</u>

| Aylus | Apple | Court |
|---|---|---|
| Controls for the display of video content (*e.g.*, play, pause, rewind, stop buttons). | Plain and ordinary meaning. | Controls for the display of video content not limited to those which traditionally appear on a VCR. |

22       Video play controls appears in claims 20 and 27. Those claims provide:

23 **Claim 20**: A method of controlling and delivering media content from a media server (MS) to a media renderer (MR) utilizing a wide area network for control, where a user endpoint (UE) is provisioned with control point proxy (CPP) logic that includes (i) logic to negotiate media content delivery with at least one of the MS and the MR, (ii) logic to cooperate with network control point (CP) logic to negotiate media content delivery between the MS and the MR, and (iii) ***video play controls to control a presentation of content*** provided by the MS and rendered by the MR, wherein the CPP logic resides in the UE and serves as a first proxy, comprising the acts of provisioning a serving node in the wide area network with control point (CP) logic that includes logic to negotiate media content delivery with at least one of the MS and the MR,

| | | |
|---|---|---|
| | | wherein the CP logic, MS, and MR resides outside of a user endpoint (UE) and the CP logic resides in the signaling domain and serves as a second proxy; in response to a media content delivery request, the wide area network determining a network context of the UE and a network connectivity of the MS and MR; invoking the CPP logic and the CP logic to cooperatively negotiate media content delivery between the MS and the MR if one of the MS and MR are not in communication with the UE via a local wireless network; and once media content delivery is negotiated, receiving *video play controls* from the UE. |
| | **Claim 27**: | A user endpoint (UE) for communication with a serving node in a network, the serving node having control point (CP) logic that includes logic to negotiate media content delivery with at least one of a media server (MS) and a media renderer (MR), wherein the CP logic, MS, and MR reside outside of the UE and the CP logic resides in the signaling domain and serves as a first proxy, the UE comprising a transceiver to communicate with the network, the MS and the MR; and a computer readable medium comprising: personal agent logic configured to determine a network context of the UE; and control point proxy logic configured to: negotiate media content delivery with at least one of the MS and the MR, cooperate with the serving node CP logic to negotiate media content delivery between the MS and the MR, and once media content delivery is negotiated, control a presentation of media content provided by the MS and rendered by the MR with *video play controls*. |

The parties' dispute regarding "video play controls" is an extension of its dispute regarding the term "VCR controls." In short, the parties seem to dispute whether two claim terms ("VCR controls" and "video play controls") can refer to the same thing – the controls for video display. Absent that, the parties do not dispute that the meaning of "video play controls" is clear and commonly understood. *See* Ay. Op. at 17 (stating that its proposed construction expresses the same thing as the "widely accepted meaning of the commonly understood words of the claim: 'video play controls'"); Apple's Resp. at 22 (arguing that the plain and ordinary meaning of the term is sufficiently clear).

As discussed, the Court construes "VCR controls" to mean: "controls for the display of video content that traditionally appear on a VCR (*e.g.*, play, pause, rewind, stop buttons)." The Court construes "video play controls" more broadly to mean: "controls for the display of video content not limited to those which traditionally appear on a VCR."

///

///

///

///

E. "negotiate media content delivery between the MS and the MR"

| Aylus | Apple | Court |
|---|---|---|
| Plain and ordinary meaning. | Compare transfer protocols and content formats supported by each of the MS and MR to select a transfer protocol and content format supported by both, and instruct the MS and MR to transfer media content between them using the selected transfer protocol and data format. | Coordinate transport of audiovisual content from the MS to the MR. |

"[N]egotiate media content delivery between the MS and the MR" appears in claims 1, 2, 4, 20, 21, 23, and 27. Those claims provide:

Claim 1: provisioning the UE of the wide area network with control point proxy (CPP) logic that includes (i) logic to negotiate media content delivery with at least one of the MS and the MR, (ii) logic to cooperate with CP logic to **negotiate media content delivery between the MS and the MR**, and (iii) video cassette recorder (VCR) controls to control a presentation of content provided by the MS and rendered by the MR, wherein the CPP logic resides in the UE and serves as a second proxy;

Claim 2: The method of claim 1, wherein the CPP logic is invoked to **negotiate media content delivery between the MS and the MR** if the MS and MR are both in communication with the UE via a local wireless network.

Claim 4: The method of claim 1, wherein the CP logic is invoked to **negotiate media content delivery between the MS and the MR** if neither the MS nor the MR are in communication with the UE via the local wireless network.

