UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| AYLUS NETWORKS, INC.,<br><br>    Plaintiff,<br><br>    v.<br><br>APPLE INC.,<br><br>    Defendant. | Case No.  13-cv-04700-EMC   (KAW)<br><br>**ORDER REGARDING JOINT DISCOVERY LETTER BRIEF**<br><br>Re: Dkt. No. 115 |

The parties to the above-captioned case have filed a joint discovery letter brief concerning Aylus' Second Set of Requests for Production, No. 43,[1] which seeks "[a]ll documents relating to all revenues, costs, and profits from media content accessible through the Serving Node." (Joint Ltr. at 1, Dkt. No. 115.) Aylus has now modified the scope of the RFP "to documents relating to the revenue, costs and profits from (1) purchases or rentals of iTunes video content using the accused Apple TV and/or iOS products iPhone, iPad, and iPod Touch ('Accused iOS Products') [and] (2) purchases of video games on the App Store using the Accused iOS Products." (*Id.* at 1.) It claims that this information is relevant to its damages claims. *(Id.)*

Federal Rule of Civil Procedure 26(b)(1) permits "discovery regarding any nonprivileged matter that is relevant to any party's claim or defense." The information sought "need not be admissible at the trial" so long as it "appears reasonably calculated to lead to the discovery of admissible evidence." *Id.* There is a "broad mandate in favor of the relevance that is conferred by Rule 26(b)(1)." *Barnes & Noble, Inc. v. LSI Corp.*, C 11-02709 EMC LB, 2012 WL 1564734, at * 5 (N.D. Cal. May 2, 2012).

---

[1] In a footnote, there is a brief reference to RFP No. 44. *See* Joint Ltr. at 1 n.2. This order only concerns RFP No. 43, as that is the only RFP reproduced in the joint letter.

Title 35 U.S.C. § 284 provides that "[u]pon finding for the claimant the court shall award the claimant damages adequate to compensate for the infringement, but in no event less than a reasonable royalty for the use made of the invention by the infringer, together with interest and costs as fixed by the court." "Infringement compensation can be the patentee's 'lost profits' or the 'reasonable royalty he would have received through arms-length bargaining.'" *Emblaze Ltd. v. Apple, Inc.*, --- F. Supp. 3d ---, ---, 2014 WL 2889764, at *4 (N.D. Cal. June 25, 2014) (footnote omitted). "The *Georgia-Pacific* factors are used in the 'hypothetical negotiation' approach to determining a reasonably royalty." *GPNE Corp. v. Apple, Inc.*, No. 12-CV-02885-LHK, 2014 WL 3870256, at *3 (N.D. Cal. Aug. 6, 2014). *Georgia-Pacific* factor six examines "[t]he effect of selling the patented specialty in promoting sales of other products of the licensee; that existing value of the invention to the licensor as a generator of sales of his non-patented items; and the extent of such derivative or convoyed sales." *Georgia-Pacific Corp. v. U.S. Plywood Corp.*, 318 F. Supp. 1116, 1120 (S.D.N.Y. 1970), *modified and aff'd*, 446 F.2d 295 (2d. Cir. 1971).

In this case, the sales information Aylus seeks addresses the sixth *Georgia-Pacific* factor, even if some of the information relates to sales involving non-infringing products. *See Micro Chemical, Inc. v. Lextron, Inc.*, 317 F.3d 1387, 1393 (Fed. Cir. 2003) (trial court did not abuse its discretion in allowing expert to testify on the effect sales of non-infringing products had on a reasonable royalty rate); *Trans-World Mfg. Corp. v. Al Nyman & Sons, Inc.*, 750 F.2d 1552, 1566 (Fed. Cir. 1984) (district court incorrectly excluded evidence of profits where infringing use of displays could have increased eyeglass sales and thus could be relevant in determining the amount of a reasonable royalty). Apple's description of the accused Airplay functionality as only a "small feature" of certain of its iOS devices does not mean that the information Aylus seeks is not relevant. *See Haworth, Inc. v. Herman Miller, Inc.*, 162 F.R.D. 286, 288 (1995) ("It may well be that when all factors in the market for [the patented product] are considered, convoyed sales of freestanding [collateral products] will play a negligible role in calculating a reasonable royalty. But it is too soon to tell whether recovery for convoyed sales would over-compensate [plaintiff].").

To the extent that Airplay, no matter how small its role, draws more consumers to purchase video content/video games through the iTunes store so that they can, through their iPod Touch,

iPad, or iPhone, direct that content to an accused AppleTV for display on a home television screen, those sales could shape the reasonable royalty analysis. *See Positive Techs., Inc. v. Sony Elecs., Inc.*, No. 11-cv-2226-SI (KAW), 2013 WL 707914, at * 4 (N.D. Cal. Feb. 26, 2013) ("If the parties had negotiated a price for using Plaintiff's patented specialty in Defendants' E-Readers before the alleged infringement began, the parties might reasonably have considered not only the revenue Defendants stood to gain through sales of the E-Readers containing the improved-quality displays, but also through sales of accessories and content."); *Haworth, Inc.*, 162 F.R.D. at 288 ("[H]ere, [plaintiff] must only show a cause-effect relationship that hypothetical negotiators would consider in establishing the license fee.") (citation omitted).

