UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

Before The Honorable Kandis A. Westmore, Magistrate Judge

AYLUS NETWORKS, INC.,            )
                                 )
          Plaintiff,             )
                                 )
vs.                              )     No. C 13-04700-EMC (KAW)
                                 )
APPLE, INC.,                     )
                                 )
          Defendant.             )
_____  )

                              Oakland, California
                              Thursday, August 20, 2015

 TRANSCRIPT OF PROCEEDINGS OF THE OFFICIAL ELECTRONIC SOUND
            RECORDING 11:33 - 12:33 = 60 MINUTES

APPEARANCES:

For Plaintiff:
                         Quinn, Emanuel, Urquhart &
                           Sullivan, LLP
                         865 South Figueroa Street
                         10th Floor
                         Los Angeles, California  90017
                    BY:  AMARDEEP LAL THAKUR, ESQ.

                         Quinn, Emanuel, Urquhart &
                           Sullivan, LLP
                         3842 Sacramento Street
                         San Francisco, California
                           94118
                    BY:  WILLIAM OWEN COOPER, ESQ.

          (APPEARANCES CONTINUED ON FOLLOWING PAGE)

*Echo Reporting, Inc.*

2

APPEARANCES:   (Cont'd.)

For Plaintiff:
                              Quinn, Emanuel, Urquhart &
                                Sullivan, LLP
                              50 California Street
                              Suite 22
                              San Francisco, California
                                94111
                         BY:  JOSEPH B. MARTIN, ESQ.

For Defendant:
                              DLA Piper US, LLP
                              2000 University Avenue
                              East Palo Alto, California
                                94303
                         BY:  MARK FOWLER, ESQ.
                              ERIK R. FUEHRER, ESQ.
                              ROBERT BUERGI, ESQ.


Transcribed by:               Echo Reporting, Inc.
                              Contracted Court Reporter/
                              Transcriber
                              echoreporting@yahoo.com

3

Thursday, August 20, 2015                              11:33 a.m.

P-R-O-C-E-E-D-I-N-G-S

--oOo--

THE CLERK:  Calling C 13-4700, Aylus Networks versus Apple.

Will counsel please approach and state their name for the record.

MR. FOWLER:  Good morning, your Honor.  My name is Mark Fowler.  I'm representing defendant Apple.  With me this morning are my colleagues, Erik Fuehrer and Robert Buergi.

THE COURT:  Okay.  Good morning, Mr. Fowler.  Good morning, Mr. -- is it Buergi?

MR. FOWLER:  This is Mr. Buergi and Mr. Fuehrer.

THE COURT:  Buergi.  And Mr. Fuehrer.  Good morning.

MR. THAKUR:  Good morning, your Honor.  Amar Thakur on behalf of the plaintiff Aylus.  I'm joined by my colleagues Will Cooper and Joseph Martin.

THE COURT:  Okay.  Good morning, Mr. Thakur.  Good morning, Mr. Cooper.  And good morning, Mr. Martin.

So we have before the Court Aylus's motion for leave to amend its infringement contentions.  I have reviewed everything submitted by the parties.  And I do have

4

questions to ask both sides.

So why don't I just start with Aylus, Mr. Thakur.

My first question is, how does granting leave to amend in this case crystalize the theories of the case early in litigation, I mean considering that this case was filed in October of 2013, discovery closed in June of this year, and you have a trial date in March?

MR. THAKUR:  Correct, your Honor.

So we filed the initial infringement contentions as required by the rules.  In our amended infringement contentions that -- we are asking sort of do not change a single theory.  The only thing that we're asking is to add the evidence that has been produced by Apple.  So there's no third party evidence.  It is just the evidence that has been produced by Apple.

What Apple does, however, say is that -- in their opposition motion on page 13, they cite some slight changing in the wording of the infringement contentions and say "Oh, those change the theories."

First of all, as a matter of fact they do not and here's why.

In March of 2015, we provided them supplemental infringement contentions that said, hey, we're going to get more evidence.  We're not going to enter these now because we'd be burdening the Court twice.  You got them.  You got

5

notice.  You got three months of discovery.  And then we'll go ahead and at the end of discovery seek to amend, which is what we've done.

So all the examples that they give -- five examples -- they had word for word three months before the close of fact discovery.

THE COURT:  Oh.  So, see, I was thinking that you had amended your infringement contentions without getting leave of court.

MR. THAKUR:  No.  What we did was we prepared amended infringement contentions and provided them to Apple and said, look, we're not going to get leave of court to amend these now, because that would require us going to the Court twice.

THE COURT:  Right.

MR. THAKUR:  We're going to give them to you so you have notice.  You've got three months of discovery to complete.  Go ahead and do your discovery, and then once we get all the depositions and all the source code, we'll do it once so we'll have to ask the Court once.

And, frankly, I'm not used to ever having to ask leave of court to amend for addition of evidence.  But this is the first time I'm actually having to do that.  It's obviously new claims and that's -- if you look at all the case law, that's the situation here.

You never actually have -- I mean they did the same -- Ladeek (phonetic) mentions they sought to add evidence.  We just stipulated.

THE COURT:  And you got feedback from them when you submitted your proposed amended infringement contentions the first time.

MR. THAKUR:  Correct.  They did not complain.

THE COURT:  Or the supplement ones anyway.

MR. THAKUR:  Correct.  They did not complain whatsoever.

THE COURT:  So you received some feedback from them and then made some other changes?  Is that how it worked?

MR. THAKUR:  No changes were made thereafter.

THE COURT:  No changes, okay.

MR. THAKUR:  So we -- I feel like I'm talking over you.  I apologize if I am.

THE COURT:  No, that's fine.

MR. THAKUR:  March 15, we gave it to them.  They never objected.

THE COURT:  Okay.

MR. THAKUR:  And then we sought to add evidence in June of 2015.

THE COURT:  Okay.  And so it's your position that there is no change then in your legal theories.

MR. THAKUR:  Correct.  And, your Honor, there's a case exactly on point -- I apologize it was not cited.  But it's identical to the facts in our case -- in the Northern District of California, a case involving Stanford University where they provided the other side -- they did exactly what we did.

They gave the other side a copy of the infringement contentions or provided them notice and then said -- moot several months later.  They entered them once they had all the evidence.

And in that case, the court found -- the court in the Northern District found that it was sufficient due diligence as long as they had notice.

THE COURT:  Okay.

Now, when did Aylus first contact Apple regarding all of the deficiencies in its responses to Aylus's first set of requests for production?

MR. THAKUR:  So it started -- we served them in March of 2015, the first of the RFPs.

