**Pages 1 - 112**

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

BEFORE THE HONORABLE EDWARD M. CHEN, JUDGE

| | |
|---|---|
| AYLUS NETWORKS, INC., a Delaware,    )<br><br>          Plaintiff,    )<br><br>  VS.                   )<br><br>APPLE INC., a California corporation,    )<br><br>          Defendant.    )<br>_____)   | <br><br><br><br><br>**No. C 13-4700 EMC**<br><br><br><br><br>San Francisco, California<br>Friday, December 18, 2015 |

**TRANSCRIPT OF PROCEEDINGS**

**APPEARANCES**:

For Plaintiff:          QUINN, EMANUEL, URQUHART & SULLIVAN LLP
                        865 South Figueroa Street, 10th Floor
                        Los Angeles, California 90017-2543
                   BY:  **AMAR L. THAKUR, ESQUIRE**

                        QUINN, EMANUEL, URQUHART & SULLIVAN LLP
                        50 California Street - 22nd Floor
                        San Francisco, California  94111
                   BY:  **JOSEPH B. MARTIN, ESQUIRE**

For Defendant:          DLA PIPER LLP
                        2000 University Avenue
                        East Palo Alto, California  94303
                   BY:  **MARK D. FOWLER, ESQUIRE**
                        **CHRISTINE K. CORBETT, ESQUIRE**
                        **ROBERT BUERGI, ESQUIRE**
                        **JONATHAN HICKS, ESQUIRE**
                        **ERIK R. FUEHRER, ESQUIRE**

Also Present:           Kim Moore, Apple In-House Counsel

**Reported By:  Katherine Powell Sullivan, CSR No. 5812, RMR, CRR**
            **Official Reporter**

**Friday - December 18, 2015**                          **2:38 p.m.**

                    **P R O C E E D I N G S**

                         ---000---

THE CLERK:  Calling case C13-4700, Aylus Network versus Apple.

Counsel, please come to the podium and state your name for the record.

MR. THAKUR:  Good afternoon, Your Honor.  Amar Thakur and Joseph Martin on behalf of Aylus Networks, Inc.

THE COURT:  Thank you, Mr. Thakur.

MR. FOWLER:  Good afternoon, Your Honor.  Mark Fowler, DLA Piper, for Apple.

With me today from Apple is Kim Moore, who's in-house counsel right there, and my colleagues from DLA Piper, Christine Corbett, Robert Buergi, Erik Fuehrer, and Jonathan Hicks.

THE COURT:  All right.  Welcome.  And good afternoon.

So we have a number of motions on this afternoon.  And maybe you can tell me, since you seem to have everything set up, what your anticipation is in terms of the most fruitful but efficient way of proceeding this afternoon.

MR. FOWLER:  Well, there's four motions on calendar. There's summary judgment going each way and a *Daubert* motion going each way.

We have not talked in advance as to how we would like to

proceed.  We'd proceed in any manner that the Court would like us to.  If there's one motion of particular interest more than the others we'd, of course, be interested in taking that first.

THE COURT:  Well, unless you have any comments.

MR. THAKUR:  No, Your Honor.  I'll defer to you.

THE COURT:  I mean, just maybe for no other good reason why don't we start with the plaintiff's motion for partial summary judgment on the -- well, the infringement questions.

And maybe this would be a good way to start because I want to make sure I understand the technology.  And maybe that's what you, hopefully, have teed up to explain exactly how the accused device works.  And maybe in the context of some of the main arguments here, such as the claim about the CPP is invoked to negotiate media content delivery between MS and MR limitation.

MR. THAKUR:  Your Honor, I actually agree that's the first motion we should take up, frankly, for the reason that it's case dispositive and, we think, would be the easiest one to get through.

MR. FOWLER:  Just to clarify, that would be our motion for summary judgment.

THE COURT:  Your motion for summary judgment, right, on noninfringement.

MR. FOWLER:  Sure, sure.

**THE COURT:** And it would be helpful -- we've done a tutorial before, I guess, but it's been awhile -- to see exactly how this all plays out. I assume that's why you have set up --

**MR. FOWLER:** We actually don't have slides that map that out because we were specifically focused on the arguments that Mr. Thakur was making in his briefs. I apologize, Your Honor. We don't have something like that.

**THE COURT:** Okay. Well, maybe you can explain to me as best you can. Why don't we go ahead and take that issue first.

**MR. FOWLER:** Okay. Thank you, Your Honor.

We have a slide deck to hand up to you.

**THE COURT:** Okay.

**MR. FOWLER:** Now, Your Honor, this perhaps partially explains why we don't have a tutorial is -- let me go to the first actual slide. There are four arguments we make in our summary judgment motion.

**THE COURT:** Yes.

**MR. FOWLER:** Three of them, the first three that are on this slide, are noninfringement arguments. Any one of them is case dispositive for the entire case. So if Your Honor were to agree with any one of these arguments, the case is over.

The last argument has to do more with the validity issue. If you'd like, there's two places we have this in our slides.

We can do it as part of this motion, or it's also an issue on Mr. Thakur's validity motion.  And we can address, perhaps -- it fits, maybe, better in responding to his motion.

THE COURT:  I agree.  Let's do that.

MR. FOWLER:  I will just argue the three.

The reason I started with the point about the tutorial is that the good thing about these three arguments is there are no disputes of fact as to any of them.  All three arguments turn on either an issue of claim construction or what the law requires.  So all three of these are really asking the Court to do something that's purely legal.

And let me go through each of those in turn, if I may.

THE COURT:  Yeah.

MR. FOWLER:  So the first argument has to do with this claim step, the CPP logic is invoked to negotiate media content delivery between the MS and MR.

Just to give you a taste of what that's about, MR is the media renderer.  That's the thing that you're going to be viewing.  And the media server is where the stuff is stored.  It's going to go from point A to point B.  And how is it going to get there?  In this particular claim, it's done through the CPP logic.

Now, as I said, there are no disputed facts.  I'm on slide 4.  There are no disputed facts.  This is solely a claim construction issue.  And let me explain what I mean by that.

So if you look at claim 2, we have the language "wherein the CPP logic is invoked to negotiate media content delivery between the MS and the MR."

There are two asserted claims in this case, Your Honor. Apologize if you remember this. Originally there were a whole slew of claims. There was an IPR. As a results of that, all of the claims were dismissed other than dependent claim 2 and dependent claim 21. The same language that's highlighted in claim 2 is also present in claim 21.

The parties have a dispute over the meaning of the highlighted language in yellow. And, in particular, if you look there it says "wherein the CPP logic is invoked."

So the issue is, it's Apple's contention that that means that this negotiation that's referenced there in yellow has to be done by the CPP logic exclusively.

The position of Aylus is no, it can be the CPP logic and the CP logic. So it's solely an issue of claim construction.

The reason it's solely an issue of claim construction -- and I'm on slide 6 now -- there's no dispute that in the Apple products what Mr. Thakur is pointing to as being the CPP logic, which is software on your iPhone or your iPad, the IOS device software, on the alleged CP logic, which is software on the iTunes servers, are both invoked to do what he points to as being the required negotiation.

So if Apple's position on the meaning of this claim term

is correct, then we win.  And if it's not correct, then Mr. Thakur can proceed to trial on this claim.  So it turns solely on claim construction.

And it's actually a fairly straightforward claim construction issue, too, because on slide 7 -- I'm going to focus on the claim -- claim 1, on which claim 2 depends, you see there that in claim 1 it says "invoking the CPP logic and the CP logic."  So on claim 1 both are doing this negotiation. In claim 2 it's only the CPP logic.  And the same pairing works for claims 20 and 21.

Now, why is it that claim 2 is limited to the CPP logic? Well, it has to do with prosecution disclaimer.  So this is solely a prosecution disclaimer issue.

Your Honor, I'm sure you're familiar with this so I won't spend a lot of time on slide 8.  But I've put up some of the classic cases.  *Southwall*, *BenQ*, and *Gillespie*.

And the long and short of the law, which is briefed at more length in our brief, is that a patentee cannot say one thing to the Patent Office in order to avoid prior art -- which is what happened in this IPR in this case; while this case was pending, they said one thing in the IPR in order to avoid institution of claims 2 and 21 -- and then say something else in the lawsuit.  Which is exactly what's happening here.

So advancing to slide 10, this is the evidence.  We have, basically, five slides of evidence.  Now, this one -- there

were two IPRs that were filed, Your Honor, in -- relating to this case.

If you look down at the bottom, at the cite, this is what we call the 1565 IPR.  That's the one that ultimately was granted by the PTAB.  And look at the language here.  This is from Aylus's brief in that IPR.  And it says, "Similarly, certain of the challenged dependent claims" -- let me just stop there.  We're talking here about claims 2 and 21.

THE COURT:  And that's clear, when it refers to assertion of the challenge?

MR. FOWLER:  Absolutely.  If you were to pull back out and look at the full page, it would be absolutely clear.  I don't think Mr. Thakur would disagree with that.

-- "require that only the control point logic" -- and that's referring to two other claims that are not at issue here, and then the parenthetical, "or only the control point proxy logic" -- that's the CPP logic.  That's claims 2 and 21.

The reference to the control point logic refers to claims 4 and 23, I think.  But right here, the parenthetical, the "or only control point proxy logic," that's claims 2 and 21.

So, you know, Your Honor, I just get old so I start saying stuff like this, but I've argued a lot of prosecution disclaimer cases.  And frequently what the Courts look to is, Did the patentee use absolute language?

Well, in the world of prosecution disclaimer "require" and

"only" are just about at the top of the pantheon of words you can use to get disclaimer.  It's not "maybe," "sometimes."  It's "require" and it's "only."

Now, let's look at the next page, page 11.  This is in the same document where they say "only the CPP logic is invoked to negotiate media content delivery between the MS and MR."  And those brackets claims 2 and 21.

So in both of these places together they are telling the Patent Office that for these two dependent claims it's only the CPP logic.  And they talk about "require."

Now, let's look at the next slide, slide 12.  This is in the companion IPR.  Now, the Patent Office didn't grant this one.  You see at the bottom, it's 1566.  And the language we're looking at is identical.  It's like a cut and paste.

So they said exactly the same thing in the other IPR, on slide 12.  And then if we advance to slide 13, they said exactly the same thing as in slide 11, on slide 13.

So they said both things in both IPRs.

THE COURT:  So what happened in the 1566?

MR. FOWLER:  That was not granted for other reasons.  But they made the statement in both.

And the reason I put both of them in there is sometimes plaintiffs, and perhaps the bench, will say, well, you know, I'm not going to count a slip of the lip against somebody.  But here they said it twice in each one.  And then they did it in

two different IPRs.  So it was not a mistake.

So then let's look at what the PTAB said.  So on slide 14 we have the actual order, the institution decision granting the IPR on this.  Again, they granted it as to every claim that was asserted in this lawsuit other than 2 and 21.  And let's see what it says.

"It is unclear from the petition how UPnP design allegedly meets the different limitations of dependents claims 2, 4, 21, and 23 in which either the CP logic" -- that's for claims 4 and 23 -- "or the CPP logic" -- that's for the claims we're talking about now, 2 and 21 -- "exclusively handles the negotiation of media content delivery between MS and MR."

So Aylus told the Patent Office that it was required that only the CPP logic do the negotiation.  Here the PTAB is indicating that it apparently reads the claims the same way. "CPP logic exclusively handles."

So that's the evidence on this, Your Honor.  I think that there's no question that there's a disclaimer here.  It was in the Patent Office.  It was try to avoid art.  As a matter of fact, if the PTAB had disagreed with them I might not be standing here right now because all of the claims would have been an IPR, and Your Honor might have stayed the whole case. So it had an effect.

So what are Aylus's comeback arguments on this?  Well, they make a couple of arguments.  First they say, well, Your

Honor, the claim has the word "comprising" in it, and comprising means that it's an open-ended claim.

I have two things to say about that, the least important of which is the first point on slide 15, which is, the Courts have held "comprising" is not a weasel word that makes the claim completely malleable.

But the more important part, as we see in the *Computer Docking Station* case that's cited on slide 15 and is in our brief, if someone says something during prosecution that constitutes disclaimer, that trumps the use of the word "comprising."

If the patentee says "My claim is limited to this" or "My claim means this," then the fact they've put that word "comprising" in there doesn't get them around what they said to the Patent Office.

So what else do they say?  Well, on slide 16 they say, well, the specification doesn't support this disclaimer argument.

And the response to that is:  So what?  Because this is about prosecution disclaimer.  It doesn't matter what the specification says.  What we're basing this on and what the cases, the *Southwall* case and all those other cases that we cited in our brief, what those all talk about is what the patentee says during prosecution, not what is in the specification.  And as we've cited here, the *Uship Intellectual*

*Property* case, in any event, the prosecution disclaimer trumps the specification.

What else does Aylus say?  Well, Aylus's next argument is basically, well, we didn't really mean that; that's not what we meant.  And they argue that.  And the highlighted language is how they try to twist what they say.  And this is from their brief for this motion.

"Aylus explained that only the CPP logic handles" -- and that's their emphasis -- "the negotiation of media content delivery and that the CP logic is not required to participate in the handling as it is in claims 1 and 20."

Well, the problem with that is that's not what they said to the Patent Office.  There's no support.  There's no cites there.  They don't cite to anything that supports their assertion.  That's pure lawyer argument that is inconsistent with what was said during prosecution.

Fourth point they make, they say, well, the Patent Office didn't really rely on this, and they didn't issue an express claim construction.  Well, that's true.  There was no claim construction.

But, again, it doesn't matter.  As indicated in the *Greenliant* case from 2012, in the federal circuit, federal circuit has made clear that prosecution disclaimer is bounded by what the patentee says.  It doesn't matter whether the board agreed with them; disagreed with them; ignored them; responded

to them.  It's what they said.  Because this all goes to public notice -- right? -- the public notice function of what is said during prosecution.

THE COURT:  It's unlike judicial estoppel.

MR. FOWLER:  That's right.  Right.  Exactly.  That's exactly right.

And so you can just stop there.  But the fact is when we go back to the slide -- you've seen this before; I've shown you on slide 19 -- the Patent Office did agree.  I mean, regardless of whether they had to agree, they did agree.  They adopted this position that it's the CPP logic exclusively.

So they either did one of two things.  They read the claim the same way that we read the claim, Apple reads the claim, or they agreed.  They greed with Aylus.  But, in any case there is estoppel.

So let me sum up here.

THE COURT:  And the PTAB decision uses the word "handles."

MR. FOWLER:  Right.

THE COURT:  Does that make any difference?

MR. FOWLER:  No, I don't think so.  No.  I mean, it's talking about the negotiation.  Negotiation is what's in the claim.  And it says "negotiates."

