1  MARK D. FOWLER, Bar No. 124235
   mark.fowler@dlapiper.com
2  CHRISTINE K. CORBETT, Bar No. 209128
   christine.corbett@dlapiper.com
3  ROBERT BUERGI, Bar No. 242910
   robert.buergi@dlapiper.com
4  ERIK R. CORBETT, Bar No. 252578
   erik.Corbett@dlapiper.com
5  JONATHAN HICKS, Bar No. 274634
   jonathan.hicks@dlapiper.com
6  **DLA PIPER LLP (US)**
   2000 University Avenue
7  East Palo Alto, CA  94303-2214
   Telephone:  650.833.2000
8  Facsimile:   650.833.2001

9  ROBERT WILLIAMS, Bar No. 246990
   robert.williams@dlapiper.com
10 **DLA PIPER LLP (US)**
   401 B Street, Suite 1700
11 San Diego, CA  92101-4297
   Telephone:  619.699.2700
12 Facsimile:   619.699.2701

13 Attorneys for Defendant
   APPLE INC.

14

15                    UNITED STATES DISTRICT COURT

16                    NORTHERN DISTRICT OF CALIFORNIA

17                       SAN FRANCISCO DIVISION

18

19 AYLUS NETWORKS, INC.,                CASE NO.  3:13-cv-04700-EMC

20              Plaintiff,              **DEFENDANT APPLE INC.'S NOTICE OF
                                        MOTION AND *DAUBERT* MOTION TO
21 v.                                   STRIKE THE EXPERT REPORT OF
                                        PLAINTIFF AYLUS NETWORKS, INC.'S
22 APPLE INC.,                          DAMAGES EXPERT JAMES KEARL AND
                                        TO PRECLUDE DR. KEARL FROM
23              Defendant.              TESTIFYING AT TRIAL**

24                                      DATE: December 10, 2015
                                        TIME:  1:30 p.m.
25                                      PLACE: Courtroom 5, 17th Floor
                                        JUDGE: Honorable Edward M. Chen
26

27                           **REDACTED VERSION**

28

DLA PIPER LLP (US)
EAST PALO ALTO

# TABLE OF CONTENTS

**Page**

I.    INTRODUCTION ................................................................................................. 1

II.   FACTUAL BACKGROUND .............................................................................. 4

III.  LEGAL STANDARD ......................................................................................... 5

IV.   DR. KEARL'S EXPERT REPORT SHOULD BE STRICKEN AND HE
      SHOULD BE PRECLUDED FROM TESTIFYING AT TRIAL BECAUSE HIS
      OPINIONS ARE IMPROPER, UNSUPPORTED AND UNRELIABLE........................ 6

      A.   Dr. Kearl Should Be Precluded From Testifying As To His Improper
           Opinions Regarding The Accused iOS Products .................................... 7

           1.   Step 1: Dr. Kearl's Inappropriate Starting Point For His iOS
                Damages Analysis Has No Tie To The Accused Functionality And
                Is Grounds Alone To Strike His Opinion..................................... 8

           2.   The Remaining Steps Of Dr. Kearl's Damages Analysis For iOS
                Devices Also Are Unreliable And Not Tied To Any Facts Of This
                Case ...................................................................................... 11

                a.   Step 2: Improper Apportionment Based On The Unaccused
                     AirPlay Mirroring Functionality ..................................... 11

                b.   Step 3: Dr. Kearl's Unsupported AirPlay Video
                     Apportionment ............................................................. 13

                c.   Step 4: Dr. Kearl Inappropriately Assumes That Active
                     iTunes Accounts Indicate Use Of AirPlay ...................... 15

                d.   Step 5: Dr. Kearl's 70/30 Bargaining Split Is Fatally Flawed
                     And Taints His Entire Analysis ....................................... 16

      B.   Dr. Kearl Should Be Precluded From Testifying As To His Improper
           Opinions Regarding the Accused Apple TV Products........................... 18

           1.   Step 1: Dr. Kearl's Improper Reliance On A Target Selling Price of
                The "Wireless Mirroring Accessory"....................................... 19

           2.   The Remaining Steps Of Dr. Kearl's Analysis Are Equally Flawed........ 20

                a.   Step 2: Dr. Kearl's Improper Adjustment For AirPlay Video
                     Is Based Upon Unreliable Evidence ............................... 20

                b.   Step 3: Dr. Kearl's Improper Adjustment For iTunes
                     Accounts..................................................................... 21

                c.   Step 6: Dr. Kearl's 70/30 Bargaining Split Is Fatally Flawed
                     And Taints His Entire Analysis ..................................... 21

V.    CONCLUSION .............................................................................................. 21

## TABLE OF AUTHORITIES

**Page**

### CASES

*Cornell Univ. v. Hewlett-Packard Co.*,
609 F. Supp. 2d 279 (N.D.N.Y. 2009) .................................................. 6, 7, 8, 10, 15

*Cornell Univ. v. Hewlett-Packard Co.*,
No. 01-cv-1974, 2008 WL 2222189 (N.D.N.Y. May 27, 2008)................................ 5

*Daubert v. Merrell Dow Pharms., Inc.*,
509 U.S. 579 (1993) .................................................................................. passim

*Dynetix Design Solutions, Inc. v. Synopsis, Inc.*,
No. 11-cv-05973 PSG, 2013 WL 4538210 (N.D. Cal. Aug. 22, 2013) ............................ 5, 17

*Garretson v. Clark*,
111 U.S. 120 (1884) ........................................................................................ 6

*Gen. Elec. Co. v. Joiner*,
522 U.S. 136 (1997) ........................................................................................ 5

*Grain Processing Corp. v. Am. Maize-Prods. Co.*,
185 F.3d 1341 (Fed. Cir. 1999) .................................................................. 7, 10, 15

*Kumho Tire Co. v. Carmichael*,
526 U.S. 137 (1999) ........................................................................................ 5

*LaserDynamics, Inc. v. Quanta Computer, Inc.*,
694 F.3d 51 (Fed. Cir. 2012) ...................................................... 5, 6, 17, 18, 19

*Lucent Techs., Inc. v. Gateway, Inc.*,
580 F.3d 1301 (Fed. Cir. 2009) .......................................................................... 7

*Oracle Am., Inc. v. Google Inc.*,
798 F. Supp. 2d 1111 (N.D. Cal. 2011) ............................................................... 18

