UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| AYLUS NETWORKS, INC., | Case No. 13-cv-04700-EMC |
| Plaintiff, | |
| v. | **ORDER DENYING DEFENDANT'S MOTION FOR ATTORNEY'S FEES** |
| APPLE INC., | Docket No. 257 |
| Defendant. | |

## I.  INTRODUCTION

Plaintiff Aylus Networks, Inc. filed the instant suit against Defendant Apple, Inc., alleging that Apple's AirPlay feature infringed claims 2 and 21 of U.S. Patent No. RE44,412 ('412 patent). *See* Docket No. 37 (Second Amended Complaint) (SAC) at ¶ 11.  The '412 patent describes a media streaming architecture that allows a user to coordinate the transport of media content from an internet-based media server to a physically proximate media renderer.  *Id.* at ¶ 12.

On January 21, 2016, the Court granted Apple's motion for summary judgment, finding non-infringement.  Docket No. 245 (Summary Judgment Order) (Ord.).  Based on the claim language, the patent specification, Aylus's preliminary response to Apple's *inter partes* review petition of the '412 patent, and the Patent Trial and Appeal Board's (PTAB) adjudication of Apple's petition, the Court found that claims 2 and 21 require that only the Control Point Proxy (CPP) logic negotiates media content delivery, in contrast to claims 1 and 20 which require that both the CPP and Control Point (CP) logic are invoked to negotiate media content delivery.  *Id.* at 10.  As AirPlay involved steps in which the CP logic was invoked to negotiate media content delivery, the Court found that there was no infringement, entitling Apple to summary judgment. *Id.* at 12.

United States District Court
For the Northern District of California

1   Apple now moves for attorney's fees under the Patent Act, which permits "[t]he court in

2   exceptional cases [to] award reasonable attorney fees to the prevailing party."  35 U.S.C. § 285;

3   Docket No. 257 (Mot.).  In total, Apple requests attorney's fees in the amount of $2,009,797.80

4   and nontaxable costs in the amount of $23,480.81 for work performed after May 29, 2015.

5   Apple's motion came on for hearing before the Court on March 10, 2016.  For the reasons stated

6   below, the Court **DENIES** Apple's motion for attorney's fees.

7   ## II.    BACKGROUND

8   The '412 patent describes two scenarios, one which involves three primary components –

9   the Control Point (CP), the Media Server (MS), and the Media Renderer (MR) – and one which

10   involves four primary components – the CP, MS, MR, and the Control Point Proxy (CPP).  In the

11   first scenario, the CP queries the MS for a directory of content, and negotiates content delivery

12   within the MS, including instructing the MS to deliver content to the MR.  Docket No. 183

13   (Buergi Dec.), Exh. 6 (IPR Decision) at 4-5.  The CP also negotiates media rendering with the

14   MR, instructing the MR to start expecting content from the MS and to present such.  *Id.* at 5.  The

15   MS then delivers media content to the MR.  *Id.*  In the second scenario, the CP is located in a wide

16   area network via the "Service Provider," while the CPP is within the "User Premises."  *Id.* at 5.

17   There, "[t]he CP communicates with the MS, the CPP communicates with the MR, and the CP and

18   CPP communicate with each other."  *Id.* at 5-6.

19   At issue in this litigation were dependent claims 2 and 21.  Claim 2 depends from claim 1,

20   while claim 21 depends from claim 20.  In relevant part, claim 1 is:

22   [a] method of controlling and delivering media content from a media
      server (MS) to a media renderer (MR) utilizing a wide area network
23   for control, comprising the acts of . . . invoking the CPP logic and
      the CP logic to cooperatively negotiate media content delivery
24   between the MS and the MR if one of the MS and MR are not in
      communication with the UE [user endpoint] via a local wireless
25   network . . . .

26   Buergi Dec., Exh. 1 ('412 Patent) col. 24 ll. 37-39, 58-61.  Claim 2, in turn, is "[t]he method of

27   claim 1, wherein the CPP logic is invoked to negotiate media content delivery between the MS

28   and the MR if the MS and MR are both in communication with the UE (user endpoint) via a local

1    wireless network." *Id.* at col. 24 ll. 64-67.