Claim 20: A method of controlling and delivering media content from a media server (MS) to a media renderer (MR) utilizing a wide area network for control, where a user endpoint (UE) is provisioned with control point proxy (CPP) logic that includes (i) logic to negotiate media content delivery with at least one of the MS and the MR, (ii) logic to cooperate with network control point (CP) logic to **negotiate media content delivery between the MS and the MR**, and (iii) video play controls to control a presentation of content provided by the MS and rendered by the MR, wherein the CPP logic resides in the UE and serves as a first proxy, comprising the acts of provisioning a serving node in the wide area network with control point (CP) logic that includes logic to **negotiate media content delivery with at least one of the MS and the MR**, wherein the CP logic, MS, and MR resides outside of a user endpoint (UE) and the CP logic resides in the signaling domain and serves as a second proxy; in response to a media content delivery request, the wide area network determining a network context of the UE and a network connectivity of the

|   |   |   |
|---|---|---|
|   |   | MS and MR; invoking the CPP logic and the CP logic to cooperatively **negotiate media content delivery between the MS and the MR** if one of the MS and MR are not in communication with the UE via a local wireless network; and once media content delivery is negotiated, receiving video play controls from the UE. |
|   | Claim 21: | The method of claim 20, wherein the CPP logic is invoked to **negotiate media content delivery between the MS and the MR** if the MS and MR are both in communication with the UE via a local wireless network. |
|   | Claim 23: | The method of claim 20, wherein the CP logic is invoked to **negotiate media content delivery between the MS and the MR** if neither the MS nor the MR are in communication with the UE via the local wireless network. |
|   | Claim 27: | control point proxy logic configured to: negotiate media content delivery with at least one of the MS and the MR, cooperate with the serving node CP logic to **negotiate media content delivery between the MS and the MR**, and once media content delivery is negotiated, control a presentation of media content provided by the MS and rendered by the MR with video play controls. |

The parties dispute the meaning of "negotiate media content." Apple argues that it is limited to the universal plug-and-play ("UPnP") method of negotiating media content. Aylus argues to the contrary.

By way of background, UPnP refers to a specific media architecture that operates to transfer content between a MS and a MR. The architecture includes three distinct entities: (1) media server; (2) media rendered; and (3) a control point. Docket No. 54-3, Ex. 2 at 5. One of the primary goals of the UPnP architecture is to support the interaction of differing devices (different media servers and renders), each utilizing differing transfer protocols and content formats. *Id.* at 3. The parties do not dispute that the UPnP method of negotiating media content entails the CP logic comparing and selecting a transfer protocol and data format that are supported by both the MS and the MR. Further, there is no dispute that UPnP method is encompassed in the '412 patent, or that the data transfer at issue is *from* the MS *to* the MR.

What is disputed is whether the invention also discloses a method in which the "data formats" and "transfer protocols" of the MS and MR are *preselected*. A preselection method of negotiating media content differs from that of the UPnP because it does not require the CP logic to "compare" or to "select" the data formats/transfer protocols that are supported by the MS and MR – because that information is already agreed upon.

11

The Court finds that the term "negotiate media content" should be construed to encompass a preselection method (which differs from the UPnP method), because the preselection method is disclosed in the specification. Specifically, Figure 15 of the '412 specification discloses an embodiment in which the Real Time Streaming Protocol ("RTSP") is the preselected transfer protocol between the MS and MR. Thus, in the Figure 15 embodiment, the "negotiation of media content" between the MS and the MR does not require a determination of delivery protocol, because that protocol is already selected as RTSP. Were the '412 patent limited to the UPnP method described by Apple, the embodiment in Figure 15 would not be possible. Apple's construction is improper because it interprets the claim language in a manner that excludes an embodiment expressly contained in the specification. *See Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 979 (Fed. Cir. 1995), aff'd, 517 U.S. 370 (1996) ("[claims] must be read in view of the specification, of which they are a part.")

Nonetheless, the Court finds that the term "negotiate media content delivery between the MS and MR" requires construction because it is technical in nature and does not have an obvious and widely accepted meaning. *See Brown*, 265 F.3d at 1352. Having found that the '412 patent covers both a preselection method and a UPnP method of negotiation, the Court construes the term in a manner that would encompass both. Accordingly, the Court adopts the following construction: "coordinate transport of audiovisual content from the MS to the MR."