Apple's arguments to the contrary are not persuasive. Its assertion that Aylus "seeks iTunes Store revenue that is not tied to the accused AirPlay functionality" ignores the allegations in the complaint, which include:

> 12. Apple makes, has made, imports, offers for sale, and/or sells an AppleTV product. The AppleTV product, when connected to a display device, such as a television, enables the rendering and displaying of audiovisual media that comes from a media server on a wide area network, such as the internet, on the television or other display device. This includes the rendering and display of audiovisual media from Internet services, including, but not limited to, Apple's iTunes Store. According to Apple, "Apple TV with 1080p HD gives you access to the best content — blockbuster movies, TV shows, sports, your music and photos, and more — right on your widescreen TV. You can even play content from your iOS devices on your TV using AirPlay." http://www.apple.com/appletv/[.]
>
> 13. Apple makes, has made, imports, offers for sale, and/or sells Apple iPod Touches, iPhones, and iPads.
>
> 14. AppleTVs and Apple iPod Touches, iPhones, and iPads include a version of Apple software AirPlay.
>
> 15. Apple's AppleTVs with AirPlay allow Apple iPod Touches, iPhones, and iPads to direct audiovisual media from servers located on the Internet, including, but not limited to, the iTunes Store, to be rendered on an AppleTV for display on a display device. According to Apple, "Apple TV gives you anytime access to endless entertainment. Thousands of HD movies and TV shows from iTunes — many in stunning 1080p — play through Apple TV on your HDTV, and music and photos stream from your computer. You just click and watch. With AirPlay, it's simple to play content from your iPad, iPhone, or iPod Touch on your TV. And finding whatever you're in the mood for — from any compatible content provider —is quick and easy thanks to a beautiful and consistent interface." http://www.apple.com/appletv/what-is/. In addition, these devices have the ability to control the media being displayed on the display device.

16. In addition, Apple's AppleTVs with AirPlay allow Apple iPod Touches, iPhones, and iPads containing certain applications or "apps" to direct and control audiovisual media content from servers located on the Internet, owned and/or operated by third parties, including NetFlix and Amazon, to be rendered on an AppleTV. Apple provides the software development environment for producing the apps and the marketing, sales, and distribution systems for the apps. In addition, Apple provides the software code incorporated into the apps operating on the iPod Touches, iPhones, and iPads that enables the iPod Touches, iPhones, and iPads to use the AirPlay feature to render a video signal received from the third party provided media servers at the AppleTV. Apple also provides the software code incorporated into the AppleTV which allows the AppleTV to interact with the Apple iPod Touches, iPhones, and iPads to receive and render the video signals from the third party provided media servers. The software incorporated into the app and incorporated into the AppleTV has no substantial non-infringing use and is especially intended to render media content on the AppleTV from media servers at the direction and control of the Apple iPod Touches, iPhones, and iPads.

17. Apple engages in marketing and provides resources and documentation to encourage users of AppleTVs to use Apple iPod Touches, iPhones, and iPads to direct and control audiovisual content from servers located on the Internet, including servers operated by Apple, and those operated by third parties, including NetFlix, Hulu, and Amazon, to be rendered on an AppleTV. Indeed, on its public website, Apple advertises and instructs customers on how to use its products in a manner that infringes the '753/412 patent claims. On information and belief, Defendant Apple knew its actions would induce infringement of the '753/412 patent.

(2d Am. Compl. ("SAC") ¶¶ 12-17, Dkt. No. 37.)

Apple also argues that Aylus is not entitled to iTunes sales information because no functional relationship exists between iTunes and AirPlay, and thus, any resulting sales are not convoyed sales as contemplated by *Georgia-Pacific* factor six. This argument is misguided, and the two cases Apple cites in support of the argument illustrate this.

In *American Seating*, the trial court granted the defendant's motion to set aside the verdict for lost profits on convoyed sales. *American Seating Co. v. USSC Group, Inc.*, 514 F.3d 1262, 1268-69 (Fed. Cir. 2008). The Federal Circuit upheld that ruling on appeal. *Id.* at 1269. It determined that the jury had no basis to conclude that the plaintiff was entitled to lost profits on collateral sales, as no interrelated or functional relationship existed between the defendant's passenger seats and the plaintiff's patented tie-down system. *Id.* In *Inline Connection Corporation*, the court granted a motion in limine to exclude expert testimony on the issue of purported convoyed sales where the expert conceded that such sales had no effect on his reasonable royalty analysis. *Inline Connection Corp. v. AOL Time Warner Inc.*, 407 F. Supp. 2d

4

424, 432 (Fed. Cir. 2007).

Neither of these cases stand for the proposition that information concerning convoyed sales is not discoverable simply because a plaintiff may fail to prove that those sales are, in fact, convoyed sales. If Apple wishes to argue the convoyed sales issue at trial, to either challenge the admissibility of certain evidence or undermine Aylus' theory of damages, it may do so. But the argument is unsuccessful insofar as Apple expects to resist discovery of the information Aylus seeks here.

For the reasons set forth above, Apple shall produce documents relating to the revenue, costs, and profits from (1) purchases or rentals of iTunes video content using the accused Apple TV and/or the Accused iOS Products and (2) purchases of videos games on the App Store using the Accused iOS Products, [2] documents which are apparently readily available on the SAP accounting database Apple maintains in the regular course of business.[3]  *See* Joint Ltr. at 4.

IT IS SO ORDERED.

Dated: 04/09/15

_____
KANDIS A. WESTMORE
United States Magistrate Judge

---

[2] The parties did not brief any issues concerning the relevant damages period. The Court presumes that they are in agreement on this, as it was not raised in the joint letter.

[3] Because it appears that the information Aylus seeks is readily available, the Court declines to limit Apple's production to only information that is necessary to show the pull through effect of the accused functionality on sales of video content through the iTunes Store.

5