THE COURT:  Right.

MR. THAKUR:  And the communication began almost within a month after they served the production.  Several letters went back and forth with respect to the production, and they kept saying production is forthcoming.

What became the issue was that Judge Chen actually has

8

a rule that says the party must certify completion of the production in response to those RFPs.

THE COURT: Right.

MR. THAKUR: We kept pressing Apple to do that. What they said was -- first, they refused to do it on the grounds that Apple had similarly served a substantial RFPs on us and said, well, you must do the same.

While Apple is a large organization with an infrastructure for doing discovery, Aylus has never been involved in patent litigation so we had to collect the documents and produce them.

So we certified completion of all production in December of 2014, the night before the meet and confer.

At the meet and confer the following day, the issue that really sort of brings to the forefront what happened was this patent case involves four items: an IOS device, a user endpoint, an Apple TV, a media server and a serving mode, which is the iTunes store where the contents was.

It was at that meet and confer in December of 2014 that they first informed us that they were only going to produce documents relating to the iOS device and the Apple TV, not relating to the iTunes store or the media server.

The following week we served them a joint discovery letter with basically a motion to compel. And upon receiving that motion to compel, they essentially said,

9

okay, we'll produce these documents.

And the first document that shows how the server there, the iTunes store works was first produced to us in April of 2015. That's just --

THE COURT: In April?

MR. THAKUR: April. And, your Honor, this is the document. I would call it the most important document in this case.

What I'd also like this Court to take a look at is the response to the interrogatory about how the product works. What I --

THE COURT: Was that interrogatory number 13?

MR. THAKUR: Correct. So you have all these documents, I just want to put them in front of you.

THE COURT: But this one is different, right, because this one wasn't propounded until much later, right? In March of 2015?

MR. THAKUR: Correct. So what we did was we served RFPs asking for documents to explain how the system works. You want contemporaneous documents. You don't want the rog that asks the defendant to tell you how the system works, because what they're going to do is construct non-infringement argument.

THE COURT: So just so I'm clear, this chart here that you've provided to me, this is something that was

produced by Apple in April of 2015.

MR. THAKUR:  Correct.

THE COURT:  This was over a year after your RFP.

MR. THAKUR:  Correct, in fact, after -- two months before the close of fact discovery -- just two and a half months before the close of fact discovery.

Your Honor, it's just as a matter of objective evidence, this document without an explanation was what we got.

THE COURT:  Okay.

MR. THAKUR:  And what they're saying is you should have understood this document -- actually, you should have understood the source code.

THE COURT:  I can't even see this document.

MR. THAKUR:  Actually, I blew it up just to make it easier.  In the exhibit, it might actually be smaller.

THE COURT:  I mean I can see it, but I can't read anything on it.  Okay.

MR. THAKUR:  Ask yourself, looking at this document, how could you figure out how iTunes works without a single explanation?

THE COURT:  Okay.

MR. THAKUR:  And they say, well, we gave you source code.

THE COURT:  Right.

11

MR. THAKUR:  Your Honor, our expert in the case, when they gave us the first production of source code, said it will cost you six figures if you tell me exactly what I'm looking for, and I don't know if I can re-do it but it will cost you seven figures if you want me to just go look at the source code and figure out how the system works.

THE COURT:  And your expert got an opportunity to look at the source code when?

MR. THAKUR:  So he got the -- what happened was they produced some of the source code.  Remember I said they produced some of the source code in the beginning.  And then some of the most critical elements of the source code, if you will -- the juice of the material, the real juice -- that didn't come until March of 2015.

And you can take a look at the exact list.

THE COURT:  The first time was in May of 2014, right?

MR. THAKUR:  Correct, some of the code.  Because if Apple is to be believed -- Apple's arguments to be accepted, the law will change.  The law would say when you have some pieces of the puzzle, you must disclose those pieces of the puzzle then, and when you actually get the remainder of the pieces of the puzzle, you disclose them at the later time.

That cannot be the law, because until we know how the

12

system works, how can we possibly have figured out how some of it works.

And the easiest way for this Court to look at that is just look at the exhibit that identifies the source code -- It's Exhibit 1, I believe -- to their opposition.  It identifies certain items were produced early and then a large number of items that were produced later.

And you'll just have to take my word, the most important stuff was produced in March of 2015.

THE COURT:  Okay.  Now, what about -- let's talk about this response to your interrogatory number 13.

You really place a lot of emphasis on that and say that it's pretty critical.  So I'm just wondering why wait until March of 2015 to propound it?

MR. THAKUR:  Because you're waiting for documents. You want Apple documents --

THE COURT:  You needed those other documents in order to propound this?

MR. THAKUR:  No, no, not to propound the rog but in a patent case you ask the defendant for documents because that is contemporaneous evidence of how the system works.

What Apple has said is that no such document exists. No document exists to explain how interrogatory 13 works, and if it had, you would have seen this document.  And they would have told you, look, here's when we produced it.

13

No document explains how this works.

Now, somehow their engineers were able to propound to the response to the rog, but no document explains with specificity as to how their system works.

And what they say is, you should have looked at the spec and the source code.

THE COURT:  Okay.

MR. THAKUR:  Don't listen to the lawyers.  Take a look at the chart.  Take a look at that spec and say could I have figured this out?  And I will take the position, your Honor, no reasonable human being could have figured this out from what they had sent to us.

And if we had, we would have done it.  I mean it's not as though we wouldn't have wanted to do it.  I've been practicing patent litigation for 20 years.  If I had the evidence, I would have given it to them.

THE COURT:  Okay.  Now, what about this reviewing of source code at different times?

So you have -- your attorneys reviewed the source code on -- was that June?  Was it June 18, 2014?

MR. THAKUR:  Correct.

THE COURT:  And that was for like 2.5 hours and then did not review the source code again until June 4th of 2015.  How is that diligent?

MR. THAKUR:  The key I'm going to explain is, your

14

Honor, what we knew was that we had source code -- source code without explanation is a seven-figure endeavor if it could be done.  And our expert said he sincerely doubted it could be done.

And, again, I don't -- give objective evidence, not -- our source code expert sat in the deposition in May of 2015 -- I forget the exact date -- of Mr. Meldram (phonetic) with the rog response, with that chart and finally for the first time understood what he needed to do to go look at.

And then he went in and looked and he said "Half the stuff isn't there."  So that was actually how -- the source code wasn't complete, and we couldn't have known it was not complete because we didn't even know what we were looking for.

The witness told us what we needed to look for, and that occurred in May of 2015.