What matters is "exclusively."  "Exclusively."

THE COURT:  Does "handles" add anything?

MR. FOWLER: I don't think so.  I mean, for purposes of what we're doing here, what matters is it's the CPP logic exclusively as opposed to the CP logic.  That's what "exclusively" is qualifying is as between the two of those, for these dependent claims, the CPP logic.

Remembering, Your Honor, in claim 1 it specifically says in the claim itself it's both that's doing the negotiation. That's the contrast that's being drawn.

So do we have a disclaimer?  Yes.  There's specific statements made by the applicant or, in this case, the patentee as to what the claims say.  Was it to get around prior art? Yeah, it was.  Matter of fact, if they hadn't the claims would probably all be gone.

By the way, just as an aside, Your Honor, this probably should wait until the status conference part of this, but the hearing on the IPR was earlier this week.  So we're getting close to the end of that process.

Was there disclaimer?  Yes.  Was it to get around prior art?  Yes.  Does the law say if that's the case they're bound by it?  Yes.  Is there any dispute that we don't do what's described if it's limited to just the CPP logic?  No.  So we're entitled to summary judgment.

Now, Your Honor, I have two other arguments, but I don't know whether it would be more useful to Your Honor to hear their response.

**THE COURT:** Let's take it one at a time.

**MR. FOWLER:** Okay.

**THE COURT:** And let me hear the specific response to the disclaimer argument.

**MR. THAKUR:** Thank you, Your Honor.

Could I have you turn to your slide 10 before we get started.

Your Honor, this claim construction has nothing to do with what the patent says. It's based on what we said to the PTAB. That's it. Right? There's no dispute on that.

So what they showed you --

**THE COURT:** Say that again.

**MR. THAKUR:** There's no dispute -- the proposal of the claim construction, that only the CPP should be interpreted to mean that in this claims to the CPP and the CP do not communicate is based 100 percent on what they say we said to the PTAB. They don't tie that proposed claim construction to the patent at all. It's based entirely on prosecution history disclaimer.

Isn't that correct?

**MR. FOWLER:** No.

**THE COURT:** I thought that the comment was, sort of, Aylus's interpretation of the claim language.

**MR. THAKUR:** Right. So what they're saying is our interpretation of the claim language, that only the CPP logic

is invoked, means in claim 2 the CP plays no part.

**THE COURT:**  That it is exclusively the CPP.

**MR. FOWLER:**  That's a fair statement.

**MR. THAKUR:**  The CPP does not communicate with the CP. That's what they're saying.

And that argument is based entirely on what they say we said to the PTAB before time, already twice, in two petitions. That's the argument, that we made a disclaimer at the prosecution history at the IPR.

And why I asked you to put this slide back up is because this is the evidence they present to you, in slides 10 and 11 as to what we said to the PTAB.  And that's going to be important because I want to show you what was really said to the PTAB.

So let's turn to our slides.

Your Honor, so let me quickly go through what the three claims are and how they work, because that's really the essential point.

First one is claim 1.  Claim 1 deals with a scenario where it's a television broadcast, where I want to watch a movie.  I watch the movie, and the broadcaster has to turn the movie on.

So, if you will, both the CPP and the CP have to work together.  They have to cooperate in the delivery of the content.  That's the television broadcast scenario.  There probably still only really are three ways to deliver content.

That was one.

Claim 2, which is the scenario we're dealing with, is the video-on-demand scenario.

I actually have two copies for you, and one copy for you.

So claim 2 deals with the scenario where we have a video on demand.  The CPP logic decides when it wants to watch the movie.  And it basically turns the key, invokes the video on demand, and works with the CP to get the content.

And, similarly, on 4, which is really the emergency broadcast scenario, was where the CP is in control.

That's how the three claims work.  In claim 1, the CP and the CPP both handle.  In claim 2, the CPP handles.  And in claim 4, the CP logic handles.

**THE COURT:**  Claim 2, which handles?

**MR. THAKUR:**  The CPP handles, which is what we -- which is what the claim says and which is what we told the PTAB.

**THE COURT:**  Handles the --

**MR. THAKUR:**  Negotiation.

**THE COURT:**  Between the MS and the MR?

**MR. THAKUR:**  MS and the MR.  But they certainly have to work together.  CP is the fundamental technology that makes all of this work.  The idea that they cannot communicate -- which is what Apple's proposed construction is -- is inconsistent with how the invention works.

So that's the technology invention.  And let me show you --

**THE COURT:**  Where does it say that it can't communicate?  It just says "handles" --

**MR. THAKUR:**  Right.

**THE COURT:**  Or only the -- the CPP is exclusively what invokes --

**MR. THAKUR:**  That is how claim 2 is -- what we're saying is how claim 2 works.  Only the -- the CPP is invoked, is what the claim says.  And that's what they are talking about doing.  The CP turns on and says, I want this movie.  And it goes back to the CP, which then gives it the information it needs, and then it can go to the Akamai CDN Server and get the content.

That is what the claim says.  And that was pretty self-evident from what the claim is.  And that's how it works.  This is how it's always worked.

But to argue that what we said to the PTAB is the CPP logic cannot communicate with the CP really asks this Court to interpret our statements to the PTAB incorrectly.  And the reason I put up the slide for 10 -- that's really important -- is they say that's based on what we said to the PTAB.

So what was really said to the PTAB, Your Honor?  That's what matters.  Let me show you exactly what was said to the PTAB.  What was said to the PTAB is in this slide.

What was said to the PTAB in this slide was, "If, however, the media server and the media renderer are both in communication with the UE via a local wireless network, then only the CPP is invoked to negotiate media content."

The next sentence deals with claim 4.  The next paragraph explains what that means.

"Importantly, as discussed above, these steps serve the key purpose of enabling the claimed invention to use a local wireless network such as a network is available to reduce" -- there's the word -- "to reduce the wireless spectrum-consuming communications."

So what we explained to the PTAB was, the purpose of the CPP invoking is to reduce those communications between the CP and the CPP.

We said that exactly the second time in the PTAB.  So when we are talking about claim 2 --

THE COURT:  By the way, your slide here -- oh, this is your page 6?  Is that what I'm looking at?

MR. THAKUR:  Correct.  Our slide 6 and 7 is actually what was said to the PTAB.

What Apple showed you in slide 10 was just one sentence, without allowing -- giving this Court a chance to understand what was actually being said to the PTAB.

What was actually being said to the PTAB was about using the CPP to reduce the communications between the CP and the

CPP.  And why do we say that?  Because that's exactly what the spec says.

So, Your Honor, this is compelling language from the specification.  It says, "In a preferred embodiment wireless spectrum-consuming communications between the CP," media servers and media renderers, "are reduced by introducing a CPP that resides in the user endpoint."

The point of this invention, Your Honor, is, the CP lies in the wide area network.  The CPP lies in the phone.  When they communicate over the wireless network, they consume bandwidth.

So the goal in the spec is -- and I'll show you further citation in the spec.  The goal is to reduce that level of communication.  And in claim 2, the CPP is, sort of, the one put in charge.  So that is what we told the PTAB, not the one cutoff sentence that Apple has showed to you.

So if you look at what we said to the PTAB, we said "reduce the communications."  What they're asking this Court to do is read that to "eliminate all communications."

**THE COURT:**  So what does the prior paragraph and the key sentence that Apple provides, what does that mean?

If they're in communication with the UE via local wireless, then only the CP is invoked to negotiate media content delivery.  Why does it read that way?

**MR. THAKUR:**  It reads that way, Your Honor, because if

you read the whole specification the patent -- what it does is it says the CP is in the wide area network and the CPP is local.  It presumes communications.  So let's make the CPP as powerful as possible to reduce the amount of communication.

So the goal, Your Honor, is to put the user endpoint as much in charge as they could.  And so as I explained --

**THE COURT:**  And not to the exclusion of the CP?

**MR. THAKUR:**  Not -- Your Honor, it couldn't work without CP.  If you read the patent invention, there is not a single disclosure of how it would work without the CP.  Every single embodiment disclosed in the patent shows you how that works.

And that's what I'm saying, Your Honor.  They show you just this one sentence that's cut off from the PTAB.  I'm going to show you what the spec shows, and every single embodiment in the spec, Your Honor.  Every single one.

So I'll finish up this argument with what happened in the IPR.  What happened in the IPR is they're asking this Court to rewrite our statement to the IPR on "reduce" to mean "eliminate," and then based on "eliminate" add a word to the claim that only the CPP is invoked, and then interpret that claim to preclude all communication.

So their demand of this Court requires a substantial amount of rewriting of what actually happened during the prosecution and in the patent.  But if you actually look at the

patent, Your Honor, there is no ambiguity whatsoever that the CP and the CPP all work together.  And they communicate with each other.  The only difference is, claim 2, only the CCP is invoked to complete the transaction.

And so they cite no intrinsic evidence.  But if you look at the intrinsic evidence, Your Honor, Figure 15 and Figure 16, as we discussed at *Markman*, that shows negotiation, there is not a single, single instance in the spec where the CPP and the CP don't communicate.  Every single embodiment showed in the spec they communicate.

And repeatedly, Your Honor, this concept of reducing and optimizing the communication between the CPP and the need to limit that communication to empower the CPP to be more powerful is repeatedly in the spec.

**THE COURT:**  So remind me again, so what is the meaning -- assuming you are right, the CP is always involved no matter what, there has to be some communication.

**MR. THAKUR:**  Right.

**THE COURT:**  What does it mean to say then "only the CPP is invoked to negotiate media content delivery between the MS and the MR"?

**MR. THAKUR:**  So what that means, Your Honor, is actually the claim -- that was an explanation of what we were talking about, the handling.

Because if you look at this video picture of how the

system works, under claim 2 the user endpoint determines whether it is -- whether it has WiFi -- local wireless communication with both the media renderer and the media server.  That's actually what the claim says.

Once you make that check, that only the CPP -- basically touch the CPP to get the CPP software going, to get it.  And then everything else, in terms of communication with the CP, it doesn't require the CP to make decisions.  It requires -- in terms of active decisions.  It requires the CP to facilitate the negotiation.  But the CPP is handling.  That's what we said.  That's what it means.

**THE COURT:**  So does this more accurately read that the CPP is invoked to initiate the negotiation?  Because you're saying that's where control resides, sort of?

**MR. THAKUR:**  Right.  It is to request -- where the CPP is invoked is where the CPP initiates the delivery of the content.  But I think that's what the word "invoke" already means.  So getting a new construction doesn't seem necessary.

**THE COURT:**  I'm not proposing a new construction.  I'm trying to understand what this sentence means.  And I take it what you say it means is to -- is "invoked to negotiate," that means, sort of, it starts the process or controls.  It doesn't mean it's the exclusive agent then that does the negotiation.

**MR. THAKUR:**  That's correct, Your Honor.

And the proposal that it's the exclusive and cannot

communicate is antithetical to the whole patent.  I mean, the title of the patent is where the CP is placed in the wide area network.  The idea that the CP wouldn't be involved, it just doesn't make sense.

THE COURT:  All right.  Let me hear the response to that.

MR. FOWLER:  I wish Mr. Thakur had been -- he had said all of this to the Patent Office when we had sought institution of the IPR, because then it would have been granted as to 2 and 21.  Because they didn't say, at that time, that "invoke" just means starting.  They didn't -- they didn't say that.  They said "only."

The prior art, there was communication between what we are pointing to as the CP and the CPP logic.  But they said no, it's got to be only the CPP logic.  And, as we saw from what the PTAB did, they pointed to the exclusivity language in saying no.

If it had been what Mr. Thakur was just saying, which is it's okay to have some communication as long as it's not the one that was starting, then we wouldn't be here right now.  Claims 2 and 21 would be in examination right now, and shortly to be --

THE COURT:  How do we know that?  Why is that?

MR. FOWLER:  Well, for example -- can we switch back to ours, please, our deck.

Because, among other things, if we look at the language we already highlighted, the criticism that was leveled by the PTAB of the argument --

**THE COURT:**  What page are you on?

**MR. FOWLER:**  I'm at slide 19.  And we're focused on 2 and 21.  So I'm going to focus on the CPP logic.

The criticism was there was no showing as to how, for 2 and 21, the CPP logic exclusively handles the negotiation. They didn't say, We looked to see whether the CPP logic starts it; and we don't care if the CPP is not involved.

But the more fundamental point -- let me back up, Your Honor -- is they've mischaracterized the argument to begin with.  Which is, Mr. Thakur stood up and told you that we're arguing that there can't be any communication between the CP and CPP.  That's not true.  That's not true at all.  We never made that argument.  It's not in our briefs.  It's not in our slides.

What the claim requires, and let's go back to the claim -- sorry, take me a minute to click back.

Okay.  Here we go.  What claim 2 requires, as opposed to claim 1 -- sorry -- is that the CP logic is invoked to negotiate the content delivery between the MS and the MR.

And that's as opposed to claim 1, where both of those cooperatively negotiate the content delivery between the MS and MR.

What we're saying is that their theory, the theory that they've advanced, is that both the CP and the CPP logic are both invoked to negotiate. That's their theory. That's in our papers. And before I stood up and heard this today, I didn't think that was in doubt. But it's in our papers, and they don't challenge that.

They don't challenge that that's what their expert is saying, that both the CPP logic and the CP are invoked to negotiate, both of them, what they're pointing to. And it's not just a question of communication. So we're starting off on the wrong foot when we hear Mr. Thakur's argument.

The issue is, is the CPP logic alone what's going to be used to invoke? If the answer is yes -- which is what they told the Patent Office -- they lose because the only theory that their expert has put forward is that the CP and the CPP logic are both invoked.

That's in our papers. I didn't see anything in any of Mr. Thakur's slides to show something to the contrary. He showed you some picture which didn't have any cites to his expert report, any cites to any evidence. It was just lawyer argument to the contrary.

THE COURT: Wait. You're saying relative -- repeat, again, your point about the expert testimony.

MR. FOWLER: Well, Mr. Thakur showed you at slide -- this is his deck.

**THE COURT:** Yeah.

**MR. FOWLER:** Slide 3.  He explained this is how the claims work.  You notice that he doesn't match it up to what their expert argued.  He doesn't match it up to what Apple does.  There's no -- he hasn't argued anything anywhere in this section of his slides about what we do.

We've shown in our moving papers that their expert's theory is that the CP logic -- what they point to as the CP logic and what they point to as being the CPP logic are both invoked to do this claim negotiation.  That's their theory.  We haven't seen anything to the contrary.  And if it would be, it would only be attorney argument.

So the issue is, if that's the case, and it's the CPP logic that only which must be invoked -- which is what they told the Patent Office -- then they have to lose.

Now, the other thing I want to say, before I forget, is, I think maybe this is just misdirection, but I want to talk about what Mr. Thakur said with respect to slide 6 and 7 of his deck.