*Riles v. Shell Exploration & Prod. Co.*,
298 F.3d 1301 (Fed. Cir. 2002) ...................................................................... 5, 6

*ResQNet.com, Inc. v. Lansa, Inc.*,
594 F.3d 860 (Fed. Cir. 2010) .............................................................. 7, 10, 12, 15

*Uniloc USA Inc. v. Microsoft Corp.*,
632 F.3d 1292 (Fed. Cir. 2011) ................................................................ 5, 17, 18

## TABLE OF AUTHORITIES
### (continued)

**Page**

*Versata Software, Inc. v. SAP Am., Inc.*,
717 F.3d 1255 (Fed. Cir. 2013) ........................................................................................... 6

*Virnetx, Inc. v. Cisco Sys., Inc.*,
767 F.3d 1308 (Fed. Cir. 2014) ........................................................................................... 6

### OTHER AUTHORITIES

Federal Rule of Civil Procedure 30(b)(6) ................................................................ 3, 12, 14, 20

Federal Rule of Evidence 403 ........................................................................................................ 1

Federal Rule of Evidence 702 ............................................................................................... 1, 4, 5

DLA PIPER LLP (US)
EAST PALO ALTO

WEST\263110203.1

-iii-
APPLE INC.'S NOM & *DAUBERT* MOT TO STRIKE KEARL REPORTAND
TESTIMONY; CASE NO. 13-CV-4700-EMC

**NOTICE OF MOTION AND MOTION**

TO ALL PARTIES AND THEIR ATTORNEYS OF RECORD:

NOTICE IS HEREBY GIVEN that on December 10, 2015, at 1:30 p.m., or as soon thereafter as counsel may be heard in Courtroom 5 of the above-titled court, located at 450 Golden Gate Avenue, San Francisco, CA 94102, Defendant Apple Inc. ("Apple") will and hereby does move the Court for an order striking the expert report of Plaintiff Aylus Networks, Inc.'s ("Aylus") damages expert, James Kearl, and precluding Dr. Kearl from testifying at trial.

This Motion is made pursuant to the Federal Rules of Evidence 403 and 702 and *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579 (1993), on the grounds that the testimony Aylus seeks to elicit from its damages expert is not relevant to any issue in this matter and is unreliable, incorrect, and unhelpful to the finder of fact.

This motion is based upon this Notice of Motion, the following Memorandum of Points and Authorities, the Declaration of Christine Corbett submitted in support of this motion, all matters as to which this Court may take judicial notice, all pleadings, papers and records on file in this action, and such oral argument as may be presented at the hearing on this matter.

**STATEMENT OF THE ISSUES TO BE DECIDED**

Whether the opinions of Aylus's damages expert, James Kearl, are unreliable, incorrect, and would be unhelpful to the finder of fact, and whether the Court should strike Dr. Kearl's expert report and preclude Dr. Kearl from testifying at trial regarding his improper opinions.

**MEMORANDUM OF POINTS AND AUTHORITIES**

**I.     INTRODUCTION**

Aylus is a failed technology company that never made, used or sold its own patented technology.  Aylus's patent-in-suit, U.S. Patent No. RE 44,412 (the "'412 patent"), recites a very specific, narrow way of streaming video from a remote server to a viewer's television or video monitor.  Notwithstanding the fact that no one – not Aylus, its customers or Apple – ever used the claimed technology to stream video, Aylus has elicited an opinion from its damages expert, Dr. Kearl, that Apple somehow owes Aylus the preposterous sum of ███████.  While Aylus may feel pressured to provide a windfall to its empty-handed investors, it is precluded as a matter of

1   law from doing so based on a damages theory, like Dr. Kearl's, that is neither tethered to relevant

2   facts, nor based on any reliable methodology.

3        Aylus's patent infringement claim against Apple accuses a specific and limited use of

4   Apple's "AirPlay" functionality.  AirPlay allows users of certain Apple products, such as iPads,

5   iPods, iPhones, and Macs, to select and display video, music, or photos on a television connected

6   to an Apple TV.  However, Aylus's infringement allegations are limited to using an iPad, iPod or

7   iPhone (not Macs) to stream (not mirror) video content (not any other type of content) that is

8   downloaded from the Apple iTunes Store (not any other source) to a television via an Apple TV.

9   Thus, for example, Aylus does not contend that a user who uses AirPlay to mirror what they are

10  viewing on their iPhone to their television infringes the patent, nor does Aylus accuse using

11  AirPlay to listen to music, view pictures, stream homemade video, or stream video from third

12  parties such as Netflix and Hulu.

13       AirPlay is just one of the hundreds of features offered by Apple on the accused iOS

14  devices (iPhones, iPads and iPods).  Moreover, the *accused* AirPlay functionality is just one of

15  the many uses of AirPlay.  As a result, under governing Federal Circuit precedent, Aylus cannot

16  base a damages claim on either the value of the iOS devices themselves, or even on the value of

17  AirPlay, and must instead correctly apportion the value of the *accused, allegedly infringing*

18  *aspects* of AirPlay's functionality from the rest of AirPlay, and from the value of the non-

19  infringing aspects of the accused iOS devices and Apple TVs.  But Dr. Kearl fails to do so.

20       Dr. Kearl's apportionment analysis is improper from beginning to end.  Amazingly, his

21  analysis begins with the alleged price of two *non-accused* products (one that never was sold, and

22  one that is not an Apple product) *that do not perform the allegedly infringing functions* – which

23  itself dooms the rest of his analysis.  Dr. Kearl then compounds this fundamental error by failing

24  to attempt to apportion out other non-patented features that are present in these non-accused, non-

25  infringing products.  While Dr. Kearl attempts to justify his unprecedented starting point as being

26  an allegedly "conservative" approach to calculating damages, this excuse is irrelevant because the

27  starting point is simply wrong and leads to highly inflated numbers that directly result from his

28  failure to properly and reliably apportion.

Specifically, Dr. Kearl opines that Apple should pay damages for both its Apple TV and iOS products.  Dr. Kearl's improper apportionment analysis for Apple TV starts by identifying a proposed (not actual) price for a never released Apple "███████████████████."  In addition to the fact this product never was sold and never had an actual price, this proposed product performed a function (██████) that is ***not*** accused of infringing Aylus's patent.  This fact is undisputed.  There is therefore no basis to use this product as the foundation of a damages analysis.