2         Similarly, Claim 20 is:

3

4         [a] method of controlling and delivering media content from a media
          server (MS) to a media renderer (MR) utilizing a wide area network
5         for control, where a user endpoint (UE) is provisioned with control
          point proxy (CPP) logic that includes (i) logic to negotiate media
6         content delivery with at least one of the MS and the MR, (ii) logic to
          cooperate with network control point (CP) logic to negotiate media
7         content delivery between the MS and the MR, and (iii) video play
          controls to control a presentation of content provided by the MS and
8         rendered by the MR, wherein the CPP logic resides in the UE and
          serves as a first proxy, comprising the acts of . . . invoking the CPP
9         logic and the CP logic to cooperatively negotiate media content
          delivery between the MS and the MR if one of the MS and MR are
10        not in communication with the UE via a local wireless network; and

11   *Id.* at col. 25 ll. 55-65, col. 26 ll. 8-11.  Claim 21, like claim 2, is "[t]he method of claim 20,

12   wherein the CPP logic is invoked to negotiate media content delivery between the MS and the MR

13   if the MS and MR are both in communication with the UE via a local wireless network."  *Id.* at

14   col. 26 ll. 14-17.

15        Apple filed a Petition for *inter partes* review of all claims (*i.e.*, claims 1-33) of the '412

16   patent, arguing that the claims were obvious over prior art, specifically the UPnP (Universal Plug

17   and Play) Design book.  IPR Decision at 2-3.  In its preliminary response to Apple's Petition,

18   Aylus explained that the challenged claims require "determining the 'network context' of the UE

19   (*i.e.*, the networks available to the UE) and the 'network connectivity' of the MS and MR (*i.e.*, the

20   networks through which the UE can communicate with the MS and MR).  Buergi Dec., Exh. 4

21   (IPR2014-01565 Resp.) at 4; Exh. 5 (IPR2014-01566 Resp.) at 4.  For example:

22

23        Specifically, for claims 1 and 20, if . . . it is determined that "one of
          the MS and MR are not in communication with the UE via a local
          wireless network" the "CPP logic and the CP logic are both
24        invoked["] and will "cooperatively negotiate media content delivery
          between the MS and the MR."  If, however, "the MS and MR are
25        both in communication with the UE via a local wireless network,
          then **only** "the CPP is invoked to negotiate media content delivery
26        between the MS and the MR."  [Claims 2 and 21].

27   IPR2014-01565 at 34-35 (emphasis added); IPR2014-01566 at 33 (emphasis added); *see also*

28   IPR2014-01565 Resp. at 4; IPR2014-1566 Resp. at 4 (if neither (or both) the MS or the MR is in

United States District Court
For the Northern District of California

United States District Court
For the Northern District of California

1    communication with the UE via a local wireless network, "the challenged dependent claims

2    require that only the control point logic (or only the control point proxy logic) be invoked . . . .").

3    Thus, Aylus argued that "the challenged claims require selectively invoking the CP logic and/or

4    CPP logic based on whether the MS and/or MR can communicate with the UE through the local

5    network." IPR2014-01565 Resp. at 4; IPR2014-1566 Resp. at 4.  The purpose of this selective

6    invocation based on what network is available is "to reduce the 'wireless spectrum-consuming

7    communications between the CP, media servers and media renderers." IPR2014-01565 Resp. at

8    35; *see also* IPR2014-01566 Resp. at 35 (explaining that the UPnP "fail[s] to disclose at least two

9    limitations of each of the challenged claims: provisioning a serving node in the wide area network

10   with CP logic; and determining a network context of the UE and a network connectivity of the MS

11   and MR in order to choose the least-cost routing for negotiating media content delivery.").[1]

12          The Patent Trial and Appeal Board (PTAB) initiated review of claims 1, 3, 5-20, 22, and

13   24-33, but not claims 2, 4, 21, and 23.  IPR Decision. at 2.  For the claims that the PTAB instituted

14   *inter partes* review, the PTAB found that Apple would likely prevail with respect to those claims

15   being obvious over the UPnP Design book.  *Id.* at 14.  However, with respect to dependent claims

16   2, 4, 21, and 23, the PTAB explained that Apple's Petition had relied on the same evidence to