F. <u>"The CP logic . . . serves as a [first/second] proxy"</u>

| Aylus | Apple | Court |
|---|---|---|
| Plain and ordinary meaning. | The CP logic accepts control messages from the CPP and passes them on to the MS or MR. | The CP logic accepts requests for service from the CPP and passes them on to the real server. |

"the CP logic . . . serves as a [first/second] proxy" appears in claims 1, 20, and 27. Those claims provide, in relevant portion:

Claim 1: provisioning a serving node in the wide area network with control point (CP) logic that includes logic to negotiate media content delivery with at least one of the MS and the MR, wherein the CP logic, MS, and MR resides outside of

12

|   |   |   |
|---|---|---|
| 1 |  | a user endpoint (UE) and **the CP logic resides in the signaling domain and serves as a first proxy;** provisioning the UE of the wide area network with control point proxy (CPP) logic that includes (i) logic to negotiate media content delivery with at least one of the MS and the MR, (ii) logic to cooperate with CP logic to negotiate media content delivery between the MS and the MR, and (iii) video cassette recorder (VCR) controls to control a presentation of content provided by the MS and rendered by the MR, wherein the CPP logic resides in the UE and serves as a second proxy; |
| 5 | Claim 20: | A method of controlling and delivering media content from a media server (MS) to a media renderer (MR) utilizing a wide area network for control, where a user endpoint (UE) is provisioned with control point proxy (CPP) logic that includes (i) logic to negotiate media content delivery with at least one of the MS and the MR, (ii) logic to cooperate with network control point (CP) logic to negotiate media content delivery between the MS and the MR, and (iii) video play controls to control a presentation of content provided by the MS and rendered by the MR, wherein the CPP logic resides in the UE and serves as a first proxy, comprising the acts of provisioning a serving node in the wide area network with control point (CP) logic that includes logic to negotiate media content delivery with at least one of the MS and the MR, wherein the CP logic, MS, and MR resides outside of a user endpoint (UE) and the **CP logic resides in the signaling domain and serves as a second proxy**; in response to a media content delivery request, the wide area network determining a network context of the UE and a network connectivity of the MS and MR; invoking the CPP logic and the CP logic to cooperatively negotiate media content delivery between the MS and the MR if one of the MS and MR are not in communication with the UE via a local wireless network; and once media content delivery is negotiated, receiving video play controls from the UE. |
| 16 | Claim 27: | A user endpoint (UE) for communication with a serving node in a network, the serving node having control point (CP) logic that includes logic to negotiate media content delivery with at least one of a media server (MS) and a media renderer (MR), wherein the CP logic, MS, and MR reside outside of the UE and the **CP logic resides in the signaling domain and serves as a first proxy**, the UE comprising a transceiver to communicate with the network, the MS and the MR; and a computer readable medium comprising: personal agent logic configured to determine a network context of the UE; and control point proxy logic configured to: negotiate media content delivery with at least one of the MS and the MR, cooperate with the serving node CP logic to negotiate media content delivery between the MS and the MR, and once media content delivery is negotiated, control a presentation of media content provided by the MS and rendered by the MR with video play controls. |

During the prosecution of the '753 patent the Examiner explained that the accepted meaning of the term "proxy" is: "[a] process that accepts requests for some service and passes them on to the real server." Docket No. 56-5 (Mar. 25, 2009 Office Action) at 3-4. At the hearing, the parties agreed to adopt this definition of the term "proxy," in lieu of their own proposed constructions.

The Court adopts that construction. The Court notes that both of the constructions proposed prior to the hearing and stipulation are problematic. First, Aylus's proposal that the Court retain the

1  "plain and ordinary meaning" does nothing to clarify a term that is technical in nature. Second,
2  Apple's construction inserts a reference to "control messages," which seems to obfuscate rather than
3  elucidate the role of a "proxy."
4        Accordingly, the Court rejects the constructions proposed prior to the hearing, and –
5  applying the agreed upon definition – supplies the following construction: "the CP logic serves as a
6  process that accepts requests for service and passes them on to the real server."
7  G.    <u>"cooperate with CP logic to negotiate media content delivery between the MS and the MR"</u>

| Aylus | Apple | Court |
|---|---|---|
| Plain and ordinary meaning. | The CPP logic communicates with at least one of the MS and MR, and the CP logic communicates with at least the other of the MS and MR. | Plain and ordinary meaning. |

      "[C]ooperate with the [network/serving node] CP logic" appears in claims 1, 20, and 27. Those claims provide as follows:

    Claim 1:    provisioning a serving node in the wide area network with control point (CP) logic that includes logic to negotiate media content delivery with at least one of the MS and the MR, wherein the CP logic, MS, and MR resides outside of a user endpoint (UE) and the CP logic resides in the signaling domain and serves as a first proxy; provisioning the UE of the wide area network with control point proxy (CPP) logic that includes (i) logic to negotiate media content delivery with at least one of the MS and the MR, (ii) logic to **cooperate with CP logic to negotiate media content delivery between the MS and the MR**, and (iii) video cassette recorder (VCR) controls to control a presentation of content provided by the MS and rendered by the MR, wherein the CPP logic resides in the UE and serves as a second proxy;