THE COURT:  So that deposition is what clarified it for your expert.

MR. THAKUR:  Correct.

THE COURT:  Okay.  And then he looked at the source code again with that understanding.

MR. THAKUR:  Correct.  And why would we have our source code expert sit there if it wasn't necessary?

THE COURT:  And you took the depo after receiving the final production from Apple?

15

MR. THAKUR:  Correct, after -- frankly, the two most important things in this case was that chart and this document.  They gave us this rog response I believe two days before Mr. Meldram's depo.

THE COURT:  So did you understand this chart after his depo?

MR. THAKUR:  I do understand the chart now after his depo.

THE COURT:  Okay.

MR. THAKUR:  I would say I understood the chart after I got this and I think I got clarification -- which was a couple of days apart.  But I think the deposition confirmed for us that we were correctly understanding this.

And just to clarify, this rog response turned out, after that depo, to be deficient and it was supplemented six times over the next month and a half.  So this is the sixth supplement.

THE COURT:  Oh, this one was supplemented --

MR. THAKUR:  Six times.

THE COURT:  -- six times?

Do you want me to give this back to you?

MR. THAKUR:  I'm happy to leave it with you because it is an exhibit to --

THE COURT:  You don't need it?

MR. THAKUR:  I don't need it.

16

THE COURT:  Okay.  I can keep it.

MR. THAKUR:  I believe it's Exhibit I, but I don't want to misremember.  All these documents are attorneys' eyes only.

THE COURT:  Okay.  Now, Apple states that without -- well, it states but it doesn't really cite to the proposed amendment.  But it does say that all but one of the technical documents you cite in your proposed infringement contentions were produced in 2014.

So I'm just wondering why you waited until now to seek --

MR. THAKUR:  Your Honor, again --

THE COURT:  If it's really just one document that we're talking about.

MR. THAKUR:  It's essentially -- this is the AirPlay specification that they say was produced in 2014 along with Zukor (phonetic).  Your Honor, I challenge a human being to figure out from that document how the system works.

THE COURT:  Right.

MR. THAKUR:  And I'm an electrical engineer and I can't figure it out from that document.

What Apple did was it provided us highly technical documents without explanation.  And they were half the puzzle.  So the two deficiencies I -- the two points I want

to emphasize is they provided us half the story and then they provided the other story just two months ago.

And even the half of the story that they provided us, your Honor, I challenge a human being to look at the AirPlay specification, to look at that flow chart and say without explanation I could have understood it.

And just to be clear, this is a case dispositive motion. I mean if we're not able to get our evidence and this is case dispositive, a claim that has survived six word-for-word claim construction in favor of the plaintiff, two IPRs -- you know, the sort of claims that survive the IPRs -- and Apple is asking this Court to do a case dispositive motion on procedural grounds saying Mr. Thakur, you should have added the evidence earlier.

THE COURT:  All right.

MR. THAKUR:  Right?  And I can say, you know, 20 years of practicing patent litigation because that's all I have done, if I had the evidence, I would have given it to them.

It's not as though I would not have given it to them. I just didn't have it.  And there were at least half a dozen motions to compel that were delivered to them that were not filed with the Court because at the very last second they would say, okay, you can have it.

THE COURT:  Right.  And of course, you know, the

18

Court appreciates when the parties try and eliminate as many issues in dispute as possible.  As you know, we keep sending things back to you saying, okay, you can work this out, you can work this out and it looks like there was a lot of that that took place.

MR. THAKUR:  Correct.

THE COURT:  You started with 10 issues and then you narrowed it down to two, and so the Court always appreciates that.  And so we're not inclined to punish anybody for not filing an unnecessary motion or a joint letter in trying to resolve it on your own.

So I just want to let both sides know that I do recognize that and I appreciate that.

MR. THAKUR:  And I will say the turning point came when they gave us the rog response.  I mean I do want to acknowledge when Apple was good.

I think Apple didn't produce any documents to describe how the system worked but they did produce in April of -- May of 2015 a document that clearly explained how the system worked so we could know what to go look for in the source code.

And the witnesses were very helpful in walking us through the system.

So I don't -- I appreciate what they did do correctly. But certainly the May -- the 2014 production was both

19

inadequate and uninformative.

THE COURT:  So what did you need to know before propounding that interrogatory that resulted in that very helpful information?  Because that was propounded before you received this very confusing document.

MR. THAKUR:  Correct.

THE COURT:  Right.

MR. THAKUR:  The reason was that basically -- I think it was propounded -- we had gotten to a point where they basically said a year after we served our RFPs that we are now about to certify completion of our production.  And I believe it occurred in March of 2015.

THE COURT:  Right.

MR. THAKUR:  I think we propounded the rog a few days before because it became apparent to us that Apple was not going to give us any document that was going to explain how the system worked.

So essentially, like any good plaintiff's lawyer, you sit back and say okay, I'm not getting information that I would have normally expected contemporaneous, I've got to do something different.  And I've got to -- that's when we served the rog.

And what Apple was saying is we should have served teh rog earlier.  I'm not aware of any court in the land that has ever said you should have taken a different less

desirable source for discovery earlier in the case.  I'm not aware of a single case that has ever held that.

THE COURT:  Okay.

MR. THAKUR:  And you can understand why we would not serve a rog.  You want a document that explains how the system works.

You don't want Apple to tell the story in their own words.

THE COURT:  But they did.

MR. THAKUR:  They did and --

THE COURT:  And it was helpful.

MR. THAKUR:  It was very helpful.

THE COURT:  Okay.  All right.  I think those were my main questions for you.

So go on.  I'll go to Mr. Fowler now.

Mr. Fowler, how was Aylus supposed to get the discovery that it needs?  What it seems to me is that it's producing information according to its narrow view of the scope of the case.

And as we just discussed, it really took a long time to get this completed.

MR. FOWLER:  Sure.  So I think your Honor touched upon some of those points, but let me put them in a bit of a chronology.

THE COURT:  Okay.

21

MR. FOWLER:  As we point out in our papers, and as Aylus does not dispute, all but one of the technical documents that they're citing in their current proposed contentions were produced in 2014, most of them in the early part of 2014.

It's also without dispute that at least 90 percent of teh code that they're relying upon now was also produced in 2014, again early in 2014.  So we're talking about most of the evidence that their expert -- or presumably their expert was relying on when they put together their infringement contentions, was information that they've had for a year.

THE COURT:  But what do you say about his --

MR. FOWLER:  Well, that's what I want to -- I apologize, your Honor.

THE COURT:  Okay.  Go ahead.