If you could turn to that for a moment.

**THE COURT:** Yep.

**MR. FOWLER:** I think -- Your Honor kept pointing Mr. Thakur back to the sentence that matters, which is "only."

He goes to the -- he goes to the next paragraph and he talks about the purpose.  Right?  Matter of fact, it says the purpose.  And in the -- in the next slide it talks about an

objective.  And these are the goals; right?  He's talking about what the goals are.

But the goals are not relevant here.  What matters is the means; right?  What the patent requires to be done to achieve those goals.

And what the claim says is the CP logic is invoked. That's as in contrast to claim 1, where both of them are being invoked cooperatively, and what they told the Patent Office, which is only the CPP logic is invoked.

So it doesn't really matter what the goal is, what the purpose is.  What matters is what the claim says and what they told the Patent Office the means was.

So that's really all I have to say, I mean, other than to say a lot of what we just heard from Aylus's counsel was after-the-fact spin trying to change what they told the Patent Office.

What they told to Patent Office is in black and white. And people, Apple, the public, everyone is entitled to rely on what they told the Patent Office in determining what these claims mean.

**THE COURT:**  What does "invoke" mean?

**MR. FOWLER:**  That term hasn't been precisely -- we haven't asked the Court to construe that.  But I think it's "used," is the term that we frequently use in this case.  It's used to negotiate.  The key is the negotiation.  It's -- to

transfer the contents from the MS to the MR through negotiation, invoked is used.  And it's not start.

THE COURT:  So in your view, what role does the CP play in the claim 2 scenario?  You have the CPP and only -- and exclusively the CPP logic is invoked to negotiate.

MR. FOWLER:  Right.  Exactly.

THE COURT:  What happens -- does the CP play any role at all?

MR. FOWLER:  Well, there can be communications.  But it doesn't really matter what it's doing for purposes of claim 2.  Claim 2 doesn't talk about CP, other than to say it's the CPP logic that's doing the negotiation.  Right?

THE COURT:  What does that mean, "negotiation"?

MR. FOWLER:  It's being -- that term was construed.  Yes?

MR. THAKUR:  Coordinate the --

MR. FOWLER:  Coordinate.  Okay.  Coordinate.  The CP logic is being used to coordinate the media content delivery.

But in this case, what they're pointing to is what they allege to be the CPP logic and the CP logic in the Apple devices -- they point to both of those things as being used to coordinate the content delivery.

THE COURT:  And is it possible to have just a CPP logic do the coordination?

MR. FOWLER:  Well, that's what they told the Patent

Office.

**THE COURT:** I'm just wondering, in the real world is it possible to have such an embodiment?

**MR. FOWLER:** I can't answer that. That's outside of the record before Your Honor. All I'm saying is that's what they claimed. That's what they told the Patent Office. And that's why the Patent Office doesn't have these two claims in front of them right now.

**THE COURT:** All right. Let me ask Mr. Thakur two questions.

**MR. THAKUR:** Okay.

**THE COURT:** Number one, Apple's slide, page 19, which has the institutional decision of the PTAB.

**MR. THAKUR:** Right.

**THE COURT:** Where they say, "It is unclear from the Petition," et cetera, et cetera, "or the CPP logic exclusively handles negotiation of media content delivery," maybe "handles" does have some meaning, at least in the eyes of the PTAB.

It doesn't say "initiate" or "start." "Handles" seems like a broader term. That was the assumption of the PTAB.

**MR. THAKUR:** Your Honor, we didn't get a chance to, sort of, talk to the PTAB on that term because that's what they said as a basis of institution. But we're not disagreeing.

Your Honor, they're saying, well, the first slide we produced -- if you can put that up real quick -- is attorney

argument, Your Honor.

That was what you said.  Can you explain to me how the technology works?  And you understand there's a difference between broadcast, on demand, and emergency.

Can we put up our slide.

Your Honor, you have to understand the invention in the context of how things work.  So we are not disagreeing that the CPP handles the negotiation.  The CPP takes the product and then it basically facilitates the negotiation thereafter.  The CP responds as requested.  It doesn't have a chance to say no. We do not disagree with that.

THE COURT:  So CP plays no -- it's just a passive role in this situation?

MR. THAKUR:  Well, the concern I have is, Your Honor, the word "passive" might suggest that it has to do something. It may request something from the CPP.  And it might do a test and then come back to it.

The point, I think, Your Honor, is once the user endpoint, the person says, I want to watch the movie, after that the process becomes automatic.

Now, it doesn't mean that the movie has to be given, because at the other side the billing credit card might have expired.

The point, simply, if I want the movie, at that point the CP will facilitate what's necessary.  The CP doesn't have to be

turned on.

THE COURT:  But the negotiation is being done by the CPP?

MR. THAKUR:  Correct.  The CPP is saying, I want the movie.  Here's the credit card.  This is the movie.  Give it to me.

THE COURT:  Which is different than claim 1, where it talks about invoking the CPP and the CP logic to cooperatively negotiate.  That anticipates a different role of the CP logic.

MR. THAKUR:  Correct.  A more active role.

THE COURT:  Right.  So what's important about claim 2 is that not just the facilitation but the negotiation is being done not cooperatively but solely by the CPP logic.

MR. THAKUR:  Right.  The CP is asking the question and getting the responses.

THE COURT:  So why isn't Apple correct in that that's not only how the claim seems to read, but that seems to be what is suggested in the Aylus brief to PTAB?

MR. THAKUR:  We're not disagreeing with the statement to the PTAB that the CPP handles the negotiation.

What we are saying is what Apple is asking this Court to do is go that one step further and say "handling" means that you cannot go to the CP, and the CP cannot further process the request and give you the commands back.

The point simply is once the CPP wants the information and

wants this content, I get to select it.  I get the content subject to meetings certain requirements that might be on the back end.

THE COURT:  So what is the difference between your two positions with that statement just said?

MR. FOWLER:  I think you put your finger right on the thing.  Mr. Thakur, as far as I'm concerned, just conceded the point.

MR. THAKUR:  I disagree.

MR. FOWLER:  I'm going to explain why.

He's told you, Your Honor, in response to your question, that the CP is passive.  That's what he says.  That the CP is passive.

So the evidence -- now we have to turn to the evidence. And, again, they've never to date, not in their papers, not today have they contested this.

I don't have it right in front of me, Your Honor.  I suppose I could put it up on the ELMO.  But if you have our brief, or if you want to look at our brief after the hearing, please look at pages 9 and 10 of our motion.

THE COURT:  Hold on.

MR. FOWLER:  Would you like me to put it up on the ELMO?

THE COURT:  No.  I can get it here.

MR. FOWLER:  Okay.

**THE COURT:** Your opening brief?

**MR. FOWLER:** Yes, Your Honor.

Can we go back to our slides for a minute, please, because I'm going to put this in context.

May I start, Your Honor? Or do you have --

**THE COURT:** Hold on.

**MR. FOWLER:** -- those pages?

**THE COURT:** All right. I have page 9 of your motion.

**MR. FOWLER:** Let's -- first, I got up on the screen again the claim; right?

**THE COURT:** Right.

**MR. FOWLER:** "CPP logic is invoked to negotiate." Okay. That's coordinate. Used to coordinate. I think that's the terminology we've, kind of, settled on here. "Media content delivery."

So what is it, the CPP logic or CP logic, or both of them, that are being used to coordinate that delivery of content between the MS and MR?

If it's, in fact, the case that what they told the Patent Office is true, that for claim 2 -- unlike claim 1 -- it's the CPP logic that has to be used to coordinate that effort, and if it's true, as Mr. Thakur just told you a minutes ago, that in that process claim 2 permits the CP to be passive, we win.

**MR. THAKUR:** I disagree.

**THE COURT:** Hold on.

**MR. FOWLER:**  Excuse me.  And that's because we've shown at pages 9 and 10 that in the process of what happens with Apple, there are -- there are 14 steps that this -- that is being used to do what they claim is the negotiation.

And four of those steps are done by the iTunes servers.  iTunes Store servers.  Those are the MZFinance, MZBuy, MZPlay.  That's the alleged CP.  That's what they point to as being the CP.

So 4 of the 14 steps that are used to do this content delivery between the MS and MR are being done by the CP.  That's not passive.  It's actively doing something.  They, in response to our motion, did not dispute this.  These are undisputed facts.

That's why I started my motion argument to begin with is that this is premised on undisputed facts that if Your Honor concludes that what they said to the Patent Office means that only the CPP logic can be used to negotiate, we win.

Here's the evidence.  And it cites to evidence that we've submitted to the Court in the form of the deposition testimony of Mr. Meldrum, for example.

So, again, I heard it.  I heard Mr. Thakur say that CP, you know, is passive.  But that's not what happens here.  That's why we win.

**MR. THAKUR:**  Your Honor, that's incorrect.  Here's why:  Just as in the PTAB statement they would like you to look

at a little piece of the thing and not what was said.

Let's take a look at what the claim says.  "Wherein the CPP logic is invoked to negotiate media content delivery." That's the sentence.

The point -- what they are trying to talk about is all the other stuff that happens in the claim before.  The several steps they talk about, which is you go to the control point logic to get the simpf (phonetic) and all of that, those steps occur early in the process.

The final step, where you do it -- remember, negotiating is coordinating media content.  The coordinating occurs between the media server and the media renderer.  That is the step. And that step occurs basically with the -- the user endpoint basically saying, I want that content.

The negotiate media content delivery is one step.  It's not 14 steps.  That is the last couple of steps where they go and get information.  The concept of buying the movie, getting the play information stuff, those are not the steps that are involved in the negotiating the media content delivery.  That's a step, not 14 steps.

**MR. FOWLER:**  All I can say is -- I appreciate the fact that Mr. Thakur doesn't want to lose this motion.  But go back and look at their briefs.  They didn't make that argument before.  They didn't dispute any of this evidence.

This is what happens.  This is what their expert is

pointing to.  We actually cite in our brief, at page 10, what their expert is pointing to.

Maybe Mr. Thakur should have been their expert.  But that's not the case that's before this Court right now.

MR. THAKUR:  No, Your Honor.  That's not -- that's a misrepresentation.  What the expert is saying is these steps take place.  And the fact that there is communication with the CP, that doesn't mean anything in terms of not being under claim 2.

The question under claim 2, as our expert said was, "wherein the CPP logic is invoked" that's the process where the CPP starts the negotiation and thereafter communicates --

THE COURT:  Where does negotiation of media content delivery begin?  Which step?

MR. THAKUR:  Your Honor, so the invocation occurs at the step of where the user endpoint goes to the iTunes server to get the content.

The negotiation of the media content delivery, which is transporting, occurs in the last step.  When you want to buy a movie, you buy a movie.  You purchase it.  You decide where you want to send it.  But the delivery is the last step in the process.  And that occurs between the media server and the media renderer.

MR. FOWLER:  That's not what the claim says, Your Honor.  It says "invoke to negotiate."  We've already told Your

Honor that based on the prior construction "negotiate" means "coordinate."

So it's coordinate media content delivery between the MS and the MR.  It's not talking about the beginning.  It's talking about the whole thing.  That's what the claim says.

**MR. THAKUR:**  If the whole thing was applicable, the whole claim would be that step.

**THE COURT:**  Well, between the MS and the MR.  So where in these four steps, on pages 9 through 10 of your brief, does it address what happens between the MS and the MR?

**MR. FOWLER:**  In our brief, Your Honor?

**THE COURT:**  Yeah.  The four steps on page 9, the one you directed me to.

**MR. FOWLER:**  It's all of it.  These are things going back and forth.

**THE COURT:**  Well, explain to me the -- how the MZFinance server sends the IOS device a --

**MR. FOWLER:**  Sure.  If you don't mind, Your Honor, I'll have Mr. Buergi, who is the technical whiz on this, explain that to you.  Is that acceptable to the Court?

**THE COURT:**  Sure.

**MR. BUERGI:**  Your Honor, if I understand your question, you're asking about how these four steps in Aylus's, the four bullet points, how those relate to the alleged negotiation.

**THE COURT:** Of content delivery.

**MR. BUERGI:** Of content delivery.

**THE COURT:** Between the MS and the MR.

**MR. BUERGI:** Correct. So these are four -- there are 14 steps in total that are alleged to perform that negotiation.

**THE COURT:** Is there 14 listed somewhere?

**MR. BUERGI:** They are listed in various places in the records. I'm not sure I can give you a pinpoint cite right now.

But the four -- there are four of them that are important. And the four are listed on pages 9 and 10.

**THE COURT:** Yeah.

**MR. BUERGI:** And those four are important because those involve the CP logic. As my colleague explained, the CP logic is alleged to be the MZFinance, MZBuy and MZPlay servers.

So these four steps are where the CP logic is involved in the negotiation. And there's no dispute --

**THE COURT:** CP or CPP logic?

**MR. BUERGI:** CP. CP, which is the logic which cannot be involved in the negotiation in light of Aylus's statements to the PTAB.

**MR. FOWLER:** And in answer to your question, you want to know -- Your Honor wanted to know where all 14 steps are. It's Exhibit 7, that we submitted. It's referred to at the top of page 10. It lists all of the steps.

**THE COURT:**  Okay.

**MR. THAKUR:**  Your Honor --

**THE COURT:**  Wait.  I'm not done here.

So come back and explain to me -- take me through these four steps and why these constitute, in your view, the negotiation of media content delivery between the MS and the MR.

**MR. BUERGI:**  Well, these are -- more importantly, it's not in my view that these are negotiation.  We actually think these are not negotiation.

It's Aylus's view -- Dr. Schonfeld admitted -- Dr. Schonfeld is Aylus's expert.  He admitted that these steps are involved in that negotiation.  And the discussion of that is on page 10, in the paragraph in the middle of the page, where it says, "Dr. Schonfeld concedes that AirPlaying iTunes Store video to a Apple TV involves the iTunes store server steps."

So we might dispute that -- we dispute that these satisfy the claim limitation.  But they are, nonetheless, part of the negotiation.  These are steps in AirPlaying.

The thing that's alleged to be the negotiation is AirPlaying.  And AirPlaying has 14 steps.  And four of them, the four listed here, are performed by the CP logic.  And so Aylus's expert admits that these steps are involved in AirPlaying in the media content delivery.

**THE COURT:**  Well, the MS here would be, for instance, the MZFinance, MZBuy server?

**MR. BUERGI:**  The MS in the accused products is alleged to be an Akamai server, which is not listed in these four steps.  But these four steps are involved in getting the content from that Akamai server to the media renderer.