Similarly, for the accused iOS products, Dr. Kearl begins his apportionment analysis by identifying the price of a third party (non-Apple) application, AirParrot2, that not only has no connection to Apple or its products, but also does ***not*** practice the patented technology.  Again, this is undisputed.  There is therefore no basis to use this product as the foundation of a damages analysis.

Dr. Kearl's reliance on the prices of products that do not practice the claimed invention as the basis for his apportionment analysis – an analysis that is supposed to apportion the value of infringing features from the value of non-infringing features – is exactly the type of unsound methodology that the Court – as a gatekeeper – should exclude from presentation to the jury.

While Dr. Kearl's opinions should be stricken based on his improper and unreliable starting points alone, Dr. Kearl's failure to rely on sound economic and factual predicates pervades the rest of his analysis as well.  At every step, Dr. Kearl either fails to tie his analysis to any evidence, or engages in unreliable methodology, or both.  For example, Dr. Kearl relies on ████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████.  Nevertheless, Dr. Kearl uses this overbroad and ██████████ data (without any attempt to apportion out non-accused uses) as a purported means to further apportion the value of the allegedly infringing features of AirPlay.

As explained below, Dr. Kearl then proceeds to compound the errors of his already unsound methodology by attempting to further apportion the value of the accused functionality in

-3-

1  a series of steps that depend on unreliable evidence, fail to isolate the value of the claimed

2  invention, and are unconnected to any sound economic principle or methodology.

3         Dr. Kearl's opinions are contrary to Federal Circuit precedent requiring a discernable and

4  reliable methodology based upon relevant and reliable evidence.  The Court should strike Dr.

5  Kearl's report and preclude him from testifying at trial because his opinions fail to satisfy the

6  requirements for expert testimony as set forth in *Daubert* and Federal Rule of Evidence 702.

7  **II.    FACTUAL BACKGROUND**

8         Having abandoned the rest of its case in light of the invalidating prior art cited by Apple in

9  the pending *inter partes* review proceeding before the PTAB, Aylus now accuses Apple's AirPlay

10 functionality of infringing only dependent claims 2 and 21 of the '412 patent.  Apple's AirPlay

11 technology directs content (*e.g.*, audio, pictures, and video) that otherwise can be displayed on the

12 user's device (*e.g.*, an iPhone, iPad, iPod touch, MacBook, iMac) to a television via an Apple TV.

13 However, Aylus asserts infringement of the asserted claims ***only*** in the specific circumstance in

14 which video content from the Apple iTunes Store is directed to an Apple TV-connected TV using

15 certain iOS products.  Ex. A (Kearl Expert Report) at 6.[1]  As shown below, many common uses

16 of AirPlay are not accused of infringing the '412 patent:

| Apple TV/AirPlay Use Cases | Accused | Not Accused |
|---|---|---|
| Use an iOS device to display iTunes video content on Apple TV-connected TV | X | |
| Stream iTunes audio content from iOS device to Apple TV via AirPlay | | X |
| Stream iTunes video content from desktop computer to Apple TV via AirPlay | | X |
| Stream third party video content (e.g., Netflix, YouTube) from iOS device to Apple TV via AirPlay | | X |
| Stream third party audio content (e.g., Pandora) from iOS device to Apple TV via AirPlay | | X |
| Stream third party video content (e.g., Netflix, YouTube) from desktop computer to Apple TV via AirPlay | | X |
| Stream third party audio content (e.g., Pandora) from desktop computer to Apple TV via AirPlay | | X |
| Stream audio content to AirPlay-enabled speakers or stereos | | X |
| Stream audio to an AirPort Express via AirPlay | | X |
| Stream homemade videos from desktop computer to Apple TV via AirPlay | | X |
| Stream homemade videos from iOS device to Apple TV via AirPlay | | X |
| Stream photos from iOS device or desktop computer to Apple TV via AirPlay | | X |
| Mirror iOS device screen to Apple TV via AirPlay (e.g., video, audio, games, photos) | | X |
| Mirror desktop computer screen to Apple TV via AirPlay (e.g., video, audio, games, photos) | | X |

[1] Unless otherwise indicated, all exhibits cited herein are attached to the Declaration of Christine Corbett in Support of Apple's *Daubert* Motion to Strike the Expert Report of Plaintiff Aylus Networks, Inc.'s Damages Expert James Kearl and to Preclude Dr. Kearl from Testifying at Trial ("Corbett Decl."), filed with this motion.

1    **III.    LEGAL STANDARD**

2           The Court must exercise its gatekeeping obligation to ensure that Dr. Kearl's damages

3    testimony is reliable and tied to the relevant facts and circumstances of the particular case.

4    *Daubert v. Merrell Dow Pharms. Inc.*, 509 U.S. 579, 598 (1993); *Uniloc USA Inc. v. Microsoft*

5    *Corp.*, 632 F.3d 1292, 1318 (Fed. Cir. 2011); *Dynetix Design Solutions, Inc. v. Synopsis, Inc.*, No.

6    11-cv-05973 PSG, 2013 WL 4538210, at *2 (N.D. Cal. Aug. 22, 2013).  Federal Rule of

7    Evidence 702 requires that experts base opinions on sufficient facts or data, use reliable principles

8    and methods, and reliably apply the principles and methods to the facts of the case.  Rule 702

9    imposes a "special obligation upon a trial judge" to "ensure the reliability and relevancy of expert

10   testimony." *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 147, 152 (1999); *see also Daubert*,

11   509 U.S. at 589.  Vigilance in assessing the admissibility of expert testimony is critical because of

12   its potentially misleading and powerful influence on untrained jurors. *Daubert*, 509 U.S. at 595,

13   Fed. R. Evid. 702; *see also Daubert*, 509 U.S. at 590.  "This entails a preliminary assessment of

14   whether the reasoning or methodology underlying the testimony is scientifically valid and of

15   whether that reasoning or methodology properly can be applied to the facts in issue." *Daubert*,

16   509 U.S. at 592-93.

17          With respect to a patent case, an expert's damages theory must be based on "sound

18   economic and factual predicates." *LaserDynamics, Inc. v. Quanta Computer, Inc.*, 694 F.3d 51,

19   67 (Fed. Cir. 2012) (quoting *Riles v. Shell Exploration & Prod. Co.*, 298 F.3d 1302, 1311 (Fed.