17   show that the UPnP design met the limitation of claims 1 and 20 (which require that the CP and

18   CPP logic cooperatively negotiate media content delivery between the MS and MR) as it did to

19   show that the UPnP design met the limitations of claims 2 and 21.  *Id.* at 17-18.  In short, the

20   PTAB found that  "[i]t [wa]s unclear from the Petition how UPnP design allegedly meets the

21   *different* limitations of dependent claims 2 [and] 21 . . . in which . . . the CPP logic *exclusively*

22   handles the negotiation of media content delivery between the MS and MR."  *Id.* at 18 (emphasis

23   added).

24          Following the PTAB's decision, on May 29, 2015, Aylus dismissed with prejudice its

25   _____

26   [1] Aylus argues that this key purpose of reducing use of the wireless spectrum-consuming
     communications between the CP, media servers, and media renderers supports Aylus's argument

27   that only the CPP is required to be invoked, but the CP can still be involved.  Docket No. 260
     (Opp.) at 9.  This purpose is not at-odds with the Court's construction of claims 2 and 21; by only

28   involving the CPP, claims 2 and 21 eliminate the wireless spectrum-consuming communication
     between the CP, MS, and MR.

United States District Court
For the Northern District of California

infringement claims except as to dependent claims 2 and 21. Docket No. 131. The parties then moved for summary judgment in October 2015, with Apple asserting that it was entitled to summary judgment of non-infringement because it did not practice the limitation "The CPP is invoked to negotiate media content delivery between the MS and the MR," as the CP was also involved in media content delivery. Docket No. 182 (Apple MSJ) at 5. Aylus in turn argued that barring any involvement by the CP logic would improperly add a negative limitation on the claim. Docket No. 205-4 (Aylus MSJ Opp.) at 3. This was the first time the parties ever asked the Court to construe the claim term. *See* Apple MSJ at 5-6.

The Court ultimately agreed with Apple, holding that claims 2 and 21 should be read as requiring that *only* the CPP logic be invoked to negotiate media content delivery, whereas AirPlay operated by using both the CPP logic and the CP logic to negotiate media content delivery. Ord. at 6. In so ruling, the Court looked at the claim language, finding that the independent and dependent claims were distinguishable by whether both the CPP logic and the CP logic were invoked to negotiate media content delivery (independent claims 1 and 20) or if only the CPP logic was invoked to negotiate media content delivery (dependent claims 2 and 21), depending on whether the MS and MR are in communication with the UE. *Id.* at 7. The Court explained that to read dependent claims 2 and 21 as encompassing both the invocation of CPP logic only and the invocation of CPP logic and CP logic would render the distinction meaningless. *Id.*

The Court further found that this distinction was supported by the patent specification, as well as Aylus's preliminary response to Apple's Petition for *inter partes* review. *Id.* at 8-9. For example, Aylus had explained that "the challenged claims require selectively invoking the CP logic and/or CPP logic based on whether the MS and/or MR can communicate with the UE through the local network." IPR2014-01565 Resp. at 4; IPR2014-1566 Resp. at 4. Thus, for claims 1 and 20, if either the MS or MR are not in communication with the UE via a local wireless network, then both the CPP logic and CP logic are invoked and will cooperatively negotiate media content delivery between the MS and the MR. But if "the MS and MR are both in communication with the UE via a local wireless network, then **only** the CPP is invoked to negotiate media content delivery between the MS and the MR." IPR2014-01565 at 35 (emphasis added); IPR2014-01566

United States District Court
For the Northern District of California

1   at 33 (emphasis added).  Relying on this distinction, the PTAB had denied Apple's Petition for

2   *inter partes* review of dependent claims 2 and 21 because Apple had relied on the same evidence

3   to show the UPnP design met all of the claims' limitations, even though the limitations of claims 1

4   and 20 were different from claims 2 and 21.  IPR Decision at 18.

5        During the hearing, Aylus attempted to argue that even if the claim requires that only the

6   CPP logic is invoked to negotiate media content delivery, the CP logic can be involved as a

7   "passive" actor while the CPP is the exclusive active agent.  *See* Docket No. 232 at 46:23-47:10.