    Claim 20:    A method of controlling and delivering media content from a media server (MS) to a media renderer (MR) utilizing a wide area network for control, where a user endpoint (UE) is provisioned with control point proxy (CPP) logic that includes (i) logic to negotiate media content delivery with at least one of the MS and the MR, (ii) logic to **cooperate with network control point (CP) logic to negotiate media content delivery between the MS and the MR**, and (iii) video play controls to control a presentation of content provided by the MS and rendered by the MR, wherein the CPP logic resides in the UE and serves as a first proxy, comprising the acts of provisioning a serving node in the wide area network with control point (CP) logic that includes logic to negotiate media content delivery with at least one of the MS and the MR, wherein the CP logic, MS, and MR resides outside of a user endpoint (UE) and the CP logic resides in the signaling domain and serves as

14

a second proxy; in response to a media content delivery request, the wide area network determining a network context of the UE and a network connectivity of the MS and MR; invoking the CPP logic and the CP logic to cooperatively negotiate media content delivery between the MS and the MR if one of the MS and MR are not in communication with the UE via a local wireless network; and once media content delivery is negotiated, receiving video play controls from the UE.

Claim 27: A user endpoint (UE) for communication with a serving node in a network, the serving node having control point (CP) logic that includes logic to negotiate media content delivery with at least one of a media server (MS) and a media renderer (MR), wherein the CP logic, MS, and MR reside outside of the UE and the CP logic resides in the signaling domain and serves as a first proxy, the UE comprising a transceiver to communicate with the network, the MS and the MR; and a computer readable medium comprising: personal agent logic configured to determine a network context of the UE; and control point proxy logic configured to: negotiate media content delivery with at least one of the MS and the MR, **cooperate with the serving node CP logic to negotiate media content delivery between the MS and the MR**, and once media content delivery is negotiated, control a presentation of media content provided by the MS and rendered by the MR with video play controls.

The parties basic dispute is over the term "cooperate." The question underlying this dispute is: what is claimed to happen when the CPP "cooperates" with the CP to negotiate media content delivery?

Apple argues that the term "cooperate" is too vague and does not capture the specific process that is claimed in the '412 patent. Specifically, Apple contends that "cooperate" refers to a process wherein the CPP communicates with *either* the MR or the MS, and *then* the CP communicates with the *other* of the MS or the MR. Apple's proposed construction reflects this relationship between the CPP and CP, and requires that if the CP communicates with the MS, then the CPP *must* communicate with the MR.

The problem with Apple's construction is that it defeats claim 4. Claim 4 provides:

> The method of claim 1, wherein the CP logic is invoked to negotiate media content delivery between the MS and the MR if neither the MS nor the MR are in communication with the UE via the local wireless network.

PAT, 25:4-7. That claim describes a situation in which the CP communicates with both the MS and the MR to negotiate media content delivery, and the CPP is not involved. Apple's construction expressly disallows this scenario, because it requires the CPPs involvement. Accordingly, because Apple's construction creates an inconsistency between claims, the Court rejects it. *See Phillips v.*

15

*AWH Corp.*, 415 F.3d 1303, 1314 (Fed. Cir. 2005) (constructions that create inconsistency between claims should be avoided).

Beyond Apple's deficient proposal, neither party provides a reason why the plain and ordinary meaning of this term is inappropriate, and the intrinsic evidence does not suggest one. Accordingly, the Court adopts the plain and ordinary meaning of the term: "cooperate with CP logic to negotiate media content delivery between the MS and the MR."

H. "serving node"

| Aylus | Apple | Court |
|---|---|---|
| A node configured to establish communication with the UE. | A node configured to establish an IMS session with the UE. | A node configured to establish communication with the UE. |

"[S]erving node" appears in claims 1, 7, 11, 15, 20, 27, 32. In each claim, its use is the same, and refers to a component of the architecture:

Claim 1: ". . . provisioning a **serving node** in a wide area network . . ."

Claim 7: The method of claim 1, wherein at least one of the MS and the MR is on a 3G network and in communication with the **serving node**.

Claim 11: The method of claim 1, wherein the UE communicates its network context to the serving node and the **serving node** informs the UE of the serving node's capabilities for negotiation with devices local to the UE.

Claim 15: The method of claim 1, wherein, if one of the MS and MR are remote from the UE, the CPP logic provides information about invoked VCR controls to the CP logic on the **serving node** to allow the CP logic to control the remote MS or MR.