MR. FOWLER:  So what I kept hearing counsel just say is, well, those documents didn't explain themselves.  We needed an explanation.

THE COURT:  Right.

MR. FOWLER:  But how do you get an explanation? You don't get an explanation from another document.  And we told him from the beginning there are no single documents. He didn't believe us.  We kept telling him there is no single document.  You need to look at the code or talk to the witnesses.

22

If you want an explanation in litigation there's only two ways to do that. One is to serve an interrogatory and one is to take someone's deposition. And they chose not to do that until, as you pointed out, your Honor, in the case of the deposition, they didn't serve the notice until January of 2015 and in the case of the interrogatory, they didn't do so until March of 2015.

So they waited a very long time to get that explanation.

And something I wanted to point out, your Honor, is that although we just heard Mr. Thakur citing to the overly large document, the one that's hard to read that I'm holding up, as the most important document in the case, your Honor, please go back and look at their -- I'm not asking you to do it now on the spot.

And I don't know how to pronounce his name, so forgive me if I get it wrong. But Mr. Lanovitz, he's the source code expert that they submitted a declaration with for the reply papers.

THE COURT: Right.

MR. FOWLER: You'll note that what he says in there -- and I'm paraphrasing here -- is I gave them a quote. There's nothing -- no mention of like a million dollars. That's something we just heard for the first time. "I gave him a quote and I said it would be complicated to

23

look at the code."  He didn't say he couldn't.  He just said it would be complicated and I would like some information.

What he says in paragraphs nine through 13 of his declaration is he explains what information he found helpful in knowing what to look at in the code.  He doesn't mention this document.

Mr. Thakur just said it's the most important document in the case, it was the key that allowed to unlock -- understanding.

Mr. Lanovitz doesn't say that.  He doesn't refer to this document at all.  He instead refers to the two things your Honor mentioned.  He refers to the depositions and he refers to the interrogatory.

So this seems to be a little bit of a red herring. There's no factual basis, just lawyer argument behind what we heard from Mr. Thakur.  And on that point, your Honor -- forgive me, and I'm sure the Court has other questions.  But I also have a case that we didn't cite and I'd like to hand that up as well, if I could.

THE COURT:  All right.

MR. FOWLER:  And let me give this a little context, because this case that we've just handed up -- which is the Google case which I'll talk about in a minute -- is cited by one of the cases that we cited.  We cited the Dynetix case, which is D-Y-N-E-T-I-X.  That's a

24

Judge Grewal opinion from 2012.

And it says in there:  "In considering the party's diligence, the critical question is whether the party could have discovered the new information earlier had it acted with the requisite diligence."

So that's not when you discovered it, how you discovered it.  And that case cites the Google opinion that I've just handed up to your Honor.

And the Google opinion which is at 210 Westlaw 1838693 is a decision by Judge Armstrong in 2010.  I will just briefly cover it, but on the second page of the document near the top, Judge Armstrong framed the issue.  This was also a motion to amend infringement contentions.

THE COURT:  Okay.

MR. FOWLER:  She said -- the court said:

"Netlist claims that good cause supports its request on the ground that it only recently learned of non-public information to support these contentions through two Rule 30(b)(6) depositions at Google, which took place in February and March 2010.

In response, Google contends that Netlist has not been diligent in pursuing discovery which has been open

25

since January 28, 2009 and that it would suffer undue prejudice if Netlist were permitted to quadruple the number of infringement contentions after the close of fact discovery."

On the right-hand column -- I'm skipping some --

THE COURT: We don't have any quadrupling going on here.

MR. FOWLER: No, but I'll get to the -- the key point here is what Judge Armstrong said next on the right-hand side. She goes, "The critical issue is not when Netlist discovered this information ..."

I'm going to pause there, because that's exactly what Aylus says in its reply brief, is that the cases say it's when they discovered it, not when they should have asked for it.

She goes on to say, "... but rather whether they could have discovered it earlier had it acted with requisite diligence. The answer is yes."

And then I'll leave it to your Honor to read the rest of it, but among other things, they talk about Rule 30(b)(6) depositions. And in this case -- in that case, Netlist says Google obstructed the 30(b)(6) depositions and they weren't taken for a while.

What Judge Armstrong said in response to that is, well,

quote, "Netlist should have promptly sought relief from the Court."  And then later it says "Having failed to do so, Netlist cannot blame Google for the timing of the Rule 30(b)(6) depositions."

Here, they didn't even serve the notices.  They didn't serve the notices.  So this is a perfect example of a court, in this case Judge Armstrong, saying you can't say you were diligent if you didn't even try.

And here we have this period of time where they're saying we want an explanation.  In discovery explanation comes through interrogatories and depositions, and they didn't ask for that.

So as Judge Chen said -- when he ruled when he ruled on our motion to amend our invalidity contentions, he said eight months is too long.  I have the exact quote if you want, but he says an eight-month delay is not diligent.

Here we have, depending on when you want to start the clock, maybe a year.

Your Honor, I apologize for going on, but I did want to respond to something else that Mr. Thakur said.  I haven't had a chance to read that Stanford case very carefully.  I glanced at it as you were asking questions.  I was trying to do both at the same time.

THE COURT:  All right.

MR. FOWLER:  But as I read that case, what

27

happened is they were ordered to provide their initial contentions under the patent local rules, which they had to do and then later they added other contentions.  And then what was happening is they were pointing back to their original authorized contentions.

What's different about this case is the March contentions that Mr. Thakur cited, those were not authorized contentions.  Matter of fact, if those somehow count, it would just flout the rules of this Court.

The local rules, which I thought I had -- right here. The local rule -- patent local rule 3-6 says "Amendment of the infringement contentions or the invalidity contentions may be made only by order of the Court."  They didn't do that.  They said "Well, you didn't object."

We didn't object because they didn't move to have those entered in.  Matter of fact, they said at the time, "We're going to file another one with the Court."

And we thought, okay, at that time, we'll look at it and take an assessment.  This is a non-event.

In the Stanford case, there were authorized contentions followed by a motion to amend.  Here, there were authorized contentions followed by one set of authorized contentions, followed by another set of authorized contentions by this.

And that leads me back -- and I'm trying to answer all your questions kind of at once -- but that leads me back to

28

the point of the changes.  And I should say, as we said in our brief, the law is pretty clear.  If they can't prove diligence, you don't have to go to prejudice.  You don't have to go to new theories.  You don't have to do any of that.

That's the '02 <u>Micro</u> case and the <u>Acer</u> case at page nine of our opposition.