**THE COURT:**  So what's the relationship of these four steps to the Akamai server?

**MR. BUERGI:**  These four steps are used to get content from the Akamai server to the Apple TV, which is alleged to be the MR.  So --

**THE COURT:**  So these are necessary to get the content off the server?

**MR. BUERGI:**  Correct.  Correct.  And, therefore, they're part of the alleged negotiation.

**THE COURT:**  Okay.

**MR. BUERGI:**  And because these are performed by CP logic, and they're part of the alleged negotiation, that limitation of claims 2 and 21 is not satisfied because --

**THE COURT:**  I understand that point.

**MR. BUERGI:**  Okay.

**THE COURT:**  All right.  What -- what's your response?

**MR. THAKUR:**  Your Honor, we correctly agree that these steps are performed.  We don't disagree that these steps are performed.  The issue was about handling.  That's what the PTAB

understood that's what we were saying.

In every one of these steps, Your Honor, as you follow through the step, the CPP asks and the CP gives.  The CP does not decline to give.

So the mere fact that the CPP goes to the CP to get certain information along the steps, that does not equal handling, because the CP provides that information.

The coordination of the transportation, however, is being done by the phone because he's deciding which media server to get the content from and which media renderer to give it to.

**THE COURT:**  Well, but still, why isn't -- I'm not sure I understand your point that -- you're saying these four steps do not involve the CP being actively involved in the negotiation?

**MR. THAKUR:**  That's correct, Your Honor.  Our point is, it is not involved in the negotiation.  Because when you ask and someone gives because they're required to, that's not part of the negotiation.

Our point in claim 2, Your Honor, is the video on demand.  What the user wants, it gets.  That is what happened.  All of these steps happen in response to CPP commands.  None of them does the CP refuse to provide.

**THE COURT:**  Now, this seems like a different argument.  It's not arguing about the exclusivity, but it is arguing that the accused product, even if you read this to be exclusively

invoked, there's still infringement because it is still the CPP that has exclusively invoking.  Just because the CP is involved in, quote, a passive role doesn't vitiate the infringement claim.

MR. THAKUR:  That's correct.  That was what we were saying.  I am sorry if I did not come through earlier.

THE COURT:  That sounds different than what I thought we were --

MR. THAKUR:  So we were talking about handling.  What handles.  That's what we said.  The word "exclusively" was a PTAB-chosen word.  But, really, the right word is:  Who handles?  The CPP handles the negotiation.

And the idea that the communication between the CPP and the CP would be eliminated is inconsistent with what we told the PTAB.

THE COURT:  Let me ask counsel to address this.

If I understand the argument correctly, that the CP in Apple's accused products really is not -- although it's there in a chain of events, it's not actually handling anything.  It's not being invoked.  It's this passive thing.

MR. FOWLER:  That's just not -- well, one, it's not true.  But, more important part, as Mr. Buergi said, it's not their theory.

MR. THAKUR:  That's not correct.

MR. FOWLER:  They can't change their expert's theory.

I'll leave it to Your Honor to look back at page 9 and 10 of our brief and the evidence we cite, including what their expert says, which notably they haven't cited at all during their argument here.

**MR. THAKUR:**  Because --

**THE COURT:**  Hold on.

**MR. FOWLER:**  The alleged CP that they are pointing to is not passive.  These are things that are affirmatively happening.  And, more importantly, this distinction that he's trying to draw, he's now trying to create a new claim construction of what "invoked" means.

The language says "is invoked to negotiate."  Negotiate means coordinate or cooperate -- coordinate.

So, clearly, under the -- Your Honor's claim construction, negotiate is coordinate media content delivery between the MS and the MR.

Here in this 14-step process, the alleged CP and the alleged CPP logic are together coordinating that process. That's what's happening.

They didn't dispute any of these facts in their opposition brief.  They didn't say we are wrong.  All they said was we are wrong on our claim construction argument.

**MR. THAKUR:**  Because we thought there was no dispute that the handling in Apple's system is clearly done by claim 2. So they were not asking this Court to construe claim 2 as

handling because we agree with that.  They were asking this Court to construe claim 2 as prohibiting any communication with the CP.

MR. FOWLER:  That's the point, Your Honor.  They're asking you to do a new claim construction.

He keeps saying "handling."  "Handling" is not in the claim.  It's not in this Court's claim construction.  The claim language says "invoke to negotiate."  "Negotiate," Your Honor has said, means to coordinate.

This handling thing that he's just injecting in is something they are making up to try to save their case.

THE COURT:  It came up in the PTAB institutional decision --

MR. FOWLER:  Sure, sure.

THE COURT:  -- the word "handle."

MR. THAKUR:  If the Court doesn't want to say "handle," we are perfectly confident explaining to the jury why the CPP logic is invoked to negotiate media content delivery.

THE COURT:  What's the difference between claim 1 and claim 2 in real-world terms?

If you say --

MR. THAKUR:  Can you turn to our slides?

THE COURT:  What's an example of the CP logic and the CPP logic working cooperatively in claim 1, and the CPP logic being invoked exclusively, if that's the way it is, in claim 2?

**MR. THAKUR:**  So the scenario is where both the user and the provider both take action to give you.  An example scenario is the movie theater scenario.

Essentially, if a movie theater wants to make a movie available after six weeks, they put the movie on and say, I'm going to show it at 3:00 p.m., 6:00 p.m., 9:00 p.m.  I sign on at 3:00 p.m. and purchase the 3:00 p.m. movie.  And then the broadcaster takes affirmative action to make it available.

It is not a wide-use scenario, but that is certainly the scenario that the invention is talking about, is where both work to handle the negotiation and give each other the keys, times.

**THE COURT:**  A broadcast movie is an example of what you are talking about --

**MR. THAKUR:**  Correct.

**THE COURT:**  -- of cooperatively negotiating?

**MR. THAKUR:**  Correct.  Because the broadcaster has to take action -- it's not automatic.  The broadcaster elects to make the movie available at that particular hour.

**THE COURT:**  Whereas, in claim 2 --

**MR. THAKUR:**  The movie is available.  I want to buy it whenever I want to buy it.  It's video on demand.

**THE COURT:**  So let me make sure I understand your current position because it seems to be either I misunderstood or it seems to be shifting.

You don't take issue with the CPP logic being exclusively the active agent not the passive agent.  It's that -- so even if we were to construe claim 2 that way, you're saying that there's still infringement because that's exactly what's happening with the Apple product?

**MR. THAKUR:**  That's correct.

**THE COURT:**  The CP, even with all these steps, is really not involved in the negotiation/coordination.  It's just sitting there as a passive valve or whatever.

**MR. THAKUR:**  That's correct.

**THE COURT:**  Okay.

**MR. FOWLER:**  Well, that's the problem, Your Honor.  This is a motion for summary judgment.  We put on our evidence.  The evidence is summarized at pages 9 and 10.  It shows that it's not a passive agent; that it's actively involved in this process.

In response to our motion, they did not argue to the contrary.  They did not assert that it's a passive agent.  And, more importantly, they didn't cite any contrary evidence.  Nor could they because the evidence we're citing is primarily their own evidence that they've put together for their own case.

**MR. THAKUR:**  And --

**MR. FOWLER:**  So there's no dispute of facts.  There's nothing to go to the jury.  There's no argument as to what happens.  The parties are in agreement as to what happens.  So

it's just a question of applying the claim language to the facts.

MR. THAKUR:  Your Honor, our brief was about a claim construction interpretation.  That's what we thought the issue is going to be, is that they were trying to prohibit all communication by saying only the CPP is invoked rather than handles.

So neither party briefed our evidence on why it handles. But it's sort of self-evident, Your Honor.

MR. FOWLER:  That's not true.  It's at 9 and 10 of our brief.  We explained how it works and --

THE COURT:  All right.

MR. FOWLER:  Sorry.

THE COURT:  Okay.  I understand the parties' position at this point.

Let's go on to another one.  As between the next two, argument 2 and 3, if you had to choose one, Mr. Fowler, to emphasize, which one?

MR. FOWLER:  Well, Your Honor, I would pick number 2, if Your Honor would like me to pick one of the two.

THE COURT:  Okay.  Let's go with 2.  This is the claim methods not all performed attributable to Apple?

MR. FOWLER:  Yes.

THE COURT:  Okay.

MR. FOWLER:  I'll try to move to this promptly so we

can get to our other arguments as well.

Again, there's no disputed facts here.  It's solely a question of the application of law.  It's not a claim construction issue.  This is really what the federal circuit requires and how you apply it to the facts.  So this is also ripe for summary judgment.

Now, again, we've gone over this at slide -- I'm at slide 22.  We're down to one pair of dependent claims that are for all intents and purposes the same.  There's no doctrine of equivalents.  There's no indirect infringement.  So all we're talking about here is direct literal infringement of the method claims.  That's -- that's the focus of this.

I think Your Honor probably knows, to restate it -- and we've got the *Ormco* case here.  It's just one of many examples. If a client like mine, Apple, makes a device and it sells that device, and it's being accused of infringing a method claim, the act of selling that device is not an act of infringement because it's a method claim.  It has to be performed.  That's what *Ormco* is saying.

And what the recent authority from the federal circuit, in the *Akamai* case, which has bounced up and back, back and forth to the federal circuit several times, but the most recent word is that you can only have direct infringement, of a party like Apple, where the method is either performed by Apple itself or it's attributable to Apple.

So that what I'm going to do is I'm going to run through, first, the performance and the attribution.  But before I get there we have to go back to Dr. Schonfeld.  This is at slide 24.

Dr. Schonfeld is their expert.  He has an infringement theory.  We're here at paragraph 81 of his report, where he -- he opines:

"It is my opinion that the above listed accused Apple products directly infringe claims 2 and 21 of the patent."

What he focuses on is the operation of the products.  He never goes to the analysis that we're going to be talking about of who performs it.  Is it Apple?  Or is it attributable to Apple?

They decided to put together their infringement theory this way.  There are other cases that we've cited elsewhere in our brief that say that's the horse they rode in on; they can't change that theory at the time of summary judgment.  Because they didn't address this at the time in his report, we're done. We win.

Your Honor can decide this just on that basis alone.  But if Your Honor wants to go beyond that and talk about who performs it, and the attribution, I'm going to go through that quickly now.

There are at least three claim limitations that were neither performed nor attributable to Apple.  Any one of these,

if Your Honor agrees with us as to any one of these on both counts we win.

And I'll just -- I won't read them into the record.  I know we're short on time, but they're on slide 25, and they're in our brief.  So let's go through each one of them.  I'm going to do performance first for all three, and then attribution for all three.

So the first one is the same claim limitation we were talking about a minutes ago.  The CPP logic is invoked to negotiate the delivery media content between the MS and MR.

So what does Dr. Schonfeld say?  Well, he says -- and we have the highlighted language here:

"When the user has selected the AirPlay button on the IOS device, and has selected to display the content on the Apple TV."

Now, that's part of what he says, part of what he said constitutes this process.  Not all of it, but part of it.  But the important part here is, look what he says when the user has selected AirPlay button and has selected.  And that's implicitly saying and when the user has selected the display.

So what he's pointing to as satisfying this claim limitation, at least in part, involves the user.  It's not Apple who's hitting the AirPlay button.  And it's not Apple who's selecting the display of contents.  So this claim limitation is not practiced or performed by Apple.

Let's look at -- I'll skip over this.  27 is basically what I said before.

This is, perhaps, the easiest one.  So this one is the controlling or presentation of delivery via the VCR controls. You may recall, Your Honor, this was the subject of claim construction.  And what we're talking about is rewind, pause, fast-forward.

Now, I think it probably is obvious that when one of these devices is out in the world and somebody wants to pause, rewind and fast-forward, Apple doesn't come to your house and press the button.  It's the user doing it.

Dr. Schonfeld, of course, admitted that in the deposition testimony that we have here.  So this limitation is clearly not performed by Apple.  Here we have a picture on slide 29. That's the rewind, that's the pause and the fast-forward button.  The user does that.  Not Apple.

So then we have the third limitation, determining a network context and so forth.  And Dr. Schonfeld, he doesn't point to Apple is doing it.  He says the products do it.  But, again, you can't win as a plaintiff on a method claim by pointing to the product.  You've got to point to who's doing it.  And he doesn't point to Apple.

So these are easy, I think.  I'm not even sure we're going to get an argument from Mr. Thakur that Apple performs these three.

So let's turn to attribution.  That's the second prong of the *Akamai* test.  Now, what does *Akamai* tell us, or what does the federal circuit tell us about what attribution means?

For that you have to turn to the *SiRF* case, which is an earlier case.  And here are the three things that *SiRF* tells you what attribution mean.

One, the product has to perform the step automatically. It's got to be prebaked in.  The user is not involved.  The second is that the user can't modify the operation.  And the third is that only the manufacturer's actions, as opposed to the user's, are involved.  As we'll see when we go through these, it's 1 and 3 that we're looking at right now.  Not 2.

So let's go through each of these again.

The CPP logic is invoked.  Well, what has to happen?

Well, first, the user has to press the AirPlay button. And then we see then you have to select the Apple TV.  If you look at the blowup we have here, the user can pick the iPad, the user can pick the Apple TV.  Or you can do mirroring.  And mirroring is relevant in the *Daubert* motion.  It's not being accused of infringement here.  The use of the Apple TV is.

So you have to hit the AirPlay button.  The user then has to go and hit the Apple TV button.  And then it has to pick the video it's going to pick.  None of this is automatic.  It's not like you turn it on and the thing goes.  The user is actively involved in this.  So it's not automatically.  Therefore, it's

not attributable to Apple.

Again, this is probably the easiest, best example.  The VCR controls.  Pressing a VCR control is not automatic.  A human being does that.  A human being has to press the rewind, the forward, or the pause.  It's not something that the equipment does by itself.

I'm not even sure what the argument to the contrary is going to be.  This is something that the human does.  The machine doesn't do it.

And here's the third one:  Determining a network context.  This is answered by the claim language itself because the "determining a network context" is the language on claim 35 that's not in highlighting.  But this happens in response to a media content delivery request.

And Dr. Schonfeld testified that the media content delivery request is the user's request to rent or purchase the movie, which is something a person does.

So these steps are not attributable to Apple either.  All of the steps that we've looked at are attributable to the user, not to Apple.

I'm going to skip a couple of slides in the interest of time.

Go to slide 38.  In their brief they point to the *SiRF* case.  And they said the facts of *SiRF* are identical to what's being pointed here.

I will note, if you go back to the brief, they don't explain why.  There's no argument or comparison of that case to this case as to why it's identical.  And that's probably because it's not.

In *SiRF*, what you had was you had a chip that went into a GPS device.  And so if you had that device like -- wasn't a Garmen device, but if you had a Garmen device in your car and you were driving around San Francisco, that thing is pinging the satellite.  As long as the thing is on, it's going on.  That's what's being talked about in this slide here, the quote from *SiRF*.  It's doing it automatically.  The user doesn't have to do anything.  Once the thing is on, it's going.