20   Cir. 2002)).  The proponent of the expert has the burden of establishing the admissibility of the

21   expert's testimony. *Daubert*, 509 U.S. at 592 n. 10.  To properly carry this burden, the patentee

22   must sufficiently tie the expert testimony on damages to the facts of the case. *Uniloc*, 632 F.3d at

23   1315 (citing *Daubert*, 509 U.S. at 589).  "A court may conclude that there is simply too great an

24   analytical gap between the data and the opinion proffered." *Gen. Elec. Co. v. Joiner*, 522 U.S.

25   136, 146 (1997).  Although the Federal Circuit allows for "some approximation" in the

26   reasonable royalty context, this "does not negate the Federal Circuit's requirement of 'sound

27   economic and factual predicates' for that analysis." *Cornell Univ. v. Hewlett-Packard Co.*, No.

28   01-cv-1974, 2008 WL 2222189, at *2 (N.D.N.Y. May 27, 2008) (Rader, C.J., sitting by

1  designation) (citing *Riles*, 298 F.3d at 1311, and granting-in-part HP's *Daubert* motion).

2  "[W]hen claims are drawn to an individual component of a multi-component product, it is

3  the exception, not the rule, that damages may be based upon the value of the multi-component

4  product." *Virnetx, Inc. v. Cisco Sys., Inc.*, 767 F.3d 1308, 1326 (Fed. Cir. 2014) (citing

5  *LaserDynamics*, 694 F.3d at 67-68 ).  In these instances, "[a] patentee may assess damages based

6  on the entire market value of the accused product ***only*** where the patented feature creates the

7  basis for customer demand or substantially creates the value of the component parts." *Versata*

8  *Software, Inc. v. SAP Am., Inc.*, 717 F.3d 1255, 1268 (Fed. Cir. 2013) (emphasis added).  In the

9  absence of such a showing, principles of apportionment apply.  *Virnetx*, 767 F.3d at 1326.  To

10  properly apportion damages, no matter what the form of the royalty sought, a patentee:

11      must in every case give evidence tending to separate or apportion the defendant's
   profits and the patentee's damages between the patented feature and the

12      unpatented features, and such evidence must be reliable and tangible, and not
   conjectural or speculative; or he must show, by equally reliable and satisfactory

13      evidence, that the profits and damages are to be calculated on the whole machine,
   for the reason that the entire value of the whole machine, as a marketable article,

14      is properly and legally attributable to the patented feature.

15  *Id.* (quoting *Garretson v. Clark*, 111 U.S. 120, 121 (1884)).  Where an expert's underlying

16  methodology is unsound, a district court should exercise "its gatekeeping authority to ensure that

17  only theories comporting with settled principles of apportionment [are] allowed to reach the jury"

18  by striking those opinions.  *Virnetx*, 767 F.3d at 1328.

19  **IV.   DR. KEARL'S EXPERT REPORT SHOULD BE STRICKEN AND HE SHOULD**
   **BE PRECLUDED FROM TESTIFYING AT TRIAL BECAUSE HIS OPINIONS**

20  **ARE IMPROPER, UNSUPPORTED AND UNRELIABLE**

21  Dr. Kearl opines that Aylus is entitled to ▮▮▮▮▮▮ in damages from the date of the

22  hypothetical negotiation (August 2013) through March 2016 (time of trial) based on alleged

23  infringement of the accused Apple TV and iOS products.  Dr. Kearl's opinions should be stricken

24  because, at every step of his analysis, Dr. Kearl fails to tie the value of the patented feature to the

25  accused products <u>and</u> fails to properly apportion – all of which are important requirements of

26  patent damages law.

27  An appropriate damages analysis must include "well-documented economic evidence [that

28  is] closely tied to the scope of the claimed invention."  *Cornell Univ. v. Hewlett-Packard Co.*, 609

-6-

APPLE INC.'S NOM & *DAUBERT* MOT TO STRIKE KEARL REPORT AND
TESTIMONY; CASE NO. 13-CV-4700-EMC

F. Supp. 2d 279, 283 (N.D.N.Y. 2009) (granting JMOL for defendant and decreasing damages awarded by jury over 70%). The Federal Circuit has strongly cautioned district courts that there must be a clearly established and economically justified nexus between the value of the particular patented technology and the alleged damages suffered by the patentee. *See ResQNet.com, Inc. v. Lansa, Inc.*, 594 F.3d 860, 869 (Fed. Cir. 2010) ("[A] reasonable royalty analysis requires a court to hypothesize, not to speculate. . . . [T]he trial court must carefully tie proof of damages to the claimed invention's footprint in the market place.") (citation omitted); *Lucent Techs., Inc. v. Gateway, Inc.*, 580 F.3d 1301, 1338 (Fed. Cir. 2009) (rejecting expert's proffered royalty because the evidence showed that patented software feature was not the reason that consumers purchased the entire accused software product). Further, when evaluating damages for patent infringement, the Federal Circuit has been clear that expert testimony "requires sound economic proof of the nature of the market and likely outcomes with infringement factored out of the economic picture." *Grain Processing Corp. v. Am. Maize-Prods. Co.*, 185 F.3d 1341, 1350 (Fed. Cir. 1999); *see also ResQNet.com*, 594 F.3d at 869.

As established below, Dr. Kearl's opinions are not legally sufficient evidence of damages. The methodology he utilizes is fatally flawed at every step, yielding inflated and unreliable results. And in no way did he appropriately tie his damages to the allegedly infringing feature of the product or to economic realities of the marketplace, as Federal Circuit law requires.

### A.   Dr. Kearl Should Be Precluded From Testifying As To His Improper Opinions Regarding The Accused iOS Products

Dr. Kearl opines that Apple owes Aylus ███████ in damages relating to Apple sales of the accused iOS devices. Dr. Kearl reaches this conclusion by performing a five-step analysis, each step of which fails to comport with Federal Circuit requirements for reliability and sound methodology. Dr. Kearl's five steps are summarized in the following chart:

As established below, Dr. Kearl's incorrect $14.99 starting point is fatal to his entire iOS damages analysis, as he does nothing to determine or associate the value of the patented features of the device on which he bases his starting point, thereby (1) improperly relying on that device at all, and (2) improperly relying upon the entirety of the $14.99 price. Each subsequent step also is fatally flawed, either individually or when combined with other steps, as explained below.

    **1.**    <u>**Step 1**</u>**: Dr. Kearl's Inappropriate Starting Point For His iOS Damages Analysis Has No Tie To The Accused Functionality And Is Grounds Alone To Strike His Opinion**

Dr. Kearl begins his damages analysis for the accused iOS devices by identifying a third party application ("app") that was not developed by Apple and that does not (and is not even capable) of performing the accused functionality. This starting point cannot be any further from the Federal Circuit requirement that an appropriate damages analysis must include "well-documented economic evidence [that is] ***closely tied to the scope of the claimed invention***." *Cornell*, 609 F. Supp. 2d at 283 (emphasis added).