8   However, the Court found that even accepting this argument, Aylus's argument that the CP was

9   not invoked during AirPlay was "at odds with the testimony of Aylus's own expert," who had

10  testified that steps which *only* required action by the CP were part of the negotiation of media

11  content delivery.  Buergi Dec., Exh. 8 at 139:3-17, 139:22-141:12, 141:17-142:17, 142:23-144:1,

12  152:3-13.  Thus, the Court determined that Apple AirPlay did not infringe on dependent claims 2

13  and 21, entitling Apple to summary judgment.

14  ## III.   DISCUSSION

15  A.   Legal Standard

16       35 U.S.C. § 285 states: "The court in exceptional cases may award reasonable attorney fees

17  to the prevailing party."  As defined by the Supreme Court, "exceptional" is defined by its

18  ordinary meaning, *i.e.*, "uncommon, rare, or not ordinary."  *Octane Fitness, LLC v. ICON Health*

19  *& Fitness, Inc.*, 134 S. Ct. 1749, 1756 (2014) (internal quotations omitted).  Thus, an

20  "'exceptional' case is simply one that stands out from others with respect to the substantive

21  strength of a party's litigating position (considering both the governing law and the facts of the

22  case) or the unreasonable manner in which the case was litigated."  *Id.*  The district court "may

23  determine whether a case  is 'exceptional' in the case-by-case exercise of their discretion,

24  considering the totality of the circumstances."  *Id.*  For example, the district court "could consider

25  a 'nonexclusive' list of 'factors,' including frivolousness, motivation, objective unreasonableness

26  (both in the factual and legal components of the case) and the need in particular circumstances to

27  advance considerations of compensation and deterrence."  *Id.* at 1756 fn. 6.  The district court

28  should not, however, use "sanctionable conduct" as the appropriate benchmark; instead, "a district

court may award fees in the rare case in which a party's unreasonable conduct--while not necessarily independently sanctionable--is nonetheless so 'exceptional' as to justify an award of fees." *Id.* at 1757.

For example, in *MarcTec, LLC v. Johnson & Johnson*, the Federal Circuit upheld the district court's finding of an "exceptional" case and the award of attorney and expert fees. 664 F.3d 907, 910 (Fed. Cir. 2012).[2] There, the patents at issue were "directed to a surgical implant in which a polymeric material is bonded by heat to an expandable implant, where the polymer includes a therapeutic agent such as an antibiotic." *Id.* The accused infringing product was a stent which had a drug/polymer coating that was sprayed onto the stent at room temperature and bonded at room temperature, not by the application of heat. *Id.* at 912. However, in its claim construction order, the district court construed the term "bonded" to require bonding by the application of heat, and the terms "surgical device" and "implant" to exclude stents. *Id.* The district court's construction was based on prosecution disclaimers, in which the plaintiff had limited his claims to heat bonding to overcome another patent, and disclaimed stents to obtain allowance. *Id.* at 913.

Moving for summary judgment, the defendant argued non-infringement based on: (1) the patents required bonding by heat, and (2) the accused product was a stent. *Id.* In response, the plaintiff presented expert testimony that the bonding did occur by heat, and argued that nothing in the prosecution history precluded coverage of stents. *Id.* The district court disagreed with the plaintiff on both points. First, it found that the expert's theory that bonding occurred by heat was untested, unreliable, and irrelevant, and thus inadmissible under *Daubert*. *Id.* Second, it found that the plaintiff had disclaimed stents during prosecution. *Id.* at 914. On these two bases, the district court granted summary judgment.

The defendant then moved for a finding that the case was exceptional and the grant of

---

[2] *MarcTec, LLC* precedes the Supreme Court's decision in *Octane Fitness*; prior to *Octane Fitness*, the Federal Circuit applied a higher standard for an "exceptional" case, requiring either material inappropriate conduct or a finding of both (1) the litigation was brought in subjective bad faith and (2) the litigation was objectively baseless. 664 F.3d at 916; *see also Octane Fitness*, 134 S. Ct. at 1754. The Supreme Court criticized this standard as unduly rigid and "impermissibly encumber[ing] the statutory grant of discretion to district courts." *Octane Fitness*, 134 S. Ct. at 1755.