Claim 32: The UE of claim 27, wherein the UE communicates its network context to the **serving node** and receives from the **serving node** the **serving node's** capabilities for negotiation with devices local to the UE.

The parties dispute whether the term "serving," embraces the capability of communicating with the UE over non-IMS networks. Apple argues that "serving" does not embrace this capability and that it must have the capability of communicating over only IMS networks. Aylus argues that "serving" is not so limited. Looking to the prosecution history and the disclosures of the patent, the

1 Court finds that "serving" does embrace the capability of communicating with the UE over non-IMS
2 networks.

3 In general, if a claim limitation was removed during prosecution, it is improper to read that
4 limitation back into the claim during litigation. *Kistler Instruments AG. v. United States*, 628 F.2d
5 1303, 1308 (Ct. Cl. 1980) (" defendant's insistence upon this court's reading back into the claims
6 limitations which were originally there and were removed during prosecution of the application
7 through the Patent Office cannot be permitted."). Here, it is undisputed that the original application
8 for the '412 patent limited the serving node to communicating with the UE via an IMS network.
9 Docket No. 62, Ex. 4 ('753 Prosecution History, Original Claims) at 2. In fact, the claims of the
10 original application were drafted with the explicit instruction that the serving node communicated
11 with the UE *via an IMS session*. *Id*. It is also undisputed that the applicant for the '412 patent
12 amended these claims, and removed this explicit designation. *Id*. Thereafter, the examiner granted
13 the '412 patent, which contemplated communication between the serving node and the UE over *any*
14 wide-area network. PAT at 24:37-40. Apple's proposed construction, which limits the serving node
15 to communication over IMS networks is thus improper because it asks the Court to read a limitation
16 that was removed during prosecution back into the patent. *See United States v. Telectronics, Inc.*,
17 857 F.2d 778, 783 (Fed. Cir.1988) ("[C]ourts are not permitted to read back into the claims
18 limitations which were originally there and were removed during prosecution of the application
19 through the Patent Office.").

20 In response, Apple argues that reading a claim limitation back into a patent *can* be proper if
21 the specification, as here, continues to be replete with references to that limitation. In support of this
22 proposition, Apple cites *Decisioning.com, Inc. v. Federated Dept. Stores, Inc.,* 527 F.3d 1300 (Fed.
23 Cir. 2008).

24 In *Decisioning*, one of the disputes discussed by the Federal Circuit was whether the patent
25 at issue limited the user-interface to being practiced in a kiosk. *Id*. at 1309. One party argued that
26 because the specification consistently referred to the user interface as being housed in a kiosk, the
27 invention was so limited. *Id*. The other party argued that the kiosk limitation should not be read
28 back into the patent, because it was removed during prosecution. *Id.* ("However, in an amendment

17

dated August 15, 1995, the inventor deleted all references to the kiosk housing in claim 1"). The court agreed that reading this limitation back into the patent was improper, stating: "[w]e think that the effect of this amendment was to remove the requirement that the remote interface be enclosed by a specific kiosk housing." *Id.* However, the Court went on to clarify that the removal of the kiosk term did not broaden the scope of "the entire remote interface itself" or alter "the required computer equipment." *See id.* at 1308-09.

Here, Apple seems to rely on the *Decisioning* court's refusal to "broaden the scope of the applicant interface" for the proposition that even when a claim term is removed during prosecution, it is proper to read that limitation back into the patent. Apple's reliance is misplaced. Put simply, the *Decisioning* court did not read the deleted kiosk-housing limitation back into the patent. Thus, the *Decisioning* case does nothing to disturb the general rule that an amendment which removes a claim limitation has the effect of removing that limitation. Applying that rule here, the serving node's limitation to IMS network communication was removed during prosecution, and may not be reintroduced.

Furthermore, the specification itself supports this conclusion because it refers to the "serving node" communicating with the UE over non-IMS networks and non-IMS architectures. *See* PAT at 1:60-2:15; 2:25-30; 5:41-14 (describing communication over 2.5G networks and 1xRTT EVDO); *see also* Wigdor Decl. at ¶ 9, 16. Thus, Apple's reliance on the specification to overcome the prosecution history is factually meritless.

///
///
///
///
///
///
///
///
///

Accordingly, the Court adopts Aylus's proposed construction which embraces communication between the serving node and the UE over differing networks; *i.e.* the term is construed to mean: "A node configured to establish communication with the UE."

## IV. CONCLUSION

For the foregoing reasons, the Court adopts the above constructions for the disputed terms at issue.

IT IS SO ORDERED.

Dated: January 27, 2015

_____
EDWARD M. CHEN
United States District Judge