But here, if you were to look -- and, your Honor, I'm not asking you to do this on the fly.  But if you were to look at their reply brief, what they do is they copy our chart where we show the changes.  And I will admit, they are right on one of these.  We got it wrong.

This is at pages six and seven of their brief.  We had identified five changes of theory.  And the first one, they're right.  They're right.  We hadn't seen that in their original contentions they had said that.

So I apologize.  We were wrong on that.

THE COURT:  Okay.

MR. FOWLER:  But the other four, these are changes in theory.  And you'll note when you go back and look at that charge, each time they said that it had previously been identified, it wasn't in their original contentions.

THE COURT:  So you're talking about four changes from the original ones.

MR. FOWLER:  Yes.

29

THE COURT:  Not from the unauthorized.

MR. FOWLER:  Exactly.  That's exactly the point, your Honor, is if you look at the boxes, the second one down, they say "Well, this isn't new."  They point to their interim contentions.

The third one, same thing.  They point to their interim contentions.

The fourth one, same thing.  They point to their interim contentions.

The last one, you may not know this on the face of it. They refer to Exhibit D, but that was their first unauthorized interim contentions so those are all new.

And I guess the last thing I would say before of course answering all of the other questions that you may have is he just said to, your Honor, this is a case dispositive motion. That's not in their papers.  But think about that for a minute.

I mean I thought about it when he said it.  He said there are no new theories, that all of our theories were in original contentions.

And this -- and at the same time, he's saying this is case dispositive.  How could that be?  Those two things can't both be right, because if he's got the same theories in both contentions, then we can't knock out his theories.

The fact of the matter is, he's changed his theories.

30

That's why this is a risk for him.  That's why they're arguing this, is because I think they figured out that we -- well, we don't infringe, period.  But we don't infringe certainly under their first theory, so they had to change their theory.  And under this new theory that's belated and they did way too late, I think that's what he's concerned about.

If this were just a situation where, like our invalidity contentions, they had repeated the same thing and added more evidence, I don't think we'd be standing here.

But that's not what happened.  They changed their theory and added evidence.  And so we're attacking both of those.

And I'm sorry if I'm --

THE COURT:  But technically -- I mean technically you're correct, but I'm just wondering if you're saying that because the other versions that were given to Apple were not authorized, that they just simply don't count and so there's prejudice to Apple even though they received them?

MR. FOWLER:  Right.  Well, the first point is you don't get to the prejudice or change of theory if they weren't diligent.  The law is pretty clear on that.

THE COURT:  Right.

MR. FOWLER:  But, yes, that's right, your Honor.  That's what I'm saying --

31

THE COURT:  Okay.

MR. FOWLER:  -- is we shouldn't be put in the position where they violated the local rules and we're somehow accountable for that violation.

THE COURT:  Yeah.

MR. FOWLER:  I'm sorry, your Honor.  I think you asked me one question, then I went on for a few minutes.

THE COURT:  Well, you answered a couple of questions.

MR. FOWLER:  So I apologize.  I was trying to respond.  So I think that's all.

THE COURT:  I mean that was something that stood out as I was looking through this as an issue, because I said, well, these weren't authorized.

There was no leave of court.  I went back and just checked the docket to make sure, and there was no leave of court obtained for these amended or supplemental contentions.

So, you know, that was certainly a concern and I was -- it sort of led me to wonder if the content of those infringement contentions can be taken into account when determining whether Apple is going to be prejudiced here.

MR. FOWLER:  Well, I would say no, they can't for the reasons I articulated.

Mr. Thakur, if I understand -- I'm sure we'll get to

32

hear from him again if the Court permits.  My understanding is he is relying on the Stanford case, which again, I haven't looked at carefully but I don't think that is a case involving unauthorized interim contentions.  So I don't think that gets him off the hook.

THE COURT:  So I need to get some clarity and the dates and when things were produced.  I know there was discussion about tens of thousands of documents being produced, and you've said to me that everything was produced in 2014 except one document?

MR. FOWLER:  Yeah, and I'm not saying everything. There were of course many documents that were produced after, but of the ones they're relying on, the ones that they say count, all but one of them were produced or versions of them were all produced in 2014 with the exception of that one, the one spreadsheet.

THE COURT:  So in the reply brief, it states that the proposed amendments are based on two key pieces of information:  one, the identity and function of the iTunes store servers that comprise the claim serving note and, two, the existence of multiple implementations of AirPlay that operate concurrently in Apple's products.

When did Apple produce that information?  Aylus states that it wasn't disclosed until the final weeks of discovery.

MR. FOWLER:  Right.  Well, that information is in

33

the documents.  They apparently couldn't recognize it.  One of the documents -- and I'll hand this up, your Honor.  It doesn't look like I have an extra copy, just the one.  Can I show it to Mr. Thakur and then hand you --

THE COURT:  Sure, yes.  I'm just trying to figure out if this is what you're talking about it was already produced in 2014 or if this really was produced in the final weeks of discovery.

MR. FOWLER:  Well, it's within the documents.  But the media control specification --

May I hand this up, please?

And forgive me, your Honor, let me get out my copy of it.

So this has to do with this notion that it was somehow some big secret that -- I need to find it.  Here we go -- that there were two ways of doing this.  And, your Honor, could I direct -- if I could, I'll share --

THE COURT:  Can you tell me first, before you go on, what this document is that I'm holding.

MR. FOWLER:  This is a media control specification that was produced by Apple in 2014.

THE COURT:  This was 2014, okay.

MR. FOWLER:  Right.  So I'm going to look at this with Mr. Thakur since -- if you don't mind.

THE COURT:  No problem.

34

MR. FOWLER:  So here on page two if you were to look under section 3.2, which is in the middle of the page. And this is just an example, your Honor.

It says "M1 streamer."  It says "If a streamer is playing media from a local file and not using cloud-based playback," et cetera.

So you recall that the two versions that Aylus is pointing to is so-called version 1, and then version 2 is streaming from the cloud.

So this is talking about the non-cloud option.  That's when it says "playing media from a local file and not using cloud-based playlist."

And then, your Honor, if you look the next page, "M4 iTunes store streamer," it starts:  "For cloud-based playback, iTunes store takes" so forth.

So it may not be readily apparent to a non-engineer what this is, but an engineer reading this would understand that there are two ways to do this.  And this is just one example of the fact that there were two.

But the other thing to turn back to, your Honor, is even if for some reason they didn't retain the right expert to look at this -- which they should have -- and recall --

THE COURT:  So you're saying this -- you're attributing this to a deficiency in the expert?