That's not the case here; right?  We've just seen that, that the user has constantly got to be doing things.  So *SiRF* and this case are completely different.

And in slide 39 -- I've already talked about these.  Here are some things that are unrelated to AirPlay that the user has to do, that shows that it's not automatic; that it's beyond enabling.  These are all in our brief as well.

I won't spend much time on this.  This is in our brief.  They point to the *Ericsson* case.  I'm still not clear what their argument is here as somehow being an evolution of *SiRF*.  That's at page 40.  Then the *Adaptix* case.

What I would say about both of those cases is both of those cases ruled against the plaintiff.  And they basically

both said that they were not liable because none of the steps were performed by -- by the company or the user.  I'm sorry. All of the steps were performed by the product.  All of the steps were performed by the product.

But -- so that's all they had to do.  They didn't have to get to any other scenario.  They certainly don't stand for the proposition -- which seems to be the implied argument that Aylus is making here, is that if one step is performed by something other than the product then somehow you're liable.

That's not what the cases say.  That's certainly not what *SiRF* says.

And in the interests of time, I will move on to their last argument.  So their last argument -- and this also comes from the recent federal circuit decision in *Akamai* -- is if you have a situation where, yes, it's the user doing the action, but the user's action is a precondition of a benefit to be received, then *Akamai* says that, you know, that perhaps, you know, could go to the jury if that were the case.

But that's not what happens here.  So let's look at this. So on slide 43, Dr. Schonfeld says that this step -- excuse me. Let me go back.  Slide 42.

He says that the step of this negotiation -- I'm sorry, Aylus's opposition.  They said "the IOS device sending a 'getPlay Info' request to an MZFinance server."

And they say that step is required before you can get the

benefit of streaming.  So that's the *quid pro quo* they point to.  They say, okay, that's the step.  You've got to do it.  And here's the benefit.  The benefit is the streaming.  Right?

But the problem with that and the reason their argument falls apart is you look at what Dr. Schonfeld says.  He says -- and this is at slide 43 -- that that getPlay Info request is part of the process of streaming.  So what they've basically done, Your Honor, to do the logic here, is on slide 44 they're saying that the step that you're performing, this getPlay Info is part of the method step, but it's also the benefit.

In other words, we want you to perform streaming to get the benefit of streaming.  That's what they're saying.  And that point they've now completely collapsed the *Akamai* conditional participation test so it doesn't mean anything.

In *Akamai* what happened is the customer had to take come content in order to get hosting and serving data.  The two things were separate.  Here, they pointed to two things which are the same.

Again, maybe I should have led with this in all cases.  This is the clearest sense.  Again, Your Honor, we only have to win on one of these.

Slide 45, look what they say.  Talk about circular reasoning.  This is having to do with the VCR controls limitation.  They say:

"Therefore, Apple conditions the receipt of these benefits, i.e., the benefit of being able to pause, rewind and fast-forward Apple TV content using the IOS devices on the performance of this step."

But what's the step? The step is pausing, rewinding and fast-forwarding. So they've said, You're preconditioning getting the benefit of rewinding, forwarding and pausing on rewinding, forwarding and pausing. That makes no sense at all. It's incomprehensible. And it certainly doesn't meet the requirements of *Akamai* that you do something as the quid to the quo, because the two things have been collapsed.

So, Your Honor, I realize that was like a fire hose, but that's the argument. There's no dispute of the facts. It's just a question of the application of the law to them.

And, again, all we need to do is win on one of these three. I think all three we're right on. But on any one of these three things if we're right, and you conclude that, then summary judgment is required.

Thank you.

**THE COURT:** All right. Thank you.

**MR. THAKUR:** Your Honor, so counsel said there's no -- the *Ericsson* and *Adaptix* case is confusing. I agree that this dispute today is about one case. It's the reading of *SiRF*.

So *Adaptix* and *Ericsson*, the analysis is if all the steps are performed on the user device, you send off the user device,

there's no infringement.  If some of the steps are performed in Apple and some are performed in the software provided by Apple, then in that case they can be infringement.  But you still have to prove that those steps that were performed on the software on the user endpoint met the *SiRF* test.

So the issue is really, one, crystal clear.  What does the *SiRF* test mean?

And what counsel does is convert the issue of automatic as somehow saying that the user has to take steps along the way; and, therefore, that's not automatic.

Your Honor, the *SiRF* language is two or three paragraphs.  And it's really quite clear as to what it's saying.  I'll just read it --

**THE COURT:**  What slide is this on?  21?

**MR. THAKUR:**  Correct, Your Honor.

So, actually, this Court can read it.  So I don't want to spend more time reading it.  But the simple answer is:  What does *SiRF* say in terms of the steps?  And what is the principle *SiRF* is talking about?

Before I quickly get into that, Counsel said any one of those three terms is case dispositive.

That's actually not true.  You have to find claims 2 and 21 deal with the CPP -- claim 21 deals with two steps.  And claim 2 deals with the third step.  And they really focus on the controlling the presentation that only applies to claim 2.

It does not apply to claim 1.

But under *SiRF* the language is unclear.  "Unclaimed customer actions to 'enable' or 'activate' the preprogrammed software do not defeat the infringement."  So the manufacturer who performs the software executes the claims in the step.

So the key point is, if the software does the step automatically, without the user having to stop to do it, take action.

So let me give you an example of what I mean.  If the claim had said wherein the user interface is activated, what I call had claimed that step, then that claim step cannot be added.

So if you actually look at the terms, it says "determining the network context step is performed in response to the media content delivery request."

They can't make the additional unclaimed action that you've got to request that response and add it into the claim.

And that is exactly what the Court said in *SiRF*.  Appellant misreads the claim's limitations.  There exists no method step in any of the disputed claims that requires enabling or activating the device of the performed claim limitation.  Nor is there a step which requires downloading the data.  So the Court was not going to import these limitations in.

So what -- what counsel is really asking for is to read in

the request for the media content delivery as a user action. But that's not a claimed element.

And the same is true for --

THE COURT:  Even where it says "wherein the CPP logic is invoked," that doesn't -- I mean, who invokes it?  Doesn't that require the end user to invoke it?

MR. THAKUR:  Correct.  But that logic, taken to its obvious extreme, means at some point you've got -- someone has to power on the phone.  The point is that there are unclaimed steps that come along the way.  That's what *SiRF* is talking about.  Powering on, enabling AirPlay.

THE COURT:  Right.  That's why *SiRF* would apply, because that's not a claim limitation here, so powering on. But invoking the CPP logic --

MR. THAKUR:  Correct.

THE COURT:  -- is -- obviously is claim language limitation.

MR. THAKUR:  Correct.  But what Dr. Schonfeld is clearly -- invoking occurs several layers down below.

What I mean by that is, once the user says I want the movie and presses the play button, as they said, that goes down into the IOS software.  And that request generates the command.

So it says "determining the network context in response to"; right?  The "response to" is the actions that are unclaimed.

Because the whole point of these claims or elements was to say, Here's what you do once the request comes from back above. And it's way down what I would call the third-tier layer in the software.  It's not the user interface level.

The claimed element is performed way deep in the software. And it could not be more identical to what happened in *SiRF*.

THE COURT:  How do I know where the claim element starts?  You say it starts three levels down.  How do I know that from just looking at the --

MR. THAKUR:  Your Honor, that is explained in Dr. Schonfeld's report.  And I believe we cited it in the -- in the docket, Your Honor.

So it's -- so here we go.  Schonfeld's report at Exhibit A.  And on slide 23 and 22, Your Honor, we actually cite Dr. Schonfeld's report and the specific page where he shows which particular piece of software down in the system works to provide the command.  It is not the user interface commands.

THE COURT:  So that the invoking to negotiate media content delivery occurs beneath or beyond what the user initiates?

MR. THAKUR:  Correct.

THE COURT:  And he explains why that's the case, why it's not at the initial if not power on, pressing the button, the play movie button, or choosing the Apple --

MR. THAKUR:  Your Honor, because those are unclaimed

elements.  He's not explaining what is unclaimed.

To be perfectly honest, Your Honor, the patent prosecutor knows full well what method claims are and how to write claims to show method claims.  Otherwise, if you show the user action and you claim that specifically, then the software patent is not infringed.

Your Honor, so I can talk more about *SiRF* or I can talk about why even under the *Akamai* standard, you know, which is the case that says if for some reason these steps were not automatically performed, as they are in *SiRF*, the *Akamai* standard, Your Honor, changes the law in favor of the --

**THE COURT:**  Why don't you address that.

**MR. THAKUR:**  So the *Akamai* case says that if you condition the benefit upon the performance of the step and establish the manner of timing, then you can still be attributed step.

And I think the primary focus for them, on that one, is the controlling the video presentation because that does get a little bit closer.

Our argument on that one is, it's still under *SiRF* because the user interface invokes, it passes signals down below.  And then we've actually cited in the PowerPoint the specific commands that are invoked.  But at least the language of that comes a little bit closer, since it's controlling the presentation.

But Apple's argument is saying, well, that doesn't work because control -- controlling the benefit is conditioning the receipt of the benefit.  And that is insufficient.  And you heard counsel say, well, that's a circular argument.

**THE COURT:**  Right.

**MR. THAKUR:**  Right?  They say, How can you condition the benefit of something on the benefit step itself?

Your Honor, there are some steps in a claim that are going to be about setting up the process.  And there are some steps that are requesting to be -- or there's going to be a step that would deliver the benefit.

The idea that the step that delivers the benefit cannot meet the *Akamai* standard, no Court has ever said that.  And that is illogical.

Let me explain what I mean.  If the method was go grocery shopping, get food, come home, cook, eat -- right? -- it is natural that the last step in a claim will almost always be the step that provides the benefit.  The idea that the last step itself in a claim is exempt from the category of conditioning the benefit, that makes no logical sense.  Nor has any Court such held.

**THE COURT:**  But then if you ignore the circularity problem, then you would always win.  I mean, right?  What's the limitation?

**MR. THAKUR:**  So, Your Honor, in this particular case,

conditioning the benefit is the ability to receive iTunes content using an IOS device into an Apple TV using a singular device.  That's the benefit.

Ultimately, you want to watch the movie.  The conditioning, Your Honor, is saying as part of that process to get it you have to press the pause/play buttons.  Because there's no other way -- it's not as though there's any other device that can help make that happen.

The difference, I think, in this particular claim is because it is the last step, it actually gives you the full benefit.

THE COURT:  Well, the question is how you define benefit for purposes of *Akamai*.

If you define it more broadly as, sort of, the end goal then the initiating steps, the intermediate steps are not just circular.  It depends -- if you -- maybe it's a definitional problem.

MR. THAKUR:  I don't disagree with you that the ultimate issue -- what is the benefit?  The benefit, I believe, is the performance of the claim.  Which in this particular case is the ability to use a device, a user endpoint to access the serving node to receive authorization to go to a media content provider, obtain the content, have it rendered onto an Apple TV using a singular device.  That's the benefit.  Ultimately, the benefit is watching the movie.

The last step --

THE COURT:  The ultimate benefit is watching a movie of your choice on demand.

MR. THAKUR:  Correct.

THE COURT:  The fact that you have to besides power on and hit the series of three buttons to get to the iTunes Store or the Apple TV and choose your content --

MR. THAKUR:  Right.

THE COURT:  -- all that are steps that are conditioned --

MR. THAKUR:  Correct.

THE COURT:  -- by Apple and its product in order to get the ultimate benefit.

MR. THAKUR:  Correct.

THE COURT:  And, therefore, under *Akamai* it's attributable.

MR. THAKUR:  Correct.

And it's not as though -- and I believe this was a big issue in *SiRF* is, could the user modify the software?  The user in this case has no access to modify the software.

THE COURT:  Okay.  What's the response to that?

MR. FOWLER:  Sure.  Let me go backwards.

So it can't be that the benefit is watching a movie, because it's undisputed that you or anyone in this courtroom can watch an iTunes movie without using AirPlay.

I've never used AirPlay in my life.  I've watched plenty of iTunes content.

What the benefit is, is streaming the content.  That's the alleged benefit.  That's what they've pointed to, is streaming it.

And the invocation steps that they're pointing to are part of the streaming.  So that's why it's circular.

**THE COURT:**  It all seems definitional.  If the benefit is the end product of streaming content that you choose, and you have to press a couple of buttons to get there, you know, I'm not sure.  You don't get there until you finish that process.  You may have to press a button six different ways to make your selections, but things happen beneath the surface when you press those buttons.  And Apple obviously anticipates that you're not going -- you can't see the movie unless you go through those six steps.

**MR. FOWLER:**  That's not true, Your Honor.

There are plenty of ways that you can watch a movie from iTunes without using their invention.  He doesn't dispute that.  Even using an Apple TV, you can watch a movie without using AirPlay.

It's the streaming that's allegedly being performed here that's the infringing conduct, not watching the movie.  So you can get a movie.  You can watch it from iTunes.  You can watch it on your Apple TV.  You can watch it any way you want.  But

you don't have to use AirPlay to do it.

The alleged benefit here is not watching the movie. That's not what's purportedly covered by their claim.  It's the streaming of it.

And they're pointing at streaming steps as the precondition for streaming.  And that can't be the case. That's the circularity of it.

And going to the use of the VCR controls, that's after you have the movie.  So how can the movie be the benefit when the fast-forwarding and that step is something that's going to occur when you're watching the movie, after you already have the movie?  So that certainly is circular.

And I would like to respond to his other points.  But if Your Honor wants to focus on this I would be happy to, of course, wait.

THE COURT:  How do you answer the point that the invocation, the methods here really begins two or three layers down?

MR. FOWLER:  Right.  That's what I wanted to address. Let's take a step back.

THE COURT:  You know, again, you could use just hitting the power button as an example of that.

MR. FOWLER:  So let's take a step back.

Okay.  Under *Akamai* the default is that a party cannot infringe a method claim unless it performs it itself.  And

since Mr. Thakur is only pointing to *SiRF*, I think we're all in agreement that that prong of *Akamai* is not at issue.  Apple is not performing.

So the only other way, attributable.  That's where *SiRF* comes into play, attributable.  So I'm just going to focus on that.

*SiRF* says it has to be automatic.  What I heard Mr. Thakur basically say is if you go far enough down in the software, you're going to be removed from user content.  That's the essence of the logic of what he just said.

But if that's true, then any software would always be attributable to the manufacturer, because at a certain level, of course, it's the software that's performing the conduct.

But that's not what *SiRF* was talking about.  *SiRF* isn't saying if you get far enough down in the software level it's going to be doing it's own thing.  I mean, a human being can't climb into bits and bytes and cause things to happen.