Specifically, Dr. Kearl begins with a $14.99 price of one "AirPlay like app" (AirParrot2) and then "***assumes*** that the value of AirPlay to those iOS users who use AirPlay is approximately $14.99." Ex. A (Kearl Expert Report) at 23 (emphasis added). Dr. Kearl's assumption, however, is not based on "sufficient facts or data," and certainly is not based on sound economic evidence (or even any evidence) that is tied to the scope of the claimed invention.

First, it is literally impossible to determine the value of the patented features from AirParrot2 since that product does not include the patented features.  For example, Dr. Kearl admits that AirParrot2 cannot be used on the accused iOS devices, which are a required element of the asserted claims.  Ex. B (Kearl Depo. Tr.) at 103:4-6 (████████████████████████ ██████████████████████████████).  Moreover, Aylus's technical expert – Dr. Schonfeld – is completely silent and offers no opinion regarding the purported technical comparability of AirParrot2 to the patented invention.  On the other hand, Apple's technical expert provides a wholly unrebutted opinion that "AirParrot is not comparable to the accused Apple products and accused AirPlay functionality for several reasons."  Ex. C (Polish Report at ¶¶ 321-331).  Accordingly, because AirParrot2 does not practice the asserted claims, and because AirParrot2 is not technically comparable to the accused functionality, it is literally impossible for Dr. Kearl to determine what value of the AirParrot2 is attributable to the claimed invention of the '412 patent.  Accordingly, any further attempt to apportion value based upon the AirParrot2 is necessarily wrong, as **none** of the value of the AirParrot2 app is attributable to the claimed invention.

Second, although nothing in AirParrot2 practices the claimed invention (so there is nothing to apportion out from features that are covered by the patent), Dr. Kearl makes **no attempt** to apportion out **any** of the non-patented features of AirParrot2, which further results in an highly inflated and unreliable starting point.  Rather, Dr. Kearl relies on the entire $14.99 market price of AirParrot2 even though the app cannot perform the accused functionality.  In this regard, Dr. Kearl admits that he performed no analysis to apportion the value of the allegedly "AirPlay like" aspect of AirParrot2 compared to non-accused functions, including technology offered by AirParrot2 that has nothing to do with the accused functionality.  For example, Dr. Kearl gave the following testimony concerning AirParrot2's patented "quick connect" technology:

████████████████████████████████████████████
████████████████████████████████████████████
██████████████████████



Ex. B (Kearl Depo. Tr.) at 102:4-8, 101:25-102:3.

Indeed, rather than perform an actual apportionment analysis as required, Dr. Kearl simply assumed that customers purchase AirParrot2 because it allegedly is like AirPlay.  In this regard, Dr. Kearl testified during deposition that "                                                                          

                                    " Ex. B (Kearl Depo. Tr.) at 101:9-15 (emphasis added).  This *presumption*, which is not tied to any facts or evidence, is the reason that Dr. Kearl chose not to apportion out the non-accused technologies.  *Id.* at 102:25-103:11.  This factually unsupported presumption is exactly the type of unreliable methodology that never should see a courtroom.  *See ResQNet.com, Inc.*, 594 F.3d at 869; *Grain Processing Corp.*, 185 F.3d at 1350; *Cornell*, 609 F. Supp. 2d at 283.

Third, Dr. Kearl improperly ascribes the entire $14.99 price of AirParrot2 as the "value of AirPlay to those iOS users who use AirPlay" even though Dr. Kearl admits that AirParrot2 cannot perform the AirPlay functions that form the heart of Aylus's infringement theory.  Ex. A (Kearl Expert Report) at 23.  For example, as discussed above, Dr. Kearl admits that AirParrot2 cannot be used on the accused iOS devices.  Ex. B (Kearl Depo. Tr.) at 103:4-6.  Dr. Kearl also admits that AirParrot2 cannot be used to stream iTunes Store video content.  *Id.* at 106:3-13.  And, Dr. Kearl admits that AirParrot2 was not developed by Apple.  *Id.* at 96:24-97:2.  Yet, despite the complete lack of connection between the price of AirParrot2 and the claimed invention, Dr. Kearl still uses the entire $14.99 AirParrot2 price as his starting point and testified he will tell the jury that the $14.99 starting point is proper.  *Id.* at 63:6-19; Ex. A (Kearl Expert Report) at 23, Table 3.

Fourth, AirParrot2 only is used with desktop and laptop computers, which are not accused in this case, and not with smartphones and tablets, which are accused in this case.  Ex. B (Kearl

1   Depo. Tr.) at 102:25-103:5; Ex. C (Polish Expert Report) at ¶¶317-318, 322.  Yet, Dr. Kearl

2   provides **no analysis** in support of his opinion that the price paid for AirParrot2 by desktop and

3   laptop computer users is in any way comparable to the value ascribed to the AirPlay feature by

4   Apple mobile device purchasers.  In fact, during deposition, Dr. Kearl admitted he performed no

5   analysis to determine this value other than relying on "▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮."  Ex. B (Kearl

6   Depo. Tr.) at 104:24-106:2.

7          Put simply, Dr. Kearl's starting point for his damages analysis for the accused iOS devices

8   could not be further from what is required under basic damages law.  AirParrot2 does not perform

9   either the claimed or the accused functionality, Dr. Kearl did nothing to determine the value of

10  the allegedly "AirPlay-like" aspect of AirParrot2, he did nothing to apportion out value of the

11  non-claimed functionality of AirParrot2, and he did nothing to consider the fact that AirParrot2 is

12  used only with desktop and laptop computers and not with the accused mobile devices.  These

13  fundamental deficiencies in Dr. Kearl's methodology mandate the exclusion of Dr. Kearl's

14  opinion.

15          **2.      The Remaining Steps Of Dr. Kearl's Damages Analysis For iOS
                       Devices Also Are Unreliable And Not Tied To Any Facts Of This Case**

16          While the Court would be fully justified in excluding Dr. Kearl's testimony based solely

17  on the improper and unreliable starting point of his analysis, Dr. Kearl's failure to rely on sound

18  economic principles runs through each of the other steps of his iOS product damages analysis and

19  provides further bases for excluding his testimony.