United States District Court
For the Northern District of California

1  attorney's fees.  The district court agreed that the case was exceptional, finding that the

2  infringement allegations were baseless and frivolous because the plaintiff had ignored the

3  specification and prosecution history in its claim construction argument.  *Id.* at 915.  The district

4  court further found that the plaintiff had misrepresented both the law of claim construction and the

5  constructions adopted by the court, as well as relying on expert testimony that did not meet the

6  *Daubert* standards.  *Id.*  For these reasons, the district court found -- and the Federal Circuit

7  affirmed -- that the case was exceptional, warranting the award of fees.  *Id.* at 920.

8       By contrast, the district court in *Vasudevan Software, Inc. v. Microstrategy, Inc.* declined

9  to find the case exceptional.  Case No. 11-cv-6637-RS, 2015 WL 4940635, at *1.  There, the

10  plaintiff's patents were related to business intelligence software, a federated database system that

11  retrieves data from disparate databases to create and display to users a data structure called an

12  online analytical processing (OLAP) cube.  *Id.*  During the litigation, the primary issue was the

13  meaning of "disparate databases."  The plaintiff argued that the term meant "incompatible

14  databases having different schemas."  *Id.* at *2.  The defendant argued for a definition that was

15  almost word-for-word what the plaintiff had stated before the PTO, namely that disparate

16  databases were "databases having an absence of compatible keys or record identifier (ID) columns

17  of similar value or format in the schemas or structures of the database that would otherwise enable

18  linking data within the constituent databases."[3]  *Id.*  The parties did not dispute that the

19  defendant's product had compatible keys, and that under the defendant's construction, there would

20  be no infringement.  *Id.*  The district court agreed that the plaintiff's description before the PTO

21  was binding, and found that the defendant's claim construction was correct.  *Id.*

22       Following the court's claim construction order, the parties disputed whether the

23  construction was to be interpreted disjunctively or conjunctively, with the plaintiff filing an expert

24  report asserting an infringement theory based on a disjunctive interpretation.  *Id.*  This led to the

25  district court issuing a clarification order which adopted the defendant's conjunctive interpretation,

26

27  [3] The plaintiff's exact statement to the PTO was that the term "disparate" "refers to the absence of
compatible keys or record identifier columns of similar value or format in the schemas or
28  structures of the database that would otherwise enable linking data within the constituent
databases."

United States District Court
For the Northern District of California

such that disparate databases are "databases having an absence of compatible keys *and* an absence of record identifier columns of similar value *and* an absence of record identifier columns of similar format in the schemas or structures that would otherwise enable linking data." *Id.* at *3. The plaintiff stipulated to non-infringement, and summary judgment of invalidity was granted. *Id.*

The defendant moved for attorney's fees, arguing that the plaintiff's decision to sue was exceptional when the plaintiff had explained during patent prosecution that its invention was distinguishable from prior art because the plaintiff's technology did not require the databases to share common keys. *Id.* at *4. The district court disagreed, distinguishing cases like *MarcTec* where the definitional dispute -- heat or no heat -- was "simple and binary." *Id.* In contrast, the "disparate databases" definition was a complex and multifaceted question, and the plaintiff had mounted a non-frivolous argument that statements made at prosecution did not yield a single clear answer by relying on statements made during prosecution other than those the court ultimately held to be dispositive. *Id.* Furthermore, after the court issued its claim construction order, the plaintiff did not rely on its rejected proposed construction, but urged a disjunctive reading. *Id.* The court concluded that the fact that the plaintiff "pursued a facially plausible, albeit feebly supported, construction in lieu of stipulating to non-infringement does not rise to conduct warranting a fee award." *Id.* at *5. The court also noted that on appeal, the Federal Circuit had "grappled squarely with [the plaintiff's] arguments in reaching its decision to affirm this Court's adoption of a conjunctive construction." *Id.* Thus, "[t]hat [the plaintiff] advanced positions based on a reading of the prosecution history ultimately found to be untenable does not render its case wholly frivolous, or necessarily imply it acted in bad faith, such that its conduct should be deemed 'exceptional.'" *Id.*