MR. FOWLER:  Well, that's -- well, your Honor, I

35

didn't want to go there.  But another issue is the expert they're relying on for this, Mr. Lanovitz, he could not have seen this document or the source code until this Court's protective order until he was disclosed to us and was cleared to look at confidential information of Apple.

So he wasn't disclosed to us until March of 2015.  They say they retained him in May of 2014.  But he couldn't even have looked at this stuff until March.

So I don't know what conversations they had about whether he could understand Apple's materials or not, but they as heck didn't have that conversation until at least sometime in March or April 2015 unless they were violating the protective order.  And my guess is they weren't violating the protective order.

So again, I didn't want to go down that path, but that shows another aspect of lack of diligence.  They say they've talked to an expert that said this would be really tough, I would need to look at some documents, but they didn't show him any of the documents until the spring of this year.

And so what I would further say is that even if they couldn't make out that there were two streams, as they said in their two points, that falls into the category, well, why didn't you take somebody's deposition?  Why didn't you serve that interrogatory?

And I have yet to hear a good answer for that other

36

than Mr. Thakur saying, well, we were waiting for that golden document that explained everything. And we kept telling him there is no such thing at Apple. That's not the way we do things.

If you want to know something, you look at the source code and you take people's deposition. That's the way it works. I'm sorry.

THE COURT: But what about the rest of the information that was provided that Aylus is saying wasn't disclosed until the final weeks of discovery to respond to these --

MR. FOWLER: I haven't heard yet what specific thing they think was produced so-called late that required them to wait this long to file some kind of amended contentions.

Like I said, 90 percent of the code, all but one of the documents -- 2014, they could have taken a depo. They could have served rogs. They could have done an amended set of contentions then.

If they did and it had been granted, maybe we would be talking about some thin slice of more recently produced stuff on some further amended contentions, but that's not what we're talking about.

We're talking about a wholesale slew of new information, most of which they had for a year.

37

THE COURT:  And how -- I mean what are we talking about in terms of volume of the production and the documents that had to be removed a couple of months before the discovery cutoff?

MR. FOWLER:  Well, so your Honor, we --

THE COURT:  Because that wasn't clear.  I know there are lots and thousands of pages but I just don't have a good picture in my mind about what they had to do with respect to reviewing tens of thousands --

MR. FOWLER:  Right.

THE COURT:  I think it was 25,753 documents totaling one million -- 150,001,353 pages, and so I was thinking surely, you know, Aylus would need time to review such a voluminous amount of material and then depose Apple's 30(b)(6) witnesses and propound interrogatories.

And then I was thinking that possibly shortly after those depos were completed, that they then sent proposed amended infringement contentions.

So if that was sort of the way things played out, then I would think there might not have been such a lack of diligence, but I don't have a good sense of exactly what they had to do.

MR. FOWLER:  Great question.  May I respond?

MR. THAKUR:  I don't want him to respond.  I just want to say we have it in the brief.  We can point it out to

38

you.

THE COURT:  Yes.

MR. FOWLER:  And I'll point to our brief too.  On page five of our opposition we point out that by July of 2014 -- so this is still very early on -- we had produced about 100,000 pages of documents in addition to the source code.

THE COURT:  By when?  I'm sorry?

MR. FOWLER:  July 2006.

THE COURT:  Right.  Okay.

MR. FOWLER:  And by February 2015, we had produced 800,000 pages.

Now, I want to focus though because I think to a certain extent the idea of the documents is a little bit of a red herring, because what they're relying on now is the source code and 90 percent of that source code was produced a year ago.

And so they didn't review that source code for a year. That's not in dispute.  They sent one of their attorneys there for two and a half hours to look at it.  They didn't have their source code guy show up for a year.

That can't be diligence in a case where source code is the main evidence, especially if they're looking, as Mr. Thakur said, for an explanation.

The only way to get an explanation is interrogatories

39

and depositions -- I'm sorry, I'm sounding like a broken record now.  But that they could have done early on.

THE COURT:  Right.

Mr. Thakur, you were going to say something.

MR. THAKUR:  Yes.  I didn't want to interrupt. Our footnote one sets with specificity the exact question you asked, what percentage of the production occurred when. 93 percent of Apple's production occurred in the last three months.

THE COURT:  93 percent.

MR. THAKUR:  93 percent.  And the seven percent that occurred in June was essentially all marketing materials, completely -- I don't think a single one of the documents served a meaningful purpose.

The only thing meaningfully they produced was, as I say, the source code and a couple of the specifications that provided some of the pieces of the puzzle.

They did not give us the other half of the piece of the puzzle until April of 2015, which is what we needed to understand how the system worked.

So what Apple's saying is our lack of diligence is that we should have served deposition notice early --

THE COURT:  But their production was certified complete in March of 2014.

MR. THAKUR:  Correct, and they completed an

40

incredible amount -- well, there's two things.  One, we did sort of settle our fee so that will give them a hook, though I believe of course our fees are clearly what was done.

Production occurred by them at the close of fact discovery.

THE COURT:  So, Mr. Fowler, what was in this 93 percent of your production in the last three months?  I mean does that go to what they needed to --

MR. FOWLER:  No.  That's my point, your Honor, is -- well, one of my points.

What they needed, right, is what ultimately they pointed to in their infringement contentions.  And all but one of those documents was produced in 2014 and the source code was produced -- or most of it, or 90-something percent of it was produced in 2014.

The fact is that in this case -- and your Honor has some familiarity with this, but the practice is that Aylus was -- I don't want to say this in a pejorative way, but aggressive in seeking a lot of discovery, a lot of discovery we didn't think was relevant.

So we ended up either voluntarily or in response to the Court's order producing a lot of information that I don't think has any bearing on this case.  As a matter of fact, their expert report now -- although that's not before the Court -- actually rolls back some in terms of what they're

doing in this case.

The documents that they needed are the ones they cite in their infringement contentions, and again, most of those are back in 2014.

So the fact that there were a lot of other documents produced in 2015 doesn't really matter, I think, because if they were diligent, they would have looked at the smaller production -- what they're saying is a smaller production before and found the documents that mattered, if that makes sense.

THE COURT:  So, Mr. Thakur, when you say that your proposed amendments are based on two key pieces of information and you've listed them there, when did you have the information from Apple regarding those?

MR. THAKUR:  The interrogatory response, your Honor, a few days before the deposition.

THE COURT:  It was the interrogatory response. And what they say is you should have asked a deposition. Your Honor, you're a --

THE COURT:  And so -- I mean it kind of takes me back to my previous question about why you didn't propound that interrogatory earlier.