What *SiRF* was talking about was whether there was user intervention.  And in that particular situation, what was happening is there was communication going back and forth between the *SiRF* device and the satellites.  And all of that was happening automatically without the user being involved or even knowing it was happening.  That's what *SiRF* is.  That's what *SiRF* is about.

Here, as I pointed out, the user is involved all the time.

They have to press buttons.  They have to make choices.  It's not happening automatically.  The question is, what does automatic mean?  And can automatic mean something where the user has to press buttons?

And going back to Dr. Schonfeld's report, which we pointed to, he says that this whole thing gets kicked off, this process that we're talking about, the invocation process, by the user taking steps; not the software.  He doesn't start at the software.  He starts with the user.

MR. THAKUR:  That's incorrect.

MR. FOWLER:  So this is a common sense approach.

*SiRF* doesn't say if you go down into the stack the software will perform it.  Because that will always be the case; right?  That will always be the case that the software does something automatically if you go far enough down.

The question is, is the user having to do something to get that software to do it?  In *SiRF*, the answer is no.  Here, the answer is, for all of these limitations, yes.

MR. THAKUR:  Your Honor, just one comment that the software will always be that way.  That's not correct, Your Honor.

In fact, the *SiRF* case is really specific.  It says there exists no method step in any of the disputed claims that requires enabling our activating.

You can't have software that says if I had an unclaimed

element -- said wherein the user interface is activated, press play.  Then I'm not under *SiRF*.  That's what *SiRF* was saying.  If you need enable, you activate and you add that to the claim step, you're not under *SiRF*.

I mean, the facts of this case are just almost identical.  And what he characterizes about enabling in *SiRF* occurred at the GPS level, that was actually one step above in the *SiRF* case, because the *SiRF* case involved a little more technologically complex matter, where the server -- the user -- it wasn't just a two device.  It was the server on the provider.  And on the user side, the user had its own servers.  So it had to take action to get that information.  And, thereafter, it became automatic.

The focus of the *SiRF* plate, Your Honor, is over two different sections.  The latter section gets into the issue exactly involved in this case.

And he said unless there's an activation or enabling step that is in addition, the Court will not import that limitation of the claims.

**MR. FOWLER:**  So it sounds like we're agreed on one thing, Your Honor, which is that this is going to turn on Your Honor's reading of *SiRF*.

Our view of *SiRF* is that was talking about something that's happening automatically, without user intervention.

We're not seeking to impose any additional claim

limitations.  We're pointing at the claim limitations as being practiced, according to their expert, through at least partially user conduct.

Whereas, in *SiRF* the claim limitations at issue were being performed solely by the device, not by -- and didn't require any kind of user involvement.

**MR. THAKUR:**  It's actually a two-step process.  If the Court rules in our favor under *SiRF*, that's direct infringement.  If the Court does not rule under our interpretation of *SiRF*, then the *Akamai* case --

**THE COURT:**  I understand that.

Looking at the claim language of 2, "wherein the CPP logic is invoked to negotiate" et cetera, et cetera, is that clear that part of the claim, one of the elements of the claim or the limitations is -- why does that necessarily require -- cover the pressing of the button?  Why can't this be read as saying, sort of, once it's invoked, it negotiates?  Why does invocation itself have to be turning it on, pressing the button?

**MR. FOWLER:**  Well, my answer to that question is, we're not basing our argument on that.  We're basing our argument on their infringement theory, as explained not by Mr. Thakur but by their expert, which is why I showed you the slide that shows that when he's describing how this claim limitation is practiced, he's pointing to the user engaging in conduct.

Now, does the user do everything?  No, of course not.  The software is involved in it too.  But he points to the user's involvement in this.  And this goes not just for invocation, but the other two claim limitations, where we're pointing to what Dr. Schonfeld points to as being what's practicing this claim limitation.

**MR. THAKUR:**  And that's incorrect because that's the question they asked in his deposition.  And he acknowledges there is a power up; there is a press play.

But his expert report specifically -- and I think the sections of the deposition they don't show you, he specifically says that those steps have to be performed.  I don't disagree with that.  But this step is performed by this piece of software.

That's what the report says.  And we showed you the report.  Not a snippet from his deposition transcript.

**THE COURT:**  All right.  Time is running out.

I want to give you a chance to explain your motion in terms of on the invalidity.  And there are, I guess, several aspects to it.  But I would like you to focus in on what you think the most persuasive aspect is.

**MR. THAKUR:**  Your Honor, recognizing time limitations, first, our arguments -- turn to our slides real quick.

What I will do is explain just for maybe three of the references because the systems they all sort of repeat

thereafter.

But the motion for summary judgment on validity is the claims 2 and 21 are about the media server and the media renderer both being in communication with the UE via the local wireless network.

What Apple has done in its expert report is, remember we talked about wherein only the CPP is invoked and there is no wide area network?  Well, contrary to what you heard Mr. Fowler say, they do say that.  Dr. -- their technical expert does interpret "wherein only the CPP logic is invoked" to have no communication.

So this point that I was -- and I recognize this, sort of, came out mumbled in my explanation about wherein only the CPP is invoked.

But the point simply is, their interpretation of "wherein only the CPP is invoked" involves a local area network architecture.  This is what we discussed right at the beginning of this case.  This is what happened in the prior art.

So they -- all of the pieces of prior art that they describe as prior art to this invention turn on this structure.  So what do I mean by that?

First, quickly, Your Honor, just a slide about the prior art.  We came -- of all the pieces of prior art that remained in the case, was one of them was not presented in the IPR, which was a system.  All the others were.  So we actually have

quite detailed descriptions also from the prior art PTAB as to what they said.

What I mean by that is, this sort of slide sums up the key situation here. The key situation here is, Your Honor, Dr. Polish points about a particular configuration for claims 1 and 20. In 1 and 20, the wide area network is present in the system. And there is communication between the CPP and the CP.

In Dr. Polish's interpretation of claims 2 and 21, there is no communication between the CPP and the CP. You're entirely in a local area network. So it talks about obtaining media content from a local computer.

So the important thing to recognize is he -- contrary to what they said in their summary judgment motion, Dr. Polish clearly did understand what "only the CPP is invoked" meant. And that is exactly why he presented his invalidity motion in this way.

Claims 1 and 20, wide area network CP and CPP negotiate. In claim 20, there is no communication with the CP. You're in a local area network. You rely entirely on that structure.

But the reason that fails, Your Honor, is that claim 2 does require all the limitations of claim 1. Claim 1 requires that there be communication with the CP and the wide area network. You cannot just have the presence of a wide area network. You have to include it in your structure.

So for the prior art, I'll start with the AirTunes prior

art, Your Honor, because I think this one is the easiest one to overcome. They --

**THE COURT:** Before you get there, explain to me why it is -- I know it's a dependent claim, but it's got its own limitations. So why does it require communications between the CP and the CPP?

**MR. THAKUR:** Your Honor, let me just pull claim 1. Do you have claim 1?

So, Your Honor, in our brief we cite to -- actually, I can do it here. So here we go.

Your Honor, claim 2 is about the CPP being invoked. But claim 1 requires utilizing the wide area network for control and providing -- provisioning a serving node in the wide area network. That is required for claim 1. Claim 2 and claim 1.

So Dr. Polish's interpretation of the prior art being the local area network cutting off all communication between the CPP and CP to maintain consistency with their noninfringement argument essentially puts the prior art in the prior art structure in their scenario.

In their opposition brief, Your Honor, they give a handful of arguments for each piece of prior art about why no, no, no, he has not done that.

And I recognize that there was no way in a single hearing today I could get through every one of those arguments. So what I did was, Your Honor, give you an easy pathway to look

at.

And what I mean by that is I created a slide for each one of the seven pieces of prior art, identifying on the left column every single citation, every single citation Apple gives you for why that's not true.

**THE COURT:**  Where are we?

**MR. THAKUR:**  I'm sorry.  Two copies.

So for the AirTunes content piece of prior art, Your Honor, they make three arguments as to why the patent is valid. Excuse me, is invalid.

**THE COURT:**  Okay.

**MR. THAKUR:**  They wouldn't concede that as a fact.

**THE COURT:**  I wouldn't think so.  That would be an easy motion to resolve.

**MR. THAKUR:**  They make three arguments for AirTunes, why it's valid.

But, actually, Your Honor, if you look at each one of those arguments, the first argument they make talks about the system being in the local area network.  So, therefore, that's consistent, actually, with what we said.

Your Honor, the more pervasive thing you'll note with each one of the prior art is they will cite to you other charts. But the problem is that's Dr. Polish's chart for claim 1.  And remember in claim 1, he interpreted the CPP and the CPP communicating.  And, therefore, those charts provide an

entirely different embodiment than what Dr. Polish claimed for claim 2. He can't rely on invalidity charts for claim 1 to support invalidity for claim 2.

And for AirTunes, Your Honor, basically he has -- that's all they have done for that one citation.

And one of the things, Your Honor, I would ask of this Court is to the extent the Court finds there was something in the prior art for one prior art reference, it still can grant partial summary judgment for that piece of prior art where the limitation is missing.

THE COURT: Say that again.

MR. THAKUR: There's six pieces of prior art for which we moved summary judgment of invalidity. The Court can make a decision that for some of them, yes, Aylus has failed to present evidence, but for others it might say it has raised sufficient question of fact to go to the jury.

THE COURT: Right.

MR. THAKUR: I present that for AirTunes -- and there's a couple more, Your Honor -- I think they really cannot possibly meet that.

In the interest of time, because I would like to have some time to oral argue our *Daubert* motions because they are more fact specific, I present to you that that's exactly what happened to UPnP.

And so we've laid out for this Court a very

straightforward path to look at each and every argument and why that argument isn't satisfactory.

I do think there's one piece of prior art that also, like AirTunes, is uniquely positioned for being evaluated separately.  And that's the Intel Tools.

**THE COURT:**  That's the?

**MR. THAKUR:**  Intel Tools prior art reference.

Here's way, Your honor:  Intel Tools is a book about a piece of software that says you can configure things a certain way.

So what Dr. Polish did was configured the system in a local area network where the CPP stayed inside the house, didn't communicate with the outside.  And in that structure for claim 2, it did not -- it invalidated the prior art.

What makes Intel Tools considerably more inappropriate than the rest of the prior art is, he testifies in his deposition that the prior art -- that this particular configuration is done based on the book.  But he has no evidence, whatsoever, that it actually existed.  So let me repeat that.

His invalidity is based on a configuration that he has done using his own knowledge and expertise.  But the actual prior art configuration as to whether it actually existed, he has no knowledge.  He quotes as saying:

"I don't know that I have testimony or evidence about

any particular use in the past.  And I'm unaware of any case where a configuration made up after the fact has been found as a basis for invalidity of the patent."

And, again, Your Honor, we -- we do this for every one of the pieces of prior art.  It's listed, sort of, in a way each and every argument that Apple has made, and identified each and every time that argument is insufficient.

THE COURT:  All right.

MR. THAKUR:  If you have questions, I can do that. But I would like, in the interest of time, to leave you with this.

THE COURT:  Let me hear the response.  And I want to hear what your main *Daubert* issues are.

MR. FOWLER:  Can we slip to our slides, please.

I'm going to split the duties with my colleague, Mr. Buergi.  I'm going to address the first threshold point, which was not addressed by Mr. Thakur, which is the patentable weight issue.  Let me go to that.  And then Mr. Buergi is going to make the points that were made.

So I'm looking at slide 4 of our deck.  Because if you rule in our favor on this issue, then you can't grant their motion.

THE COURT:  Do I have -- is there a second --

MR. FOWLER:  Do we have the deck here?  I'm sorry, Your Honor.  My apologies.

May I proceed?

**THE COURT:**  Yeah.  We're going to have to take a break soon.

**MR. FOWLER:**  Well, maybe I can just do the conditional patentable weight issue and before we turn to Mr. Buergi.

So we're using the Intel Tools here as an example. There's four tests.  Tests 1, 2, 3, 4, and test 5.  Those are each different configurations of the Intel tools.

Apple relies on each one of these configurations to invalidate the limitations of claims 1 through 20.  It doesn't rely on those tools to invalidate the added limitation of 2 and 21.  It does for 5.

So when Mr. Buergi stands up and he responds to Mr. Thakur's arguments, he's going to be talking about test 5.

Now, the issue here is:  Do the limitations of claims 2 and 20, the one additional limitation, does it have patentable weight?  Because if it doesn't, and we've proven that all of the limitations of claims 1 and 20 are practiced, then the claim's invalid.

So that's the background of that.  So let's look at the issues here.  I'm at slide 5.

Now, the federal circuit case that's relevant is *In re Johnston*.  It's cited in our papers and in a later slide.  But it says, "Optional elements do not narrow the claim because they can always be omitted."

And although this Court, of course, is not bound in any way by the two PTAB decisions that we have here, here are two 2015 PTAB decisions in which that rule is applied to find that if you have a conditional limitation, it doesn't have to be found in the prior art.  It's basically employing the rule of *In re Johnston*.

So let's look at claim 1 and 2.  Claim 1 is independent. 2 is dependent.  And, again, the same pattern appears in claims 20 and 21.

So I'll focus, in interest of speed, on claim 2, which is the one that's at issue.  It has a conditional limitation.  It says, "If the MS and MR are both in communication with the UE via local area network."  So that's an if.  Does that have to happen?  No.  It may not occur.

What's one reason that we know that that may not be the case?  Well, claim 1 has a different way of doing it.  A different way.

So there's two ways to skin the cat here.  One is claim 2 and one is claim 1.  This is a condition that may not occur. Then we have some more case authority on page 7.

These are all PTAB decisions plus the patent examiner's manual that basically says if it's a conditional limitation, you don't have to find that limitation in the art to find it invalid.

So I think the law is pretty clear.  If it's a conditional

limitation, it doesn't have to be in the art.  So what are the arguments that Aylus has made to try to get around this? Because right now, based on the law and based on the fact that it's very clear that these are conditional limitations, we don't have to prove that they're in the prior art.  All we need to do is invalidate claim 1 and claim 20.

So the first thing they say -- I'm at slide 8.  And I won't read this to Your Honor, but what they did in their brief is they pulled a part of one sentence of what Your Honor said in this passage and they claimed that that was a ruling -- their words -- a ruling by the Court on the issue of patentable weight and conditional limitations.

Your Honor, I hesitate how to say this because I can't know exactly, of course, what was in your mind.  But --

**THE COURT:**  Neither can I, actually.

(Laughter)

**MR. FOWLER:**  -- I can read though what you said. First of all, this isn't a ruling at all.  It's -- it's your view -- you're giving the Court's view on something and inviting the parties to argue about it.  But it's not a ruling, first of all.  And it certainly doesn't address patentable weight or conditional limitations.  Not even mentioned in what you discussed.