20          **a.      Step 2: Improper Apportionment Based On The Unaccused
                       AirPlay Mirroring Functionality**

21

22          The next improper step performed by Dr. Kearl is taking the $14.99 starting point and

23  multiplying that amount by ▮▮% based on ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ that

24  show that ▮▮▮▮ of buyers rate ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

25  ▮▮▮▮▮▮▮▮▮▮"  Ex. A (Kearl Expert Report) at 24.  Specifically, Dr. Kearl states:

26          Based on Apple's ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

27          ▮▮▮▮▮▮▮▮  While I understand that the mirroring feature of AirPlay is not
            accused of infringement, Apple's ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

28

1

2  *Id.*  Thus, despite acknowledging that AirPlay *mirroring* is *not accused* of infringement in this

3  case, Dr. Kearl uses survey results regarding *mirroring* to determine the value of the accused

4  functionality.  Ex. B (Kearl Depo. Tr.) at 9:2-6 (agreeing that AirPlay mirroring functionality is

5  not accused).  Dr. Kearl's reliance on irrelevant survey results flies in the face of Federal Circuit

6  guidance that strongly cautions district courts to ensure that a clearly established and

7  economically justified nexus exists between the value of the particular patented technology and

8  the alleged damages suffered by the patentee.  *See ResQNet.com*, 594 F.3d at 869 ("[T]he trial

9  court must carefully tie proof of damages to the claimed invention's footprint in the market

10 place.").

11       Dr. Kearl justifies his reliance on the irrelevant mirroring statistics by stating that "

12

13                                                "  Ex. A (Kearl Expert Report) at 24.  To reach this

14 conclusion (and, therefore justify his reliance on statistics relating to unaccused functionality), Dr.

15 Kearl states that "Apple's

16                                                                                                              ."  *Id.*

17

18

19                                                       .  Ex. D (Biderman Depo. Tr.) at 72:2-5.  And, as

20 established below in connection with Step 3 of Dr. Kearl's analysis, the

21

22

23

24                                   Citing unreliable and overbroad              statistics as the

25 justification for using, as a linchpin of his damages analysis, survey results concerning an

26 unaccused              function finds no basis in the law, in or any other recognized and accepted

27 form of damages methodology, and Aylus cites no such basis.

28

**b.**      **Step 3: Dr. Kearl's Unsupported AirPlay Video Apportionment**

The third step in Dr. Kearl's iOS damages analysis is to multiply the end result of Step 2 (*i.e.,* ███████████████████) by the percentage of AirPlay sessions that are "████" sessions, or ███████ Ex. A (Kearl Expert Report) at 25.  Dr. Kearl improperly relies on Apple's ████████ ██████████████████████████████████.  However, Dr. Kearl once again made no attempt to isolate the accused functionality at this step of his opinion, and, instead continued to use inflated, unreliable, and untested data points, as explained below.

<u>First</u>, Apple's █████████████████████████████████.[2]  The use of AirPlay to stream non-iTunes Store video content is not accused of infringement.  For example, the common use case of AirPlaying video content from Netflix and Hulu are outside the scope of the alleged infringement.  Yet, Apple's ███████████████████████████████████████ █████████████████████████████████████████████ █████████████████████████████████████████████ █████████████████████████████████████ ███████" Ex. A (Kearl Expert Report) at 21.  This statement – which completely fails to account for any of the unaccused uses in the ███████ category – underscores Dr. Kearl's utter failure to make any effort to determine all of the unaccused uses of AirPlay that are included in the ███████ category and then apportion them out.  Such a slipshod approach bears no resemblance to a scientific or professional approach to damages calculation, and his failure to apportion results in Dr. Kearl's unreliable, unsupported, and completely speculative assertions that:  (1) ███ represents the video usage that is relevant to the allegedly infringing uses (which it does not); and (2) ██████████████████████████████ █████████████████" which, as discussed above, is the major assumption that Dr. Kearl makes in Step 2.

<u>Second</u>, the ████████████████████████████████.  Aylus's technical expert – Dr. Schonfeld – testified that his infringement analysis is limited to the

---

[2] ███████████████████████.

1   first AirPlay session of a given piece of purchased iTunes video content.  Ex. F (Schonfeld Depo.

2   Tr.) at 196:17-198:9.  For example, if a user purchases "The Lion King" and AirPlayed that

3   movie twenty times, the alleged infringement is limited to the first AirPlay session, yet the █████

4   ███████ include all of the AirPlay sessions.  Dr. Kearl admits that he did nothing to determine

5   what proportion of the ████████████ related to first versus subsequent AirPlay sessions:

6

7

8

9

10

11   Ex. B (Kearl Depo. Tr.) at 87:9-11.  This confirms, once again, for this additional reason that the

12   

13   ███ used by Dr. Kearl is unreliable.

14        Third, ████████████████████████████████████████████.  For example, ███████

15   ██████████████████████, which are not accused of infringement.  Ex. G (Weber Expert

16   Report) at 27-28; Ex. B (Kearl Depo. Tr.) at 80:13-19.  Dr. Kearl did nothing to determine what

17   proportion of the ████████ was reported from non-accused devices.  The ████████████████

18   ████████████████████████████.  Ex. E (████ Data) at APL-

19   AYLUS_01281467 ████████████████████████████████████████████████████████

20   ████████████████████████████████████████████████████████████

21   ████████████; Ex. B (Kearl Depo. Tr.) at 80:1-12.  Dr. Kearl also did

22   nothing to determine what portion of the data relate to these irrelevant entries.  Thus, this is yet a

23   third reason why the ████ number used by Dr. Kearl is unreliable.

24        Fourth, Apple's ████████████████████████.  Aylus took the deposition of an

25   Apple Rule 30(b)(6) witness who testified regarding the ████████████████.  That witness, Mr.

26   David Biderman, testified that █████████████████████████████████████████

27   █████████████████████████.  See Ex. D (Biderman Depo.

28   Tr.) at 72:2-5, 73:1-2, 74:8-13 █████████████████████████████████

1

2 ██████████████████████████████████████████████████).  Yet,

3 despite this evidence, Dr. Kearl relies on the usage statistics, and even goes so far as to state that

4 ████████████████████████████████████████████████████.