Further reinforcing this ruling was the manner of litigation. As an initial matter, the district court noted that "[a]lthough *Octane* ostensibly liberalized the standard for fee shifting, and clearly reduced the prevailing party's burden from clear and convincing to a preponderance of the evidence, post-*Octane* decisions awarding fees have generally cited egregious behavior." *Id.* Applied to the case, the district court found that while the plaintiff "engaged in numerous questionable and overly aggressive litigation tactics[, o]n balance, however, such behavior may

United States District Court
For the Northern District of California

1   reasonably be interpreted as part of [the plaintiff's] good-faith effort to advance its position in the

2   face of [the defendant's] vigorous and equally fervent defense." *Id.* at *6.  Taken together, the

3   district court held that the plaintiff's manner of litigation was not sufficiently egregious to justify

4   fee-shifting, and denied the motion for attorney's fees.

5   B.    Application

6        In the instant case, Apple seeks attorney's fees and nontaxable costs for the period after

7   May 29, 2015, "after which there can be no doubt that Aylus had no objectively reasonable basis

8   for continuing its patent infringement suit against Apple." Mot. at 2.  Specifically, Apple contends

9   that in January 2015, Aylus informed the PTAB in its preliminary response to Apple's Petition for

10  *inter partes* review that "only" the CPP logic is invoked to negotiate media content delivery under

11  claims 2 and 21.  *Id.*  On May 11, 2015, Apple provided written discovery stating that the accused

12  negotiation of media content delivery invoked both the CPP logic and the alleged CP logic.  *Id.*

13  Finally, on May 29, 2015, Aylus dismissed with prejudice its claims under the '412 patent except

14  for dependent claims 2 and 21.  *Id.*  Thus, Apple argues that Aylus had no "objectively reasonable

15  basis to assert claims 2 and 21 as of May 11, 2015, [and] as of May 29, 2015 Aylus had no other

16  infringement allegations against Apple as to the remaining asserted claims." *Id.* at 3.  For these

17  reasons, Apple requests that the Court find this case exceptional, due to the substantive weakness

18  of Aylus's case.[4] *Id.* at 6.

19       The Court finds that, although a close question, this is not an exceptional case.  The instant

20  case is more comparable to *Vasudevan Software* than *MarcTec, LLC*; whether "the CPP logic is

21  invoked to negotiate media content delivery" was not a simple question, but presented a more

22  complex question with which this Court grappled.  Specifically, Aylus argues that it had at least a

23  plausible or reasonable argument that claims 2 and 21 permit the CP to be involved, in that claims

24

25  _____

    [4] Apple also contends that Aylus never articulated a factual basis for an infringement finding

26  under the correct construction of the term "the CPP is invoked."  Reply at 9.  It is unclear why
    Aylus should be required to allege a factual basis for an infringement finding under this

27  construction when the parties vigorously disputed at summary judgment what the construction
    should even be; if Aylus had prevailed in showing that the CP could be involved, then it would not

28  have been required to establish a theory of infringement under a construction where only the CPP
    can be invoked to negotiate media content delivery.

**United States District Court**
For the Northern District of California

2 and 21 on their face only require that the CPP be invoked but do not explicitly preclude CP logic from being invoked.  Docket No. 260 (Opp.) at 4.  While the Court ultimately rejected Aylus's construction, Aylus's construction was not plainly precluded by the express language of claims 2 and 21.