MR. THAKUR:  Your Honor, because you're looking for contemporaneous evidence of document production and that's what explains it.  What Apple now says today is we

42

had no such document.

I mean the idea that this interrogatory response is based on information in the heads of engineers and does not exist in a single document is what they're asking this Court to believe, that there is no document that explains what this rog response is and this information exists solely in the heads of the engineers.

But we're not fighting that fight --

THE COURT:  Right.

MR. THAKUR:  -- because we have the information we need.

But that's what they're asking this Court to assume. That's incorrect.  And every single case that they're citing is dealing with new claims, new products.  All we're doing is citing new evidence.

And those five minor word-smithing items that they have said are new theories are minor word-smithing errors, and the Court can review it for itself.  And they had the notice that if they needed any deposition, they could have done so back then.

And if the Court puts on the burden -- saying unauthorized infringement contentions don't count, you're going to start seeing dozens of motions to amend infringement contentions as patent cases progress.

MR. FOWLER:  I've never seen an unauthorized set

43

of infringement contentions in my practice.  I've been doing this a little even longer than Mr. Thakur.  This was a new thing.

I do have an answer to your question.  Mr. Fuehrer was kind enough to respond.

You asked, your Honor, what was the bulk of that production late in time.  I had forgotten.  That was a result of the parties waited to do email custodian discovery until they ended the case.

THE COURT:  Okay.

MR. FOWLER:  And Aylus served about 15 email custodian document requests in April and May of 2015 and the bulk of what we produced during that period of time was in response to those requests.

And so, one, the requests weren't served very early on.  They were served late in time.

And, two, apparently what we produced to them, even though it was incredibly burdensome on us, didn't bear any fruit because they're not cited in their infringement contentions.

THE COURT:  So what about this argument that they are introducing new theories as opposed to just including new evidence that they just received?  I know you do assert that but your assertion seemed to be a little bit out of context, so I couldn't tell --

44

MR. FOWLER:  Sure.

THE COURT:  -- how you decided that these are new theories of infringement.

MR. FOWLER:  Right.  So, your Honor, on that one what I would say is if your Honor wants to go back and review that issue again, I would ask that you look at pages 12 and 13 of our opposition brief.

THE COURT:  Okay.

MR. FOWLER:  Those set forth the comparison.

Now, I'm not sure what Aylus's position is because originally when we started this hearing the position was they're not new theories because, with the one exception that I admitted is wrong, which is the first box --

THE COURT:  Right.

MR. FOWLER:  -- on the bottom of page 12, is they're not new because they were in our interim contentions, which seemed to me to be an acknowledgment that they weren't in their original contentions.

THE COURT:  Oh, I see.  Okay.

MR. FOWLER:  And now what we just heard Mr. Thakur said, he actually said -- I think he used the word -- I'm not sure if he said "typo" but he said "error."  There is basically a wording error that they had to fix.

Well, that's a pretty big wording error where they say you infringed because of this and now they're saying it's

45

because of this.

And I certainly -- or my client certainly shouldn't be on notice of so-called wording errors.  I mean that strikes me as that's an admission that there's a change in the substance, not just adding evidence.

THE COURT:  That's right.  Okay.  So I keep forgetting.  The new theory of infringement argument requires me to also conclude that the unauthorized supplemental or amended --

MR. FOWLER:  Right.

THE COURT:  -- versions don't count.

MR. FOWLER:  Right.  And also, just as a reminder, under the Acer in '02 case, you don't have to reach this issue if you don't find that they were diligent.

They have to show that they were diligent before you even get to this issue and then it's still in your discretion whether to grant or deny the motion at that point.

THE COURT:  Right.  Well, and that's -- what I'm doing is trying to figure out whether or not they were diligent, because I think it really depends on whether or not Apple simply didn't complete its production for over a year and therefore that would justify why Aylus wasn't able to complete -- get the information that they needed in order to seek leave to amend or was there was something more going

46

on that they should have done that could have gotten them the information.

MR. FOWLER:  And I completely agree with your Honor.

I mean I would never presume to be in your position, but if this was a situation where Mr. Thakur could come in and say:  Look at our infringement contentions. Instead of seven of eight documents being produced in 2014, seven and eight were produced in March of 2015.  Instead of 90 percent of the code being produced in 2014, 90 percent was produced in March of 2015.  How could he have done it?

Then what you said would be exactly right.  Then shame on me for not timely producing my material.

Here, we timely produced it.  They don't dispute that. What they said in their papers and what you heard them say today is, "We didn't know what it meant."

THE COURT:  Right.

MR. FOWLER:  Again, broken record but how do you get that?  You serve interrogatories and you serve deposition notices.

THE COURT:  Okay.  On another issue, in its reply Aylus represents that it will not pursue claims of infringement with respect to content sources from Netflix, Hulu, or Amazon and that it has no intention of pursing claims of willful infringement, indirect infringement, or

47

infringement of the doctrine of equivalence and that it will not assert that its products practice the 412 patent claims.

So doesn't this address Apple's concerns on these issues?

MR. FOWLER:  Yes.

THE COURT:  And couldn't the parties just file some sort of stipulation?

MR. FOWLER:  As to those parties, that satisfies us.  They've subsequently served their expert report.  Their expert does not opine on any of those issues.

We had one loose issue that Mr. Thakur confirmed with me before court, so as to that part of the motion, I think we're done.

The Court could note it in its order that the parties have agreed that that's resolved that issue, if the Court still wishes.

THE COURT:  Okay.

MR. FOWLER:  I don't suspect Mr. Thakur is going to go back.  I trust Mr. Thakur's word on this that I won't show up to trial and suddenly hear about these things and that Judge Chen will hear about it.

MR. THAKUR:  We can't go beyond the scope of our expert report --

THE COURT:  Right.

MR. THAKUR:  -- and have no intention of doing so.

48

THE COURT:  Okay.  So the parties agree that those issues are resolved.

MR. FOWLER:  Yes, your Honor.

THE COURT:  And you also seem, Mr. Fowler, to be asking me to affirmatively strike the infringement contentions that you claim are deficient and shouldn't that be addressed in some sort of separate motion as opposed to an opposition?

MR. FOWLER:  Well, yeah, and I saw the case that Aylus cited on that.  If we said something like that, that is not our intention.

THE COURT:  Okay.

MR. FOWLER:  I think the procedural mechanism here is they moved to amend their infringement contentions. We've opposed it.  That's the mechanism for doing that.

THE COURT:  Exactly.

MR. FOWLER:  If your Honor were to deny that motion, those infringement contentions wouldn't exist, so there's nothing to strike.

THE COURT:  Right.