Again, this is in our brief so I won't belabor the point. But then Your Honor issued a ruling.  And at least the way I

interpret your ruling, Your Honor, the basis -- I'm sorry.  I think you know this, Your Honor.  This is in the motion to stay; right?

So, Your Honor, your view, as I understand it from reading the order, is that Apple -- "I've asked them to dismiss their claims.  And they've agreed that they're going to dismiss their other claims.  These two claims, 2 and 21, they are going to go -- they are not going to be resolved by the PTAB."  And that's true.  2 and 21 are not going to be resolved by the PTAB.  That's for this Court to handle.  So you did not stay the case.

2 and 21 are before you.  Your Honor needs to decide whether they have patentable weight and whether they're conditional limitations.  That's a decision this Court has to make.  That was not addressed in your order.  You did not rule this.

They have the law of the case doctrine.  Of course, that only applies if Your Honor already ruled on this issue.  And, respectfully, I don't think Your Honor has ruled on this issue yet.

They also point, on slide 11, to something my colleague, Ms. Corbett, said at the hearing.  And they basically are saying, well, somehow you admitted or you disavowed this argument that you're making now.

But, Your Honor, respectfully I think that you have to

read this in context.  And the context was, as I read this question and answer, is if the PTAB invalidates the other claims, will these die?  And the answer to that is no, they don't automatically die.

We have to prove that they're dead in this court before you.  There's no automatic -- and we're talking about automatic.  But what the PTAB does to claims 1 and 20 does not automatically result in claims 2 and 21.  We have to show you why that's the case.

And, in fact, the reason that I know that Ms. Corbett didn't mean this is, at slide 12 we make the patentable weight argument in our briefs on the stay motion.

We didn't take the position they're trying to attribute to Ms. Corbett.  We took exactly the opposite position, the position we're taking now.  Although we advanced that argument at the time --

THE COURT:  Well, if it were possible that -- not because it wasn't addressed, but on the merits, that claims 1 and 20 were declared invalid, and 2 and 20 could survive legally, what does that do to your argument?

MR. FOWLER:  Well, that's -- again, just to parse that, what the PTAB does to 1 and 20 does not result in the automatic invalidity of 2 and 21.  We have to go through the process of a court case here to do that.

However, because these two limitations, if Your Honor

concludes that they do not have patentable weight and, therefore, that we don't have to find those limitations in the claims, that means when we go to the jury, if this case does go to the jury, all we need to do to show that the two asserted claims are invalid is that the limitations of the base independent claims are invalid.

Now, what makes that interesting here, Your Honor, if there was no PTAB proceeding, that would be the end of it.  But what makes this interesting is the fact that we do have this concurrent PTAB proceeding.

I mentioned we had the oral argument in that case this week.  We won't -- we don't know when we're going to get a decision.  The statutory deadline would mean that they would issue their ruling about two weeks after this jury trial is going to be over, at which point we'll know whether those claims are valid or not.

If the PTAB were to find the claims invalid after the jury has issued its ruling, I suppose then we're going to have two different/inconsistent rulings that will need to go up to the federal circuit for resolution.

But for purposes of this case, unless Your Honor stays the case before we go to trial, right now we would have to prove up the limitations of claims 1 and 20 in the prior art.  That's what we would have to do.

Does that answer Your Honor's question?

**THE COURT:** Well, I think you have answered it. I mean, you would amend Ms. Corbett's statement to clarify that if you had to redo it again, that there would not -- they would be invalid. 2 and 21 would not survive because there's no patentable weight. If 1 and 20 goes, so goes 2 and 21.

**MR. FOWLER:** Yes. That's right, Your Honor.

**THE COURT:** The only reason why they wouldn't is -- I don't know. Why wouldn't they, under your theory?

**MR. FOWLER:** No, I agree with Your Honor. That's the entire point of our argument here today on this invalidity motion, is that's exactly right.

But in terms of the procedure that we are talking about at the time -- and I'm just explaining what was represented -- is those claims don't go away just because the Patent Office does that.

And we're not going to get -- unless the Court stays the case, which maybe we can revisit when we do the case management conference, the jury is going to be deciding the validity of claims 1 and 20, effectively, before the PTAB does.

So we have to prove the elements of claims 1 and 20 are in the art. It's not an automatic thing. That's the answer.

**THE COURT:** Let's move on.

**MR. FOWLER:** Okay. So --

**THE COURT:** It's now getting very late.

**MR. FOWLER:** Sure. Your Honor, in the interests of

time, I think everything else that I have is in the brief.  So what I'd like to do is turn it over to Mr. Buergi.

THE COURT:  I think our court reporter needs a break at this point.

MR. FOWLER:  Okay.

THE COURT:  And I don't have that much time left.  So I don't know how much you want to get into the *Daubert*, whether there are specific issues you want to alert me to now.

MR. THAKUR:  I want to make one statement.  There's no patentable weight.  And it might make sense we do that before the break.

THE COURT:  Do that quickly then.

MR. THAKUR:  We were going to address that issue in the motion for summary judgment.

Put those slides up.  Go to the end real quick.  Keep going please.  Keep going.

Okay.  Your Honor, with respect to the no patentable weight, Your Honor, we've laid out, as this Court has already noted, there is no question or doubt that we had this conversation about whether claims 2 and 21 would survive even though claims 1 and 20 are invalid.  But the Court can read for itself and make that determination.

But even if that was not the case, just on the merits, Your Honor, there's only one federal circuit case, only one, that has ever addressed the exact issue that's before this

court.

And the issue was whether there is -- let me -- there's only one federal circuit case that has ever held that a dependent claim is invalid because the independent claim was invalid.  It was exactly for all the reasons we cite in our brief.  That means that that particular step has to be optional.

And, Your Honor, I cite you the claim where that actually occurred.  The claim said:

"Further including that said wall may be smooth, corrugated or profiled with increased dimensional proportions."

That dependent claim makes it absolutely unambiguously clear that you may have to perform that step.  No Court has ever held in the cases in our scenario where a condition has to be met to perform the claim.

In our claim, it's not -- claim 2, it's not optional.  If the user endpoint is in local wireless communication with the media server and the media renderer then the CPP is invoked. It happens.

That's all I have, Your Honor.

THE COURT:  All right.  Thank you.

MR. FOWLER:  Your Honor, we addressed that -- we disagree.  And we addressed that issue in our brief.

THE COURT:  Okay.

All right.  Let's take a 10-minute break.

(Recess taken from 4:38 to 4:49 p.m.)

THE COURT:  All right, Counsel.  I have about ten minutes.  However you want to spend it.

MR. FOWLER:  Your Honor, we had -- we wanted to address one slide on the merits of the invalidity motion, please.

THE COURT:  Yeah.

MR. FOWLER:  Can we go to our slides and then slide 29.

So everything else Mr. Thakur said, other than the patentable weight, which I've addressed, Mr. Buergi was going to address.  But we'll submit it on our briefs.

But I wanted to bring your attention to slide 29, because this has to do with the notion that somehow the configuration that's discussed in claim 1 and the configuration discussed in claim 2, somehow that evidence wasn't put forward in Dr. Polish's report.

This is the Intel Tools example.  But if you go through our brief, and if you were to look at the slides we've given you, we've explained this.

What we have in orange, with the dotted lines, which is in the upper left, and also part of NY-2, that's claim 1.  And it's in the body of his report.  We cite the page.  It's in the claim chart for that claim limitation.  That's the cite on the left.

On the right, we have the same -- same configuration. It's one configuration, where we have the configuration in blue that matches up to claim 2.  This is one thing that's practicing both claim limitations.  And we have the cites.

So I'd like you to take that into account when you consider Aylus's arguments on that.

With that said, I would rely on our briefs for the rest so we can turn to our *Daubert* motions.

**THE COURT:**  Do you have a comment on slide 29, you want to make?

**MR. THAKUR:**  Yes.  They do disclose that.  But the point is, that's the local area network structure that Dr. Polish set up.

Our point is, it never actually -- there's no evidence, and we can see that he does not have any evidence that it actually existed.  The prior art cannot be created.

**THE COURT:**  All right.  Tell me what *Daubert* issues you want to discuss or highlight at this point.

**MR. THAKUR:**  Five minutes each?

**MR. FOWLER:**  Five minutes each, Your Honor?

**THE COURT:**  Yes.

**MR. THAKUR:**  Should we start with Aylus?

**THE COURT:**  Sure.

**MR. THAKUR:**  Put my stopwatch on.

Your Honor, we essentially have two issues for the

technical expert and two with respect to the damages expert.

THE COURT: Yep.

MR. THAKUR: First, with respect to the technical expert, Your Honor, there is one of his dozen-plus noninfringement arguments. One of them is that he says that the media server must be the server.

And this is exactly what was the issue before the Court. And the Court said it can be the real server. It does not have to be the media server or media renderer. That's slide 4.

And that is consistent with what we said at the *Markman* hearing. The Court construed it based on what we said.

The other complaint that Apple has is that we did not cite evidence as to what the real server is. Your Honor, I give you a citation to Dr. Schonfeld's report, Exhibit A at 6, where he specifically cites that the real servers are the back end iTunes servers, the receiver --

THE COURT: I'm looking at your slide what now?

MR. THAKUR: Your Honor, the key slide is 8.

THE COURT: 8.

MR. THAKUR: There is specific evidence as to what the real server is.

THE COURT: So tell me what's in 8 that I should be looking at.

MR. THAKUR: What is in 8 is the fact that Apple says that the real server should be the media server, which is

inconsistent with what was in the claim construction.

And the second complaint is we don't identify the real server.  And I'm saying that is expressly in our infringement contentions -- our expert report.

So expert report shows what we claim to be the real server, which is the back end iTunes servers.

THE COURT:  Okay.

MR. THAKUR:  Okay.  Next argument, Your Honor, is Dr. Polish.

Second argument he says is there's a design-around called "resides in the signaling domain."  So what he says in summary is -- slide 13 depicts what he's saying.  You put infrequently movie trailer there and then the rest of the content is delivered from media path.

So slide 13 shows what Apple is saying.  But the problem with that design-around, Your Honor, is -- as shown in slide 14, some of it infringes.  Actually, 99.9 infringes.  The .001 doesn't infringe.  So the simple question before this Court really is:  What's in slide 15?

The mere fact that you have one iota of content that is not infringing, and you mix it with the 99.99 percent of the time where it is infringing, the fact that two coexist is not a basis to make the entire thing noninfringing.

THE COURT:  Why isn't it?

MR. THAKUR:  I think it's established law that the --

if a claimed feature is performed, the mere fact that additional functions are available doesn't make it noninfringing.

Your Honor, if that was the case, every defendant in every case would add a noninfringing functionality as an option, make both of them available, and say the entire thing doesn't infringe.

Your Honor, they could make it entirely noninfringing by moving all of that content into the serving node, but that would cost them far more than what they are being asked to pay in this case.

So they don't make the entire media content noninfringing. They just put a little bit of content noninfringing and say if both are available, the whole thing is out.

And that's -- and, Your Honor, and the next slide is what the second argument for noninfringing is.  If the infrequent media content is available -- which is slide 18 -- if the infrequent media content is available, also in an infringing way, somehow making that somehow -- slide 18, because *Gigli* is available in both infringing and noninfringing, makes the entire thing noninfringing.  That's not what this case is about.

This case is about having some noninfringement, some infringement.  The mere fact that both are available is not a design-around.  It's a design-around for the noninfringing

content.  It doesn't make the whole thing noninfringing.

Slide number 3, Your Honor, Mr. Malackowski's market approach --

**THE COURT:**  Why don't we take comments on that right now.

**MR. THAKUR:**  Okay.

**MR. FOWLER:**  Well, Your Honor, if we're going to use five minutes, he's used four.  We prefer to use our five minutes on something else.

**THE COURT:**  All right.  Thank you.

**MR. FOWLER:**  Unless Your Honor would like us to --

**THE COURT:**  Give me one minute of your comment on what was just said, especially on the one iota of noninfringing.

**MR. FOWLER:**  The noninfringing alternative, well, the short version on that -- and I will refer you to our brief because I don't want to take time to bring up our slides.

The claim construction says that the CP logic never receives any media content.  Not that it seldomly receives it, or only 1 percent is okay and 99 percent is okay.  It says it never receives it.

This design-around would assure that at least sometimes it receives media content.  That means that this does not infringe the claim as construed by the Court.  That's the answer to that question.

**THE COURT:**  All right.

**MR. THAKUR:**  Your Honor, I'll go to the next one because our argument still applies.

There's two complaints that we have about Mr. Malackowski. The first one, Your Honor, is he takes a modular computer, which is broken into a piece, and does not include any of the serving node without -- which is not in the signaling domain, and says a nuisance-value settlement in that agreement is a basis for him to say it's an analogous license and we should use it.

Your Honor, there is evidence in the record, unambiguous, this is a nuisance value settlement.  The first three defendants paid up.  Amazon decided to file a Rule 12(b)(6) motion in Northern District.  12(b)(6).  It was called an *Alice* motion.  This was an invalid patent.

And you know how we know it was invalid?  Because Judge Illston made it abundantly clear how she felt about the patent, Your Honor.

The one thing in all of this that I would like the Court to look at is what Judge Illston had to say.

**THE COURT:**  In the context of the oral argument?

**MR. THAKUR:**  From the oral argument.

So what happened was they were going to have oral argument on the 12(b)(6) motion.  You know what Smart Data did?  It dismissed the case with prejudice because they were afraid of the attorneys' fees, because it was a nuisance value

settlement.

And Judge Illston made an unambiguous comment:

"You're trying to get out of Dodge."

THE COURT:  Okay.

MR. THAKUR:  And, Your Honor, the transcript was not available previously, so we have brought it for this Court's attention here.

THE COURT:  Copy to counsel.

MR. THAKUR:  I'm sorry?

THE COURT:  Copy to counsel.

MR. THAKUR:  Yes, of course.

THE COURT:  Okay.

MR. THAKUR:  That was the one argument as to why a settlement agreement should not be allowed.

And, Your Honor, the last part is, the law sets a standard -- which is slide 26 -- as to when a settlement agreement can be allowed.  And Mr. Malackowski did not consider the history -- didn't consider the steps.  He just simply says it's the closest, most reliable.

And then the last argument, Your Honor, I'm going to turn to is Malackowski's income approach, Your Honor.

THE COURT:  Yeah.

MR. THAKUR:  And the income approach is one fundamental area.  He starts with how important a particular product is at the time -- whether a particular product was

important to you when you purchased the device.  And it has absolutely nothing to do with the usage of the method.  If you consider it important at the time of purchase, you can use it. Otherwise, you can't.