5 Ex. A (Kearl Expert Report) at 25.  Dr. Kearl's statement, however, is based entirely on

6 conjecture and he was unable to identify ███████████████████████

7 ████████████

8

9

10

11

12

13

14 Ex. B (Kearl Depo. Tr.) at 69:20-70:2.

15    The fact that Dr. Kearl did absolutely nothing to isolate the accused functionality within

16 the ████████████████████████████████████████████

17 ███████████████████████████████████, renders his

18 opinion unreliable and violates the Federal Circuit mandate that damages opinions rely on "sound

19 economic and factual predicates."  *See ResQNet.com, Inc.*, 594 F.3d at 869; *Grain Processing

20 Corp.*, 185 F.3d at 1350; *Cornell*, 609 F. Supp. 2d at 283.

21    **c.    Step 4: Dr. Kearl Inappropriately Assumes That Active iTunes
       Accounts Indicate Use Of AirPlay**

22    Dr. Kearl's fourth step is to then multiply the output from Step 3 (*i.e*

23 ███) by ███████████████████████████████████████.

24 Ex. A (Kearl Expert Report) at 25.  Specifically, Dr. Kearl determined that ████████████

25 █████████████████████████ and, therefore, these owners "would be less likely to

26 practice the accused method."  *Id.* at 21-22.  As a result, Dr. Kearl concluded that ████ of iOS

27 device owners who have an active iTunes account should be considered when determining the

28

value of the accused functionality.  Dr. Kearl does so even though there is no analysis or evidence that establishes (or even suggests) that all iOS device owners who have an active iTunes account use AirPlay, much less use AirPlay in the limited allegedly infringing manner.  Ex. B (Kearl Depo. Tr.) at 141:3-142:11.  Rather, Dr. Kearl simply *assumes* that for *all*

█████████████████████████.  As a consequence, multiplying by ████████████

████████████████████████, based upon any evidence, facts or statistics, the value of AirPlay video to "AirPlay video from iTunes."  Thus, Dr. Kearl's use of the ███ figure is highly unreliable and results in an inflated damages calculation that is not grounded in any sound methodology.

        **d.**     <u>**Step 5**</u>**: Dr. Kearl's ██████████████████ Is Fatally Flawed And Taints His Entire Analysis**

As the final step of his apportionment analysis, Dr. Kearl takes the output of his Step 4 ██████████████) and applies a █████████████████████████████████████████

████████████) to reflect what he opines would be the result of the hypothetical negotiation.  Ex. A (Kearl Expert Report) at 25.  This results in Dr. Kearl's ultimate ███████████████ for the accused iOS devices.

In performing this step, Dr. Kearl relies on a ████████████████████████████████

████████████ and, therefore, access to millions of customers (in which ████████████

████████).  There simply are no facts, case law, economic studies, or articles in Dr. Kearl's report that support his conclusion that Apple's █████████████████████████ are in any way analogous to a patent license negotiation (such as the hypothetical license negotiation here between Apple and Aylus), or that Apple or Aylus would have employed it in their negotiation.  In fact, Dr. Kearl admits that this ████████████ has nothing to do with the negotiation of a patent license agreement.

████████████████████████████████████

DLA PIPER LLP (US)
EAST PALO ALTO

WEST\263110203.1              APPLE INC.'S NOM & *DAUBERT* MOT TO STRIKE KEARL REPORT AND TESTIMONY; CASE NO. 13-CV-4700-EMC



Ex. B (Kearl Depo. Tr.) at 151:10-21.  Dr. Kearl also admits that Apple's iOS ▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ (which have nothing to do with a bare patent license that would be the subject of the hypothetical negotiation in this case) is the only basis for his application of the ▮▮▮▮▮▮▮▮▮▮▮▮▮. *Id.* at 148:22-149:1 ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮).

Dr. Kearl's ▮▮▮▮▮▮▮▮▮▮ is devoid of any facts relating to this case and is indistinguishable from the 25% rule of thumb that has been "emphatically rejected" by the Federal Circuit.  In *Uniloc*, the Federal Circuit held that:

> [A]s a matter of Federal Circuit law that the 25 percent rule of thumb is a fundamentally flawed tool for determining a baseline royalty rate in a hypothetical negotiation. Evidence relying on the 25 percent rule of thumb is thus inadmissible under Daubert and the Federal Rules of Evidence, ***because it fails to tie a reasonable royalty base to the facts of the case at issue.***

*Uniloc*, 632 F.3d at 1315 (emphasis added).

Likewise, in *LaserDynamics*, the Federal Circuit rejected a similar one-third apportionment by a damages expert as lacking "economic analysis to quantitatively support" and likened it to the 25% rule that it has squarely rejected.  *See, e.g.*, *LaserDynamics*, 694 F.3d at 69 ("This complete lack of economic analysis to quantitatively support the one-third apportionment echoes the kind of arbitrariness of the '25% Rule' that we recently and emphatically rejected from damages experts, and would alone justify excluding Mr. Murtha's opinions in the first trial."); *Dynetix*, 2013 WL 4538210, at *4-5 (excluding expert testimony on royalty rate that began from a starting point of a 50/50 split because the expert's methodology was "indistinguishable from 25%

1   rule"); *Oracle Am., Inc. v. Google Inc.*, 798 F. Supp. 2d 1111, 1119-21 (N.D. Cal. 2011)

2   (excluding testimony based on Nash Bargaining Solution because it "would invite a miscarriage

3   of justice by clothing a fifty-percent assumption in an impenetrable façade of mathematics").

4         Here, not only is the ███████ something used in the context of ██████████ rather

5   than a patent license, Dr. Kearl's justification for its application here is not grounded in any fact

6   and actually makes no sense.  In particular, in asserting that ████████████████████████

7   ████████████████████████████████████████████████████████████████████

8   ████████████████████████████.  Ex. A (Kearl Expert Report) at 35-36.  However, while

9   Dr. Kearl is certainly correct that Aylus is truly "passive" in the hypothetical negotiation between

10  Aylus and Apple – as Aylus merely provides Apple a bare patent license in that transaction –

11  there is no basis for Dr. Kearl to call Apple "passive" with respect to ████████████████

12  ███████.  In this regard, Apple provides substantial value to its ███████████, including, for

13  example, ████████████████████████████████████████████████████████████████

14  ████████████████████████████████████████████████████████████████████

15  ████████████████████████████████████████████████ Ex. H (Malackowski Expert

16  Report) at 67.

17        As stated clearly in Federal Circuit precedent, the use of a rule of thumb bargaining split

18  with "no relation to the facts of the case" is "arbitrary, unreliable, and irrelevant" and "[t]he use

19  of such a rule fails to pass muster under *Daubert* and taints the jury's damages calculation."