While Aylus's construction is considerably weakened, among other things, by its statements before the PTAB, in which it stated that for claims 2 and 21, where "'the MS and MR are both in communication with the UE via a local wireless network,' then only 'the CPP is invoked to negotiate media content delivery between the MS and the MR,'" (*see* IPR2014-01565 Resp. at 35; IPR2014-01566 Resp. at 33), like the plaintiff in *Vasudevan Software*, its argument was not completely at odds with that statement.  Aylus argued herein that the CP logic could be involved but not necessarily "invoked," such as where the CPP logic makes use of the CP logic for the media delivery but the CPP logic acts as the exclusive active agent.  *See* Aylus MSJx Opp. at 4; Ord. at 11.  While the argument was weak, it was not completely frivolous.  Thus, like the plaintiff's losing argument in *Vasudevan Software*, which was "facially plausible, albeit feebly supported," Aylus's argument is not conduct that must clearly be deemed "exceptional."  2015 WL 4940635, at *5; *see also Site Update Solutions, LLC v. Accor N. Am., Inc.*, Case No. 5:11-cv-3306-PSG, at *4, 7, 11 (N.D. Cal. Feb. 11, 2015) (declining to find case exceptional where, among other things, the plaintiff's erroneous claim construction was based on a misinterpretation of Federal Circuit case law, and the plaintiff's failure to include the Table of Files in its proposed construction "strains credibility"); *Digital Reg of Tex., LLC v. Adobe Sys., Inc.*, No. C-12-1971 CW, 2015 WL 106226, at * (N.D. Cal. Mar. 9, 2015) (declining to find case exceptional where the court had found in three instances that the plaintiff's proposed claim constructions were inconsistent with the specification and prosecution history and where the plaintiff relied on expert testimony that was excluded under *Daubert*); *Kreative Power, LLC v. Monoprice, Inc.*, Case No. 14-cv-2991-SI, 2015 WL 1967289, at * (N.D. Cal. Apr. 30, 2015) (declining to find case exceptional where the court devoted nearly five pages of its summary judgment order to analyze the plaintiff's allegation of infringement and rebuttal to prosecution history estoppel, although the court was ultimately unpersuaded).

**United States District Court**
For the Northern District of California

1    In exercising its discretion in not finding this an exceptional case, considering the totality

2    of circumstances, the Court notes that many of the "post-*Octane* decisions awarding fees have

3    generally cited egregious behavior." *Vasudevan Software*, 2015 WL 4940635, at *5.  *See*, *e.g.*,

4    *Home Gambling Network, Inc. v. Piche*, No. 2:05-cv-610-DAE, 2014 WL 2170600, at *9 (D. Nev.

5    May 22, 2014) (finding case exceptional in part because the plaintiffs engaged in patent misuse by

6    "first tr[ying] to limit Defendants' usage of something that was never owned by [the plaintiffs],

7    and then attempt[ing] to sue for infringement of steps of the patent that they voluntarily

8    relinquished years earlier"); *IPVX Patent Holdings, Inc. v. Voxernet LLC*, Case No. 5:13-cv-01708

9    HRL, 2014 WL 5795545, at *5-6 (N.D. Cal. Nov. 6, 2014) (finding the case exceptional because

10   the plaintiff never expected to prevail on literal infringement, proposed term constructions that

11   were "absurd and farfetched," served a "boilerplate complaint on dozens of defendants," may not

12   have performed presuit investigation, served discovery requests that had nothing to do with the

13   accused product, and did not expend the resources necessary to support its positions on

14   infringement).  Here, Apple does not contend that Aylus engaged in any egregious behavior

15   beyond relying on a claim construction that the Court ultimately rejected.  There is no evidence (or

16   even an allegation) of improper motivation or bad faith, and no need to deter Aylus from future

17   litigation.  Thus, the absence of egregious behavior, while not dispositive, also weighs against

18   awarding fees in this case.  *See H-W Tech., Inc. v. Overstock.com, Inc.*, Civil Action No. 3:12-CV-

19   0636-G (BH), 2014 WL 4378750, at *7 (N.D. Tex. Sept. 3, 2014) (denying motion for § 285

20   attorney's fees because "[a]side from the legal arguments that ultimately did not prevail,

21   Defendant does not allege any unreasonable conduct or delay caused by Plaintiff.  There are no

22   other factors that merit an award of attorneys' fees.").

23   ///

24   ///

25   ///

26   ///

27   ///

28   ///

# IV.  CONCLUSION

For the reasons stated above, the Court finds that the instant case is not so exceptional that it "stands out from others with respect to the substantive strength of a party's litigation position (considering both the governing law and the facts of the case) or the unreasonable manner in which the case was litigated." *Octane Fitness, LLC*, 134 S. Ct. at 1756.  The Court therefore **DENIES** Apple's motion for attorney's fees.

This order disposes of Docket No. 257.

**IT IS SO ORDERED**.

Dated: March 30, 2016

_____
EDWARD M. CHEN
United States District Judge