MR. FOWLER:  I think if your Honor's asking what the next step might be, we'd need to talk to my client and we'd need to look at your Honor's order.  But if you were to --

THE COURT:  If I allow them to amend, then what

49

happens?

MR. FOWLER:  Then probably nothing.

THE COURT:  Okay.

MR. FOWLER:  If you were to not allow them to amend, I think the next step would probably be a motion directed at their expert report which exceeds the scope of their infringement contentions.

That would be the procedural mechanism that you were referring to, your Honor.

THE COURT:  Okay.  With respect to the two iterations of infringement contentions done without leave of court, have the parties conducted any discovery based on those?

MR. THAKUR:  Your Honor, they've not indicated that they wanted discovery.  We've asked them -- even after -- they had three months to do it, but we asked them in the meet and confer process if there's some discovery that you want that could -- they did not indicate any discovery that they want.

THE COURT:  Has Apple taken any discovery based on those?

MR. FOWLER:  Well, since these are infringement contentions, there's no real discovery that you can take as to the plaintiff as to its contentions per se.  There's no witness on their part that they could ask.  The person to

50

ask about that would be the expert, and we haven't come up to expert.

The thing that we had pointed to though, your Honor, is the issue of prior art.  Although in a perfect world, maybe this wouldn't ever exist, but as a practical matter if a plaintiff says "Here's our contentions.  Here's your product.  You do that," then we will often say, "Well, no, that's not on our product.  But, by the way, if what you're saying were true, here's some product art that -- prior art that looks just like this.  We actually think your claims mean something else, and here's the prior art that applies to that."

And so that's what we're saying is, until these contentions are final, we didn't go out and look for prior art or discovery on prior art on that.  That's true.

THE COURT:  Okay.

MR. FOWLER:  I will concede that.  But, again, those were not effective contentions.

THE COURT:  Right.

MR. FOWLER:  And I have to say one important point on that -- I believe Mr. Thakur accurately reflected this -- is when they served their March 2015 unauthorized contentions, they told us:  These are interim contentions. We're going to be serving final ones soon -- soon, and then we'll be moving to amend.

51

But they didn't move soon.  They waited and they waited and they waited -- was it June?  May?  It was some months.

THE COURT:  I think it was June.

MR. FOWLER:  June before they actually served and moved.

And so we were basically at that point frozen because they said:  We're serving these on you, but they don't really count.  We're going to give you the final ones later.

So we kept waiting for the final ones, which I think, talking about reasonable, is a reasonable approach to take.

MR. THAKUR:  Your Honor, the patent prior art is a non sequitur.  I never really had a chance to present that motion to Judge Chen and Judge Chen denied that motion.

What they were trying to do is add new pieces of prior art.  Basically what happened is this patent has survived IPR which means effectively the case -- the patent's valid.

So what you want to do is take non-patent prior art and they've tried to do that and Judge Chen rejected it.  This is a backhanded way to bring something completely non sequitur into the case.

Patent prior art is basing the claims -- has nothing to do with what you say in infringement contentions.

MR. FOWLER:  Well, I disagree with that.

First of all, Judge Chen ruled on a situation where we were talking about art.  It's not the situation.

52

If they had moved to infringe their contentions timely in early 2014, I don't think Judge Chen would have been able to say, as he did in his motion, you waited eight months.

We would have been right on top of that situation.

But I agree with Mr. Thakur that this issue that we're talking about now shouldn't be driving the result --

THE COURT:  Right.

MR. FOWLER:  -- in terms of the order here.

THE COURT:  And --

MR. FOWLER:  And, by the way, your Honor -- I'm sorry.

THE COURT:  Go ahead.

MR. FOWLER:  Just to clarify the record, Mr. Thakur said his patent survived IPR.  That's not true.  We went to the patent office and moved on the claims.

There hasn't been a final decision yet.  The patent office said preliminarily that all but two claims were invalid and Mr. Thakur's client has dismissed all of those claims with prejudice.

So we won on those claims actually.  We won.  Dismissal with prejudice I would take as a victory.

And so he's got two claims that he's now left with that he's taking to trial.

THE COURT:  Okay.

MR. THAKUR:  I'd clarify.  The two asserted claims

53

have survived IPR.

THE COURT:  Okay.

MR. THAKUR:  And that's what this case is about, not claims that are still being reviewed by the patent office.

THE COURT:  Okay.  So my last question to you, Mr. Fowler -- this is not saying that I'm going to do it one way or the other.  I just want to know what additional discovery would Apple have to conduct if the Court grants this motion.

MR. FOWLER:  That's a good question, your Honor.  I think the frank answer is that if the Court doesn't think that prior art is relevant, then the answer would likely be none.

THE COURT:  Okay.  Because that was one of -- I mean that your main argument about prejudice --

MR. FOWLER:  Prejudice.

THE COURT:  -- I mean assuming if I could find that they were diligent, then looking at the prejudice part of it, your argument was you would be denied an opportunity to conduct fact discovery because discovery is closed.

MR. FOWLER:  Right.

THE COURT:  And so --

MR. FOWLER:  And the caveat was if you don't consider the prior art issue -- the issue there is under these theories, we didn't have the opportunity to go out to

54

third parties.

In this kind of case, the best prior art is probably going to be product prior art, and that's what you look for. So we didn't have the opportunity to do that here. I'm not sure we would under the existing schedule.

THE COURT: Judge Chen tells me that his main concerns are that the trial dates don't change, the pretrial conference and the motion for summary judgment date in this case not change. He's not totally against the idea of that hearing date moving slightly, the motion for summary judgment slightly but not much.

So what that means to me is if I were to give Aylus leave to amend and you felt that it was necessary to do some minimal discovery, that might be something you could get leave to do from Judge Chen.

MR. FOWLER: Thank you, your Honor.

THE COURT: I will take everything into consideration that's been discussed here today and go back through everything that's been submitted and make a final decision.

MR. FOWLER: Thank you, your Honor. Appreciate the Court's time.

THE COURT: Thank you.

(Proceedings adjourned at 12:33 p.m.)

55

CERTIFICATE OF TRANSCRIBER


I certify that the foregoing is a true and correct transcript, to the best of my ability, of the above pages of the official electronic sound recording provided to me by the U.S. District Court, Northern District of California, of the proceedings taken on the date and time previously stated in the above matter.

I further certify that I am neither counsel for, related to, nor employed by any of the parties to the action in which this hearing was taken; and, further, that I am not financially nor otherwise interested in the outcome of the action.


Echo Reporting, Inc., Transcriber

Wednesday, October 14, 2015