I want to give this Court a very clear real-life example of what happened.  I bought this stopwatch because I like hiking.  My son -- when I took it home, my son said, "You don't need a stopwatch.  You got it right on the phone.  It's free." And I use that stopwatch two or three times a month.  I didn't think it was important when I purchased the phone.

I use it all the time.  Should I not receive value?  If it was a patent inventor who had a method claim on the stopwatch, should -- I mean on the compass --

**THE COURT:**  The survey and only -- the only way to have a valid survey on which to base this analysis is actual usage, not importance or attitude at time of purchase?

**MR. THAKUR:**  At the time of purchase.

**THE COURT:**  Even though there may be some correlation?

**MR. THAKUR:**  There can be no correlation because you don't know whether someone at the time of purchase would actually use it.

Their own statistics show several times many people, I think it's a considerable factor higher, actually use it rather than -- when they consider -- at the time of the purchase.

And so if you look at slide 32, the entire prism, the

entire prism through which this approach, income approach, looks at -- the report is based on how important it was at the time of purchase and then how it was relatively important. The fact that some usage for those people was considered is not really relevant.

THE COURT: All right.

MR. THAKUR: That's all I have.

THE COURT: All right. Thank you.

MR. FOWLER: So, Your Honor, I believe Counsel used about ten minutes. Can we have ten minutes, please?

THE COURT: Just go. Come on, let's move.

MR. FOWLER: So I'm going to address Dr. -- our motion on Dr. Kearl. I have, actually, a lot to say, but I would defer to our brief. But I want to show you this slides 11. If you have that deck. It's our presentation on Dr. James Kearl.

THE COURT: Slide 11?

MR. FOWLER: Right.

THE COURT: Yep.

MR. FOWLER: So the rest of it's in our brief. It's in the other slides. But this is what's fundamentally wrong here.

Dr. Kearl has two analyses. One for the IOS devices and one for the Apple TV. They're independent. You could accept one and throw the other one out. But they both are fundamentally flawed for the same reason. And that is because

the first step in his analysis is contrary to every federal circuit case that's come down on this issue.

It's not -- this is not an issue that can go to the jury. This is not a theory that can go to the jury. And what is that about?

Other slides. I won't I go through all the law. The net of the law is clear that in order to go to the jury, his theory has to -- in a multicomponent device like this, his device -- his theory has to be based upon the thing that infringes. The thing that infringes. And he's got to allocate out everything else. So that's why I get to slide 11. This was supposed to be the punchline, but it's the main point.

In a perfect world, when you have a claim and you have an infringing device, they're the same. And maybe if the claim was on a broom, you could have a device that's exactly matched up.

In the real world, and what the cases address, is the middle situation where you have -- in this case, we've arbitrarily picked 50 percent. The accused device, 50 percent of it is practicing the invention. And you have 50 percent that's not. And then the -- what the Court says you have to do -- not that it's good; you have to -- you then allocate out the rest. And so what you would bring to the jury is a theory that's based upon the red half in the middle.

What's fundamentally wrong with Dr. Kearl's analysis, and

why it cannot go to the jury, is because in the case of IOS they start with the device, the AirParrot, that is not the accused device.  It's not an Apple device.  It's a third-party application.

And these are the two important points, Your Honor.  And we've proved this in our brief.  This AirParrot device, one, does not practice the claims.  They've made no showing that it does.  We made a showing that it doesn't.

Two, it doesn't perform the same accused functionality.  It does something different.

Three, the law -- and it's two slides later, but the law says that if you're going to take something other than the infringing device and say it's comparable, then it's your obligation as the plaintiff to put in expert testimony that shows that they're technically comparable.

They have not done that.  And I'm not talking about the quality of something they've done.  They haven't done it period.

Dr. Schonfeld, their technical expert, doesn't opine on this subject.  Apple's expert, Dr. Polish has.  And he says they're not comparable.

So what you end up with in this case is, he starts with the AirParrot, which doesn't practice the invention, doesn't perform the end function.  There's no expert testimony that says they're comparable.  So you start with a circle that is

zero.  There is no infringement.

So then they do all of this apportionment.  By the way, the apportionment is wrong.  And I have a slide on that, and it's in our deck.

They apportion like crazy.  But what you're doing is you're apportioning away stuff that doesn't infringe from other things that don't infringe.  So what they end up with is $1.51 that doesn't infringe.

If there's just one point I would like you to take away, Your Honor, from the hearing is this:

Every other step he performs is also flawed as a matter of law, all the way down, including but not limited to his 30/70 split, which bears no relationship to anything having to do with the Apple licensing agreement.

There's a slide on that, but I won't take the time because I'm assuming there will be no more argument from Mr. Thakur.

So I'm going to give Ms. Corbett some time to address his arguments about Mr. Malackowski, unless Your Honor has some questions about this.

**THE COURT:**  No.

**MR. FOWLER:**  Thank you.

**MS. CORBETT:**  Okay.  Your Honor, so with respect Aylus's *Daubert* motion, with respect to Mr. Malackowski, quickly on the Smart Data agreement, you have our PowerPoint presentation, hopefully, in front of you.

And I just want to highlight for the Court Aylus's suggestion that the settlement agreement must include the asserted patent. That's not the law. That's nowhere -- no federal circuit has ever said that a settlement agreement, in order to be admissible, must include the asserted patent. That's the first point.

I've also --

THE COURT: The main point, if you're talking about the Smart Data license --

MS. CORBETT: Correct.

THE COURT: -- is that those are unusual circumstances. It was a nuisance suit about to be dismissed based on the judge's comments. So it's not a comparable situation.

MS. CORBETT: Well, Your Honor, those are about comments that are made in a different case. They are not comments that were made in the Apple Smart Data case.

And so information that is gleaned from other litigation that happened after Apple entered into the settlement agreement with Smart Data --

THE COURT: What was the date of the settlement agreement?

MS. CORBETT: The date of the settlement agreement is December of 2012, after Apple entered into the settlement agreement with Smart Data.

I also want to point the Court to *Laser Dynamics* where there there was a question about the settlement agreement and the reliability of the settlement agreement. But that was in the context of that case, not about some other cases that happened years later. And --

THE COURT: What do we know about the case, the actual case, the 2012 case that makes it comparable?

MS. CORBETT: Sure. What we know about the Smart Data case is that it was executed -- the settlement agreement was executed in December of 2012.

We have a hypothetical negotiation here of August of 2013. That is an eight months difference. That's very close in temporal scope in terms of the reliability of the Smart Data agreement.

THE COURT: What else do we know qualitatively about that suit, besides temporal proximity?

MS. CORBETT: Well, we know that Apple entered into a settlement agreement for half a million dollars, which is --

THE COURT: Were there motions? Was there a 12(b)(6)? Was there an *Alice* motion? Was there anything --

MS. CORBETT: No, there was not.

THE COURT: So this was settled early on?

MS. CORBETT: It was settled right around the time of Markman, I believe, Your Honor.

THE COURT: After or before Markman?

**MS. CORBETT:**  It was before Markman.

**THE COURT:**  So you're telling me there is nothing in the record that would suggest that there's something unusual about the Smart Data licensing settlement?

**MS. CORBETT:**  Not between Apple and Smart Data. That's correct, Your Honor.

Also, the arguments that are being made by counsel are attorney argument.  None of their experts have made the argument that the Smart Data agreement is not economically comparable, because there are these other litigations.

**THE COURT:**  All right.  Thank you.

**MS. CORBETT:**  So really quickly on the income approach, if I may, Your Honor.

**THE COURT:**  Yeah.

**MS. CORBETT:**  What I want to highlight there is they talk about how Mr. Malackowski used importance in his income approach.

And I've included on slide 33 a portion of Aylus's reply brief where they take to heart, they sum up the issue --

**THE COURT:**  Slide 33?

**MS. CORBETT:**  Yes.

**THE COURT:**  Okay.

**MS. CORBETT:**  And there they sum up their issue.

"Rather, Mr. Malackowski's income approach should be excluded because it *ignores*" -- they italicize

"ignores" -- usage of the patented method; i.e. infringement."

If Your Honor could please turn to the next page, where we have an excerpt of Mr. Malackowski's expert report.  And this comes specifically from his income approach analysis section, where after he considers importance so does their expert.

He considers importance.  But after that what does he do? He adjusted for the percentage of those respondents who used AirPlay in the accused manner.  Exactly what they said that we didn't do, we did.

THE COURT:  How did he do that?

MS. CORBETT:  Well, he says here what he did.  He did this by applying the percentage of use related to playing video via an Apple TV, and the percentage of that video that is sourced from the iTunes store.

So there has to be video and there has to be -- from the iTunes Store.  Those two things have to be there in order to be part of the accused functionality.

THE COURT:  This is based on the survey?

MS. CORBETT:  Exactly, Your Honor.

THE COURT:  Well, let me ask you a question I have about the survey.

After the numbers were reduced, you have a very small sample.  34.  26 on the iPad.  28 respondents on the iPad Touch.  Right?

MS. CORBETT:  There are small numbers for the number of people that used AirPlay in the limited accused manner.

THE COURT:  Right.

MS. CORBETT:  That is correct.

THE COURT:  So how is that statistically significant?

MS. CORBETT:  And so what we have here is we have a survey that started with 2,000 respondents.  2,000 complete and usable surveys.  Not only that, it was based on a national representative sample of U.S. consumers.

So the fact that the numbers -- what I'm hearing from the other side is, I'm just hearing attorney argument.  "Well, I don't like those numbers.  They're too low so I'm going to say they're unreliable."

There's no expert on their side saying that those numbers are unreliable.  It's just the attorneys that don't like the numbers, saying they're unreliable.

What do we have on our side?  We have Dr. Weber, who is a renown survey expert who will stand behind her survey 100 percent.  And she opines that the result from the sample size for this matter are reliable.

THE COURT:  Even though you are down to about a hundred people?

MS. CORBETT:  Of course.  I mean, I'm not --

THE COURT:  She opines directly on the actual residual.  Not the starting point, but what you were left with.

**MS. CORBETT:**  That's exactly correct.

And I'm not a survey expert, but there's all this stuff that they do with standard errors.  And all that standard error data was provided to Aylus as part of her expert report.  And when she considered everything as a whole -- and this is the only expert testimony on this point -- she claims that it's reliable.

**THE COURT:**  Okay.

**MS. CORBETT:**  Thank you, Your Honor.

**THE COURT:**  I'll give you one minute to respond to that point, since I raised it.

**MR. THAKUR:**  Your Honor, I'll make one sentence to respond to each.

One is to say usage was considered is through the prism of the people to whom it was relevant that purchased -- I'll slow down.

The prism on where they talk about usage of the method in the calculation for the income approach only deals with the people that actually considered it important at the time of purchase.  So the sieve, if you will, starts with people who considered it important at the time --

**THE COURT:**  So it leaves out people who didn't think it was important but used it.

**MR. THAKUR:**  And used it.

So when you start that way, you can't all of a sudden

conclude with the other item.

Secondly, Your Honor, with respect to the survey and the numbers, again, how did they get to that number so small?

They got to that number so small because the sieve was the 3.6 percent that considered it important at the time of purchase.

THE COURT:  All right.  Well, that's a different issue.  One is just a question of straight statistics and statistical significance.  The other is not an incomplete picture, is what you're saying.

MR. THAKUR:  Correct.  It would take me too long to argue that statistical argument.

MR. FOWLER:  May I make a one-sentence rebuttal to the importance issue?

THE COURT:  One sentence.

MR. FOWLER:  It might be long, but here goes.

If it's true that somehow Dr. Malackowski's report gets tossed because he used "importance," Dr. Kearl is handcuffed to him and goes over the bridge too.

If you look at slide 15, if you have that handy.  I think I'm in a semicolon now.  If you have it handy.  This is the Dr. Kearl deck.  You'll see.  This is in our brief.  Dr. Kearl.  Yes.  Look at slide 15.  You'll see his step 2.  I already addressed step 1.

What does he do?  He takes the starting price and

multiplies it by the importance of mirroring.  He doesn't use usage.  He uses importance.

What Mr. Malackowski -- at least he uses usage.  Talk about the prism, he starts at the top with importance too.

So, you know, this is the Northern District of California, not Marshall, Texas.  But goose-gander.  That's what they would say down there.

THE COURT:  All right.

MS. CORBETT:  Thank you, Your Honor.

THE COURT:  Let's move on.  We've got to conclude.

You want to say something about case management at this point?

MR. FOWLER:  We didn't have anything in particular.

The only thing I would point out, Your Honor, is, of course, this is in your discretion, but if you were to decide that in response to our motion, or as part of their validity motion, that claims 2 and 21 do not have patentable weight, then the Court might want to reconsider whether it wants to proceed with the trial, given the fact that the PTAB is scheduled to issue its decision by -- under the statutory rules by no later than April the 22nd.  Right now, the trial is scheduled to end on April the 11th.

Mr. Thakur might be able to back me up on this, but in our experience over IPRs over the last couple of -- last year, is that they usually hit the deadline.  Sometimes it's two or

three weeks earlier, but usually not much more than two or three weeks earlier.

So I think what we're looking for is a result either during the trial or shortly after the trial.  And, again, Your Honor might want the benefit of what happens to the base claims before we spend some time before the jury.

**MR. THAKUR:**  That only starts if the claim has no patentable weight.  And we've argued that.

**THE COURT:**  All right.  Is there any -- let me just ask, is there any ADR possibilities or discussions or venues?

**MR. FOWLER:**  What the parties have agreed in the document that we submitted to Your Honor is that the parties would go into mediation after the Court rules on the motions.

**THE COURT:**  Okay.

All right.  I'll take it under submission.

**MR. THAKUR:**  Your Honor, I'll just add that it takes four to six weeks to get on Judge Infante's calendar.  Before trial -- I don't want to rush --

**THE COURT:**  Why don't you call him now.

**MR. THAKUR:**  Okay.

**MR. FOWLER:**  Thank you, Your Honor.

**MR. THAKUR:**  Your Honor, actually, it's not -- should we do so?

**THE COURT:**  I think you should.  We'll get something out.  I'm not --

MR. THAKUR:  I don't want to rush you in any way.

THE COURT:  I say "we."  But I think it would be wise to -- if it takes that long to get before Judge Infante, I think you ought to try to get a date.

MR. FOWLER:  Thank you, Your Honor.

MS. CORBETT:  Thank you.

MR. THAKUR:  Thank you, Your Honor.

THE COURT:  Thank you.

(At 5:17 p.m. the proceedings were adjourned.)

- - - -


**CERTIFICATE OF REPORTER**

I certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.


DATE:   Tuesday, January 19, 2016



*Katherine Sullivan*

_____

Katherine Powell Sullivan, CSR #5812, RMR, CRR
U.S. Court Reporter