20  *Uniloc*, 632 F.3d at 1318; *see also LaserDynamics*, 694 F.3d at 69.  As such, Dr. Kearl's arbitrary

21  application of a ███████████████████████ that has no relation to the facts of the case

22  taints his entire damages analysis and renders it arbitrary, unreliable, and irrelevant.  For this

23  reason, and the other reasons stated above with respect to the other steps of his analysis, Dr.

24  Kearl's entire iOS damages analysis should be excluded and he should be precluded from

25  testifying at trial.

26      **B.**     **Dr. Kearl Should Be Precluded From Testifying As To His Improper**
                **Opinions Regarding the Accused Apple TV Products**

27

28        Dr. Kearl reaches his ultimate opinion that Apple owes Aylus ███████████ in damages

relating to Apple's sale of accused Apple TVs by conducting six steps, each of which fails to comport with Federal Circuit requirements for reliability and sound methodology.  Dr. Kearl's six steps are summarized in the following chart:



As established below, Dr. Kearl's starting point of ▮ is fatal to his entire Apple TV damages analysis, as he does nothing to determine or associate the value of the patented features of the device on which he bases his starting point, thereby (1) improperly relying on that device at all and (2) improperly relying upon the entirety of the ▮ price.  Each subsequent step also is fatally flawed, either individually or when combined with other steps, as explained below.

### 1.   Step 1: Dr. Kearl's Improper Reliance On A Target Selling Price of The "▮"

Much like his analysis regarding the accused iOS products, Dr. Kearl begins his royalty analysis for the accused Apple TVs by selecting the price of a "product" that has ***nothing*** to do with the accused functionality.  Specifically, Dr. Kearl starts his Apple TV damages analysis with a ▮ projected price of a potential product that Apple once considered known as the "▮ ▮."  As Dr. Kearl admits, the ▮ never was sold by Apple.  Ex. B (Kearl Depo. Tr.) at 51:19-25.  Even more important, the ▮ was not intended to (and could not) perform the accused functionality.  *Id.* at 211:6-21.  Specifically, ▮ . Ex. H

1   (Malackowski Expert Report) at 64.  Apple's Rule 30(b)(6) deponent, Jai Chulani, testified that

2   the contemplated device was simply intended to ████████████████████████████████████

3   ████████████████████████████████.  Ex. I (Chulani Depo. Tr.) at 144-147; Ex. H

4   (Malackowski Expert Report) at 64.  Put simply, the "████████████████████████████

5   ████████████ – an undisputable unaccused feature.

6          As with Dr. Kearl's improper starting point for the iOS products, there is simply no way

7   to determine the value of the patented features in the ████████████████ since that

8   contemplated product would not have included the patented features.  In other words, *100%* of the

9   value of the ████████████████████ features are attributable to features not related to the

10  Aylus patent.  As such, Dr. Kearl's starting point for the accused Apple TVs is in no way tied to

11  the accused functionality.  For these reasons alone, Dr. Kearl's entire damages analysis for the

12  accused Apple TVs is fatally unreliable, inflated and should be stricken.

13         Moreover, Dr. Kearl ascribes the entire $██ purported value of the ██████████

14  ██████ as "the market value of AirPlay functionality."  Ex. A (Kearl Expert Report) at 20.  Dr.

15  Kearl does so without any analysis or any attempt to apportion out the non-patented features, such

16  as mirroring.  This failure also is fatal to Dr. Kearl's analysis as the ████████████████

17  ████████████████████████████████ – an unaccused function.

18         In short, Dr. Kearl begins his analysis with the $██ purported "price" of the ████

19  ████████████ without being able to (or even trying to) tie it to the claimed invention, and

20  without attempting to allocate out any non-patented features.  For this reason alone, because Dr.

21  Kearl's entire damages analysis is premised upon this $██ starting point, his opinions regarding

22  the accused Apple TVs should be stricken.

23         **2.      The Remaining Steps Of Dr. Kearl's Analysis Are Equally Flawed**

24         **a.      <u>Step 2</u>: Dr. Kearl's Improper Adjustment For AirPlay Video Is
                 Based Upon Unreliable Evidence**

25

26         Dr. Kearl next multiplies the $██ proposed selling price of the "██████████████

27  ██████" by the portion of total AirPlay sessions that are "████" sessions, or ██% to arrive at

28  approximately ██ for the "value attributed to AirPlay video usage."  Ex. A (Kearl Expert Report)

-20-

at 20-21.  For all the same reasons identified in Section IV.A.2.b above relating to Dr. Kearl's analysis of the accused iOS products, Dr. Kearl's application of the ██% number is incorrect, unsupportable, unreliable and leads to an inflated damages calculation, and therefore must be excluded.

**b.      Step 3: Dr. Kearl's Improper Adjustment For iTunes Accounts**

Dr. Kearl next proceeds to repeat the same errors he made in relation to the accused iOS devices, by multiplying the output of Step 2 ████ by the █████████████████ ████████████████████████████████████ Ex. A (Kearl Expert Report) at 21-22.  For all of the same reasons discussed above in Section IV.A.2.c, Dr. Kearl's use of the ██% number is incorrect, unsupportable, unreliable and leads to an inflated damages calculation and therefore must be excluded.

**c.      Step 6: Dr. Kearl's ████████████████ Is Fatally Flawed And Taints His Entire Analysis**

As Dr. Kearl did in his analysis of the accused iOS products, for the accused Apple TVs, Dr. Kearl once again inappropriately applies the █████████████████████████ ███████.  For all of the same reasons discussed above in Section IV.A.2.d above, Dr. Kearl's application of the ████████████ is incorrect, unsupportable, unreliable and leads to an inflated damages calculation and therefore must be excluded.

## V.    CONCLUSION

For all of the foregoing reasons, Apple respectfully requests that the Court exercise its required "gatekeeper" duty by granting Apple's *Daubert* motion and striking Dr. Kearl's damages expert report and precluding Dr. Kearl from testifying at trial.

1                                     DLA PIPER LLP (US)

Dated:  October 19, 2015

2

3                          By: */s/ Christine K. Corbett*

4                                 MARK D. FOWLER
                                CHRISTINE K. CORBETT

5                                 ROBERT BUERGI
                                ROBERT WILLIAMS

6                                 ERIK R. CORBETT
                                JONATHAN HICKS

7                                 Attorneys for Defendant
                                Apple Inc.

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

-22-